# EXHIBIT 1
# Part 3 of 3

54

1        PRESIDING COMMISSIONER SHELTON:   Marble.

2        INMATE MARROQUIN THROUGH THE INTERPRETER:

3   I worked in that company like for seven years,

4   and so that we can understand each other, I

5   really refined myself there.   I don't have - I

6   don't know if the word is correctly expressed,

7   but I learned everything there, and then I gave

8   myself the opportunity to work on my own -

9        PRESIDING COMMISSIONER SHELTON:   What did

10  you do?

11       INMATE MARROQUIN THROUGH THE INTERPRETER:

12  - and I established my own company.

13       PRESIDING COMMISSIONER SHELTON:   What did

14  you do in the marble company?

15       INMATE MARROQUIN THROUGH THE INTERPRETER:

16  Everything.

17       PRESIDING COMMISSIONER SHELTON:   For

18  example -

19       INMATE MARROQUIN THROUGH THE INTERPRETER:

20  Everything.   There's only one remaining to make

21  sculptures, images, but from there, floors,

22  offices, decorations, buildings, everything,

23  everything, one hundred percent.

24       PRESIDING COMMISSIONER SHELTON:   And then

25  your new company?

26       INMATE MARROQUIN THROUGH THE INTERPRETER:

27  And I expanded from there.

55

1          THE INTERPRETER:  I'm sorry.

2          PRESIDING COMMISSIONER SHELTON:  Tell us

3     about your new company, the company you started.

4          INMATE MARROQUIN THROUGH THE INTERPRETER:

5     in my company, I would get contracts, and I

6     really feel bad, but on Friday I'd pick up a fax

7     of which I had gotten a contract in San

8     Clemente, and I never - it never crossed my mind

9     that on that weekend my mal - that bad thing

10    that happened to me was going to happen, and I

11    expanded.  Everything would go well in the

12    company, and it was thanks to my father, who

13    rest in peace, taught me how to work the honest,

14    responsible, not to - to somebody's else's

15    stuff.

16         PRESIDING COMMISSIONER SHELTON:  Okay.

17    Do you have any other questions?

18         DEPUTY DISTRICT ATTORNEY PEARSON:  Yes.

19    I want to know, did his wife - I know she worked

20    raising the children, but did she work outside

21    the home, and if so, what did she do?

22         PRESIDING COMMISSIONER SHELTON:  Did your

23    wife work outside the home?

24         INMATE MARROQUIN THROUGH THE INTERPRETER:

25    Yes.

26         PRESIDING COMMISSIONER SHELTON:  What did

27    she do?

56

1          INMATE MARROQUIN THROUGH THE INTERPRETER:

2    She - there's this well-known city of which I'm

3    sure you'll remember, and she worked there in

4    Palos Verdes.  Back then, she - she cleaned

5    homes.  She was a housekeeper.  Housekeeper,

6    that's what she would do.

7          PRESIDING COMMISSIONER SHELTON:    And

8    that's how she raised your children while you

9    were here?

10         INMATE MARROQUIN THROUGH THE INTERPRETER:

11   Exactly.  Exactly.

12         DEPUTY DISTRICT ATTORNEY PEARSON:    I

13   don't know about this question, but if he was

14   out of here, free, and went to a party, what

15   kind of alcoholic beverages would he drink?

16   Like beer or wine or whiskey, or something else?

17         INMATE MARROQUIN THROUGH THE INTERPRETER:

18   I like that question.  Everything that contains

19   alcohol is somebody - something that gets you

20   drunk, and speaking with the permission that you

21   obtained and that you deserve, I shall never be

22   stupid.  Never.

23         DEPUTY DISTRICT ATTORNEY PEARSON:    I have

24   nothing further.

25         PRESIDING COMMISSIONER SHELTON:    Counsel,

26   do you have any questions of your client?

27         ATTORNEY RUTLEDGE:    Just briefly, thank

57

1    you. You were asked and so I want to make sure

2    we understand, your ability to be a diesel

3    mechanic, it doesn't matter in Guatemala or

4    here, you still have the same abilities,

5    correct?

6        INMATE MARROQUIN THROUGH THE INTERPRETER:

7    Correct.

8        ATTORNEY RUTLEDGE:  Your plan is to go to

9    Guatemala, but if by some chance you were to

10   stay here, you'd be able to be a diesel

11   mechanic, correct?

12       INMATE MARROQUIN THROUGH THE INTERPRETER:

13   I automatically come to the conclusion my stay

14   is defined already, and that's in Guatemala.

15       ATTORNEY RUTLEDGE:  I understand.  And

16   also just to clarify, you explained that you

17   actually did a lot of hands-on mechanic work

18   prior to taking this course; is that right?

19       INMATE MARROQUIN THROUGH THE INTERPRETER:

20   Yes, correct.  I was a driver in Guatemala, and

21   I know that you all couldn't understand me

22   exactly, but my thoughts about the United States

23   is the Unites States –

24       THE INTERPRETER:  [addressing Inmate.]

25   Greyhound?

26       INMATE MARROQUIN:  [Resuming in Spanish.]

27       INMATE MARROQUIN THROUGH THE INTERPRETER:

58

1    And a Greyhound driver for those buses that

2    travel within the city, those drivers are only

3    drivers, while with us over there, in Hispanic

4    countries, the driver there is a mechanic.  The

5    driver is a mechanic, and the mechanic is the

6    driver, because if the engine breaks down, the

7    driver needs to fix it, and as far as that, I

8    have that complement in my brain that I have

9    very good knowledge regarding engines because I

10   would constantly fix them or repair them.

11        ATTORNEY RUTLEDGE:  You had mentioned

12   that in - in the past you had gone to the

13   shooting range.  Had you done that more than one

14   time, or is that the only time that you had

15   gone?

16        DEPUTY COMMISSIONER KEENAN:  Excuse me.

17   We're about to run out of tape.

18                 (Off the record)

19        DEPUTY COMMISSIONER KEENAN:  Back on

20   record.  Tape 2, Side 1.

21        ATTORNEY RUTLEDGE:  Thank you,

22   Commissioner.  I had asked when you spoke about

23   going to the shooting range, was that the only

24   time you had ever gone, or had you gone other

25   times before?

26        INMATE MARROQUIN THROUGH THE INTERPRETER:

27   Only time that I was invited, and really, with

59

```
1   your permission, I'm speaking repentness only
2   belongs to God, but in this case with me, I
3   repent even the day I was born.
4         ATTORNEY RUTLEDGE:   Well, let's back up a
5   little bit.  Now when you got done at the
6   shooting range, where did you put the pistol?
7         INMATE MARROQUIN THROUGH THE INTERPRETER:
8   I have that knowledge it was prohibited, but
9   there's a saying: there is no - I'm not sure on
10  the saying - there is no but that is really
11  worth, but I was instructed, and you know
12  exactly that a weapon that is loaded, it was
13  completely prohibited, and so then I had in fact
14  instructions from Sacramento that if I was going
15  to be transporting it from one - that if I was
16  going to transport it from one place to another,
17  that I had to maintain both things separated
18  from each other, and excuse me, but it isn't a
19  document there states that I had the weapon
20  inside the machine?
21        INMATE MARROQUIN:   No.   No.
22        THE INTERPRETER:   No.
23        INMATE MARROQUIN THROUGH THE INTERPRETER:
24  I had part of it in the glove compartment, and
25  the other one, I had it back here, that in order
26  - and in order to unite them one with the other,
27  I would need to stop and go behind the back part
```

60

1    of the seat and put them together, and those

2    instructions came in a piece of paper that

3    Sacramento sent to me, and I automatically - and

4    automatically I had that understanding that you

5    couldn't transport both things together when you

6    were transporting from one place to another.

7    The piece of paper says that I had the hood

8    open, and that I had the weapon there, no.  No,

9    that isn't correct, and I'm not taking the case

10   apart, because a crime is a crime.

11        THE INTERPRETER:  I need a clarification

12   from the prisoner.  [Addressing Inmate.]

13        INMATE MARROQUIN THROUGH THE INTERPRETER:

14   Excuse me.  I'm not minimizing the case.  That

15   isn't my intention, but the papers from the

16   accusing party - I call it the accusing party

17   because that's how I understand it, because they

18   say one thing and it's different from other

19   versions.  I was - I testified, I was questioned

20   in front of a judge, and including the jury

21   panel, the district attorney, everything, but if

22   you allow me to give you an example -

23        ATTORNEY RUTLEDGE:  Let me stop there

24   because I want to point by point.

25        INMATE MARROQUIN THROUGH THE INTERPRETER:

26   Yes, but allow me, please.  Allow me just a

27   moment.  The papers say that it was two shots.

61

1   It was one.  The papers say that I was given 15

2   years to life, and that was from the judge, but

3   it states there that it's 21, and no, that isn't

4   correct.  That's not correct.  If you allow me,

5   I can show you something.

6          PRESIDING COMMISSIONER SHELTON:  Senor,

7   the papers says 18.

8          INMATE MARROQUIN THROUGH THE INTERPRETER:

9   Yes, but there are others right here.  Eighteen

10  plus three, that's 21.

11         PRESIDING COMMISSIONER SHELTON:  It's 15

12  plus three.

13         INMATE MARROQUIN THROUGH THE INTERPRETER:

14  Well, yes, but I'm only making emphasis of how

15  everything is turned around.

16         ATTORNEY RUTLEDGE:  Okay.  Well, let me -

17  that's why we want to make sure that we

18  understand what you were explaining.  So you had

19  said that two gentlemen pulled you away from was

20  that the inside of a bar?

21         INMATE MARROQUIN THROUGH THE INTERPRETER:

22  Exactly.

23         ATTORNEY RUTLEDGE:  And one of those two

24  gentlemen was the individual that you had had a

25  conflict with regarding the car?  The one that

26  was shot?

27         INMATE MARROQUIN THROUGH THE INTERPRETER:

62

1  Unfortunately, (indiscernible) there pulled me,

2  picked me up and pushed me out.  That is the

3  victim.

4       ATTORNEY RUTLEDGE:  Okay.  And so then

5  outside there was the – they got into their car,

6  you tried to get away, and that's when all

7  (indiscernible)?

8       INMATE MARROQUIN THROUGH THE INTERPRETER:

9  Exactly.

10      ATTORNEY RUTLEDGE:  Okay.  And at some

11 point that's when you grabbed a weapon; is that

12 right?

13      INMATE MARROQUIN THROUGH THE INTERPRETER:

14 I don't understand.  How's that?

15      ATTORNEY RUTLEDGE:  Okay.  Well, somehow

16 you got the gun in your hand.

17      INMATE MARROQUIN THROUGH THE INTERPRETER:

18 Correct.

19      ATTORNEY RUTLEDGE:  Where were these two

20 gentlemen when you had the gun in your hand?

21      INMATE MARROQUIN THROUGH THE INTERPRETER:

22 I was alone.  They had left.  They had left.  I

23 came to the car, I sat down, and I was there for

24 a little bit when I see that they show up, on

25 top of me, and then I – I run.  I'm armed and

26 they follow me.  When they see that I'm running,

27 they follow me, I walk and they're right next to

63

1  me.  I would come back, and they come and the

2  (indiscernible) and we were doing that back and

3  forth, and I went fast to where the people were,

4  and they turned around in the street.  That's

5  where I was attacked the second time.

6       ATTORNEY RUTLEDGE:  Okay.  So there had

7  been the altercation at the bar, the

8  (indiscernible), you sat in the car, then they

9  approached you again, so you tried to get away,

10  and you (indiscernible) the people at the bar

11  because you thought that they would be some type

12  of protection.

13       INMATE MARROQUIN THROUGH THE INTERPRETER:

14  I wanted to be where there was people at.

15       ATTORNEY RUTLEDGE:  Okay.  And that's

16  when you indicated that the - the victim in the

17  case approached you with a beer bottle, a broken

18  beer bottle, and that's when you shot?

19       INMATE MARROQUIN THROUGH THE INTERPRETER:

20  Exactly.

21       ATTORNEY RUTLEDGE:  So - so the people

22  that were at the bar wouldn't have necessarily

23  seen the people that were outside of the bar

24  would not necessarily see all these things that

25  happened prior to the last incident?

26       INMATE MARROQUIN THROUGH THE INTERPRETER:

27  That people - or better yet said, when somebody

64

1   sees a problem, you automatically nobody wants

2   to - how do you say - help another person, or

3   not really help, but get involved, so on the

4   second time, in front of the bar, we had the

5   problem, we had the problem.

6           ATTORNEY RUTLEDGE:   Okay.

7           INMATE MARROQUIN THROUGH THE INTERPRETER:

8   The attorney in court had the bottle in his hand

9   and asked if that would kill someone.  I - I

10  felt death three times like that.

11          ATTORNEY RUTLEDGE:   Now let's switch

12  gears a little bit.   The - the person that was

13  shot you had known before and you felt that that

14  person owed you money; is that right?

15          THE INTERPRETER:   And you felt that

16  person was a threat.

17          ATTORNEY RUTLEDGE:   No, owed you money.

18          INMATE MARROQUIN THROUGH THE INTERPRETER:

19  Yes.

20          ATTORNEY RUTLEDGE:   Now if you start your

21  - your business and somebody doesn't pay you and

22  you get upset, how are you going to handle that?

23          INMATE MARROQUIN THROUGH THE INTERPRETER:

24  That's why it's very clear, and I've said it and

25  it's been said, others - that had already gone

26  by, months had gone by.  I didn't care about

27  that anymore.  No, I didn't care about that.

65

1          ATTORNEY RUTLEDGE:  Okay.  But - but if

2    that happens, how are you going to handle it?

3          INMATE MARROQUIN THROUGH THE INTERPRETER:

4    You mean once again, if it's somebody new?

5          ATTORNEY RUTLEDGE:  If you start your

6    business, you put a lot of work into what you

7    did and that person doesn't pay you, how are you

8    going to handle it?  What are you going to do?

9          INMATE MARROQUIN THROUGH THE INTERPRETER:

10   I come up with the perfect conclusion.  How can

11   it be possible to - possible to commit a

12   stupidity after 15 years here for something

13   stupid that I did and do it again?  That's

14   impossible.  Impossible.  No.

15         ATTORNEY RUTLEDGE:  It sounds like the -

16   the - the course - and correct me if I'm wrong,

17   it sounds like the course that the commissioner

18   about you about, that if you don't have

19   (indiscernible) gave you a great appreciation

20   for life; is that right?

21         INMATE MARROQUIN THROUGH THE INTERPRETER:

22   Exactly.

23         ATTORNEY RUTLEDGE:  And it - would your

24   feelings be that life is more valuable

25   (indiscernible)?

26         INMATE MARROQUIN THROUGH THE INTERPRETER:

27   Life has no price.

66

1    ATTORNEY RUTLEDGE:   Thank you.

2    PRESIDING COMMISSIONER SHELTON:   Thank

3    you very much.  All right.  At this time we will

4    move into closing statements, and we'll start

5    with you, Mr. Pearson.  Do you have a closing

6    statement?

7    DEPUTY DISTRICT ATTORNEY PEARSON:   Yes.

8    This is a killing that didn't need to happen,

9    which of course is a lot of them that we see,

10   but it certainly didn't need to happen.   I

11   understand the Inmate getting angry in the

12   situation there, it was a frustrating situation,

13   somebody's cheating him of what is it?   A

14   thousand dollars or something as I understand

15   it, and I can see that, see being very angry,

16   but he had a golden opportunity to walk away

17   from this thing without anything happening,

18   that's when he went back to his vehicle.   He

19   could have just gotten in the car and driven

20   away, and that would have been the end of that,

21   at least for that confrontation time, he

22   could've done something else, maybe sued the

23   person in - in court, or done something, hired

24   somebody to try and collect it for him, or done

25   something else, but instead he chose to get the

26   weapon and load it, and from what he's

27   describing there it sounds like maybe this is a

67

1    — apparently a pistol where you have a clip that

2    you remove from the pistol that may or may not

3    have bullets in — in the remainder of the gun,

4    and I gather they had instructed that he's not

5    to have them together, keep the clip one place

6    and the — and the gun somewhere else.  This is

7    what I would interpret him saying.  Instead, he

8    put the two obviously together, came back,

9    confronted the person that was giving him the

10   trouble, and pulled the — attempted to pull the

11   slide up and put one of the bullets into the

12   chamber so it would be fireable, and it didn't

13   go in apparently, and so he tried clicking the

14   gun, and then pulled it back again and put the

15   chamber — or the — the — the — what am I saying

16   here, the — the clip back into the gun where it

17   this hit — the weapon — or bullet went into the

18   chamber there and he fired it, hitting the — the

19   victim here and causing him the — the injury

20   that ultimately caused the man's death.  So it

21   took some doing there, and he could've not done

22   that again when it — when the clip didn't go in

23   and he wasn't able to load the gun, he could've

24   stopped at that point and I suppose just walked

25   away with maybe a threat to the person.  And the

26   second time he could've too, but instead he — he

27   persisted, and fired the gun, so there's a lot

68

1    of thought and effort went into this, and I – I

2    think premeditation went into it, and I believe

3    that the – it sounded like it might've been a

4    jury trial, I'm not sure, but it sounds like the

5    – the trier of fact heard all of these facts and

6    rejected his self-defense argument here, that

7    the person had a – a broken bottle or something

8    there that would have threatened him.

9    Apparently the trier of fact did not accept that

10   and convicted him, forgetting the so-called

11   self-defense situation.   The aggravating factor

12   here, of course, was the alcohol.   I guess he

13   was under the influence at the time, which

14   probably clouded his judgment and his thinking

15   into making some really deadly decisions here,

16   causing the victim's death.   So I think the

17   danger here is, he thinks clear when he's here

18   in prison, and I – I liked his reasoning here

19   with a lot of what he was telling the – the

20   Board, I thought it made sense, but I'm afraid

21   if he gets back out, and it sounds like he's

22   very much down on alcohol now, gets back into

23   the community and has alcohol available to him

24   and freely offered to him by probably a lot of –

25   a lot of friends and – and acquaintances that he

26   has, "Oh, go ahead, just have one, you'll be

27   okay, oh, just another one," and you're under

69

1   the influence again and you get in some sort of

2   conflict, we could potentially have another

3   deadly situation, and that's what concerns me,

4   that this is what happens when he's readily

5   available as far as the alcohol with that sort

6   of a – a background that he has and a mindset.

7   So I would urge the – the Board at this time to

8   reject his request for parole and – and I'll

9   leave it at that.

10          PRESIDING COMMISSIONER SHELTON:    All

11   right.  Thank you, sir.  Mr. Rutledge, closing

12   statement?

13          ATTORNEY RUTLEDGE:    Thank you,

14   Commissioner.  I think the – the people bring up

15   a good point regarding the alcohol, and I think

16   Mr. Marroquin has expressed to the Board his

17   contempt at this point for alcohol and – but

18   it's easy to – to say that and have it just be

19   words, but I think he's – he's demonstrated in a

20   couple of different way that he actually feels

21   that way.  One is that he's continued with AA,

22   and as the Commissioners brought out, he even

23   was the chairman, and even beyond that, we all

24   know that there's pruno in prison, and it was

25   brought out in the psychological report that

26   he's rejected it.  He's had the opportunity to

27   go have a drink in here if he wanted to have a

70

1  drink, and he hasn't, and so he's showing that

2  his actions are following up with what his words

3  are.  If we look at the fact that he had no

4  prior criminal history, he's done his self-help.

5  The Board asked him to obtain a vocation, he

6  basically certified what he already knew how to

7  do so that the Board would have some evidence to

8  show that he knows how to do what he said that

9  he could do.  He's got good parole plans, he

10  knows that he's going to get deported, he's made

11  arrangements with his wife, he has a home to go

12  to, he's - I think he's somewhat of an

13  entrepreneur, he started his marble business,

14  and now he's wanted to move on to doing that -

15  being a diesel mechanic.  I think that's all

16  very commendable, and based on that, I would

17  request that he be given a date.  Thank you.

18        PRESIDING COMMISSIONER SHELTON:  Mr.

19  Marroquin, this is your time to tell us why you

20  think we should parole you or give you a parole

21  date.

22        INMATE MARROQUIN THROUGH THE INTERPRETER:

23  Very well.  Really with any given - at no time,

24  with nothing, can you pay for a life.  I have

25  committed a crime, and that crime hurts me a

26  lot.  It has been inside my mind for 15 years,

27  and maybe for some - a few more years of life I

71

1   shall have until I die.  I don't ask, I offer as

2   much to the community and the family of the

3   victim that I have harmed two families.  I offer

4   my true condolences to that family that I

5   harmed, including – including my own family.

6   It's two lives – excuse me – it's two families

7   that I have harmed.  I feel so miserable, and

8   even after 15 years my plan to survive the

9   little that I have left is in Guatemala.  It

10  depends on you.  Sincerely I'm not going to

11  thank for it, my family will, but there's no way

12  that I can have in my mind that I have already

13  paid for this, no.  Once again I will repeat

14  myself.  You cannot pay for a life, and really,

15  I would like to go back to Guatemala.  Thank you

16  from the gentleman's words.  I don't know what

17  his name is, but the district attorney, right?

18  And here my attorney, you as an interpreter, and

19  you as members that can decide for my life.  I

20  would like to add more, much more, but I know

21  time is valuable to you, and thank you very

22  much.

23          PRESIDING COMMISSIONER SHELTON:  Thank

24  you, sir.  We will now recess for deliberations.

25  It is 1:50 p.m.

26                  R E C E S S

27                  --oOo--

72

1        CALIFORNIA BOARD OF PAROLE HEARINGS

2                    D E C I S I O N

3         DEPUTY COMMISSIONER KEENAN:  Back on

4    record.

5         PRESIDING COMMISSIONER SHELTON:  All

6    right.  For the record, it is 2:25.  We are here

7    in the matter of Marco Marroquin, CDC number

8    H-62380.  Everyone has returned to the hearing

9    room that was here during the hearing.  The

10   panel has received and reviewed all the

11   information and relied on the following

12   circumstances in concluding that Mr. Marroquin

13   is not yet suitable for parole and would pose an

14   unreasonable risk of danger to society or a

15   threat to public safety if released from prison.

16   I'm going to take things a little out of order

17   here, sir.  We're giving you one year.  The last

18   hearing you had three years.  You have done an

19   extraordinarily wonderful job.  There's a few

20   more things we think you need to do to assure

21   that you can get through this parole process,

22   and the reason I say that is this.  We're not

23   the only ones you have to impress.  There's

24   another Board hearing, or a panel that does a

25   review, and then it goes to the Governor.  They

26   don't get to see you.  We get to see you.  We're

27   M. MARROQUIN   H-62380   DECISION PAGE 1   6/6/06

73

1  impressed by your presentation, we're impressed

2  by what you've done, and I'm going to go through

3  this stuff, but we know that there's other

4  things that people are going to ask that we want

5  you to get done ahead of time.  Does - do you

6  understand what I'm saying to you?

7       INMATE MARROQUIN THROUGH THE INTERPRETER:

8  Correct.

9       PRESIDING COMMISSIONER SHELTON:   All

10  right.  I'm going to go through this and I'm -

11  we have a couple of things that we are going to

12  need you to do this next year.  Again, we are

13  totally impressed by your presentation today, we

14  believe you to be telling us the truth, and we

15  have a couple of things that we need you to do

16  to assure that you're a - you're a step closer,

17  okay?  First of all, we know that this was -

18  this commitment offense was a - a terrible

19  offense.  You know, you had an opportunity to

20  walk away.  You didn't.  I know you mentioned

21  you felt your life was being threatened, but I

22  think there was a time where you could've walked

23  away.  You said you sat in your car for a little

24  bit.  The motive for this crime was very trivial

25  in relation to the offense.  These statements

26  were drawn from the summary of the crime that

27  M. MARROQUIN  H-62380   DECISION PAGE 2    6/6/06

74

1    was noted in the November 2002 Board Report and

2    carried on to the - let me get the month right

3    here - November 2005 Board Report.  You have no

4    previous record whatsoever.  That be on the

5    record.  It appears that your social history was

6    not unstable, and again, you had no prior

7    criminality.  I want to talk about your

8    institutional behavior.  You have received

9    absolutely zero 115s.  That is extraordinarily

10   rare, Mr. Marroquin.  That shows exemplary

11   behavior.  You received two 128a's, the last one

12   being in June of '93.  Again, exemplary

13   behavior.  You've been participating in AA and

14   NA since '95.  And I'm going to mix some of

15   these things, because we talk about

16   institutional behavior both positively and

17   negatively, but one of the things that we would

18   ask you to do is to try to participate in

19   another self-help program or two.  You've done -

20   what you've participated in is excellent, but we

21   think other people may review your file without

22   you sitting in front of them and say, "You

23   should've done, could've done more self-help

24   programs."  So do what you can to get into

25   anything you can this next year.

26          INMATE MARROQUIN THROUGH THE INTERPRETER:

27   M. MARROQUIN  H-62380    DECISION PAGE 3    6/6/06

75

1    Correct.

2            PRESIDING COMMISSIONER SHELTON:    You

3    understand, sir?  All right.  Your

4    psychiatrist's report was favorable.  Dr.

5    Macomber indicated that you had a GAF rating of

6    85.  The report was positive.  He indicated you

7    showed genuine remorse, and he felt that if

8    paroled, you would be better on parole - you

9    would be in the top 2 percent for success.  He

10    says that there are no risk factors, and the

11    prognosis for your success is good.  Your parole

12    plans are good.  This is one other area that we

13    need you to something for yourself.  You have

14    excellent parole plans for Guatemala.  There is

15    a very slim chance that you could possibly be

16    paroled here.  You have a home here and your

17    family here, so that side's okay.  What you need

18    to do is to see if you can get any kind of

19    support letter showing that you could

20    potentially get a job in Los Angeles if you

21    needed to.  Comprende?

22            INMATE MARROQUIN THROUGH THE INTERPRETER:

23    Yes.  But?

24            PRESIDING COMMISSIONER SHELTON:    No, no

25    buts.  No buts.  You need to find - you need to

26    at least - you have two skills that I'm aware

27    M. MARROQUIN  H-62380    DECISION PAGE 4    6/6/06

76

1   of, sir.  You've got your diesel mechanic skill,

2   and by your own words you indicated that you had

3   worked in marble and you had started your own

4   business.  We know that you have the ability to

5   provide for yourself.  Commissioner Keenan and I

6   believe that you can take care of yourself and

7   your family no problem, but you've got to

8   convince other people of that too, so get

9   something that says that you can have – or you

10  can find work, you have the abilities to find

11  work.  I mean, Commissioner Keenan called you an

12  entrepreneur.  That means you can survive on

13  your own with your skills and your intellect,

14  but you need to show that that can happen here,

15  just on that off chance that you don't go to

16  Guatemala right out the door.  Now that doesn't

17  mean that if you do – if you do get paroled here

18  someday, you do well on parole here, then

19  eventually you can go to Guatemala.

20          INMATE MARROQUIN THROUGH THE INTERPRETER:

21  Can I answer to that?

22          PRESIDING COMMISSIONER SHELTON:

23  Certainly.

24          INMATE MARROQUIN THROUGH THE INTERPRETER:

25  I have an INS hold, so I can consider that that

26  – there's nobody, nor an attorney, or even a

27  M. MARROQUIN  H-62380    DECISION PAGE 5    6/6/06

77

1   judge, over the control that INS has, because I

2   will be deported.  It's very difficult for me to

3   think that I (indiscernible) work, function, but

4   to work or function in my mind are making

5   illusions that I'm going to stay here.

6        PRESIDING COMMISSIONER SHELTON:   Okay.

7        INMATE MARROQUIN THROUGH THE INTERPRETER:

8   For me, that's something impossible.

9        PRESIDING COMMISSIONER SHELTON:   I

10  understand.

11       INMATE MARROQUIN THROUGH THE INTERPRETER:

12  Deporting (indiscernible).

13       PRESIDING COMMISSIONER SHELTON:   Mr.

14  Marroquin, I understand, but the world is full

15  of strange happenings and decisions and

16  nothing's for sure until it happens.  I'm just

17  saying on the - on the off chance, you need to

18  be prepared - this is - okay.  This - this is my

19  turn.  You need to be prepared for the world to

20  go upside-down sideways.  It already has in your

21  life.

22       INMATE MARROQUIN THROUGH THE INTERPRETER:

23  Correct.

24       PRESIDING COMMISSIONER SHELTON:   Se?

25       INMATE MARROQUIN THROUGH THE INTERPRETER:

26  Now I understand you.

27  M. MARROQUIN  H-62380    DECISION PAGE 6    6/6/06

78

1    PRESIDING COMMISSIONER SHELTON:   Okay.

2 That's all I'm telling you is that we're guiding

3 and directing you because we believe in you, all

4 right?  We believe in you, but this is a crazy

5 world, and you need to be prepared for whatever

6 way the ball bounces, okay?

7    INMATE MARROQUIN THROUGH THE INTERPRETER:

8 That is correct.  Like saying - well, it's like

9 putting into knowledge, or if I may be allowed

10 to ask you, what do you think, analyze or know,

11 what knowledge can you have regarding today?

12    PRESIDING COMMISSIONER SHELTON:   I

13 understand.  Okay.

14    INMATE MARROQUIN THROUGH THE INTERPRETER:

15 Regarding (indiscernible).

16    PRESIDING COMMISSIONER SHELTON:   Se,

17 senor.  Yeah.  Yeah.  Yo say.  We were talking

18 about that earlier.  Bien.  Se bien.

19    INMATE MARROQUIN THROUGH THE INTERPRETER:

20 That's fine.

21    PRESIDING COMMISSIONER SHELTON:   Es bien.

22 Okay.  We also want to acknowledge for the

23 record 32 - the 3042 responses from the District

24 Attorney's Office in Los Angeles and the Los

25 Angeles County Sheriff's Department, and again,

26 I want to reiterate the good things that you

27 M. MARROQUIN  H-62380   DECISION PAGE 7   6/6/06

79

1  have done, I want to go through this again, that

2  you have an excellent report from the

3  psychiatrist.  You worked hard for a two-year

4  period to receive your diploma as a diesel

5  mechanic, and you received that in August '04.

6  We were particularly impressed that you

7  continued and continued working on that and

8  followed through with the directions of your

9  last Board hearing.  Again, you have not

10  received any 115s during the time you were here,

11  you've been in AA and NA since 1995, you have

12  been and continue to participate in Adult Basic

13  Education, you took a Positive Parenting class,

14  you took classes on cause and prevention and

15  treatment of hepatitis, you worked on the Yard

16  Crew.  Most impressive was your request to

17  participate in individual counseling with Dr.

18  Reed.  What I especially enjoyed talking with

19  you about was the insight and feeling that you

20  developed participating in the Criminon course.

21  You participated in that last year, and for over

22  a year's period of time, and as I mentioned to

23  you during the hearing, I believe when you tell

24  us what you got out of that, because your eyes

25  lit up, you became animated, and it's like you

26  discovered a whole new sense of self and sense

27  M. MARROQUIN  H-62380    DECISION PAGE 8    6/6/06

80

1  of what life means.  So this year is a very

2  important year for you, sir, very, very

3  important.  You have done a lot of good work, we

4  want you to keep the momentum going, we want you

5  to keep it rolling, because the more you have

6  under your belt, the more you can convince other

7  people like us you have an opportunity for

8  success outside this institution.  Commissioner,

9  do you have anything to add?

10      DEPUTY COMMISSIONER KEENAN:  I would just

11  concur on your comments and note also you've

12  been on the right path, you're doing a lot of

13  good things, and I would say, you know, since

14  you have other people looking at your case in

15  the future, keep it up.  More is better.  That

16  would be my advice to you.  More is better.

17      PRESIDING COMMISSIONER SHELTON:  And

18  don't -

19      INMATE MARROQUIN THROUGH THE INTERPRETER:

20  Thank you.

21      PRESIDING COMMISSIONER SHELTON:  Don't

22  give it up.  Don't give up.  Keep on rolling.

23  All right, sir, good luck to you.  We're behind

24  you.

25      INMATE MARROQUIN THROUGH THE INTERPRETER:

26  Thank you very much.

27  M. MARROQUIN  H-62380    DECISION PAGE 9    6/6/06

81

1        PRESIDING COMMISSIONER SHELTON:    The time

2    is 2:40, and that concludes this hearing.

3    Seriously, good luck.

4        INMATE MARROQUIN THROUGH THE INTERPRETER:

5    Thank you.

6                    --oOo--

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23    PAROLE DENIED ONE YEAR            OCT 0 4 2006

24    THIS DECISION WILL BE FINAL ON:_____

25    YOU WILL BE PROMPTLY NOTIFIED, IF PRIOR TO THAT

26    DATE, THE DECISION IS MODIFIED.

27    M. MARROQUIN  H-62380  DECISION PAGE 10   6/6/06

82

CERTIFICATE AND
DECLARATION OF TRANSCRIBER


I, BERENICE BILLINGTON, a duly designated

transcriber, PETERS SHORTHAND REPORTING, do hereby

declare and certify under penalty of perjury that I

have transcribed tape(s) which total two in number and

cover a total of pages numbered 1 - 81, and which

recording was duly recorded at CORRECTIONAL TRAINING

FACILITY, SOLEDAD, CALIFORNIA, in the matter of the

SUBSEQUENT PAROLE CONSIDERATION HEARING OF MARCO

MARROQUIN, CDC NO. H-62380, ON JUNE 6, 2006, and that

the foregoing pages constitute a true, complete, and

accurate transcription of the aforementioned tapes to

the best of my ability.

I hereby certify that I am a disinterested

party in the above-mentioned matter and have no

interest in the outcome of the hearing.

Dated AUGUST 27, 2006, at Sacramento,

California.


BERENICE BILLINGTON
TRANSCRIBER
PETERS SHORTHAND REPORTING

EXHIBIT "B"

COPY

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT,  DIVISION FIVE

In re

    MIKAEL SCHIOLD,

                Petitioner-Appellee,

On Habeas Corpus.

A103107

San Francisco County Superior Court No. 4523
The Honorable Ksenia Tsenin, Judge

SETTLEMENT AGREEMENT AND FULL
AND FINAL RELEASE OF ALL CLAIMS

BILL LOCKYER
Attorney General of the State of California

ROBERT R. ANDERSON
Chief Assistant Attorney General

FRANCES T. GRUNDER
Senior Assistant Attorney General

JULIE L. GARLAND
Supervising Deputy Attorney General

ANYA M. BINSACCA
Supervising Deputy Attorney General
State Bar No. 189613

455 Golden Gate Avenue, Suite 11000
San Francisco, CA  94102-7004
Telephone: (415) 703-5713
Fax: (415) 703-5843

Attorneys for Respondents/Appellants

COPY

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT, DIVISION FIVE

| | |
|---|---|
| In re | A103107 |
| MIKAEL SCHIOLD, | |
| Petitioner-Appellee, | |
| On Habeas Corpus. | |

SETTLEMENT AGREEMENT AND FULL
AND FINAL RELEASE OF ALL CLAIMS

"Releasor": MIKAEL SCHIOLD

"Releasees": GRAY DAVIS, IN HIS OFFICIAL CAPACITY AS
GOVERNOR OF THE STATE OF CALIFORNIA; THE
BOARD OF PRISON TERMS; MICHAEL E. KNOWLES,
IN HIS OFFICIAL CAPACITY AS THE WARDEN OF
MULE CREEK STATE PRISON; AND CAROL A. DALY,
IN HER OFFICIAL CAPACITY AS THE CHAIRPERSON
OF THE BOARD OF PRISON TERMS

1.    Releasor, petitioner-appellee Mikael Schiold, is currently in the
custody of the California Department of Corrections pursuant to his
conviction by guilty plea to second-degree murder while using a deadly
weapon. Schiold's sentence is fifteen years to life plus one year. Schiold is
identified by the Department of Corrections as inmate number D-31112.

2.    The Board of Prison Terms found Schiold suitable for parole on
April 11, 2002. On September 6, 2002, the Governor reversed that decision
and found Schiold unsuitable for parole.

3.    Schiold filed a petition for writ of habeas corpus in San Francisco

1

COPY

Superior Court, Case No. 4523, challenging the Governor's determination that he was unsuitable for parole. The Superior Court granted that petition, and respondents-appellants appealed to the First District Court of Appeal, Case No. A103107.

4.   Releasor and releasees desire to enter into this settlement agreement in order to provide for a recommendation that Schiold be transferred to the custody of Sweden under the Convention on the Transfer of Sentenced Persons in full settlement of all claims which are or might have been the subject of the petition in this case, upon the terms and conditions set forth below.

5.   This release is executed in consideration of the Board of Prison Terms submitting, with its approval, the application of Schiold for custodial transfer to Sweden under Government Code section 12012.1 and the Convention on the Transfer of Sentenced Persons.

6.   Releasor Schiold agrees that upon approval of the transfer by the United States Department of Justice, Sweden, and any other necessary entities, and upon transfer to Sweden, he will stipulate to vacate the San Francisco Superior Court's order granting the petition in Case No. 4523. Releasor Schiold further agrees that pursuant to the satisfaction of the conditions of this paragraph, he will then dismiss the petition in San Francisco Superior Court Case No. 4523.

7.   Releasor and releasees agree to stay Court of Appeal Case No. A103107 pending resolution of this settlement. The stay shall immediately terminate on October 29, 2003 if before that date releasees have not fully complied with their obligations set forth in paragraph 5. Moreover, the stay shall immediately terminate on December 25, 2003 if releasor Schiold is not in Sweden prior to that date. However, with respect to the immediately preceding sentence only, releasees may file a motion to continue the stay

2

COPY

past December 25, 2003 based upon a showing that the transfer process is proceeding expeditiously.  If the stay terminates pursuant to the terms of this paragraph, releasor and releasees agree that the filing and service of the opening brief in Court of Appeal Case No. A103107 will be due two weeks after the stay terminates.  Releasees agree to voluntarily dismiss that appeal upon releasor's dismissal of the petition described in paragraph 6.

8.     Releasor agrees that he will be held in custody by the government of Sweden until January 1, 2007.

9.     Releasees agree that so long as Schiold and the government of Sweden comply with this agreement, they will take no further action against releasor arising from his conviction in San Francisco County Superior Court Case No. 119276.

10.     Upon full satisfaction of the conditions set forth in paragraph 6, Schiold thereafter fully and forever releases and discharges: the respondents-appellants in the above-captioned case and in San Francisco Superior Court Case No. 4523; the State of California; the California Department of Corrections; the Chairperson of the Board of Prison Terms; and each of their employees, agents, servants, and other representatives, past and present, from all claims, demands, actions, and causes of action, including claims for attorneys' fees, court costs, and other costs of suit, that are or could have been the subject of the petition for writ of habeas corpus in San Francisco Superior Court Case No. 4523.  This release expressly does not apply to the obligations set forth in this settlement agreement.

11.     In making this release, Schiold understands and agrees that he relies wholly upon his own judgment, belief and knowledge as to the nature, extent, effect, and duration of liability.  The making of this release is without reliance upon any statement or representation of any of the releasees or their agents.

COPY

12.    It is expressly understood by Schiold that the approval and submitting of the application for transfer under the Convention on the Transfer of Sentenced Persons referenced in paragraph 5 of this release constitutes a compromise of a disputed claim, and that the releasees expressly deny any and all liability in the above-captioned case.

13.    This agreement shall constitute the entire agreement between releasor and releasees, including attorney's fees, arising from the actions described in paragraph 3, and it is expressly understood and agreed that this agreement has been freely and voluntarily entered into by all parties, and each of them.  It may not be altered, amended, modified, or otherwise changed in any respect except by writing duly executed by the parties to this agreement.

14.    This agreement shall be governed by and construed in accordance with the laws of the State of California.

15.    This release is freely and voluntarily made.  Schiold has not been influenced to any extent in making this release by any representations or statements made by any of the releasees or their agents except as set out herein.

///

///

COPY

16.    Facsimile signatures shall bind the parties to this agreement.


Date: 10/22/03

ETHAN A. BALOGH
KEKER & VAN NEST
Attorneys for Petitioner-Appellee Mikael Schiold


Date: 10/22/03

ANYA BINSACCA
Supervising Deputy Attorney General
Attorney for Releasees Gray Davis, in his official capacity as Governor of
the State of California; the Board of Prison Terms; Michael E. Knowles, in
his official capacity as the Warden of Mule Creek State Prison; and Carol A.
Daly, in her official capacity as the Chairperson of the Board of Prison
Terms

5

EXHIBIT "C"

CONFORMED COPY
OF ORIGINAL FILED
Los Angeles Superior Court

JUN 26 2006

John A. Clarke, Executive Officer/Clerk

By _____, Deputy

LAW OFFICES OF
PICONE & DEFILIPPIS
625 North First Street
San Jose, CA 95112

1

2

3

4

5

6

7

8                    SUPERIOR COURT OF THE STATE OF CALIFORNIA

9                        FOR THE COUNTY OF LOS ANGELES

10

11   In re,                                    )   Case No.: BH003529
                                               )   ORDER RE: WRIT OF HABEAS CORPUS
12   ROBERT ROSENKRANTZ,                        )
                                               )
13            Petitioner,                       )
                                               )
14        On Habeas Corpus                      )
                                               )
15                                             )

16        The court has read and considered petitioner's Writ of Habeas Corpus filed on August 17,

17   2005, as well as the return and denial filed in response to the court's order to show cause.

18   Having independently reviewed the record, giving deference to the broad discretion of the Board

19   of Prison Hearings ("Board") in parole matters, the court concludes that the Board's decision

20   denying petitioner parole is not supported by "some evidence."

21        Petitioner is currently serving a sentence of 15 years to life with a two-year firearm

22   enhancement following his 1986 conviction of second degree murder. Petitioner's minimum

23   eligible parole date was January 23, 1996. Petitioner asserts constitutional claims, including the

24   argument that the Board violated its regulations and petitioner's right to due process by its

25   refusal to set a parole date despite its inability to find him unsuitable for parole or to deem him

26   an unreasonable risk to public safety if paroled.

27        On April 25, 2005, the Board denied petitioner parole for one year. In denying petitioner

28   parole, the Board relied upon the circumstances of the commitment offense. When determining

1

unsuitability based on commitment offense, the Board may consider as a factor whether the victim was abused, defiled or mutilated during or after the offense. (See Cal. Code Regs., tit. 15, § 2402(c)(1)(C).) Here, the Board found that the victim was "abused" due to "the number of times he was shot and the manner in which he was shot." In addition, the Board concluded that the case "rises to the highest level of second-degree murder." The Board further stated in its decision that the Deputy District Attorney and the Los Angeles Sheriff's Department opposed parole. While the Board is required to consider such opposition (see Penal Code section 3042), that opposition is not a factor on which the Board may rely to deny parole as enumerated in title 15, section 2281 of the California Code of Regulations.

Towards the conclusion of the hearing, the Board summarily mentioned its concern that petitioner is a danger to his brother, Joey. The court finds that this assertion is not only unsupported by the record, but belied by the record, which contains documented evidence that contradicts any fear that the petitioner is a threat to his brother's safety. Furthermore, the court rejects the Board's inference that the absence of yearly supportive letters from petitioner's brother shows that petitioner is a danger to his brother. In fact, the petitioner's denial and traverse draws attention to a recent psychological evaluation addressing and dismissing the Board's concern for the safety of petitioner's brother. However, because this psychological evaluation was not evidence before the Board at the time of petitioner's hearing, the court may not properly rely upon it in reviewing the Board's decision. Regardless, the court finds that there is no evidence in the record that supports the conclusion that petitioner remains a danger to his brother.

The Board's sole reliance on the gravity of the offense to justify denial of parole can be initially justified as fulfilling the requirements set forth by state law. (*Biggs v. Terhune* (9th Cir. 2003) 334 F.3d 910, 916.) However, over time, should petitioner continue to demonstrate exemplary behavior and evidence of rehabilitation, denying a parole date simply because of the nature of the commitment offense raises serious questions involving his liberty interest in parole. (*Id.* at p. 917.) Here, petitioner's record is replete with reports of petitioner's exemplary conduct as well as his vocational and educational achievements over a period of many years. Indeed,

ep

1   petitioner is a model prisoner in every respect. A parole decision supported by some evidence

2   may nonetheless abrogate due process if it did not consider and weigh all favorable evidence.

3   (*In re Capistran* (2003) 107 Cal.App.4th 1299, 1306.)

4          The court finds that petitioner's continual parole denials have been based mainly on the

5   gravity of the commitment offense, the circumstances of which can never change. Therefore, the

6   Board's continued sole reliance on the commitment offense will essentially convert petitioner's

7   original sentence of life with the possibility of parole into a sentence of life without the

8   possibility of parole. Petitioner has no chance of obtaining parole unless the Board holds that his

9   crime was not serious enough to warrant a denial of parole. (*Irons v. Warden* (E.D. Cal. 2005)

10  358 F.Supp.2d 936, 947.)

11         Prior Board panels have found petitioner suitable for parole. Petitioner was found

12  suitable for parole on June 18, 1996, but a review unit later disapproved the parole grant. At

13  subsequent hearings in 1996, 1997 and 1998, petitioner was found unsuitable for parole based on

14  the gravity of his offense. On September 9, 1999, petitioner was found unsuitable for parole but

15  the panel set his prison term. On November 18, 1999, Governor Davis reversed petitioner's

16  parole grant. On June 30, 2000, a new panel found petitioner suitable for parole, but Governor

17  Davis reversed its decision on October 28, 2000. Petitioner has now served in excess of the

18  maximum term for both second degree and first degree murder. Therefore, the commitment

19  offense should no longer function as a factor for unsuitability and in that case, it should no longer

20  operate as "some evidence" to support the Board's parole denial. Petitioner has reached the

21  point in which the denial of parole can no longer be justified by reliance on his commitment

22  offense. The Board's continued reliance on the circumstances of the offense runs contrary to the

23  rehabilitative goals espoused by the prison system and has violated petitioner's due process.

24  //

25  //

26  //

27  //

28  //

1       Therefore, this court orders that the petition for writ of habeas corpus be, and hereby is,

2   granted.

3

4   June 26, 2006

5

6                                                                   DAVID S. WESLEY

7                                                                   Judge of the Superior Court

8   Clerk to give notice.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

ep

EXHIBIT "D"

MEMORANDUM OF POINTS AND AUTHORITIES

I

FAILURE OF THE TRIAL JUDGE, SUA SPONTE, TO GIVE REQUIRED MANDATORY INSTRUCTION OF LESSER INCLUDED OFFENSE OF MANSLAUGHTER OVER DEFENSE COUNSEL'S OBJECTION.

In 1927, California Penal Code section §1181 was amended by adding subdivision 6, which empowered either the trial court or an appellate court to modify the judgment to a lesser degree of a lessor offense. In 1951, the section was amended to read as at present, authorizing the court to "modify" the verdict, finding or judgment. The purpose of these amendments was to obviate the necessity of a new trial when the trial court, on a motion for a new trial, or an appellate court, on appeal, believed that the evidence established the lesser offense, but not the greater.

Petitioner alleges that the trial court erred in not giving the lesser included manslaughter instruction, sua sponte, over defense counsel's objection. The trial record reflects the following facts:

The Court: (RT 672), Two days ago I gave counsel a packet of instructions; and the packet of instructions included the law of first degree murder, second degree murder, voluntary manslaughter self-defense as well as justifiable homicide in the course of self-defense and instructions related there to.

This morning I have added to your packet involuntary manslaughter instructions based upon misdemeanor manslaughter -- excuse me -- yes, based upon a misdemeanor battery theory and also a killing with undo -- by gross negligence, the 8.45 instruction.

1

1    The Court: (RT 673), The defense from Mr. Marroquin

2 has been strictly self-defense.

3    I have a duty under the law to instruct on all of the

4 issues; However, if I instruct on the manslaughter instructions,

5 voluntary or involuntary, it may be harmful to the defendants

6 case ...

7    Mr. Browne: (RT 674), ... for tactical reasons, your

8 Honor, I am not going to request the 192 instructions, the

9 argument will be based on a self-defense theory purely.

10    The Court: (RT 675), So you don't wish either the

11 voluntary or the involuntary manslaughter instructions?

12    Mr. Browne: For the record and for those tactical

13 reasons, I do not wish that they be given.

14    The Court: And I saw Mr. Marroquin nod his head.

15    Petitioner's defense was based on a theory of self-defense

16 and the issue of "need not retreat". The trial record establishes

17 the facts relating to "an argument", "broken beer bottles" and

18 "fear". While the record shows that the trial court judge offered

19 the manslaughter instructions and that this instruction was

20 refused by the trial counsel for "tactical" reasons, it was

21 judicial error not to give the lesser included instruction,

22 sua sponte, over counsels objection.

23    The sua sponte rule seems undoubtedly designed to promote

24 the ends of justice by providing some judicial safeguards for

25 defendants from the possible vagaries of ineptness of counsel

26 under the adversary system, so held the court in, People v.

27 Wade, 53 Cal.2d at p. 334, 1 Cal.Rptr. at p. 692, 348 P.2d at

28 p. 125.

2

1    In the case of People v. Thompkins, 240 Cal. Rptr. 516

2  (Cal. App. 4 Dist. 1987) the court held at page 517 at (4) "It

3  was error, when instructing on attempted murder, to fail to

4  give instruction on lesser included offense of attempted

5  voluntary manslaughter, EVEN if defense counsel expressly waived

6  instruction on attempted voluntary manslaughter."

7    The court further stated at p. 523 [4] "The OBLIGATION

8  to instruct on lesser included offenses exists EVEN WHEN as

9  a matter of trial tactics a defendant not only fails to request

10  the instruction BUT expressly objects to its being given." People

11  v. Sedeno, 10 Cal.3d 703, 716, 112 Cal. Rptr. 1, 518 P.2d 913.

12  The Court further stated, at p. 523;

13            "We sympathize with the burden sua sponte
             instructional requirements create for trial courts.
14           Where defense counsel drafts "pinpoint" instructions
             which focus on issues highlighted by the theory of
15           defense, however, the burden on the trial court is
             minimal. It consists primarily of understanding the
16           relevant legal principles well enough to determine
             whether the proffered instructions constitute accurate
17           statements of law. In this regard, we assume
             prosecutors will always be available to alert the
18           court to any inaccuracies in the defense offerings."

19    The recently published case of People v. Ceja, 94 daily

20  Journal D.A.R. 9081, June 29, 1994 bears many similarities to

21  the case at bar; Both cases were in the same neighborhood,

22  Compton, both had similar .380 caliber guns, both victims had

23  Corona beer bottles in their hands, both defendants were in

24  fear of their lives, although no weapon was found on the victim

25  in the Ceja, supra case this is not the facts in Petitioner's

26  case.

27    With respect to the murder count, Petitioner contends the

28  trial court committed reversible error by failing to instruct

3

1  on the lesser included offenses of voluntary and involuntary
2  manslaughter over defense objection when in fact it was offered
3  because the trial judge believed their was sufficient evidence
4  to support that finding by a jury. The jury was instructed on
5  justifiable self-defense as a complete defense to the murder
6  charge.

7       A trial court must instruct the jury on every theory that
8  is supported by substantial evidence and does not err when it
9  refuses to instruct on theories not so supported. People v.
10 Flannel, (1979) 25 Cal.3d 668, 685. see also People v. Glenn,
11 (1991) 29 Cal. App.3d 1461, 1465.

12      A genuine but unreasonably held belief in the need to defend
13 negates the malice and reduces the offense to manslaughter.
14 The California Supreme Court in the very recent case of In re
15 Christian, 94 Daily Journal D.A.R. 6607 upheld the continued
16 viability of the imperfect self-defense and concluded that
17 "[w]hen the trier of fact finds that a defendant killed another
18 person because the defendant actually but reasonably believed
19 he was in imminent danger of death or great bodily injury, the
20 defendant is deemed to have acted without malice and cannot
21 be convicted of murder." (Id. at p. 6612; see also People v.
22 DeLeon, (1992) 10 Cal. App. 4th 815, 821-825).

23      While the defendant testified that the victim came at him
24 with what he believed to be a knife and again came at him with
25 a broken bottle, even though witnesses testimony conflicts at
26 this point to finding no broken bottle, then finding broken
27 bottle(s), a witness to the actual attack by the victim.
28 Additionally, defendant testified he did not want to fight or

4

1 hurt the victim but was frightened, "I felt the kiss of death".

2 The jury might well have concluded that the defendant was

3 mistaken about the victim being armed but also have concluded

4 that the defendant honestly but reasonably believed his life

5 was in danger, making the killing at most voluntary or

6 involuntary manslaughter.

7    While a defendant may be mistaken and still claim

8 self-defense, that mistake must be reasonable. See State v.

9 Kelly, (N.J. 1984) 478 A.2d 364, 373; State v. Vasquez, (N.J.

10 Super. A.D. 1993) 628 A.2d 346, 356. An actual but unreasonable

11 mistake about the threat of imminent peril, on the other hand,

12 would not support self-defense yet would support imperfect

13 self-defense. The imperfect self-defense doctrine allows for

14 a situation where a reasonable man would not conclude a set

15 of keys held in the victim's hand was a gun, but the jury

16 nonetheless could decide the defendant actually but unreasonably

17 held such a belief.

18    In one sense, imperfect self-defense is a "lesser included"

19 defense of perfect self-defense. They share common elements;

20 the defendant killed because of an "actual" belief he was in

21 imminent danger of death or great bodily injury. Perfect

22 self-defense, however, requires proof of an additional element;

23 the defendant's belief was reasonable. For this reason, one

24 cannot establish the elements of perfect self-defense without

25 proving imperfect self-defense. For this same reason, if there

26 is sufficient evidence of all the elements required to justify

27 a perfect self-defense instruction, by definition there is

28 sufficient evidence supporting an instruction for the "lesser

included" defense of imperfect self-defense. This is the logic which impelled the disposition of this same issue in People v. DeLeon, supra, 10 Cal.App. 4th 815. Adherence to this ruling in DeLeon requires trial courts to instruct on imperfect self-defense whenever they instruct a jury on self-defense.

At issue in the case at bar is the fact that the trial court judge found sufficient evidence, on his own, to offer the lesser included instructions of voluntary and/or involuntary manslaughter. All though the record shows that the defense counsel objected to this instruction this is not the issue as the rule states "it is the duty of the trial court judge to give the instruction, sua sponte", even over objection when the evidence is sufficient to warrant the instruction.

The following cases deal with the issue before this Honorable Court:

U.S. v. Schweihs, 971 F.2d 1302 (7th Cir. 1992) and U.S. v. Washington, 819 F.2d 221 (9th Cir. 1987) have both held that:

1) Defendant is entitled to instruction on any defense recognized in law and supported by sufficient evidence to allow reasonable jury to find in defendant's favor.

2) District Court must give instruction regarding any legitimate theory of defense that is supported by evidence, and failure to do so is reversible error.

In the case of U.S. v. Zuniga, 989 F.2d 1109 (9th Cir. 1993) which dealt with an alibi issue, Petitioner contends that the legal principle is the same. Petitioner will substitute the word "manslaughter" for the case word "alibi" in the following statement. "Even if the alibi (manslaughter) evidence

6

is weak, insufficient, inconsistent, or of doubtful credibility, alibi (manslaughter) instructions should be given."

Defendant in criminal trial is entitled to have jury consider any theory of defense that is supported by law and that has some foundation in evidence. U.S. v. Carter, 910 F.2d 1524 (7th Cir. 1990).

If evidence would permit jury to find defendant guilty of a lessor included offense, defendant is entitled to instruction on that defense. U.S. v. Cavanaugh, 948 F.2d 405 (8th Cir. 1991) and U.S. v. Sotelo-Rivera, 906 F.2d 1324 (9th Cir. 1990).

"Failure to give jury instruction on defense when some evidence supported it is reversible error." People of Territory of Guam v. Agualo, 948 F.2d 1116 (9th Cir. 1991); U.S. v. Duncan, 850 F.2d 1104 (6th Cir. 1988); U.S. v. Coin, 753 F.2d 1510 (9th Cir. 1985).

"The equal protection clause essentially requires that all persons similar situated be treated alike". Mahone v. Addicks Utility Dist. of Harris County, 836 F.2d 921 (5th Cir. 1988); City of Cleburne v. Cleburne Living Center, 473 U.S. 432, 87 L.Ed.2d 313, 105 S.Ct. 3249, 1985.

The words "Duty", "Must give", "Obligated to by law" are but a few of the words in the case at bar describing the duty owed to Petitioner at trial by the trial court judge. These words show the "Existence of a legal duty owed" to this Petitioner. These words present a "Peremptory duty", City of Milwaukee v. Saxbe, 546 F.2d 693, 700 (7th Cir. 1976), these words do not permit "DISCRETION", and have been imposed by a

7

constitutional mandate that has been "<u>CLEARLY ESTABLISHED</u>" by judicial decision. <u>Harlow v. Fitzgerald</u>, 457 U.S., 800, 819 (1982).

This "<u>DUTY</u>" "so plainly prescribed as to be free from doubt", <u>Tagupa v. East-West Center, Inc.</u>, 642 F.2d 1197, 1129 (9th Cir. 1981).

Petitioner contends that it was judicial error and that there was no discretion permitted for the trial judge's failure to give the instruction, sua sponte, over counsel's objection and contends that this Honorable Court may, in the interest of justice, modify the verdict to an involuntary manslaughter finding based on the facts in the record and the <u>People v. Ceja,</u> <u>supra</u>, case as herein stated.

## II

### FAILURE OF THE PROSECUTOR TO CORRECT "KNOWN" PERJURED TESTIMONY, AND FAILURE TO EFFECTIVELY CORRECT THAT PERJURY.

Witness, Guadalupe Suazo at (RT 147) states that he never told the Deputies that he saw Petitioner and victim arguing inside the bar prior to the killing. At (RT 151) he again denies that he told the Deputies about what he saw and heard regarding the argument in the bar.

Witness, Angeli Lespia, (RT 176) states that she never told police that defendant and victim had a verbal argument.

Deputy Young testified at (RT 226) "The suspect said that they had an argument inside the bar over disrespecting his family", victim threatened to "kick the suspects ass". At (RT 233) he further testifies that he interviewed both the guard

8

EXHIBIT "E"

1

COURT OF APPEAL OF THE STATE OF CALIFORNIA

2

SECOND APPELLATE DISTRICT

3

4     THE PEOPLE OF THE STATE OF CALIFORNIA,     )
                                                )
5                          PLAINTIFF-RESPONDENT, )
                                                )
6              VS.                               ) SUPERIOR COURT
                                                ) CASE NO. TA016787
7     MARCO TULIO MARROQUIN,                     )
                                                )
8                          DEFENDANT-APPELLANT.  )
      _____      )

9

10          APPEAL FROM THE SUPERIOR COURT OF LOS ANGELES COUNTY

11          HONORABLE ELIZABETH A. BARON, JUDGE PRESIDING

12                 REPORTER'S TRANSCRIPT ON APPEAL

13

14

15    APPEARANCES:

16    FOR PLAINTIFF-RESPONDENT:     DANIEL E. LUNGREN,
                                    STATE ATTORNEY GENERAL
17                                  300 SOUTH SPRING STREET
                                    NORTH TOWER, SUITE 5001
18                                  LOS ANGELES, CALIFORNIA  90013

19

20
      FOR DEFENDANT-APPELLANT:   IN PROPRIA PERSONA
21

22

23
      VOLUME III OF V
24    (PAGES 370 TO 535, INCLUSIVE)

25
                               DONNA L. DERICHSWEILER, CSR #2696
26                             OFFICIAL REPORTER
27                             200 W. COMPTON BLVD., DEPT. D
                               COMPTON, CALIFORNIA  90220
28

                                      EX "E"  Page 1 of 8

      (DONNA L. DERICHSWEILER, CSR)

(CORONER)

BY MS. CALLAHAN:

Q    CAN YOU PLEASE STEP DOWN FROM WHERE YOU ARE
SEATED, DR. REDDY, AND APPROACH THE DIAGRAM THAT IS TO YOUR
IMMEDIATE LEFT.  CAN YOU PLEASE TAKE THE RED AND BLUE PEN WITH
YOU.

WITH THE RED PEN, CAN YOU PLEASE SHOW US WHERE
THAT BULLET FIRST ENTERED ON THE DIAGRAM YOU HAVE IN FRONT OF
YOU, P-19.

A    THIS IS THE LEFT SIDE OF THE BODY.  THIS IS THE
RIGHT SIDE.  THE BULLET ENTERED SOMEWHERE HERE.

(WITNESS INDICATES.)

THE BULLET ENTERED THE LEFT UPPER ARM RIGHT ABOUT
HERE AND EXITED RIGHT NEXT TO IT AND THEN REENTERED ABOUT HERE
INTO THE ABDOMEN.

(WITNESS INDICATES.)

Q    CAN YOU PLEASE MARK ON THE ABDOMEN THE APPROXIMATE
AREA IN RED PEN WHERE THE BULLET ENTERED.

A    (WITNESS COMPLIES.)

Q    CAN YOU PLEASE SHOW --

A    IT WAS A LITTLE CLOSER.

(WITNESS INDICATES.)

Q    CAN YOU PLEASE SHOW WHERE, WITH THE BLUE PEN,
WHERE THE BULLET TRAVELED AFTER IT ENTERED.

A    IT TRAVELED THIS WAY AND THEN THIS WAY.

(WITNESS INDICATES.)

MS. CALLAHAN:  YOUR HONOR, I HAVE A PARTIAL PHOTO OF AN
AUTOPSY PHOTOGRAPH THAT I HAVE PREVIOUSLY SHOWN TO THIS WITNESS
IN FULL.

1    I WOULD LIKE TO MARK THE PARTIAL PHOTO WHICH

2    DEPICTS THE LEFT SIDE OR PORTIONS OF THE LEFT SIDE OF THE

3    INDIVIDUAL'S BODY AS P-20.

4         THE COURT:  IT WILL BE SO MARKED.

5         MS. CALLAHAN:  I HAVE SHOWN IT TO COUNSEL.

6         Q    I AM SHOWING YOU P-20 FOR IDENTIFICATION.

7              DO YOU RECOGNIZE THAT PHOTOGRAPH AS SOMETHING I

8    SHOWED YOU PREVIOUSLY?

9         A    YES.

10        Q    IS THIS ONE OF THE PHOTOGRAPHS THAT WAS TAKEN IN

11   CONNECTION WITH THE AUTOPSY OF LUIS SILVA?

12        A    YES.

13        Q    HOW DID YOU KNOW THAT?

14        A    I VERIFIED THE CORONER'S CASE NUMBER GIVEN TO THIS

15   CASE WAS PLACED ON THE BODY ACTUALLY; SO I SAW THE NUMBER THAT

16   VERIFIES.

17        Q    IS THAT PORTION OF THE NUMBER PART OF THE

18   PHOTOGRAPH THAT IS MISSING?

19        A    YES.

20        Q    CAN YOU PLEASE STEP DOWN FROM THE WITNESS STAND

21   AND STEP OVER TO THE PHOTOGRAPH AND SHOW THE JURORS WHERE THE

22   PROBE IS AND WHAT THE PROBE MEANS IN THAT PHOTOGRAPH.

23        MR. BROWNE:  MAY I, YOUR HONOR?

24        THE COURT:  YES.

25        THE WITNESS:  THIS IS THE PROBE DR. MUKADUM PLACED ON

26   THE GUNSHOT WOUND STARTING FROM THE ENTRANCE AND LEAVING THE

27   ARM AND THEN ENTERING INTO THE ABDOMEN AGAIN.

28              (WITNESS INDICATES.)

1    Q    YES, MA'AM.

2    A    APPROXIMATELY ABOUT 7,000 AUTOPSIES.

3    Q    AND THAT IS OVER A PERIOD OF HOW MANY YEARS?

4    A    TWELVE YEARS.  ACTUALLY SIXTEEN YEARS.

5    Q    WERE THEY ALL PERFORMED FOR THE LOS ANGELES COUNTY

6  MEDICAL EXAMINER?

7    A    MOST OF THEM, YES.

8    Q    NOW, YOU HAVE INDICATED THAT THE DECEASED WAS

9  APPROXIMATELY FIVE FEET TWO INCHES TALL; IS THAT CORRECT?

10    A    THAT'S CORRECT.

11    Q    AND WEIGHED ABOUT 160 POUNDS?

12    A    YES.

13    Q    NOW, YOU MENTIONED THERE WERE TWO WOUNDS.  ONE

14  APPEARED TO BE A FLESH WOUND IN THE LEFT ARM, WOULD THAT BE A

15  FAIR CHARACTERIZATION?

16    A    IT IS A PERFORATING WOUND.

17    Q    BUT IT WENT THROUGH FLESH, DID IT NOT?

18    A    YES.

19    Q    AND IT WAS APPROXIMATELY, WHAT, AN INCH OR SO FROM

20  THE CENTER OF HIS ARM IF WE WERE LOOKING RIGHT DOWN THE MEDIAL

21  PORTION OF HIS ARM?

22    A    I DON'T KNOW.  HE MEASURED FOUR INCHES ABOVE THE

23  ELBOW.  FROM HERE IT WOULD BE FOUR INCHES.

24         (WITNESS INDICATES.)

25    Q    THE HEIGHT OF IT.  I AM NOW CONCERNED WITH THE

26  DISTANCE FROM THE REAR OF HIS ARM TO THE FRONT OF HIS ARM.

27    A    LET ME LOOK FOR YOU EXACTLY.

28    Q    PLEASE.

1  A HE DIDN'T SAY WHERE IT IS; BUT ACCORDING TO THE

2 PHOTOGRAPHS AND PICTURES, FROM HERE TO HERE LIKE I SHOWED

3 THERE.

4   (WITNESS INDICATES.)

5  Q WHAT WOULD THAT BE IN TERMS OF INCHES FROM THE

6 CENTER OF HIS ARM?

7  A IT IS NOT MENTIONED.

8  Q NO WAY OF KNOWING?

9  A WELL, YOU CAN SEE THE PHOTOGRAPHS AND DIAGRAMS,

10 THEY ARE RIGHT, YOU KNOW, CLOSE TO EACH OTHER.

11  Q YOU DON'T HAVE AN ESTIMATE?

12  A EXCUSE ME?

13  Q YOU DON'T HAVE AN ESTIMATE OF THAT DISTANCE?

14  A I CAN'T ESTIMATE.

15  Q VERY WELL.

16  NOW, THERE WAS, AS I SAY, A MENTION OF TWO WOUNDS;

17 AND THEY, OF COURSE, TO CLEAR UP ANY CONFUSION, WERE ALL CAUSED

18 BY THE SAME ROUND; IS THAT CORRECT?

19  A YES.

20  Q NOW, YOU MENTIONED THAT THE ARM HAD TO BE CLOSE TO

21 THE BODY AT THE TIME THE GUN WAS FIRED.

22  A YES.

23  Q WHAT MAKES YOU SAY THAT?

24  A BECAUSE THE BULLET ENTERED THE BODY.  IF IT IS FAR

25 AWAY, IT IS UNLIKELY TO ENTER THE BODY.

26  Q AND IN THAT PARTICULAR DIRECTION -- TRAJECTORY, I

27 SHOULD SAY, THAT ALSO INDICATES IT WAS RATHER CLOSE TO THE

28 BODY?

1      A    YES.

2      Q    AND THAT COULD HAVE BEEN ANYWHERE FROM DIRECTLY

3  TOUCHING IT OR WITHIN A FEW INCHES?

4      A    YES.

5      Q    NOW, IN THE TRAJECTORY THAT YOU HAVE ILLUSTRATED

6  ON PEOPLE'S 19, WHICH IS UP ON THE BOARD THERE, YOU HAVE MADE A

7  LINE THAT APPEARS TO GO THROUGH THE LEFT ARM AND ENTER THE

8  BODY.

9           DO YOU SEE THAT?

10     A    YES.

11     Q    AND THEN THE LINE SEEMS TO TAKE ANOTHER

12  DIRECTION.

13          ARE YOU INDICATING BY THAT LINE THAT THE WOUND

14  ENTERED AND THEN STARTED TO MOVE UPWARD?

15     A    YES.

16     Q    WHAT CAUSED THAT?

17     A    BENDING OF THE BODY.

18     Q    NOW, YOU HAVE ALSO INDICATED THAT YOU BELIEVE THE

19  WEAPON --

20     A    ONE MOMENT.  I WANTED TO SAY SOMETHING.  BENDING

21  OF THE BODY, SOMETIMES THE BULLET MAY RICOCHET, HITTING A

22  PORTION OF THE ORGAN IN THE BODY.  RICOCHET MEANS THAT IT IS

23  GOING STRAIGHT AND THEN REFLECT IN A DIFFERENT DIRECTION.

24     Q    AND ARE YOU INDICATING THAT THE BODY MOST LIKELY

25  BENT AT THE WAIST?

26     A    IT COULD BE ANY OF THOSE THINGS.  IT COULD BE

27  BENDING OF THE BODY, RICOCHET OF THE BULLET.

28     Q    IF IT WAS BENDING OF THE BODY, WOULD IT HAVE BEEN

1          WHEN YOU SAY IT ENTERED -- OR RATHER THE CAUSE OF

2    DEATH WAS A GUNSHOT WOUND TO THE ABDOMEN?

3          A      YES.

4          Q      AND, OF COURSE, THAT CAUSED SOME BLEEDING?

5          A      YES.

6          Q      IN FACT, THE BLEEDING WAS THE CAUSE OF DEATH,

7    WASN'T IT?

8          A      BLEEDING AND ALSO DESTRUCTION OF THE TISSUES.  ONE

9    OF THE KIDNEYS ACTUALLY HAS TO BE REMOVED AND A PORTION OF THE

10   COLON HAS TO BE REMOVED; SO THAT ALSO IS A MAJOR REASON.

11         Q      WITH RESPECT TO THE TRAJECTORY AGAIN OF THE ENTRY

12   WOUND, COULD YOU TELL US IN YOUR BEST ESTIMATE APPROXIMATELY

13   WHAT HEIGHT THE WEAPON WAS THAT FIRED THE BULLET?

14         A      NO.

15         Q      COULD YOU TELL US WHETHER OR NOT THE BODY OR SOME

16   PORTION OF THE VICTIM WAS IN MOTION AT THE TIME THE WEAPON WAS

17   FIRED?

18         A      IT'S POSSIBLE.

19         Q      WOULD THAT KIND OF A TRAJECTORY, THAT KIND OF A

20   WOUND, CAUSE IMMEDIATE EXPIRATION OR IMMEDIATE DEATH?

21         A      YES, IT'S POSSIBLE, YES.

22         Q      IN THIS CASE, DO YOU KNOW WHEN DEATH OCCURED?

23         A      YEAH, I CAN LOOK UP.  IT IS ALL DOCUMENTED IN THE

24   HOSPITAL AND ALL THAT.

25         Q      IF YOU COULD.

26         A      THE DATE AND TIME OF THE INJURY HE RECEIVED,

27   ACCORDING TO THIS INFORMATION, 1-13-92 AT 0020 HOURS.

28         Q      THAT WOULD HAVE BEEN 20 MINUTES AFTER MIDNIGHT?

1    A    YEAH, SOON AFTER MIDNIGHT.

2    Q    AND --

3    A    AND THEN HE DIED AT 1-13 -- SAME DAY, 1-13-92, AT

4    739 HOURS.

5    Q    THAT WOULD HAVE BEEN APPROXIMATELY 7:30 THAT

6    MORNING; SO APPROXIMATELY SEVEN HOURS LATER?

7    A    YES.

8         CAN I SAY ONE MORE THING?

9    Q    SURE.

10    A    ALL THESE SEVEN HOURS HE WAS IN SURGERY.  THEY

11    TRIED TO DO SURGERY TO HIM OF THE BULLET INJURY.

12    Q    I THINK WE ALL UNDERSTAND.

13         NOW, BASED ON YOUR EXPERIENCE, WOULD A PERSON

14    RECEIVING SUCH A WOUND BE ABLE TO MOVE, TAKE A STEP OR TWO OR

15    THREE OR WHATEVER FROM THE MOMENT OF HIS WOUND TO THE POINT

16    WHERE HE MAY HAVE BEEN FOUND ON THE GROUND?

17    A    IT'S POSSIBLE.

18    Q    IS THERE ANY WAY OF ESTIMATING HOW MANY OR HOW FAR

19    OF A DISTANCE HE COULD HAVE MOVED IN TERMS OF STEPS?

20    A    I CAN'T -- EACH PERSON IS DIFFERENT.  SOME

21    PEOPLE --

22    Q    WHAT YOU CAN SAY, HOWEVER, THAT MOVEMENT IS

23    POSSIBLE?

24    A    MOVEMENT IS POSSIBLE, YES.

25    Q    AND HOW FAR WE DON'T KNOW?

26    A    I DON'T KNOW.  AND HOW MUCH, I DON'T KNOW.

27    MR. BROWNE:  I HAVE NOTHING FURTHER AT THIS TIME.

28    THE COURT:  MISS CALLAHAN?

EXHIBIT "F"

BOARD OF PRISON TERMS                                          STATE OF CALIFORNIA
LIFE PRISONER HEARING DECISION FACE SHEET

| | |
|---|---|
| ☐ PAROLE GRANTED – (YES) | Records Use Only |
| ☐ CDC: Do not release prisoner before | Parole Release Date |
| Governor's Review | YR    MO    DAY |
| ☒ PAROLE DENIED – (NO) *1 (one) year* | Attach Prison Calculation Sheet |

☐ AGREED UNSUITABLE (Attach 1001A Form) FOR: _____ YEAR(S)
☐ HEARING POSTPONED/REASON: _____

### PANEL RECOMMENDATIONS AND REQUESTS

**The Board Recommends:**
☐ No more 115's or 128A's          ☒ Stay discipline free          ☒ Earn positive chronos
☐ Work to reduce custody level     ☐ Learn a trade*                ☐ Get a GED*
☒ Get self-help*                   ☐ Get therapy*

☐ Recommend transfer to _____
☐ Other _____
   *These programs are recommended if they are offered at your prison and you are eligible / able to participate.

Penal Code 3042 Notices          ☒ Sent    Date: 4-21-06

Commitment Offense(s)

| 187 2ND W/ 12022.5(A) | MURDER 2ND W/ USE OF F'ARM |
|---|---|
| Code(s) | Crime(s) |
| TA016787 | 01 |
| Case(s) | Count(s) |

| Date Inmate Came to CDC 1-14-93 | Date Life Term Began 12-24-93 | Minimum Eligible Parole Date 12-24-03 |
|---|---|---|
| ☐ Initial Hearing | ☒ Subsequent (Hearing No.) 1 | Date of Last Hearing 11-21-02 |

CDC Representative
Attorney for Prisoner   RICHARD RUTLEDGE          Address
D.A. Representative                               County   LOS ANGELES

This form and the Board's decision at the end of the hearing on only proposed and NOT FINAL. It will not become final until it is reviewed

Chair _Linda Shelton_          Date 6/6/06
Panel Member _____     Date
Panel Member _____     Date

| NAME MARROQUIN, MARCO | CDC# H-62380 | PRISON CTF-SOLEDAD | CALENDAR JUNE 2006 | DATE 6-6-06 |
|---|---|---|---|---|

BPT 1001 (Rev. 08/03)          1          EX "F"   Page 1 of 1

# Attachment 1



PEOPLE v. CEJA     **475**

26 Cal.App.4th     Cite as 31 Cal.Rptr.2d 475 (Cal.App. 2 Dist. 1994)

even total engagement in performing public contracts." (*Rendell–Baker v. Kohn* (1982) 457 U.S. 830, 841, 102 S.Ct. 2764, 2771, 73 L.Ed.2d 418.) The something more in this case is that the nature of TRW's work involves the defense of the country and its national security, a function traditionally the exclusive prerogative of the federal government. (*San Francisco Arts & Athletics v. U.S.O.C.* (1987) 483 U.S. 522, 544, 107 S.Ct. 2971, 2985, 97 L.Ed.2d 427 ["This Court also has found action to be governmental action when the challenged entity performs functions that have been ' "traditionally the exclusive prerogative" ' of the Federal Government. [Citations.]" (Emphasis omitted.) ]; *Becker v. Philco Corporation, supra,* 372 F.2d 771 [defense contractor immune from defamation action for statements made to the United States under defense contract].) Finally, the specific constitutional violation asserted by Ma of deprivation of his Fifth Amendment right to counsel flows from the investigative responsibilities imposed on TRW because the investigation was a first step that may have exposed Ma to federal criminal prosecution.

In this connection, I am not persuaded by the majority's assertion that because paragraph 7(c) of the ISM did not specify how the preliminary |₁₃₅₇inquiry was to be conducted, the inquiry did not qualify as state action. This is a distinction without a difference in view of the undisputed fact that the end result of the inquiry might be criminal prosecution. Additionally, *Rendell–Baker v. Kohn, supra,* 457 U.S. 830, 102 S.Ct. 2764, on which the majority relies, is easily distinguishable on its facts as is *Blum v. Yaretsky* (1982) 457 U.S. 991, 102 S.Ct. 2777, 73 L.Ed.2d 534. In neither case did the private entity fulfill the kind of traditional governmental function that was involved here nor were they obligated to perform policing tasks on behalf of the federal government.

I therefore dissent on this issue.

26 Cal.App.4th 78

|₇₈The PEOPLE, Plaintiff
and Respondent,

v.

Leopoldo CEJA, Defendant
and Appellant.

No. B076169.

Court of Appeal, Second District,
Division 7.

June 23, 1994.

Defendant was convicted in the Superior Court, Los Angeles County, No. TA017607, Steven Suzukawa, J., of second-degree murder and exhibiting firearm and he appealed. The Court of Appeal, Lillie, P.J., held that: (1) failure to instruct on lesser included offenses of voluntary and involuntary manslaughter was reversible error, and (2) admission of preliminary hearing testimony of unavailable witness without first holding hearing on competence of defense counsel at preliminary hearing did not violate rights to counsel and due process, absent showing that defendant was denied opportunity effectively to cross-examine witness at preliminary hearing.

Reversed and remanded in part; affirmed in part.

Johnson, J., filed concurring opinion.

**1. Homicide ⟐309(4), 341**

Failure to instruct jury in murder prosecution on lesser included offenses of voluntary and involuntary manslaughter was reversible error; there was evidence from which jury could have concluded that defendant, who shot and killed victim, was mistaken about victim being armed, and from which jury could have concluded that defendant honestly but unreasonably believed his life was in danger, making killing at most voluntary or involuntary manslaughter.

**2. Criminal Law ⟐770(2), 814(3)**

Trial court must instruct jury on every theory that is supported by substantial evi-



dence but may refuse to instruct on theories not so supported.

### 3. Criminal Law ⟨⟩770(2)

"Substantial evidence" such as will support instruction is evidence from which reasonable jury could have concluded that particular facts underlying instruction did exist.

> See publication Words and Phrases for other judicial constructions and definitions.

### 4. Criminal Law ⟨⟩795(2.1)

Where theory is that defendant committed lesser included offense, court must instruct on lesser included offense when there is evidence from which rational trier of fact could conclude beyond reasonable doubt that defendant was guilty of lesser crime.

### 5. Homicide ⟨⟩116(3, 4)

To be exculpated on theory of self-defense one must have honest and reasonable belief in need to defend.

### 6. Homicide ⟨⟩116(4)

Bare fear is not enough to exculpate on theory of self-defense; circumstances must be sufficient to excite fears of reasonable person, and the party killing must have acted under influence of such fears alone.

### 7. Homicide ⟨⟩116(5)

Genuine but unreasonably held belief in need to defend negates malice and reduces murder offense to manslaughter.

### 8. Homicide ⟨⟩33, 34

Person who kills another in honest but unreasonable belief in necessity to defend against imminent peril to life or great bodily injury may be guilty of voluntary or involuntary manslaughter depending on existence of intent to kill.

### 9. Homicide ⟨⟩309(4), 341

It is reversible error to refuse manslaughter instruction in case where murder is charged and evidence would warrant conviction of manslaughter.

### 10. Constitutional Law ⟨⟩268(10)

Criminal Law ⟨⟩641.12(1), 695½

Allowing preliminary hearing testimony of unavailable witness to be read to jury at murder trial without first holding hearing on competence of defense counsel at preliminary hearing did not violate defendant's constitutional rights to counsel and due process; witness had been cross-examined at preliminary hearing in attempt to show that his identification of defendant was incorrect and to establish that witness had not seen who had fired fatal shots. West's Ann.Cal.Evid. Code § 1291(a); West's Ann.Cal. Const. Art. 1, § 15; U.S.C.A. Const.Amend. 6.

### 11. Criminal Law ⟨⟩662.60

Right of confrontation does not preclude prosecution from proving its' case through prior testimony of witness who is unavailable at trial so long as defendant had right and opportunity to cross-examine witness during earlier proceeding at which witness gave testimony. West's Ann.Cal.Evid.Code § 1291(a); West's Ann.Cal. Const. Art. 1, § 15; U.S.C.A. Const.Amend. 6.

### 12. Criminal Law ⟨⟩641.13(5)

Defendant convicted of second-degree murder and exhibiting firearm failed to show that he received ineffective representation by counsel who cross-examined witness at preliminary hearing; the witness was asked questions that attempted to show that his identification of the defendant was incorrect, that he had only seen defendant for a short period of time, and that a long time had passed since the shooting incident, and the witness testified that he had not seen who had fired the fatal shots. West's Ann.Cal. Const. Art. 1, § 15; U.S.C.A. Const.Amend. 6.

### 13. Constitutional Law ⟨⟩268(11)

Instruction on presumption of innocence and proof beyond reasonable doubt did not violate defendant's constitutional rights.

---

[8]Martin Nebrida Buchanan, San Diego, under appointment by the Court of Appeal, for defendant and appellant.

Daniel E. Lungren, Atty. Gen., George Williamson, Chief Asst. Atty. Gen., Carol Wendelin Pollack, Sr. Asst. Atty. Gen., Marc E. Turchin, Supervising Deputy Atty. Gen.,

and Steven D. Matthews, Deputy Atty. Gen., for plaintiff and respondent.

LILLIE, Presiding Justice.

Leopoldo Ceja appeals from judgment entered following a jury trial in which he was convicted of second degree murder and exhibiting a firearm. (Pen.Code, §§ 187, subd. (a), 417, subd. (b).) The jury found that in connection with the murder, Ceja caused great bodily injury and death by discharging a firearm from a motor vehicle within the meaning of Penal Code section 12022.55, and that he personally used a firearm within the meaning of Penal Code section 12022.5, subdivision (a). Ceja contends the trial court committed several instructional errors which were prejudicial, and |₈₂that it prejudicially erred in allowing the preliminary hearing testimony of a witness to be read to the jury.

## STATEMENT OF FACTS AND PROCEDURAL HISTORY

On March 8, 1992, Joe Avila was on the southeast corner of Alondra and Tamarind talking on the phone when defendant approached and asked where he was from.[1] Defendant said, "fuck the '70s and stuff," and Avila responded that he didn't "bang." Avila rode his bike around the corner and defendant followed, driving a blue Escort. When Avila stopped, defendant pointed a gun at him and said he was going to kill him. Avila did not have a gun or any other type of weapon and said something to the effect, "Yeah, go ahead. You tough because you got a gun. That's all." Defendant drove away. About four or five minutes later, Avila heard approximately four shots; he then went to Alondra and Willowbrook thinking someone might have gotten killed, and saw a lot of people and a "guy laying down." An officer took Avila to Compton Boulevard where he identified the defendant.[2]

Rafael Padilla, previously convicted of armed robbery and being an ex-felon with a

gun, "used to run" with the "CV-70's's" gang. "CV" stands for "Compton Varrio" and is a primarily Hispanic gang with about 200 to 300 members. The CV-70's belong to an area near Willowbrook and Alondra.

On March 8, Rafael Padilla was hanging out and drinking on Caldwell and Alameda when his brother, Juan Padilla, rode up on a bicycle. After drinking at the location for about a half hour, the brothers drove to a liquor store on Willowbrook and Alondra. Several other cars also drove to the liquor store. Rafael Padilla parked his car on the sidewalk and Juan Padilla entered the store. Two or three "home boys" also with CV-70's went into the store; Juan Padilla stayed in the liquor store for no longer than five minutes and then walked out and put a bottle of liquor in someone else's car. He then walked to his brother and Alberto Robles, who were talking, and listened to their conversation. Defendant drove up in a blue Escort automobile and asked the time. Juan Padilla turned around, said "what" and walked towards the car, holding a Corona beer in his hands. He did not point a gun or shoot a gun. Robles walked behind him and Rafael Padilla walked behind Robles. Rafael Padilla was getting ready to look at his watch when he heard some gunshots. |₈₃As he looked up, he saw his brother falling. Defendant was pursued by Raphael Padilla and subsequently arrested. Juan Padilla died from a gunshot wound to the chest.

Neither Rafael Padilla nor Juan Padilla wore a gun that day. If Juan Padilla had been wearing a gun under his clothing he would have shown it to his brother. CV-70's are also called the "'70s." If someone were to say something like "fuck the '70s" that would be "disrespecting the '70s." Juan Padilla was mellow, not very drunk and not hostile at the liquor store.

Compton police officer Roderick Pettus took defendant into custody and searched his

---

1. Pursuant to Evidence Code section 1291, Avila was declared unavailable as a witness and his preliminary hearing testimony was read to the jury. Ceja does not dispute the trial court's finding that Avila was unavailable as a witness.

2. During cross-examination at the preliminary hearing, defense counsel established that Avila had never seen defendant before that day, that he saw him for only a short period of time, that the shooting had taken place quite some time ago and that he had not seen who had fired the shots he heard.

car. Pecuus recovered a small caliber hand-gun from underneath the steering column dash and two expended .380 casings, one from the front of the vehicle and the other from the rear of the vehicle. One unexpended round was jammed into the chamber of the firearm and two live rounds were in the magazine inside the weapon.

Compton police officer Stoney Jackson collected evidence at the crime scene. No weapon was found, but two expended bullets and one expended .380 caliber casing were found. Jackson inspected the blue Escort automobile, looking for additional casings, bullets, bullet holes, etc. He found no bullets, casings or bullet holes on the exterior or interior of the vehicle. He inspected Rafael Padilla's automobile and found no guns, bullets or expended casings.

During an autopsy of Juan Padilla, the deputy medical examiner recovered a bullet which had been fired from the gun found in defendant's automobile.

### Defense

Defendant testified that on March 8, he was near the courthouse, somewhere on Raymond, dropping off one of his brother's friends. To get home, he drove north on Tamarind. When he got to Alondra he asked a guy at a pay phone (Avila) "where he was from," because he just wanted to know "where he was from"; he knew he was in the CV-70's neighborhood; he is in a rival gang, the "CV T-Flats." Avila responded, but he (defendant) was listening to the radio and didn't know exactly what was said; he figured Avila was a CV-70 and said, "fuck the '70s" to "disrespect" them; Avila rode off on a bike, and he followed Avila to intimidate and scare him; when Avila stopped, he stopped his car and had a discussion with him and asked why he had to run; when he called Avila a punk, Avila approached, and he pulled out a gun; he did not point it at Avila, just showed it to him, and said to stay right there; he only intended to intimidate and scare Avila.

Defendant further testified he then drove down Raymond and turned right on Willowbrook and drove to Alondra; while on Alondra, a train was passing; since he had to

wait for the train, he decided to go to a liquor store and get a soda; while looking for a place to park, three people came out of the store, one of whom asked him, "What do you want, what do you want," so he asked him for the time; while Rafael Padilla looked at his watch, Juan Padilla approached and with his right hand pulled out a revolver from his waistband; he saw the barrel of the gun and got scared, extended his arm and, without aiming, fired three times; he did not want to hurt Juan Padilla but was scared; if Juan Padilla had shot him, he would get killed; he was just defending himself, and fired three rounds; he was not sure if Juan Padilla fired his gun, it happened so fast; he did not shoot at any of the other people in the liquor store; he drove away from the scene because he believed Rafael Padilla would come after him and do something.

Defendant carried a gun for protection; where he lives a lot of things happen; there are a lot of gang related shootings; rival gangs hate each other; you do not really go into other gangs' neighborhoods, if you do, you might get shot; by going into their neighborhood as a "T-Flat," he was kind of "disrespecting" them, especially by saying, "fuck the '70s"; the store where he shot Juan Padilla was not the same store at which the incident with Avila occurred.

After the shooting, an analysis for gunshot residue was performed on Juan Padilla's hands; a particle of gunshot residue was found on his right hand. There was also a second particle that was consistent with gunshot residue but not unique to it. One can get a particle of gunshot residue on his hand from firing a gun, handling a gun that has residue on it, being in close proximity to a firearm discharge, touching something other than a gun with residue on it, or being touched by someone with residue on his hands. It is unpredictable how much gunshot residue or particles are shot out from a Davis .380, but the defendant's criminalist testified he would expect more than one particle. He said the shot itself produces thousands of particles; if someone fired a gun there is probably a good chance that someone would have more than one particle deposited at the time of a shot; whether more

PEOPLE v. CEJA                    **479**

than one particle could be identified at some later time when the samples are taken is another question; he has examined samples from suspected shooters where only one or two particles were found.

An analysis of a blood sample taken from the victim revealed the blood contained ethanol and cocaine. Ethanol is drinking alcohol. The blood-alcohol level was 0.13 grams percent; the cocaine level was 0.06 micrograms per milliliter and the metabolite was 0.84 micrograms per milliliter. |₈₆Metabolite is a breakdown product of cocaine. When ethanol and cocaine are taken at the same time, there is a possibility of a drug being formed called ethyl cocaine or cocaethylene. The fluence or the effect of the substances is potentiated or increased.

Dr. Terence McGee testified that a combination of cocaine and alcohol prolongs the effect of the substances, and the effects of such a combination are much greater than the effect of either substance singularly. One with a combination of the drugs in his system would have much more of a tendency to "fly off the handle," or do things that might not occur to him in a sober state. If a person has a tendency towards being hostile, the combination of substances would "throw fuel on the fire." It would not be uncommon for such persons to be calm in their demeanor at one moment in time and the next moment be aggressive.

### I

### JURY INSTRUCTIONS RE VOLUNTARY AND INVOLUNTARY MANSLAUGHTER

[1] With respect to the murder count, appellant contends the trial court committed reversible error by failing to instruct the jury on the lesser included offenses of voluntary and involuntary manslaughter. This contention is well taken.

The jury was instructed on justifiable self-defense as a complete defense to the murder charge. The court, however, refused to give voluntary manslaughter instructions, finding there was no evidence to warrant such instructions. Defendant argued the voluntary manslaughter instructions would be appro-

priate if the jury should find defendant's belief in the need for self-defense was honest but unreasonable.

[2–4] A trial court must instruct the jury on every theory that is supported by substantial evidence and does not err when it refuses to instruct on theories not so supported. (See *People v. Flannel* (1979) 25 Cal.3d 668, 685, 160 Cal.Rptr. 84, 603 P.2d 1.) Substantial evidence is evidence from which a reasonable jury could have concluded " 'that the particular facts underlying the instruction did exist.' [Citation.]" (*People v. Lemus* (1988) 203 Cal.App.3d 470, 477, 249 Cal.Rptr. 897.) Where the theory is that the defendant committed a lesser included offense, the court must instruct on the lesser included offense when there is evidence from which a rational trier of fact could conclude beyond a reasonable doubt, the defendant was guilty of the lesser crime. (*People v. Glenn* (1991) 229 Cal.App.3d 1461, 1465, 280 Cal.Rptr. 609.)

[5, 6] |₈₆"To be exculpated on a theory of self-defense one must have an honest *and* reasonable belief in the need to defend. [Citations.] A bare fear is not enough; 'the circumstances must be sufficient to excite the fears of a reasonable person, and the party killing must have acted under the influence of such fears alone.' [Citation.]" (*People v. Flannel, supra,* 25 Cal.3d at pp. 674–675, 160 Cal.Rptr. 84, 603 P.2d 1, emphasis in original.)

[7] A genuine but unreasonably held belief in the need to defend negates the malice and reduces the offense to manslaughter. (25 Cal.3d at p. 680, 160 Cal.Rptr. 84, 603 P.2d 1.) The California Supreme Court in the very recent case of *In re Christian S.* (1994) 7 Cal.4th 768, 30 Cal.Rptr.2d 33, 872 P.2d 574, upheld the continued viability of imperfect self-defense and concluded that "[w]hen the trier of fact finds that a defendant killed another person because the defendant actually but unreasonably believed he was in imminent danger of death or great bodily injury, the defendant is deemed to have acted without malice and cannot be convicted of murder." (*Id.* at p. 783, 30 Cal.Rptr.2d 33, 872 P.2d 574; see also *People*

26 Cal.App.4th 86

*v. De Leon* (1992) 10 Cal.App.4th 815, 821-825, 12 Cal.Rptr.2d 825.)

[8] "A person who kills another in the honest but unreasonable belief in the necessity to defend against imminent peril to life or great bodily injury may be guilty of voluntary or involuntary manslaughter depending on the existence of an intent to kill. [Citations.]" (*People v. Glenn, supra,* 229 Cal.App.3d at p. 1467, 280 Cal.Rptr. 609.)

While defendant testified that the victim pulled a gun from his waistband and that defendant saw the barrel of the victim's gun before defendant shot the victim, no gun was found at the scene and prosecution witnesses testified that the victim did not have a gun. Additionally, defendant testified he did not want to hurt the victim but was frightened. The jury was entitled to accept portions of a witness's testimony and to disbelieve other portions (see *Stevens v. Parke, Davis & Co.* (1973) 9 Cal.3d 51, 67-68, 107 Cal.Rptr. 45, 507 P.2d 653) and might well have concluded that defendant was mistaken about the victim being armed but also have concluded that defendant honestly but unreasonably believed his life was in danger, making the killing at most voluntary or involuntary manslaughter. (See *People v. Glenn, supra,* 229 Cal.App.3d at p. 1467, 280 Cal.Rptr. 609.)

[9] The failure to instruct on the lesser included offense cannot be deemed harmless. " '[I]t is reversible error to refuse a manslaughter instruction in a case where murder is charged, and the evidence would warrant a conviction of manslaughter.' [Citations.]" (*People v. Edwards* (1985) 39 Cal.3d 107, 116, 216 Cal.Rptr. 397, 702 P.2d 555.) Moreover, the factual questions posed by the omitted instructions were not necessarily resolved adversely to defendant under other, properly given instructions. (*Id.* at pp. 116-117, 216 Cal.Rptr. 397, 702 P.2d 555.)

II

*PRELIMINARY HEARING TESTIMONY*

[10] Appellant contends the trial court violated his sixth and fourteenth amendment rights to counsel and due process by admitting the preliminary hearing testimony of Joe

Avila without first holding a hearing on the competence of defense counsel at the preliminary hearing. This contention is without merit.

"Evidence Code section 1291, subdivision (a), provides, in pertinent part: 'Evidence of former testimony is not made inadmissible by the hearsay rule if the declarant is unavailable as a witness and: [¶] ... [¶] (2) The party against whom the former testimony is offered was a party to the action or proceeding in which the testimony was given and had the right and opportunity to cross-examine the declarant with an interest and motive similar to that which he has at the hearing.' " (*People v. Zapien* (1993) 4 Cal.4th 929, 974, 17 Cal.Rptr.2d 122, 846 P.2d 704)

[11] "Both the state and federal Constitutions guarantee criminal defendants the right to confront the witnesses against them. (U.S. Const., 6th Amend.; Cal. Const., art. I, § 15.) The right of confrontation is not absolute, however; in particular, it does not preclude the prosecution from proving its case through the prior testimony of a witness who is unavailable at trial, so long as the defendant had the right and the opportunity to cross-examine the witness during the earlier proceeding at which the witness gave this testimony. [Citations.]" (*People v. Cudjo* (1993) 6 Cal.4th 585, 618, 25 Cal.Rptr.2d 390, 863 P.2d 635.) "As long as defendant was given the opportunity for effective cross-examination, the statutory requirements were satisfied; the admissibility of this evidence did not depend on whether defendant availed himself fully of that opportunity. [Citations.]" (*People v. Zapien, supra,* 4 Cal.4th at p. 975, 17 Cal.Rptr.2d 122, 846 P.2d 704)

[12] Appellant's claim that he was denied the opportunity to effectively cross-examine in that his counsel at the preliminary hearing was ineffective is not supported by this record. In order to establish that a defendant has been denied effective assistance of counsel, a court must conclude that counsel's performance was deficient, falling below an objective standard of reasonableness under prevailing professional norms and that there is a reasonable probability that but for counsel's unprofessional errors, the result of the pro-

26 Cal.App.4th 89

ceeding would have been different. (*People v. Kaurish* (1990) 52 Cal.3d 648, 677, 276 Cal.Rptr. 788, 802 P.2d 278.) During cross-examination, witness Avila was asked questions which attempted to show that his identification of the defendant was incorrect, that he had only seen defendant for a short period of time, and that a long time had passed since the incident had occurred. Additionally, with reference to the murder charge, Avila testified he had not seen who had fired the fatal shots. In arguing that he should be allowed a hearing to determine the effectiveness of the preliminary hearing counsel, trial counsel could not say what questions should have been asked on cross-examination at the preliminary hearing or that he in fact would have asked those questions. On this record, appellant has failed to establish that he was denied effective assistance of counsel for purposes of cross-examining witness Avila at the preliminary hearing.[3]

### III

### JURY INSTRUCTION REGARDING REASONABLE DOUBT

[13] Appellant contends the trial court committed prejudicial error and violated his constitutional rights when it instructed the jury on the presumption of innocence and proof beyond a reasonable doubt in accordance with CALJIC No. 2.90.

The United States Supreme Court in *Victor v. Nebraska* (1994) — U.S. —, — [114 S.Ct. 1239, 1248, 127 L.Ed.2d 583, 597], filed March 22, 1994, has squarely rejected this contention.

### DISPOSITION

The judgment of conviction for second degree murder is reversed and the cause remanded to the superior court with directions to enter a judgment of guilty of involuntary manslaughter if the prosecutor consents to forego prosecuting defendant for second degree murder and to resentence defendant accordingly; or, in the alternative, to set the cause for retrial if the prosecutor does not so consent. In all other respects the judgment is affirmed.

FRED WOODS, J., concurs.

JOHNSON, Associate Justice, concurring.

I wholeheartedly concur in the judgment and my colleagues' holding on the imperfect self-defense issue—so far as it goes. I write separately solely to register my view a trial court must also instruct on |89"imperfect self-defense" whenever it determines a "perfect self-defense" instruction is appropriate. In explaining my reasons, it will be helpful to begin with self-defense, both the perfect and imperfect varieties.

California Penal Code section 197, subdivision (3) makes the killing of a person justifiable if committed "... when there is reasonable ground to apprehend a design ... to do some great bodily injury, and imminent danger of such design being accomplished; ..." (1 Witkin & Epstein, Cal.Criminal Law (2d ed. 1988) Defenses, § 241 p. 277; CALJIC 5.12; *People v. McDonnel* (1949) 94 Cal. App.2d 885, 211 P.2d 910.) When this "actual" and "reasonable" belief exists it constitutes an absolute defense, relieving the defendant of criminal responsibility for the homicide.

As the majority explains, the courts also have recognized a related mental state which reduces, but does not eliminate, the defendant's culpability. It is usually called "imperfect self-defense." The California Supreme Court fully explained this concept in *People v. Flannel* (1979) 25 Cal.3d 668, 160 Cal.Rptr. 84, 603 P.2d 1. "An *honest but unreasonable* belief that it was necessary to defend oneself from imminent peril to life or great bodily injury negates malice aforethought, the mental element necessary for murder, so that the chargeable offense is reduced to manslaughter." (*Id.* at p. 674, 160 Cal.Rptr. 84, 603 P.2d 1, original italics omitted, new italics added.)

Again in a very recent and exhaustive opinion, the California Supreme Court fur-

---

3. As an offer of proof, trial counsel sought to demonstrate to the court that the lawyer that handled the preliminary hearing "never read the reports, didn't know the elements of the offenses, didn't know the exposure, never spoke to the witnesses." The privately retained attorney at the preliminary hearing was subsequently replaced by appointed counsel.

ther refined and upheld the continued viability of "imperfect self-defense." (*In re Christian S.* (1994) 7 Cal.4th 768, 30 Cal.Rptr.2d 33, 872 P.2d 574.) Quoting extensively and approvingly from this court's opinion in *People v. De Leon* (1992) 10 Cal.App.4th 815, 12 Cal.Rptr.2d 825, the Supreme Court concluded the Legislature did not eliminate "imperfect self-defense" when it abolished the "diminished capacity defense" in 1981. (7 Cal.4th at pp. 776–778, 30 Cal.Rptr.2d 33, 872 P.2d 574.) The high court did, however, alter somewhat the terminology used to define "imperfect self defense." "Although *Flannel* and other opinions referred to an 'honest belief' we shall use the more precise term '*actual belief*' because it avoids the confusing suggestion inherent in the phrase 'honest belief' that a person could have a 'dishonest belief', i.e., that a person could believe something he does not believe." (7 Cal.4th at p. 773, 30 Cal.Rptr.2d 33, 872 P.2d 574, emphasis in original.)

The trial court's decision to instruct on self-defense but not on imperfect self-defense in this case may have been based on its misunderstanding of an admittedly subtle distinction—how mistakes of fact affect the doctrine of self-defense itself. LaFave & Scott offer this explanation:

"When his *belief is reasonable* ... he may be *mistaken* in his belief and still have the *defense*. Thus one may be justified in shooting to death an adversary who, having threatened to kill him, reaches for his pocket as if for a gun, though it later appears that he had no gun and that he was only reaching for his handkerchief." (LaFave & Scott, Criminal Law (2d ed. 1986) Justification & Excuse 5.7(c), p. 457, italics added.)

While a defendant may be mistaken and still claim self-defense, that mistake must be *reasonable*. (See *State v. Kelly* (1984) 97 N.J. 178, 478 A.2d 364, 373; *State v. Vasquez* (A.D.1993) 265 N.J.Super. 528, 628 A.2d 346, 356.) An actual but unreasonable mistake about the threat of imminent peril, on the other hand, would not support self-defense yet would support imperfect self-defense. The imperfect self-defense doctrine allows for a situation where a reasonable person would not conclude a set of keys held in the victim's hand was a gun, but the jury nonetheless could decide the defendant actually but unreasonably held such a belief.

In one sense, imperfect self-defense is a "lesser included" defense of perfect self-defense. They share common elements—the defendant killed because of an "actual" belief he was in imminent danger of death or great bodily injury. Perfect self-defense, however, requires proof of an additional element—the defendant's belief was reasonable. For this reason, one cannot establish the elements of perfect self-defense without proving imperfect self-defense. For this same reason, if there is sufficient evidence of all the elements required to justify a perfect self-defense instruction, by definition there is sufficient evidence supporting an instruction for the "lesser included" defense of imperfect self-defense.

This is the logic which impelled our disposition of this issue in *People v. De Leon, supra,* 10 Cal.App.4th 815, 12 Cal.Rptr.2d 825. The Attorney General argues adherence to this court's decision in *De Leon* requires trial courts to instruct on imperfect self-defense whenever they instruct a jury on self-defense. In this, the Attorney General is correct. In my view, this is what *De Leon* indeed requires. In criticizing this position, however, the Attorney General claims "such a requirement has never been articulated by any court...." In this assertion the Attorney General is incorrect.

While *De Leon* is the only California case I have found which clearly states this requirement, our decision does not stand alone in its reasoning. LaFave & Scott state "[w]here this 'imperfect' right of self-defense is recognized, it is generally the case that whenever the facts would entitle the defendant to an instruction on self-defense regarding a murder charge, an instruction on this variety of manslaughter should also be given. [Fns. omitted.]" (Lafave & Scott, *supra,* Crimes Against the Person 7.11(a), p. 666.)

The first judicial decision my research uncovered implying a necessary tie between instructing on self-defense and manslaughter was decided by the Supreme Court of North Carolina in 1922, over 70 years ago. (*State v. Thomas* (1922) 184 N.C. 757, 114 S.E. 834.) Since that time, several other

PEOPLE v. SCOTT 483

26 Cal.App.4th 91    Cite as 31 Cal.Rptr.2d 483 (Cal.App. 2 Dist. 1994)

states have expressly articulated this requirement.[1] The Supreme Court of Wisconsin has decided "... it is inconsistent and reversible error to deny the imperfect self-defense instruction where an instruction is given as to perfect self-defense." (*State v. Gomaz* (1987) 141 Wis.2d 302, 414 N.W.2d 626, 630.)

The Illinois Supreme Court expresses their requirement as "... a self-defense and a voluntary manslaughter instruction should be given when any evidence is presented showing the defendant's subjective belief that use of force was necessary. If the subjective belief is reasonable, the result is justifiable use of force; if the subjective belief is unreasonable, the result is voluntary manslaughter. [Citations.] [¶] The determination of whether the defendant's subjective belief is reasonable is for the jury to make." (*People v. Lockett* (1980) 82 Ill.2d 546, 45 Ill.Dec. 900, 903, 413 N.E.2d 378, 381.)

The Maryland Court of Special Appeals also has addressed the issue, stating, "[i]t is difficult to envision circumstances which are sufficient to generate the issue of justification or excuse by way of perfect self-defense which do not also generate the issue of mitigation by way of imperfect self-defense. Generally, if a defendant is entitled to an instruction with respect to the former, he will be entitled to an instruction with respect to the latter." (*Faulkner v. State* (1983) 54 Md.App. 113, 458 A.2d 81, 84, fn. 5.)

I do not mean to suggest appellant has established "imperfect self-defense" as a matter of law. On the evidence presented, a jury reasonably could have found neither self-defense nor imperfect self-defense applied. As my colleagues also recognize, the problem is the jurors were not given the opportunity to consider the latter, since the court failed to even instruct on imperfect self-defense while it did instruct on self-defense itself.

In my view, *De Leon* gave expression in California to a sound, eminently logical principle which has gained wide acceptance elsewhere. In this and future cases where trial courts find sufficient reason to give an instruction on perfect self-defense, they also should grant a requested instruction on imperfect self-defense.

1. While the definitions of self-defense and imperfect self-defense may differ slightly from state to state, they are close enough to the California definitions to be persuasive authority on this issue.