PETITION FOR A WRIT OF HABEAS CORPUS BY A PERSON IN STATE CUSTODY

**FILED**

Name **MARROQUIN       MARCO**
    (Last)          (First)       (Initial)

JUN 0 9 2008

Prisoner Number **H-62380**

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

Institutional Address **CIF-Central, Soledad, CA 93960-0689 (Hwy, 101 North)**

**RECEIVED**

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

JUN   9 2008

**MARCO MARROQUIN**
(Enter the full name of plaintiff in this action.)

E-filing

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

vs.

Case No. **C 07-6098 PJH (PR)**
(To be provided by the clerk of court)

**BEN CURRY, (Warden,)**

PETITION FOR A WRIT
OF HABEAS CORPUS

**AS AMENDED**

**EVIDENTIARY HEARING REQUESTED**

(Enter the full name of respondent(s) or jailor in this action)

Read Comments Carefully Before Filling In

When and Where to File

You should file in the Northern District if you were convicted and sentenced in one of these

counties: Alameda, Contra Costa, Del Norte, Humboldt, Lake, Marin, Mendocino, Monterey, Napa,

San Benito, Santa Clara, Santa Cruz, San Francisco, San Mateo and Sonoma. You should also file in

this district if you are challenging the manner in which your sentence is being executed, such as loss of

good time credits, and you are confined in one of these counties. Habeas L.R. 2254-3(a).

If you are challenging your conviction or sentence and you were not convicted and sentenced in

one of the above-named fifteen counties, your petition will likely be transferred to the United States

District Court for the district in which the state court that convicted and sentenced you is located. If

you are challenging the execution of your sentence and you are not in prison in one of these counties,

your petition will likely be transferred to the district court for the district that includes the institution

where you are confined. Habeas L.R. 2254-3(b).

1  Marco Marroquin, H-62380
   Correctional Training Facility
2  P.O.Box 689 G-123L
   Soledad, Ca 93960-0689

3       Petitioner, in pro se

4                      UNITED STATES DISTRICT COURT
                       NORTHERN DISTRICT OF CALIFORNIA
5

6  MARCO MARROQUIN,              )     Case No. C 07-6098 PJH (PR)
                                 )
7           Petitioner,          )
                                 )     MOTION TO AMEND PETITION TO DISMISS
8  V.                            )     UNEXHAUSTED ISSUES, AND, PROCEED
                                 )     WITH THE EXHAUSTED ISSUE.
9  BEN CURRY, (Warden,)          )
                                 )
10          Respondent,          )
                                 )
11

12      Petitioner herein, in reference to this Court's ORDER, dated May 28 2008,

13  requests that this Court dismiss the unexhausted issues and proceed on to

14  adjudicate the exhausted issue (referred) to by the Respondent and Court as

15  CLAIM IV).

16      At page 3:21-26 on the ORDER "This is his fourth issue here, the one that

17  respondent concedes is exhausted."

18      With the options given by the Court (3), Petitioner has chosen "what is

19  behind door number 'two' as any attempt to exhaust the unexhausted issue in

20  the State Supreme Court would be fruitless, would cause undue delay and would

21  only result in another 'post cart' denial.

22  //

23  //

24                            Respectfully,

25                            Marco Marroquin

26

27

28

## STATEMENT OF THE CASE

In August of 1991, Luis Silva and his girlfriend, Delcia Lopez, agreed to buy a car from Petitioner for two thousand dollars. Silva was given possession of the car, and was supposed to pay Petitioner every two weeks. After the first two weeks however, Silva returned the car, saying that it had a lot of defects. Silva and Petitioner disagreed and argued when Silva tried to give the keys back to Petitioner. Petitioner asked Silva to pay him for the time that he had the car, but Silva refused to pay. Petitioner told Silva that he would regret what he had done to him.

At approximately 10 P.M. on January 12, 1992, Petitioner and another man entered the La Bajadita Bar in Compton. Before entering, the security guard checked the two men for weapons and found none. A short time later, Silva also entered the bar, but did not sit with Petitioner. Both men ordered beer. From that point forward, the defense and prosecution cases go in different directions, with vastly different evidence and completely different testimony in support of their theories of the case.

The prosecutions case continues with none of the employees at the bar recalling any argument between Petitioner and Silva, or even seeing the men approach each other while inside the bar. At some point, Silva left the bar to move his car. About two minutes after Silva left, Petitioner also left the bar, with the man that he had entered with, and walked along Compton towards Williams street.

About 10 minutes later, Petitioner and his companion returned to the bar and tried to re-enter it. However, when the security guard searched Petitioner, he discovered a gun and told Petitioner that he could not go inside the bar with a weapon. Petitioner and his companion then moved away to a distance of about three parked cars from the entrance to the bar and remained there.

Silva, after moving his car, returned in the direction of the bar. As Silva

1   reached the curb, Petitioner came toward him, according to the security guard.

2   Petitioner called Silva a son of a bitch and they argued about a car. Petitioner

3   said to Silva that he would have to pay Petitioner for the car. Silva said that

4   he did not want any problems with Petitioner, and did not threaten Petitioner

5   in any manner. Petitioner then called Silva a son of a big whore. The guard did

6   not see if Silva had anything in his hands, and that Silva's hands were at his

7   sides.

8       The security guard saw Petitioner point a gun at Silva and say that i'm

9   going to kill you. Petitioner pulled the trigger the first time and the gun did

10  not fire; he pulled it a second time and it fired. The guard did not see if Silva

11  was shot when Petitioner fired the gun. As Silva bent over, the guard pulled

12  him down to the ground and placed him in front of the doorway. Petitioner turned

13  and walked towards Williams street with his friend. There was no one else on

14  the street at that time.

15      The security guard contacted Deputy Reynolds and directed the officers to

16  Petitioner where he was standing by a white Toyota pickup with a gun in his hand.

17      A search of the immediate area and the victim's person revealed no weapons.

18  One shell casing was later found about 10-12 feet from where Silva had been lying.

19  No broken bottles were found at that time, however testimony showed the presence

20  of two broken bottles in the immediate area. One unbroken Budweiser bottle was

21  found.

22      Petitioner stated that Silva had argued with him about a family problem,

23  that Silva had threatened to kick his ass and that he went to get his gun because

24  he was afraid of Silva. Petitioner kept the gun in the battery section of the

25  engine compartment of his truck. He put the gun in his back waistband and walked

26  in the direction of the bar to get something to eat at the stand outside of the

27  bar. When he got to the bar, Silva came out and began arguing again; he then

28  pulled out his gun and shot Silva. Petitioner's defense was that Silva had tried

1 to cut him with a broken bottle.

2     The cause of death was listed as a gunshot wound to the abdomen, the evidence

3 established that the initial point of entry was a flesh wound to the arm and

4 the projectile deflecting into the body.

5     The defense case describes problems between Silva and Petitioner's girlfriend

6 and her brothers. It seems that Silva was living with Delcia, Petitioner's

7 girlfriend's sister, but was married to one of Delcia's cousins. This resulted

8 in Delcia and her brothers throwing Silva out of their house.

9     The night of the incident, Petitioner was in the bar talking with a friend

10 called "Pink Floyd", who was also a friend of Silva. When Petitioner was seated

11 in the bar, Silva came up and said to Floyd, "stop talking to trash", referring

12 to Petitioner. Silva then picked Petitioner up by his collar, and when Floyd

13 said, "you're not going to fight in here", Silva then said, "tell him to go

14 outside if he's a man". Silva then pushed Petitioner and said to him, "let's

15 go out, faggot". Silva accused Petitioner of being a gigolo because someone was

16 supporting him, and also accused him of trying to defraud Silva by asking for

17 money for the use of the car.

18     They went outside the bar where Floyd stood between them and prevented them

19 from fighting. Petitioner walked towards his car, intending to leave. He heard

20 steps behind him and turned to see Silva coming at him with something in his

21 right hand that could have been a knife. Petitioner kicked Silva's hand and Silva

22 turned and ran away. Petitioner was very frightened because he believed Silva

23 had tried to kill him. Petitioner then got his gun from his truck and loaded

24 it. He looked toward the front of the bar and saw Silva's car driving away.

25     Thinking that Silva had left, Petitioner then returned towards the bar.

26 As he walked towards the bar, Silva drove by in his car and yelled to him,

27 challenging him to a fight. Silva then made a U-turn and parked on the opposite

28 side of the street. Silva then came running toward Petitioner and, as he

1   approached, he reached down and broke a bottle he was holding by the neck.

2       Silva attacked Petitioner several times with the broken neck of the bottle,

3   but Petitioner was able to jump out of the way. Silva continued to taunt and

4   insult Petitioner. After Floyd again tried to intervene, Silva lunged a final

5   time at Petitioner with the broken bottle and Petitioner shot him in the arm.

6   At the moment that he pulled the trigger, Petitioner thought that Silva was going

7   to stab him with the bottle neck.

8       Victor Matute testified that he arrived at the La Bajadita Bar on January

9   12, 1992, between 10 P.M. and midnight. As he approached the door, he saw three

10  people arguing on the sidewalk. It appeared that two of the people wanted to

11  fight the other person. He then saw one of the people try to hit the third person

12  with a bottle. The third person moved to the side to avoid being hit. He then

13  saw the third person shoot the person with the bottle.

14      Finally, Los Angeles County Deputy Sheriff Reynolds testified that on the

15  night of the shooting, Guadalupe Suazo, the manager of the La Bajadita Bar, told

16  him he had seen Petitioner and Silva argue for a minute inside the bar. Bertha

17  Angeli, the owner of La Bajadita, also indicated to him that she had seen

18  Petitioner and Silva arguing in the bar that night.

19                              //

20                              //

21                              //

22

23

24

25

26

27

28

As amended, CLAIM IV is now CLAIM I
STATE AND FEDERAL CLAIM NUMBER FOUR (IV)
THE BOARD VIOLATED PETITIONER'S DUE PROCESS RIGHTS UNDER THE
FIFTH AND FOURTEENTH AMENDMENTS OF THE U.S. CONSTITUTION WHEN
THEY DENIED HIM A PAROLE DATE BASED ON P.C. §3041(b) BECAUSE
HIS CONVICTION WAS "A TERRIBLE OFFENSE".

The key to understanding who, how and the "exception" to setting a parole date is by tracing the statute back to when it was enacted ... (July 1, 1977) (SB42), and what life prisoners the Board was required to hold hearings for.

The Uniform Determinate Sentencing Act (DSL) became effective July/1977, §3041(a)(b) were enacted as part of the (DSL) and reads today as it did in 1977. Requiring the Board to "normally" set parole dates one year before a life prisoners M.E.P.D., (subd. (a)) with (subd. (b)) providing a narrow exception to setting a parole release date for "particularly egregious offenses."

The class of life prisoners the Board was required to see after the enactment of the DSL on July 1, 1977, were (1st) degree murders and 'kidnappers', of whom both of these sentences had to serve seven (7) years before becoming eligible for parole. P.C. §3041(a)(b) was enacted 16 months before Initiative Measure Proposition 7, which increased the murder penalty of (1st) degree murder from "life" to "25 years to life" and changed (2nd) degree murder from a "determinate" term of 5, 6 or 7 years to an "indeterminate" sentence of "15 years to life."

Before Proposition 7, of November, 1978, the Board was required to see (2) main classes of life offenses of (1st) degree murder and 'kidnapping'. P.C. §3041(a) required the Board to "normally" set parole dates for those (2) classes of life sentences. The "EXCEPTION" to setting a parole date when §3041(b) is applied; offense(s) that were such in gravity; so especially grave; so particularly egregious that public safety concerns required a longer period of incarceration for these individuals and a parole date could not be set at the initial hearing.

In People v. Anderson, 6 Cal.3d 628 (1972), the California Supreme Court held that the 'then' California death penalty law was impermissibly cruel, and

1

1    128 prisoners whose sentences were fixed at death would now have their sentences

2    reduced to 'life' with the possibility of parole (there was no life without the

3    possibility of parole in California at that time). (See, e.g., In re Stanworth,

4    (1982) 33 Cal.3d 176. In 1966 Stanworth was sentenced to death following a plea

5    of guilty to two (2) counts of 'first' (1st) degree murder. Stanworth was one

6    of the prisoners who came off of death row and was given a term of life with a

7    possibility of parole. In 1979 Stanworth was given a parole date after 13 years

8    and served a total of 17 years at the time of his release on parole.

9        When the DSL was enacted, July 1, 1977, this group/class of 128 prisoners,

10   that came off of death row, after serving 7 years were eligible for parole.

11   However, Sec. (b) of P.C. §3041 enabled the Board to indefinitely deny parole

12   because their offense(s) were of such gravity ("particularly egregious") in nature

13   that public safety concerns allowed the Board to deny setting a uniform term under

14   subd. (a) of §3041.

15       The offense(s) of the 128 prisoners that came off of death row were not

16   comparable to 'normal' first (1st) degree murder or kidnapping offenses, under

17   the provisions of the Uniform Proportionate Punishment for base terms in the Boards

18   Matrix guidelines for similar offenses. All of the 128 prisoners convictions had

19   "special circumstances" (initially warranting the death penalty sentence). P.C.

20   §3041(a) requires the Board to establish criteria not only for the setting of

21   a parole release date, but also criteria for the "EXCEPTION" to setting a parole

22   date under §3041(b) and §3041.5(b)(2). This criteria to the "exception" is

23   implemented in the Board's 1978 amended guidelines, Title 15 C.C.R.

24   §2281(c)(1)(A)(B)(C)(D), et seq..

25       The first amendment of subsection (c) filed 6/28/1979, (Register 79, No.

26   26): "Circumstances tending to show unsuitability", "the prisoner committed the

27   offense in an especially heinous, atrocious or cruel manner."

28       The language and circumstances were adopted from Proposition 7's section

                                        2

§190.2(a)(14). P.C. §190.2 ONLY applies to prisoners with a sentence of life without the possibility of parole or death penalty, NOT for prisoners serving a (1st) or (2nd) degree murder sentence with the possibility of parole. Compare Title 15 C.C.R. §2281 and §2402.

The circumstances tending to show unsuitability ... are the "EXCEPTIONS" to setting a parole release date, which, prior to the sentences of 15/25 years to life of Proposition 7 (1978) had a VERY NARROW application. The "exception" was not NORMALLY applied but was meant to be (per legislative intent), applied to the 128 prisoners that came off of death row.

The Board is violating Petitioner's due process rights by unconstitutionally applying the "exception", §3041(b) to ALL 'to life' prisoners of Proposition 7. By applying P.C. §3041(b) to ALL 'to life' prisoners, making the EXCEPTION the NORM, the Board has effectively destroyed the proportionality contemplated by P.C. §3041(a).

By legislative intent, P.C. §3041(b) CANNOT be applied to (1st) or (2nd) degree murder sentences (15/25 years to life), "unless" the exception is proven.

In summary, the enactment of P.C. §3041(a) of 1977, provided that parole dates shall normally be set for (1st) and (2nd) degree murder sentences, with subdivision (b) serving as the NARROW EXCEPTION and only being applied to offenses that are not of the normal first or second degree murder ... the 128 prisoners that came off of death row had special circumstances that the "exception" was intended (by legislative intent) to apply to.

In People v. Thompson, 29 Cal.Rptr. 847 (Cal.App.2 Dist. 1994); a case involving a fire bombing of a residence after midnight and a 2 year old child was killed, the court held that:

> "Given this deference to the Legislature, defendant is wise not to challenge the sentence imposed by the Legislature for those who are convicted under 12310. That branch has determined this crime is particularly dangerous to human life and those who are convicted of causing death by igniting a destructive device should be sure to suffer

a penalty <u>separate</u> <u>and</u> <u>apart</u> <u>from</u> <u>the</u> <u>murder</u> <u>statutes</u>. The penalty challenged herein is calculated to advance a critically important social policy for the protection of the public at large, i.e., the deterrence of a <u>PARTICULARLY</u> <u>EGREGIOUS</u> type of life-endangering criminal conduct." (People v. Isitt (1976) 55 Cal.App.3d 23, 31, 127 Cal.Rptr. 279; People v. Laursen (1972) 8 Cal.3d 192, 198, 104 Cal.Rptr. 425, 501 P.2d 1145.).

At pp.851-852: "As noted above, the legislative determination has made that the crime involved in this case is a <u>more</u> <u>serious</u> <u>crime</u> <u>than</u> <u>premeditated</u> <u>murder</u> and deserves the augmented penalty associated with it. The use of destructive devices, Molotov cocktails in this instance, which can inflict indiscriminate and multiple deaths, marks defendant as a greater danger to society than a person who premeditates the murder of a single individual." (Emphasis added throughout).

It is apparent that the court followed "legislative intent" for cases that were "particularly egregious" in sentencing Thompson. As asserted by Petitioner above, §3041(b) was enacted by the Legislature for such purposes that the "exceptions" to, separate and apart from the murder statutes, would apply. Thompson, [3] at 850.

A crime is "particularly egregious" when elements of 'special circumstances' were found that would authorize a sentence of life without the possibility of parole or the death penalty. In <u>In re Leslie Van Houten</u>, 116 Cal.App.4th 339, (2004). (Note* in Van Houten, the jury found special circumstances true at her trial).

Petitioner's conviction clearly falls within the Matrix (although under California Constitution Article II, §10(c) is illegal...), that the Board is "supposed to follow", and, there were no special circumstances found to be true at his trial thus the Board cannot apply subd. (b) of §3041 to his suitability hearing. Additionally, several courts have used the language of "ax murder", "execution style murder", when compared to "normal", "ordinary run", "common scenario", "conventional" when addressing <u>NON</u> particularly egregious murder cases, (Citations omitted).

Properly viewed, under the facts presented above, Petitioner's commitment offense simply cannot be so "particularly egregious" as to justify a denial of

4

1    parole pursuant to P.C. §3041(a)(b).

2    Petitioner asserts that, in the Board's DECISION, there is not one word

3    indicating the usage of <u>particularly egregious</u> or any other language that could

4    be remotely construed as such. The only language used to deny him a parole date

5    were: "...this commitment offense was a - a terrible offense"; "The motive for

6    the crime was very trivial in relation to the offense." (Unchangeable/immutable

7    factors).

8    In, In re Ramirez, Marin County Superior Court, Case No. SC109829A (9-13-

9    2000), (94 Cal.App.4th 549), the court held that parole could not be withheld

10   absent a <u>factual</u> finding that the offense was "particularly egregious."

11   Petitioner asserts that, the triviality of the crime (unchangeable/immutable

12   factor) claim is only supported by Title 15 C.C.R. §§2400-2411, which were

13   unconstitutionally enacted in violation of the Referendum Process, see Cal. Const.

14   Art. II, §10(c).

15   The Board's decision was arbitrary and capricious as there was no legitimate,

16   logical reason for the denial of a release date as Petitioner has served over

17   the minimum term for a second degree offense and is now starting to serve a

18   sentence of first degree murder.

19   State parole law provides inmates a liberty interest in parole protected

20   by due process. (In re Rosenkrantz (2002) 29 Cal.4th 616, 621: McQuillion v. Duncan

21   (9th Cir. 2002) 306 F.3d 895, 901-903).

22   Petitioner's protected liberty interest required his being granted parole

23   because he has been eligible since 2003 and has been evaluated <u>NOT</u> to pose an

24   "unreasonable risk of danger" to public safety, the state's parole suitability

25   standard/determinant. (See, 15 C.C.R. §§2401, 2402(a).)

26   Due process required the findings supporting Petitioner's parole decision

27   to be based on a weighing of all relevant, reliable evidence in the record (In

28   re Minnis (1972) 7 Cal.3d 639, 646; In re Ramirez (2001) 94 Cal.App.4th 549, 569-

572; See, Rosenkrantz, 29 Cal.4th at p.655; 15 C.C.R. §2402(b)), using the preponderance of the evidence standard. Decisions determining parole <u>must</u> be based on "good cause". (In re Powell (1988) 45 Cal.3d at p.901; In re Brown (1967) 67 Cal.2d 339, 342; In re McClain (1960) 55 Cal.2d 78, 87; In re Caswell (2001) 92 Cal.App.4th 1017, 1024; In re Clutchette (1974) 39 Cal.App.3d 561, 565; In re Monzo (1973) 33 Cal.App.3d 144, 147.) The Board's regulations define "good cause" as "a preponderance of the evidence". (See, 15 C.C.R. §2000(b)(50).)

The California Supreme Court recently stated, March 26, 2008, in the case of In re Ronald Singler, 73 Cal.Rptr.3d 864 at p.874 (Cal.App.3d 2008): "Accordingly, the relevant test is not whether some evidence supports the reasons cited for denying parole, "but whether some evidence indicates [an inmate's] release unreasonably endangers public safety." (In re Lee, 143 Cal.App.4th at p.1408, fn. & italics omitted; See also, In re Tripp (2007) 150 Cal.App.4th 306, 313 [58 Cal.Rptr.3d 64] ["evidence <u>must</u> substantiate the ultimate conclusion that the prisoner's release <u>currently</u> poses an unreasonable risk of danger to the public"].) (Emphasis added).

Parole denial based solely on some evidence of an egregious commitment offense may violate due process if the panel did not duly consider and weigh in its decision all of the evidence in the record favoring parole suitability. (In re Scott (2005) 133 Cal.App.4th 573, 594 et seq.; See also, 15 C.C.R. §2402(b); In re Minnis, supra, 7 Cal.3d at p.646; In re Capistran (2003) 107 Cal.App.4th 1299, 1306.)

Although a prisoner like Petitioner who qualifies for parole may initially be found unsuitable if the commitment offense was particularly egregious compared to other instances of the offense, such cases are exceptions, and commitment offenses or prior criminal conduct cannot justify repeated or interminable parole denials. (See, Biggs v. Terhune, 334 F.3d 910, 916 (9th Cir. 2003); Sass, 461 F.3d 1123 (9th Cir. 2006); Irons v. Carey, 479 F.3d 658 (9th Cir. 2007); Hayward

1    v. Marshall, 512 F.3d 536, 545–547 (9th Cir. 2008); In re Scott (2005) 133

2    Cal.App.4th 573, 595; In re Lawrence (2007) 150 Cal.App.4th 1511, 1554–1556; In

3    re Gray (2007) 151 Cal.App.4th 379; In re Barker (2007) 151 Cal.App.4th 346,

4    374–375; Martin v. Marshall (N.D. Cal. 2006) 431 F.Supp.2d 1038, 1046–1047 amended

5    at 448 F.Supp.2d 1143; Sanchez v. Kane (C.D. Cal. 2006) 444 F.Supp.2d 1049, 1062;

6    Rosenkrantz v. Marshall (C.D. Cal. 2006) 444 F.Supp.2d 1063, 1080–1087.)

7        If the Board uses offense facts and other unchangeable (historic or immutable)

8    factors to justify a finding of parole unsuitability, it must articulate some

9    nexus to the State's codified standard explaining how such factors make petitioner

10   a current "unreasonable risk of danger" to public safety is paroled; otherwise

11   such offense factors do not amount to "some evidence" that granting parole creates

12   an "unreasonable risk of danger" to public safety. See, 15 C.C.R. §§2401, 2402(a);

13   In re Lee (2006) 143 Cal.App.4th 1400, 1407–1412; In re Elkins (2006) 144

14   Cal.App.4th 475, 502.

15       If the Board's forensic psychologists, having considered the entire record

16   including the commitment offense, determine that Petitioner's parole poses a low

17   risk of danger to public safety, the Board, whose commissioners have no particular

18   qualifications by education or training to predict recidivism, in reciting that

19   Petitioner's parole would pose an unreasonable risk of danger to public safety,

20   must point to evidence demonstrating the contrary to be true, i.e., evidence in

21   the record showing that the factors the Board recites render Petitioner as an

22   unreasonable public safety risk despite their forensic experts' contrary

23   determinations, see, In re Roderick (2007) 154 Cal.App.4th 242, 272, fn.27; In

24   re Smith (2003) 114 Cal.App.4th 343, 348–349 (such findings amount to

25   "unsubstantiated speculation and as such are arbitrary and capricious.").

26       Denial of parole based solely on the facts of the commitment offense and

27   prior criminality may deny due process also when the prospective parolee has served

28   a prison term in excess of that prescribed by the regulations of an offense with

7

1    those facts, particularly if the term served at that point exceeds "the minimum

2    number of years to which he had been sentenced" (Irons v. Carey (9th Cir. 2007)

3    479 F.3d 658, 664-665), or if it exceeds the term prescribed for the most

4    aggravated form of the offense. See, Rosenkrantz, supra, 29 Cal.4th at pp.689-690.

5        Because the forensic evaluation of Petitioner's parole risk is well below

6    the State's codified "unreasonable risk of danger" standard, requiring a grant

7    of parole (P.C. §3041; 15 C.C.R. §§2401, 2402(a)), because no evidence in the

8    record supports the "unreasonable risk" determinant, because the Board lacked

9    the expertise necessary to disregard and/or override the forensic determinations,

10   and because the Board set forth no contrary evidence demonstrating Petitioner's

11   parole to currently pose an unreasonable danger to public safety, denial of parole

12   on this basis flunks the "some evidence" test and violated petitioner's right

13   to due process. (See, In re Smith (2003) 114 Cal.App.4th 343, 369; In re Roderick

14   (2007) 154 Cal.App.4th 242, 272, fn.27. In re Smith (2003) 114 Cal.App.4th 343,

15   348-349 (such findings amount to "unsubstantiated speculation and as such are

16   arbitrary and capricious.").

17       Petitioner's commitment offense cannot itself constitute some evidence of

18   unsuitability for parole because it fails to establish a basis for determining

19   that Petitioner continues to pose an unreasonable risk of danger to society. See,

20   Brown v. Kane, 2007 WL1288448 (N.D. Cal. 2007) at *7; Blankenship v. Kane, 2007

21   WL1113798 (N.D. Cal. 2007) at *10; Thomas v. Brown, 2006 WL3783555 (N.D. Cal.

22   2006) at *6; Rosenkrantz v. Marshall, 444 F.Supp.2d 1063, 1086 (C.D. Cal. 2006);

23   Hayward v. Marshall, 512 F.3d at 545-547 (9th Cir. 2008) ("The court determined

24   that the Governor's findings were unsupported by evidence in the record, id. at

25   546, or were based on unchanging factors which occurred twenty-seven to fifty

26   years ago and did not constitute evidence that the prisoner would pose a danger

27   to public safety if released from prison, id. at 545-547.

28       As these recent state and federal decisions hold, due process and the State's

parole scheme (P.C. §3041; 15 C.C.R. §§2401, 2402(a)) clearly require the articulation of a nexus between the offense facts recited and a prospective parolee's <u>current</u> parole risk. Because none was set forth by the Board or exists, denial of parole based on a recitation of offense factors was arbitrary and violated Petitioner's due process under the minimal "some evidence" standard, particularly after Petitioner has been evaluated (several times) by the Board's forensic experts not to pose an unreasonable risk of danger to public safety if paroled.

Put another way, in order to apply the "some evidence" standard, a reviewing court must ask the pivotal question, "some evidence of WHAT"? The question is answered by the State's parole determination statute: The offense facts must demonstrate that the "timing" or "gravity" of the commitment offense renders the inmate's parole a current public safety risk (every prospective parolee was dangerous when he or she committed murder). (P.C. §3041(b).)

What did the Board say about the "timing" of Petitioner's offense that makes him a <u>current</u> parole risk to public safety? NOTHING.

What did the Board say about how or why the "gravity" of the offense makes Petitioner a <u>current</u> public safety risk? NOTHING. The Board offered no hint as to how the facts it disputes still serve to make Petitioner a public safety risk if paroled.

Recent Court of Appeal decisions explain in further detail why due process requires that, in order to deny parole the Board must irrespective of the facts of the commitment offense or subsequent events, set forth evidence suggesting that the subject still would pose an unreasonable risk to public safety if paroled:

> Thus, it is not enough that there is some evidence to support the factors cited for denial; that evidence must also rationally support the core determination required by the statute before parole can be denied, i.e., that a prisoner's release will unreasonably endanger public safety. (In re Lee (2006) 143 Cal.App.4th 1400, 1408, 49 Cal.Rptr.3d 931; In re Scott (2005) 133 Cal.App.4th 573, 595, 34 Cal.Rptr.3d 905 (Scott II) "Some evidence of the existence of a particular factor does not

necessarily equate to some evidence the parolee's release unreasonably endangers public safety." (Lee, supra, 143 Cal.App.4th at p.1408). The dissent's proposed standard of review would require affirmation of every Board decision if even a single unsuitability factor is found, regardless of whether that factor would rationally support a conclusion, based on individualized consideration, that the inmate would pose an unreasonable risk of danger...If this were the standard, the courts would indeed be relegated to the status of potted plants. (Scott I, 119 Cal.App.4th at p.898, 15 Cal.Rptr.3d 32).

The only ground for a parole denial is found in P.C. §3041(b), which provides that a release date shall be set "unless (the Board) determines that ... consideration of the public safety requires a more lengthy period of incarceration." Interpreting that standard, our high court has required that the Board's decisions not be arbitrary or capricious (Rosenkrantz, supra, 29 Cal.4th at p.677, 128 Cal.Rptr.2d 104, and that the Board's decisions be made "on relevant grounds" and supported by the evidence (Dannenberg, supra, 34 Cal.4th at p.1071). We read those directives as mandating that the Board, in its decisions, must articulate reasons that are grounded in evidence and rationally related to the statutory basis for denial. The dissent's proposed standard, we think, goes beyond even the differential "some evidence" standard and would annul any meaningful judicial review. Were we required to engage in the kind of prodigious efforts undertaken by our dissenting colleague to shore up the Board's decisions denying parole, affirmance would be guaranteed in every case. (In re Roderick, supra, 154 Cal.App.4th at p.263).

Finally, as has been recently stated, because of the overarching consideration is public safety, the test in reviewing the Board's decision denying parole "is not whether some evidence supports the reasons (the Board) cites for denying parole, but whether some evidence indicates a parolee's release unreasonably endangers public safety." (Lee, supra, 143 Cal.App.4th at p.1408, 49 Cal.Rptr.3d 931, fn. omitted.) As discussed above, the "overarching" factor determining whether parole should be granted or denied is whether the criminal poses "an unreasonable risk of danger to society." (Scott II, supra, 133 Cal.App.4th at p.591, 34 Cal.Rptr.3d 905; §2281(a); Lee, supra, 143 Cal.App.4th at p.1400, 49 Cal.Rptr.3d 931.) As also discussed above. every psychological evaluation in the record dating back at least to 1999 has concluded Barker would pose little or no danger to public safety if released on parole. (In re Barker, supra, 151 Cal.App.4th at p.375; emphasis added).

In sum the Board would preclude Petitioner's parole (forever — neither his undisputed maximum parole suitability otherwise and low public safety risk, nor the facts of the offense, can ever improve), for that very reason that he is suitable for parole — he has served more than the term prescribed for the facts of his offense, established an exemplary post-conviction record of reform for

more than the past 17 years, and poses no further risk of danger to public safety.

## CONCLUSION

The finding set forth by the Board, that Petitioner currently poses an unreasonable risk of danger to public safety is unsupported, not even under the minimal "some evidence" standard of review. No contrary evidence exists, his (several) psychological evaluations were positive of release.

Petitioner has a mandatory INS hold for deportation under the Patriot Act, he will be deported and cannot furnish 'job offers', 'residence in California' or 'letters of support in California'. The law does not require parole plans or job offers especially from a foreign country, what the law and regulations do require is that the parolee have 'marketable skills' which Petitioner does have.

Because the Board's grounds/excuses for its decision to deny release for deportation, boilerplate phrases and adjectives, were unsupported by "some evidence", inapposite to the record, applicable to all such offenses, irrelevant to suitability for deportation, and/or arbitrary in the extreme, and because the Board did not determine or establish a nexus and could not have found any evidence supporting a notion that Petitioner's offense was "a terrible offense" compared to other life offenses such as Rosenkrantz and Van Houten, the denial of Petitioner's release for deportation based on the unchanging factors of his offense has abrogated his right to due process and his liberty interest in release to the INS for deportation, and, has converted his sentence of second degree murder, "15 years to life" to a life sentence without parole under P.C. §190.2.

## PRAYER FOR RELIEF

1). Order Respondents to show cause why Petitioner is not entitled to a release date;

2). Order the Board to set a release date for deportation consistent with the "some evidence" standard:

3). Grant Petitioner such other relief as this Court deems just and proper

11

1  in the interest of justice.

2  DECLARATION

3      I declare under penalty of perjury that the foregoing is true and correct.

4  Executed this __6__ day of June, 2008, at Soledad, California, State Prison, County

5  of Monterey.

6

7

8                Marco Marroquin

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# Attachment 1

PETITION FOR REVIEW

IN THE

SUPREME COURT OF CALIFORNIA

Comes now, Marco Marroquin, Petitioner in pro per, and through this verified petition for review requests that this Honorable Court review the denial(s) from the Appellate and Superior Courts as both are without a 'reasoned opinion', semi-post card denials, and relying solely on the commitment offense, past historical events.

Petitioner contends that the denial by the Superior Court was a miscarriage of the intent of the habeas corpus act as the Superior Court appeared to not even read and consider the petition but chose to apply the "some evidence" standard to support the Board's form/rote language for parole suitability denial.

The Superior and Appellate Court fell into the same form/rote language that was applied by the Board, virtually reciting the Board's decision without reading and/or considering Petitioner's claims and the true facts of rehabilitation with his lack of education, his constant efforts to learn, his virtually clean prison record, his family support for returning to his home country of Guatemala (INS hold for deportation, in the record).

As this Court will discover upon a full and fair reading of this petition for review, the lower courts were obligated to consider 'all' issues and not just make a finding based on "some evidence" of past historical events to support the Board's denial and the lack of a nexus to support a current threat level.

In the case of City of Auburn v. Quest Corp., 260 F.3d 1160 (9th Cir. 2001): Under the Supremacy Clause, the state courts are obligated to apply and adjudicate federal claims that were fairly presented to them.

Obviously Petitioner being a lay man at law reasonably believed that the Supremacy Clause in City of Auburn, supra, would apply to the Superior and Appellate Courts as well. As is established in the instant petition for review,

1

1  CLAIM NUMBER THREE was completely independent of being found suitable for parole

2  by the Board, CLAIM NUMBER SIX, also pertaining to an independent finding by the

3  Board without having to be found suitable was further by-passed by the lower courts

4  in their haste to pass over and avoid review of substantial matters presented.

5      The Superior and Appellate Courts chose to not follow the California and

6  United States equal protection and due process provisions, and, failed to follow

7  U.S. Supreme Court authority as stated in the petition for review.

8      The Appellate Courts assertion that "The record shows that the circumstances

9  of Petitioner's second-degree murder offense "exceed the minimum elements necessary

10  to sustain a conviction" of second-degree murder." Also, "The motive for the

11  offense was very trivial, and petitioner deliberately returned to the bar with

12  a loaded gun and callously shot the un-armed victim.", are without merit.

13      First, the denial of suitability must be based on a 'current' threat level

14  to the public and although, as the appellate court stated, "Denial of parole may

15  be based upon the particular circumstances of the inmate's commitment offense."

16  See below.

17      As the recent Court of Appeals in, In re scott, 133 Cal.App.4th 573, 34

18  Cal.Rptr.3d 905 (2005) regarding the continuous use of conduct prior to

19  imprisonment wrote:

20      "The Governor's assumption that a prisoner may be deemed unsuitable
for release on the basis of the commitment offense 'alone' is correct,
21  (Rosenkrantz, 29 Cal.4th at p.682), but the proposition must be properly
understood. The commitment offense is one of only two factors indicative
22  of unsuitability a prisoner can not change (the other being his 'previous
record of violence'). Reliance on such an immutable factor 'without
23  regard to or consideration of subsequent circumstances' may be unfair
(In re Smith, (2003) 114 Cal.App.4th 343, 372), and 'runs contrary to
24  the rehabilitative goals espoused by the prison system and could result
in a due process violation.' (Biggs v. Terhune, 334 F.3d at p.917).
25  The commitment offense can negate suitability only if the circumstances
of the crime reliably established by evidence in the record rationally
26  indicate that the offender will present an unreasonable public risk
if released from prisonm. Yet, the predictive value of the commitment
27  offense may be very questionable after a long period of time. (Irons
v. warden of California State Prison - Solano (E.D. Cal. 2005) 358
28  F.Supp.2d 936, 947, fn.2)." (Id. at pp.919-920)."

1    Regarding the commitment offense Petitioner committed 15 years ago, this

2 passage of time was discussed in WEN LEE, 2006 DJDAR 13961, as to Mr. Lee's parole

3 denial on a conviction of "attempted premeditated murder, and, second degree murder

4 of Mrs. Soong and two firearm enhancements" in which the Court stated that:

> "Lee's crimes almost 20 years ago have lost much of their usefulness
> in foreseeing the likelihood of future offenses than if he had committed
> them five or ten years ago. (In re Scott, supra, 133 Cal.App.4th 573,
> 595]past crime's value for predicting future crime diminishes over
> time])." (Id. at 13964-13965).

8    The Board's reliance on the commitment offense violates due process because

9 the facts surrounding the offense do not now constitute 'some evidence' with 'some

10 indicia of reliability' of petitioner's dangerousness. Hill, 472 U.S. at 455;

11 Biggs, 334 F.3d at 917; Irons, 358 F.Supp.2d at 947; Masoner v. State 2004 WL

12 1080177 *1-2 (C.D. Cal. 2004). (Id. at 816).

13    Under the holdings of Smith (Second District), Scott I & II (First District),

14 and Shaputis (Fourth District) (Courts of Appeal), the Board's boilerplate findings

15 that every crime, regardless of the facts, shows an "exceptionally callous

16 disregard for human suffering", and/or committed in a "dispassionate, and/or

17 calculated manner", of "callous manner", cannot be sustained. These criteria 'are'

18 inclusive in the Board's Matrix thus establishing them as unexceptional.

19    The instant petition before the Court is no more "callous" or "trivial" than

20 the following recent cases from the appellate courts of California. In re scott,

21 supra, 119 Cal.App.4th at p.891: "All second degree murders by definition involve

22 some callousness - i.e., lack of emotion or sympathy, emotional insensitivity,

23 indifference to the feelings, and suffering of others". Rather, the inquiry is

24 whether among murders, the one committed by Lee (supra), was particularly heinous,

25 atrocious or cruel. (In re Ramirez (2001), 94 Cal.App.4th 549, 570, disapproved

26 on another point by In re Dannenberg (2005), 34 Cal.4th 1061, 1082-1083, 1100).

27 By that measure, Lee's crimes were more commonplace that egregious."

28    "Comparing Lee to defendants for whom the Board or Governor properly denied

parole because the defendant's crimes were atrocious is illuminating." Rosenkrantz, 29 Cal.4th at p.678; In re Dannenberg, 34 Cal.4th at p.1095; In re McClendon, (2003) 113 Cal.App.4th 315 at p.321-322; In re Burns, (2006) 136 Cal.App.4th 1318 at pp.1327-1328; In re Van Houten, (2004) 116 Cal.App.4th 339, at pp.346, 351, 366; In re Deluna, (2005) 126 Cal.App.4th 585 at p.593; In re Lowe, 130 Cal.App.4th 1405 at p.1414; In re Morrall, (2002) 102 Cal.App.4th 280.

Petitioner contends that, in the above case of WEN LEE and the following case of Weider, the State of California has established what offenses and their circumstances constitute the terminology of "especially or exceptionally callous, particularly egregious, heinous, atrocious or cruel." WEN LEE or Weider did not fall under these categories and neither does Petitioner's commitment offense, because, the language used by the Appellate Court to deny Petitioner a fair review was "callous", and that was no more than what is required for the conviction of the offense.

See also, In re Bernard John Weider, Sixth Appellate District Court of Appeal, 2006 DJDAR 15795, discussing "callous" disregard for human suffering, where Weider "took a weapon into a bar, into a public place". "The evidence shows that he was angry and distraught".

In a most recent case, which applied Scott dicta: Willis v. Kane, 485 F.Supp.2d, p.1127 (N.D. Cal. 2007) (As cited in Cooper (released on parole 8-9-2007): "We agree that Cooper's crime was callous when he beat his wife with a sledgehammer. However, the facts of this case were no more callous than most such offenses and not beyond the minimum for malice aforethought." (See, e.g., Smith II, 114 Cal.App.4th at p.367.)

## CONCLUSION

The facts of Petitioner's case establish that he is entitled to a parole release date (turned over to INS for deportation), that, the Superior and Appellate Courts did not give Petitioner's case proper review and consideration under

4

California and United States due process and equal protection claims.

Petitioner asserts that his Psychological Evaluation establishes that he is not a 'current' risk to society. Also see RECIDIVISM study below.

## RECIDIVISM STUDIES

The purpose of this information is to bring to the court's attention of studies done several years ago regarding recidivism rates among inmates that the Board appears to ignore, given the no parole policy due to alleged threat or risk level to the public safety, always used by the Board and/or governor as excuses for parole suitability denials, at the current rate of 99% denials, I submit the following information.

"Studies of parole success repeatedly indicate that those who commit murder are among the best parole risks." Allen, Eldridge and Latessa, Vito, Probation and Parole in America, p.254, 1985, citing Niethercut, 1972. Both with regard to the commission of felonies in general and the crime of homicide, no other offender has such a low rate of recidivism. Bedau, Hugo Adams, The Death Penalty in America, 3rd Ed., p.180, n.3, 1980. "Paroled murderers actually present some of the best parole risks." Bedau, Hugo Adams, The Death Penalty in America, 3rd Ed., p.180, n.3, 1980, citing NCCD newsletter, Uniform Parole Reports, 1972, p.2. "Compared with other groups, murderers are actually the best parole risks." Bedau, Hugo Adams, The Death Penalty in America, 3rd Ed., p.180, n.3, citing Stanton p.149, 1969. Two studies indicated that only three (3) in 10,000 and six (6) in 10,000 convicted of murder commit another crime. Bedau, Hugo Adams, The Death Penalty in America, 3rd Ed., pp.176-179, 1980. After conducting a study for the California Board of Prison Terms (1983-1987) it was concluded that no one released after committing a murder had been returned to prison for murder. Ellwood, Eldridge T., PH.D, Research Projects On Life Prisoners, p.3, April 1989, California BPT. "As a matter of statistical probability, murderers released from a prison are

5

far less likely to commit a new crime than any other category of offender." Orland, Leonard, Justice, Punishment, Treatment, p.425, 1973. "Many murderers could be released immediately after conviction with little likelihood of offending again." Von Hirsh, Andrew, Doing Justice, Report On The Committee For The Study Of Incarceration, p.126, 1976. These authorities, from some of the most respected sociologists in our country, reveal the fallacy of assumptions regarding the dangerousness of those convicted of murder.

In reference to a murder case: Hending v. Smith, 781 F.2d 850 (11th Cir. 1986) ["[I]t is a matter of general knowledge that except for professional killers, few people commit more that one murder in a life time. It is a crime involving a specific interpersonal crisis, and not a habitual offense."]; Rosenkrantz, 444 F.Supp.2d 1063, 2006 WL 2327085 at *12-17).

Respectfully submitted,

Marco Marroquin

Dated: August 20, 2007

6

# Attachment 2

FILED

MAY 2 0 2008

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

MARCO MARROQUIN,

        Petitioner,

    vs.

BEN CURRY,

        Respondent.

_____/

No. C 07-6098 PJH (PR)

**ORDER GRANTING
RESPONDENT'S MOTION TO
DISMISS; DISMISSAL WITH
LEAVE TO AMEND**

This is a habeas case filed pro se by a state prisoner. It formerly was assigned to Judge Martin Jenkins and now has been reassigned to the undersigned. Respondent has responded to the order to show cause with a motion to dismiss the petition as mixed, and petitioner has opposed the motion. For the reasons set out below, the motion will be granted.

**DISCUSSION**

The grounds for relief which petitioner included in his federal petitioner were that: (1) he has a liberty interest protected by due process in being found suitable for parole; (2) the Board violated his right to due process in their application of 15 California Code of Regulations §§ 2400-2411 to "over-ride" California Penal Code § 3041(a),(b); (3) the Board violated his right to equal protection by failing to consider setting his term and failing to fix a primary term; (4) the Board violated his right to due process when they denied parole based on the facts of his commitment offense; (5) the Board violated his right to due process by denying parole based on a "predetermined outcome;" and (6) the Board violated his right to due process by holding parole suitability hearings for a foreign national subject to deportation, such as petitioner. Respondent contends that only the fourth issue

United States District Court
For the Northern District of California

1 is exhausted, making this a mixed petition.

2     An application for a federal writ of habeas corpus filed by a prisoner who is in state

3 custody pursuant to a judgment of a state court may not be granted unless the prisoner

4 has first exhausted state judicial remedies, either by way of a direct appeal or in collateral

5 proceedings, by presenting the highest state court available[1] with a fair opportunity to rule

6 on the merits of each and every issue he or she seeks to raise in federal court. *See* 28

7 U.S.C. § 2254(b),(c); *Granberry v. Greer*, 481 U.S. 129, 133-34 (1987). Petitioner has the

8 burden of pleading exhaustion in his or her habeas petition. *See Cartwright v. Cupp*, 650

9 F.2d 1103, 1104 (9th Cir. 1981).

10     The United States Supreme Court held in *Rose v. Lundy*, 455 U.S. 509 (1982), that

11 federal courts must dismiss a habeas petition which contains one or more unexhausted

12 claims. *Id.* at 522 (1982). If the petition combines exhausted and unexhausted claims,

13 *Rose v. Lundy* requires dismissal of the entire habeas petition without reaching the merits

14 of any of its claims. *Guizar v. Estelle*, 843 F.2d 371, 372 (9th Cir. 1988). However, the rule

15 is not as absolute as might first appear. *Rose* itself provides that the dismissal must be

16 with leave to amend to delete the unexhausted claims; if they are deleted, the court can

17 then consider those which remain. *See Anthony v. Cambra*, 236 F.3d 568, 574 (9th Cir.

18 2000). And there are two other exceptions: One is that when the petition fails to raise

19 even a colorable federal claim, it may be denied even if it is partly or entirely unexhausted,

20 28 U.S.C. § 2254(b)(2), and the other is that rather than dismiss, the court may stay a

21 mixed petition to allow the petitioner to return to state court to exhaust the unexhausted

22 issue or issues, *Rhines v. Weber*, 544 U.S. 269, 277-78 (2005).

23     Petitioner's state habeas petition was denied in the California Court of Appeal.

24

25     [1] In California, the supreme court, intermediate courts of appeal, and superior courts all have original habeas corpus jurisdiction. *Nino v. Galaza*, 183 F.3d 1003, 1006 n.2 (9th Cir.

26 1999). Although a superior court order denying habeas corpus relief is non-appealable, a state prisoner may file a new habeas corpus petition in the court of appeals. *Id.* If the court

27 of appeals denies relief, the petitioner may seek review in the California Supreme Court by way of a petition for review, or may instead file an original habeas petition in the supreme

28 court. *Id.* at 1006 n.3.

United States District Court
For the Northern District of California

2

1   Petitioner then petitioned for review in the California Supreme Court. Respondent
2   contends that the petition for review was insufficient to "fairly present" any of petitioner's
3   issues except his fourth issue.

4       The exhaustion requirement is satisfied only if the federal claim has been "fairly
5   presented" to the state courts. *Crotts v. Smith*, 73 F.3d 861, 865 (9th Cir. 1996). A claim is
6   "fairly presented" only if the petitioner either referenced specific provisions of the federal
7   constitution or federal statutes, or cited to federal or state case law analyzing the federal
8   issue. *Peterson v. Lampert*, 319 F.3d 1153, 1158 (9th Cir. 2003) (en banc). The specific
9   factual basis of the federal claim also must be presented to the highest state court. *Kelly v.*
10  *Small*, 315 F.3d 1063, 1067-69 (9th Cir. 2003), *overruled on other grounds*, *Robbins v.*
11  *Carey*, 481 F.3d 1143, 1148 (9th Cir. 2007) (finding unexhausted ineffective assistance of
12  counsel and prosecutorial misconduct claims where specific instances of ineffectiveness
13  and misconduct asserted in federal petition were neither in the California Supreme Court
14  petition nor discussed by the court of appeal).

15      In the form portion of his petition for review in the California Supreme Court
16  petitioner listed his first ground as "Due process and equal protection violations; see
17  attached petition." Ex. 1 at 3. In the subsections of ground one calling for "[s]upporting
18  facts" and "[s]upporting cases...," he wrote "[s]ee attached petition and Motion for Judicial
19  Notice attached hereto." *Id*. For ground two, he wrote exactly the same thing as in ground
20  one. *Id*. at 4.

21      It therefore is clear that the issue which was presented in the attached typed
22  document headed "Petition for Review in the Supreme Court of California" is exhausted. In
23  that document petitioner contended that the circumstances of his offense did not, given
24  the passage of time, constitute "some evidence" to support the denial of parole. *Id*. at
25  (attachment) 3. This is his fourth issue here, the one that respondent concedes is
26  exhausted.

27      But what of the other five issues? The non-form attachment "Petition for Review in
28  the Supreme Court of California" came to an end after presenting issue four. Page six of

3

1 that attachment carries petitioner's signature. Following that is an unlabeled minute order
2 from the superior court denying a state petition, then a document headed "California Court
3 of Appeals [sic][;] Second Appellate District." In it petitioner states that he "herein appeals
4 to the [California Court of Appeal]," and complains about the superior court's decision. It
5 ends with a signature line on page five. Following *that* is another document, without any
6 indication of what court it was filed in, headed "To the Honorable Judges" and listing the six
7 issues raised here. None of these attachments is labeled "exhibit."

8       Respondent's argument is that the petition for review did not fairly present the other
9 five issues when they were only contained in an attachment as described above, an
10 attachment which appears to have been intended as an exhibit rather than as part of the
11 petition for review itself. Ordinarily a state prisoner does not fairly present a claim to a
12 state court if that court must read beyond a petition or a brief (or a similar document) that
13 does not alert it to the presence of a federal claim in order to find material that does so.
14 *Baldwin v. Reese*, 541 U.S. 27, 30-34 (2004). Although the court is sympathetic to
15 petitioner's difficulties in coping with the complexities of habeas procedure, the fact
16 remains that the state supreme court would not have thought, in looking at his petition for
17 review, that he was raising any issues other than the "some evidence" one. The remaining
18 five issues are unexhausted. Respondent's motion will be granted and petitioner will be
19 afforded an opportunity to choose among three possible courses for the further conduct of
20 the case.

21                                       **CONCLUSION**

22       1. Respondent's motion to dismiss (document number 4 on the docket) is
23 **GRANTED.**

24       2. Petitioner may chose from three possible courses of action: (1) he may dismiss
25 this petition with an eye to exhausting and then filing another federal petition;[2] (2) he may
26 amend the petition to dismiss the unexhausted issue, and proceed with those which are

27

28      [2] This option is more apparent than real, because any subsequent federal petition would almost certainly be barred by the statute of limitations.

4

1  exhausted;[3] or (3) he may ask for a stay of this case while he returns to state court to

2  attempt to exhaust the five unexhausted issues, then, if unsuccessful in state court, return

3  here and ask that the stay be lifted.  If he chooses the third option, asking for a stay, he

4  must show "good cause" for his failure to exhaust sooner, that the issue is "potentially

5  meritorious," and that he has not engaged in "dilatory litigation tactics."  *See Rhines v.*

6  *Weber*, 544 U.S. 269, 277 (2005).

7       3.  Petitioner must elect one of the three choices set out in section three within thirty

8  days of the date this order is entered.  If he does not, this case will be dismissed.

9       **IT IS SO ORDERED.**

10  Dated:  May 20 , 2008.

       PHYLLIS J. HAMILTON
11       United States District Judge

25  G:\PRO-SE\PJH\HC.07\MARROQUIN6098.EXH.wpd

27       [3]  If he chooses this option he probably will not be able to file a future federal petition
containing the five unexhausted issues, because second federal petitions are generally barred
28  by 28 U.S.C. § 2244(b)(2).

United States District Court
For the Northern District of California

# UNITED STATES DISTRICT COURT

## FOR THE

### NORTHERN DISTRICT OF CALIFORNIA

MARCO MARROQUIN,

Case Number: CV07-06098 PJH

Petitioner,

**CERTIFICATE OF SERVICE**

v.

BEN CURRY,

Respondent.

_____/

I, the undersigned, hereby certify that I am an employee in the Office of the Clerk, U.S. District Court, Northern District of California.

That on May 20, 2008, I SERVED a true and correct copy(ies) of the attached, by placing said copy(ies) in a postage paid envelope addressed to the person(s) hereinafter listed, by depositing said envelope in the U.S. Mail, or by placing said copy(ies) into an inter-office delivery receptacle located in the Clerk's office.

Marco Marroquin
Correctional Training Facility
Prisoner Id H-62380
P.O. Box 689
C-117
Soledad, CA 93960-0689

Dated: May 20, 2008

Richard W. Wieking, Clerk
By: Nichole Heuerman, Deputy Clerk

# Attachment 3

1 | EDMUND G. BROWN JR.
Attorney General of the State of California
2 | DANE R. GILLETTE
Chief Assistant Attorney General
3 | JULIE L. GARLAND
Senior Assistant Attorney General
4 | ANYA M. BINSACCA
Supervising Deputy Attorney General
5 | STEVEN G. WARNER, State Bar No. 239269
Deputy Attorney General
6 | 455 Golden Gate Avenue, Suite 11000
San Francisco, CA 94102-7004
7 | Telephone: (415) 703-5747
Fax: (415) 703-5843
8 | Email: Steven.Warner@doj.ca.gov

9 | Attorneys for Respondent Warden Ben Curry
SF2008400153

10

11 | IN THE UNITED STATES DISTRICT COURT

12 | FOR THE NORTHERN DISTRICT OF CALIFORNIA

13 | SAN FRANCISCO DIVISION

14

15 | **MARCO MARROQUIN,**                    C-07-6098 MJJ (PR)

16 |                       Petitioner,      **RESPONDENT'S NOTICE OF**
                                          **MOTION AND MOTION TO**
17 |           v.                          **DISMISS; MEMORANDUM OF**
                                          **POINTS AND AUTHORITIES**
18 | **BEN CURRY,**
                                          Judge: The Honorable Martin Jenkins
19 |                       Respondent.

20

21 | TO PETITIONER MARCO MARROQUIN, IN PRO PER,

22 | PLEASE TAKE NOTICE that Respondent Ben Curry, Warden at the Correctional Training

23 | Facility, moves this Court to dismiss the Petition for Writ of Habeas Corpus pursuant to 28

24 | U.S.C. § 2254 (2000) and Rules 2 and 4 of the Rules Governing § 2254 Cases in the United

25 | States District Courts, on the ground that Marroquin did not exhaust his state court remedies for

26 | all of his claims. This motion is based on the notice and motion, the memorandum of points and

27 | authorities and exhibit, the petition for writ of habeas corpus, the court records in this action, and

28 | other such matters properly before this Court.

Respt's Not. of Mot. & Mot. to Dismiss; Mem. of P. & A.                    *Marroquin v. Curry*
                                                                    Case No. C-07-6098 MJJ (PR)

1

1    **MEMORANDUM OF POINTS AND AUTHORITIES**

2    **INTRODUCTION**

3        Marroquin, an inmate at the Correctional Training Facility, represents himself in this habeas

4    corpus action. Marroquin contends that the Board of Parole Hearings unconstitutionally found

5    him unsuitable for parole at a 2006 subsequent parole consideration hearing. This Court found

6    Marroquin's six claims sufficient to require a response: (1) that he has a liberty interest protected

7    by due process in being found suitable for parole; (2) that the Board violated his due process

8    rights in applying regulations to override statute; (3) that the Board violated his equal protection

9    rights by failing to consider setting his term and failing to fix a primary term; (4) that the Board's

10   denial based on the commitment offense violated his due process rights; (5) that the Board

11   violated his due process rights by denying parole based on a predetermined outcome; and (6) that

12   the Board violated his due process rights by holding his parole suitability hearing when he is a

13   foreign national subject to deportation. (Order to Show Cause at 2.) Marroquin failed to exhaust

14   all but one of these claim in his California Supreme Court petition for review. Thus, this Court

15   should dismiss Marroquin's mixed petition.

16   **ARGUMENT**

17   **THIS PETITION SHOULD BE DISMISSED BECAUSE IT CONTAINS
     BOTH EXHAUSTED AND UNEXHAUSTED CLAIMS.**

18

19       This Court should dismiss Marroquin's petition as mixed because Marroquin failed to

20   exhaust five of his six claims by presenting them in his California Supreme Court petition for

21   review. A federal habeas petitioner must exhaust his available state court remedies before a

22   federal court may grant his petition. 28 U.S.C. § 2254(b)(1)(A). If one or more claims in the

23   federal petition have not been exhausted, the district court must dismiss the petition. *Pliler v.*

24   *Ford*, 542 U.S. 225, 227 (2004) (citing *Rose v. Lundy*, 455 U.S. 509, 510 (1982)). This rule

25   provides the state courts a full and fair opportunity to resolve federal constitutional claims before

26   they are presented to the federal court, thus "protect[ing] the state courts' role in the enforcement

27   of federal law . . . ." *Rose*, 455 U.S. at 518 (citation omitted).

28       It is the petitioner's burden to prove that he has exhausted his state court remedies before

Resp't's Not. of Mot. & Mot. to Dismiss; Mem. of P. & A.          *Marroquin v. Curry*
Case No. C-07-6098 MJJ (PR)

2

1 filing his federal habeas petition. *See Williams v. Craven*, 460 F.2d 1253, 1254 (9th Cir. 1972)

2 (per curiam). "A petitioner has satisfied the exhaustion requirement if: (1) he has 'fairly

3 presented' his federal claim to the highest state court with jurisdiction to consider it . . . or (2) he

4 demonstrates that no state remedy remains available." *Johnson v. Zenon*, 88 F.3d 828, 829 (9th

5 Cir. 1996) (citations omitted). In California, a petitioner exhausts his federal claim by fairly

6 presenting it to the California Supreme Court. *See Kim v. Villalobos*, 799 F.2d 1317, 1318 (9th

7 Cir. 1986). Lastly, a petitioner has not exhausted the available state court remedies "if he has the

8 right under the law of the State to raise, by any available procedure, the question presented." 28

9 U.S.C. § 2254(c).

10 Here, the petition should be dismissed because Marroquin failed to meet the state court

11 exhaustion requirement for all of his federal claims. Firstly, Marroquin fairly presented only his

12 fourth federal claim – that the Board violated his due process rights by relying on the

13 commitment offense to deny parole – to the California Supreme Court. (*See* Ex. 1, Pet. for

14 Review, at 3.) In the petition for review that Marroquin filed with the California Supreme Court,

15 he does not assert any of his other federal claims, much less set forth any related legal arguments.

16 (*See id.* at 1-6.)

17 Secondly, Marroquin does not demonstrate that no state remedy is available for his

18 unexhausted federal claims. In fact, Marroquin is not precluded from exhausting his state court

19 remedies because the California Supreme Court has original jurisdiction to review petitions for

20 writ of habeas corpus. Cal. Const. art. VI, § 10. Thus, Marroquin can still file a habeas petition

21 in the California Supreme Court alleging the unexhausted claims. Accordingly, Marroquin has

22 not "reach[ed] the point where he has no state remedies available to him . . ." and the petition

23 should be dismissed. *Peterson v. Lampert*, 319 F.3d 1153, 1156 (9th Cir. 2003) (citation

24 omitted).

25 ///

26 ///

27 ///

28 ///

1

**CONCLUSION**

2          Marroquin did not fairly present all of his claim to the California Supreme Court before

3    filing this federal petition; therefore, he failed to meet his burden of proof regarding state court

4    exhaustion. Thus, this Court should dismiss Marroquin's mixed petition.

5          Dated: March 18, 2008

6                                        Respectfully submitted,

7                                        EDMUND G. BROWN JR.
                                         Attorney General of the State of California

8                                        DANE R. GILLETTE
                                         Chief Assistant Attorney General
9
                                         JULIE L. GARLAND
10                                       Senior Assistant Attorney General

11                                       ANYA M. BINSACCA
                                         Supervising Deputy Attorney General

12

13

14                                       STEVEN G. WARNER
15                                       Deputy Attorney General
                                         Attorneys for Respondent

16

17

18

19

20

21

22

23

24

25

26

27
     40225880.wpd
28

Resp't's Not. of Mot. & Mot. to Dismiss; Mem. of P. & A.                    *Marroquin v. Curry*
                                                                    Case No. C-07-6098 MJJ (PR)

4

1 EDMUND G. BROWN JR.
Attorney General of the State of California
2 DANE R. GILLETTE
Chief Assistant Attorney General
3 JULIE L. GARLAND
Senior Assistant Attorney General
4 ANYA M. BINSACCA
Supervising Deputy Attorney General
5 STEVEN G. WARNER, State Bar No. 239269
Deputy Attorney General
6 455 Golden Gate Avenue, Suite 11000
San Francisco, CA 94102-7004
7 Telephone: (415) 703-5747
Fax: (415) 703-5843
8 Email: Steven.Warner@doj.ca.gov
Attorneys for Respondent Warden Ben Curry
9 SF2008400153

10

11 IN THE UNITED STATES DISTRICT COURT

12 FOR THE NORTHERN DISTRICT OF CALIFORNIA

13 SAN FRANCISCO DIVISION

14

| | |
|---|---|
| 15 **MARCO MARROQUIN,** | C-07-6098 PJH (PR) |
| 16 Petitioner, | **RESPONDENT'S REPLY TO OPPOSITION TO MOTION TO** |
| 17 v. | **DISMISS** |
| 18 **BEN CURRY,** | Judge: The Hon. Phyllis J. Hamilton |
| 19 Respondent. | |

20

21        In this habeas petition, Marco Marroquin challenges the Board of Parole Hearings' parole

22 denial at his 2006 subsequent parole consideration hearing. Respondent moved to dismiss the

23 mixed petition because Marroquin failed to exhaust all but one of his six claims. In his

24 opposition, Marroquin does not establish that he exhausted his five challenged claims.

25        Marroquin contends that "because the California Supreme Court denied Petitioner's petition

26 without comment[,] the AEDPA differential [sic] standard of review is applicable." (Opp'n 2.)

27 This contention is not relevant to whether Marroquin exhausted his claims.

28        Furthermore, Marroquin conclusorily points out that in his California Supreme Court

1  petition for review he wrote "see attached petition" under grounds for relief, that he wrote "[s]ee

2  attached petition in full" in response to the question asking whether he filed any other petitions,

3  and then summarily contends that "Petitioner has established that he has standing . . . to

4  adjudicate the 'entire' habeas corpus petition as was presented to 'ALL' state courts." (Opp'n

5  2.) This contention does not prove that Marroquin exhausted all of his claims by presenting them

6  to the California Supreme Court. *See Kim v. Villalobos*, 799 F.2d 1317, 1318 (9th Cir. 1986)

7  (holding that in California, a petitioner exhausts his federal claim by fairly presenting it to the

8  California Supreme Court). In the grounds for relief sections of Marroquin's California Supreme

9  Court petition for review, the attached petition to which Marroquin refers is his "Petition for

10  Review in the Supreme Court of California" (typewritten on pleading paper). As Respondent

11  noted in the motion to dismiss, Marroquin fairly presented only his fourth federal claim – that the

12  Board violated his due process rights by relying on the commitment offense to deny parole – to

13  the California Supreme Court in this petition for review. (*See* Ex. 1 to Mot. to Dismiss, at

14  [typewritten page] 3.) Marroquin refers to his lower state court petitions – "attached in full" –

15  only in the section of his petition for review that inquires about other court petitions. This

16  section is numbered separately – six paragraphs apart – from the grounds for relief section, and

17  thus there is no reason to believe the California Supreme Court treated the claims in those lower

18  court petitions outside of his typewritten petition for review as presented to it. Marroquin's

19  attaching his lower state court petitions to his California Supreme Court petition for review does

20  not change the fact that five of his six federal claims were not present on the face of his petition

21  for review – from the opening line through the conclusion on the sixth typewritten page. (*See*

22  Ex. 1 to Mot. to Dismiss.) Therefore, Marroquin has not persuasively countered Respondent's

23  argument that the instant petition is mixed and must be dismissed. *Pliler v. Ford*, 542 U.S. 225,

24  227 (2004).

25  ///

26  ///

27  ///

28  ///

1    For the reasons stated above and in Respondent's March 18, 2008 Motion to Dismiss, this

2  Court should grant the Motion.

3    Dated: April 9, 2008

4                           Respectfully submitted,

5

6                           EDMUND G. BROWN JR.
                            Attorney General of the State of California
7
                            DANE R. GILLETTE
8                           Chief Assistant Attorney General

                            JULIE L. GARLAND
9                           Senior Assistant Attorney General

10                          ANYA M. BINSACCA
                            Supervising Deputy Attorney General
11

12

13                          /s/ Steven G. Warner
                            STEVEN G. WARNER
14                          Deputy Attorney General
                            Attorneys for Respondent
15

16

17

18

19

20

21

22

23

24

25

26

27

28  40234268.wpd

Resp't's Reply to Opp'n to Mot. to Dismiss                                    *Marroquin v. Curry*
                                                                    Case No. C-07-6098 PJH (PR)

3

## DECLARATION OF SERVICE BY U.S. MAIL

Case Name:   *Marco Marroquin v. Ben Curry*

No.:   **U. S. C. C., N. D., San Francisco Division, C-07-6098 PJH (PR)**

I declare:

I am employed in the Office of the Attorney General, which is the office of a member of the California State Bar, at which member's direction this service is made. I am 18 years of age or older and not a party to this matter. I am familiar with the business practice at the Office of the Attorney General for collection and processing of correspondence for mailing with the United States Postal Service. In accordance with that practice, correspondence placed in the internal mail collection system at the Office of the Attorney General is deposited with the United States Postal Service that same day in the ordinary course of business.

On <u>April 9, 2008</u>, I served the attached

### RESPONDENT'S REPLY TO OPPOSITION TO MOTION TO DISMISS

by placing a true copy thereof enclosed in a sealed envelope with postage thereon fully prepaid, in the internal mail collection system at the Office of the Attorney General at 455 Golden Gate Avenue, Suite 11000, San Francisco, CA 94102-7004, addressed as follows:

**Marco Marroquin, H-62380**
**Correctional Training Facility**
**P.O. Box 689**
**Soledad, CA 93960-0689**
In Pro Per

I declare under penalty of perjury under the laws of the State of California the foregoing is true and correct and that this declaration was executed on **April 9, 2008**, at San Francisco, California.

|  |  |
|---|---|
| J. Baker | Signature |
| Declarant |  |

40239352.wpd