# EXHIBIT 1
# Part 1 of 3

MC-275

Name  MARCO MARROQUIN

Address  P.O.Box 689  C-117

CALIFORNIA STATE PRISON

SOLEDAD, CA. 93960-0689

CDC or ID Number  H-62380



ORIGINAL
RECEIVED
LOS ANGELES SUPERIOR COURT

THE SUPERIOR COURT OF CALIFORNIA

FOR THE COUNTY OF LOS ANGELES

(Court)

OCT 2 4 2006

JOHN A. CLARKE, CLERK

BY K. Trumble
DEPUTY
K. Trumble

PETITION FOR WRIT OF HABEAS CORPUS

---

MARCO MARROQUIN

Petitioner

vs.

B. CURRY, WARDEN (Acting?)

Respondent

No. 140162282
(To be supplied by the Clerk of the Court)

## INSTRUCTIONS—READ CAREFULLY

- If you are challenging an order of commitment or a criminal conviction and are filing this petition in the Superior Court, you should file it in the county that made the order.

- If you are challenging the conditions of your confinement and are filing this petition in the Superior Court, you should file it in the county in which you are confined.

- Read the entire form *before* answering any questions.

- This petition must be clearly handwritten in ink or typed. You should exercise care to make sure all answers are true and correct. Because the petition includes a verification, the making of a statement that you know is false may result in a conviction for perjury.

- Answer all applicable questions in the proper spaces. If you need additional space, add an extra page and indicate that your answer is "continued on additional page."

- If you are filing this petition in the Superior Court, you need file only the original unless local rules require additional copies. Many courts require more copies.

- If you are filing this petition in the Court of Appeal, file the original and four copies of the petition and, if separately bound, one copy of any supporting documents.

- If you are filing this petition in the California Supreme Court, file the original and ten copies of the petition and, if separately bound, two copies of any supporting documents.

- Notify the Clerk of the Court in writing if you change your address after filing your petition.

- In most cases, the law requires service of a copy of the petition on the district attorney, city attorney, or city prosecutor. See Penal Code section 1475 and Government Code section 72193. You may serve the copy by mail.

Approved by the Judicial Council of California for use under Rule 60 of the California Rules of Court [as amended effective January 1, 2005]. Subsequent amendments to Rule 60 may change the number of copies to be furnished to the Supreme Court and Court of Appeal.

Page one of six

Form Approved by the
Judicial Council of California
MC-275 (Rev. July 1, 2005)

PETITION FOR WRIT OF HABEAS CORPUS

Penal Code, § 1473 et seq.;
Cal. Rules of Court, rule 60(a)

American LegalNet, Inc.
www.USCourtForms.com

**This petition concerns:**

| | |
|---|---|
| ☐ A conviction | ☐ Parole |
| ☐ A sentence | ☐ Credits |
| ☐ Jail or prison conditions | ☐ Prison discipline |
| ☒ Other (specify): | **Denial of suitability at a parole suitability hearing. (2nd, hearing).** |

1. Your name: **Marco Marroquin**

2. Where are you incarcerated? **California State Prison at Soledad, CA, Hgh. 101 North.**

3. Why are you in custody? ☒ Criminal Conviction   ☐ Civil Commitment

   *Answer subdivisions a. through i. to the best of your ability.*

   a. State reason for civil commitment or, if criminal conviction, state nature of offense and enhancements (for example, "robbery with use of a deadly weapon").

   **Convicted of second degree murder with gun use enhancement. Note: Conviction is not at issue, petition relates to parole suitability due process violations.**

   b. Penal or other code sections: **§§187 and 12022.5.**

   c. Name and location of sentencing or committing court: **Superior court, Compton, California**

   d. Case number: **TA016787**

   e. Date convicted or committed: **1/4/93**

   f. Date sentenced: **Confusion on my part as to date of conviction and sentence above.**

   g. Length of sentence: **15 years to life plus 3 years.**

   h. When do you expect to be released? **Undetermined with "to Life" top on sentence.**

   i. Were you represented by counsel in the trial court? ☒ Yes.   ☐ No.   If yes, state the attorney's name and address:

   **Unknown at this time, documentation lost of period of years.**

4. What was the LAST plea you entered? *(check one)*

   ☒ Not guilty   ☐ Guilty   ☐ Nolo Contendere   ☐ Other: _____

5. If you pleaded not guilty, what kind of trial did you have?

   ☒ Jury   ☐ Judge without a jury   ☐ Submitted on transcript   ☐ Awaiting trial

---

MC-275 [Rev. January 1, 1999]            **PETITION FOR WRIT OF HABEAS CORPUS**            Page two of six

6.    GROUNDS FOR RELIEF

**Ground 1:** State briefly the ground on which you base your claim for relief. For example, "the trial court imposed an illegal enhancement." *(If you have additional grounds for relief, use a separate page for each ground. State ground 2 on page four. For additional grounds, make copies of page four and number the additional grounds in order.)*

_____Due process and equal protection violations; see attached petition._____

_____

_____

_____

a.    Supporting facts:

Tell your story briefly without citing cases or law. If you are challenging the legality of your conviction, describe the facts upon which your conviction is based. *If necessary, attach additional pages.* CAUTION: You must state facts, not conclusions. For example, if you are claiming incompetence of counsel you must state facts specifically setting forth what your attorney did or failed to do and how that affected your trial. Failure to allege sufficient facts will result in the denial of your petition. (See *In re Swain* (1949) 34 Cal.2d 300, 304.) A rule of thumb to follow is: *who* did exactly *what* to violate your rights at what time *(when)* or place *(where)*. *(If available, attach declarations, relevant records, transcripts, or other documents supporting your claim.)*

_____See attached petition and Motion for Judicial Notice attached hereto._____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

b.    Supporting cases, rules, or other authority (optional):

*(Briefly discuss, or list by name and citation, the cases or other authorities that you think are relevant to your claim. If necessary, attach an extra page.)*

_____See attached petition and Motion for Judicial Notice attached hereto._____

_____

_____

_____

7. Ground 2 or Ground _____ (*i*. *p*licable):

Due process and equal protection violations; see attached petition.

_____

_____

_____

_____

a. Supporting facts:

See attached petition and Motion for Judicial Notice attached hereto.

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

b. Supporting cases, rules, or other authority:

See attached petition and Motion for Judicial Notice attached hereto.

_____

_____

_____

_____

8.  Did you appeal from the conviction, sentence, or commitment?  [XX] Yes.  [ ] No.   If yes, give the following information:

a.  Name of court ("Court of Appeal" or "Appellate Dept. of Superior Court"):
**Does not apply to this petition; documents lost over period of years.**

b.  Result: __Relief denied__    c.  Date of decision: **Unavailable**

d.  Case number or citation of opinion, if known:  **Unknown**

e.  Issues raised:  (1) _____**Unavailable at this time.**_____

(2) _____**//**_____

(3) _____**//**_____

f.  Were you represented by counsel on appeal?  [XX] Yes.  [ ] No.  If yes, state the attorney's name and address, if known:
__**Unavailable, documents lost of period of years.**__

9.  Did you seek review in the California Supreme Court?  [XX] Yes.  [ ] No.    If yes, give the following information:

a.  Result: __Relief denied__    b.  Date of decision: **Unavailable**

c.  Case number or citation of opinion, if known:  **Unavailable**

d.  Issues raised:  (1) _____**Unavailable**_____

(2) _____**//**_____

(3) _____**//**_____

10. If your petition makes a claim regarding your conviction, sentence, or commitment that you or your attorney did not make on appeal, explain why the claim was not made on appeal:
__Does not apply to this petition, parole suitability denial issue only presented.__

11. Administrative Review:

a.  If your petition concerns conditions of confinement or other claims for which there are administrative remedies, failure to exhaust administrative remedies may result in the denial of your petition, even if it is otherwise meritorious. (See *In re Muszalski* (1975) 52 Cal.App.3d 500 [125 Cal.Rptr. 286].) Explain what administrative review you sought or explain why you did not seek such review:
**Does not apply to this petition.**

b.  Did you seek the highest level of administrative review available?  [ ] Yes.  [XX] No. **Does not apply.**
   *Attach documents that show you have exhausted your administrative remedies.*

12. Other than direct appeal, have you filed any other petitions, applications, or motions with respect to this conviction, commitment, or **issue** in any court?  ☒ Yes. If yes, continue with number 13.  ☐ No. If no, skip to number 15.

13. a. (1) Name of court: __U.S. District Court, Central District of California.__

    (2) Nature of proceeding (for example, "habeas corpus petition"): **Habeas Corpus petition**

    (3) Issues raised: (a) _____Unavailable_____

       (b) _____//_____

    (4) Result (Attach order or explain why unavailable): **Relied denied, documents lost of time.**

    (5) Date of decision: _____Unavailable_____

  b. (1) Name of court: __Does not apply to this petition.__

    (2) Nature of proceeding: _____//_____

    (3) Issues raised: (a) _____//_____

       (b) _____//_____

    (4) Result (Attach order or explain why unavailable): __//__

    (5) Date of decision: _____//_____

  c. For additional prior petitions, applications, or motions, provide the same information on a separate page.

14. If any of the courts listed in number 13 held a hearing, state name of court, date of hearing, nature of hearing, and result:
**No hearings or evidentiary hearings held on appeal of conviction.**

15. Explain any delay in the discovery of the claimed grounds for relief and in raising the claims in this petition. (See In re Swain (1949) 34 Cal.2d 300, 304.)
**The instant petition addresses due process and equal protection violations at a parole suitability hearing held on June 6, 2006, a second hearing.**

16. Are you presently represented by counsel? ☐ Yes. ☒ No. If yes, state the attorney's name and address, if known:
**Petitioner is being assisted by fellow inmate Samuel A. Dubyak, D-54700, Petitioner is basically illiterate in the English language, Guatemalan National.**

17. Do you have any petition, appeal, or other matter pending in any court? ☒ Yes. ☐ No. If yes, explain:
**Petitioner is currently in the Northern District Federal Court on his previous, 2003, denial of suitability.**

18. If this petition might lawfully have been made to a lower court, state the circumstances justifying an application to this court:
**This is the Court of proper jurisdiction for habeas corpus from inmates convicted in the county of Los angeles.**

I, the undersigned, say: I am the petitioner in this action. I declare under penalty of perjury under the laws of the State of California that the foregoing allegations and statements are true and correct, except as to matters that are stated on my information and belief, and as to those matters, I believe them to be true.

Date: 10/19/06

▶ _(signature)_

(SIGNATURE OF PETITIONER)

To the Honorable Judges:

Comes now, Marco Marroquin, Petitioner in pro per, and hereby petitions this Court for a writ of habeas corpus and by this verified petition he sets forth the following facts and causes for issuance of the writ.

I.

Petitioner is presently incarcerated and confined from his liberty by the Warden in the state prison at Soledad, CA. Petitioner is serving a sentence of 15 years to life plus 3 years, pursuant to a judgment imposed by the Honorable Elizabeth Baron, Judge of the Los Angeles County Superior Court.

II.

Petitioner hereby incorporates all relevant exhibits, numbered and referenced throughout this petition, and via Motion for Judicial Notice.

III.

Petitioner asserts that under the California Indeterminate Sentencing Laws, he is entitled to a term fixed proportionately to his individual culpability and fair, and individualized, consideration for parole under Cal. P.C. §3041(a)(b) along with rules and regulations and case citations listed herein.

IV.

An indeterminate sentence which does not have a term fixed is deemed to be the maximum term for purposes of constitutional analysis. Since no indeterminately sentenced prisoners in California have a term fixed (see, exceptions under CLASS OF ONE) all have had their punishment summarily fixed at the maximum.

V.

The Legislature has specified three categories of culpability for the offense of murder in California. The most serious is one of "special circumstances" first degree murder, involving malice, premeditation, and the concurrent commission of an additional serious felony, and has a punishment of either the death penalty

i

or life without the possibility of parole. The second most serious is first degree murder, involving malice and premeditation, and has a punishment of 25 years-to-life. The last category is second degree murder, involving only malice, and a punishment of 15 years-to-life.

VI.

Since no terms are fixed (except the CLASS OF ONE), all have been set at "life"; this is contrary to the California Supreme Courts determination that each offender is entitled to a term fixed proportionately to individual culpability.

VII.

The failure to fix terms (except CLASS OF ONE) and summary denial of parole dates for life prisoners by the BPH show a defacto policy of refusing to follow the California Penal Codes, the California Constitutions Article I, section 7(a) Equal Protection Clause, also, United States Constitutions Fourteenth Amendment, Equal Protection.

VIII.

Petitioner has no plain, speedy or adequate remedy at law to protect his constitutional rights on these issues other than by this petition.

//

//

//

ii

## STATEMENT OF THE CASE

In August of 1991, Luis Silva and his girlfriend, Delcia Lopez, agreed to buy a car from Petitioner for two thousand dollars. Silva was given possession of the car, and was supposed to pay Petitioner every two weeks. After the first two weeks however, Silva returned the car, saying that it had a lot of defects. Silva and Petitioner disagreed and argued when Silva tried to give the keys back to Petitioner. Petitioner asked Silva to pay him for the time that he had the car, but Silva refused to pay. Petitioner told Silva that he would regret what he had done to him.

At approximately 10 P.M. on January 12, 1992, Petitioner and another man entered the La Bajadita Bar in Compton. Before entering, the security guard checked the two men for weapons and found none. A short time later, Silva also entered the bar, but did not sit with Petitioner. Both men ordered beer. From that point forward, the defense and prosecution cases go in different directions, with vastly different evidence and completely different testimony in support of their theories of the case.

The prosecutions case continues with none of the employees at the bar recalling any argument between Petitioner and Silva, or even seeing the men approach each other while inside the bar. At some point, Silva left the bar to move his car. About two minutes after Silva left, Petitioner also left the bar, with the man that he had entered with, and walked along Compton towards Williams street.

About 10 minutes later, Petitioner and his companion returned to the bar and tried to re-enter it. However, when the security guard searched Petitioner, he discovered a gun and told Petitioner that he could not go inside the bar with a weapon. Petitioner and his companion then moved away to a distance of about three parked cars from the entrance to the bar and remained there.

Silva, after moving his car, returned in the direction of the bar. As Silva

reached the curb, Petitioner came toward him, according to the security guard. Petitioner called Silva a son of a bitch and they argued about a car. Petitioner said to Silva that he would have to pay Petitioner for the car. Silva said that he did not want any problems with Petitioner, and did not threaten Petitioner in any manner. Petitioner then called Silva a son of a big whore. The guard did not see if Silva had anything in his hands, and that Silva's hands were at his sides.

The security guard saw Petitioner point a gun at Silva and say that i'm going to kill you. Petitioner pulled the trigger the first time and the gun did not fire; he pulled it a second time and it fired. The guard did not see if Silva was shot when Petitioner fired the gun. As Silva bent over, the guard pulled him down to the ground and placed him in front of the doorway. Petitioner turned and walked towards Williams street with his friend. There was no one else on the street at that time.

The security guard contacted Deputy Reynolds and directed the officers to Petitioner where he was standing by a white Toyota pickup with a gun in his hand.

A search of the immediate area and the victim's person revealed no weapons. One shell casing was later found about 10-12 feet from where Silva had been lying. No broken bottles were found at that time, however testimony showed the presence of two broken bottles in the immediate area. One unbroken Budweiser bottle was found.

Petitioner stated that Silva had argued with him about a family problem, that Silva had threatened to kick his ass and that he went to get his gun because he was afraid of Silva. Petitioner kept the gun in the battery section of the engine compartment of his truck. He put the gun in his back waistband and walked in the direction of the bar to get something to eat at the stand outside of the bar. When he got to the bar, Silva came out and began arguing again; he then pulled out his gun and shot Silva. Petitioner's defense was that Silva had tried

to cut him with a broken bottle.

The cause of death was listed as a gunshot wound to the abdomen, the evidence established that the initial point of entry was a flesh wound to the arm and the projectile deflecting into the body.

The defense case describes problems between Silva and Petitioner's girlfriend and her brothers. It seems that Silva was living with Delcia, Petitioner's girlfriend's sister, but was married to one of Delcia's cousins. This resulted in Delcia and her brothers throwing Silva out of their house.

The night of the incident, Petitioner was in the bar talking with a friend called "Pink Floyd", who was also a friend of Silva. When Petitioner was seated in the bar, Silva came up and said to Floyd, "stop talking to trash", referring to Petitioner. Silva then picked Petitioner up by his collar, and when Floyd said, "you're not going to fight in here", Silva then said, "tell him to go outside if he's a man". Silva then pushed Petitioner and said to him, "let's go out, faggot". Silva accused Petitioner of being a gigolo because someone was supporting him, and also accused him of trying to defraud Silva by asking for money for the use of the car.

They went outside the bar where Floyd stood between them and prevented them from fighting. Petitioner walked towards his car, intending to leave. He heard steps behind him and turned to see Silva coming at him with something in his right hand that could have been a knife. Petitioner kicked Silva's hand and Silva turned and ran away. Petitioner was very frightened because he believed Silva had tried to kill him. Petitioner then got his gun from his truck and loaded it. He looked toward the front of the bar and saw Silva's car driving away.

Thinking that Silva had left, Petitioner then returned towards the bar. As he walked towards the bar, Silva drove by in his car and yelled to him, challenging him to a fight. Silva then made a U-turn and parked on the opposite side of the street. Silva then came running toward Petitioner and, as he

approached, he reached down and broke a bottle he was holding by the neck.

Silva attacked Petitioner several times with the broken neck of the bottle, but Petitioner was able to jump out of the way. Silva continued to taunt and insult Petitioner. After Floyd again tried to intervene, Silva lunged a final time at Petitioner with the broken bottle and Petitioner shot him in the arm. At the moment that he pulled the trigger, Petitioner thought that Silva was going to stab him with the bottle neck.

Victor Matute testified that he arrived at the La Bajadita Bar on January 12, 1992, between 10 P.M. and midnight. As he approached the door, he saw three people arguing on the sidewalk. It appeared that two of the people wanted to fight the other person. He then saw one of the people try to hit the third person with a bottle. The third person moved to the side to avoid being hit. He then saw the third person shoot the person with the bottle.

Finally, Los Angeles County Deputy Sheriff Reynolds testified that on the night of the shooting, Guadalupe Suazo, the manager of the La Bajadita Bar, told him he had seen Petitioner and Silva argue for a minute inside the bar. Bertha Angeli, the owner of La Bajadita, also indicated to him that she had seen Petitioner and Silva arguing in the bar that night.

//

//

//

vi

## INDEX OF ISSUES RAISED

### I.

CALIFORNIA PENAL CODE §3041(a)(b) CREATES A PROTECTABLE LIBERTY INTEREST AT A PAROLE SUITABILITY HEARING, AND A "REASONABLE" EXPECTATION OF A RELEASE DATE. THE COMMANDING WORD "SHALL" CLEARLY ESTABLISHES THIS EXPECTATION.

### II.

THE BOARD VIOLATED PETITIONER'S DUE PROCESS RIGHTS UNDER THE FIFTH AND FOURTEENTH AMENDMENTS OF THE U.S. CONSTITUTION, CALIFORNIA CONSTITUTION, ARTICLE I, Sec. 7(a), WHEN THEY APPLIED TITLE 15 C.C.R. §§2400-2411 TO OVER-RIDE AND CONTROL PENAL CODE Sec. §3041(a)(b).

### III.

THE BOARD VIOLATED PETITIONER'S EQUAL PROTECTION RIGHTS UNDER THE CALIFORNIA CONSTITUTION, ARTICLE I, Sec. 7(a), AND, THE FOURTEENTH AMENDMENT OF THE U.S. CONSTITUTION WHEN THEY FAILED TO CONSIDER SETTING HIS TERM AND FAILURE TO FIX A PRIMARY TERM, (SEPARATE AND DISTINCT TREATMENT OF A "CLASS OF ONE").

### IV.

THE BOARD VIOLATED PETITIONER'S DUE PROCESS RIGHTS UNDER THE FIFTH AND FOURTEENTH AMENDMENTS OF THE U.S. CONSTITUTION WHEN THEY DENIED HIM A PAROLE DATE BASED ON P.C. §3041(b), BECAUSE HIS CONVICTION WAS "A TERRIBLE OFFENSE".

### V.

THE BOARD VIOLATED PETITIONER'S DUE PROCESS RIGHTS UNDER THE FIFTH AND FOURTEENTH AMENDMENTS OF THE U.S. CONSTITUTION AND, CALIFORNIA CONSTITUTION ARTICLE I, Sec. 7(a) WHEN THEY DENIED PAROLE BASED ON A PREDETERMINED OUTCOME.

### VI.

THE BOARD VIOLATED PETITIONER'S DUE PROCESS RIGHTS UNDER THE FIFTH AND FOURTEENTH AMENDMENT OF THE U.S. CONSTITUTION BY HOLDING "PAROLE SUITABILITY" HEARINGS FOR A FOREIGN NATIONAL, THAT WILL BE DEPORTED, WHO CAN NEVER BE RELEASED ON PAROLE IN CALIFORNIA. PENAL CODE §3041(a)(b) IS UNCONSTITUTIONALLY VAGUE AND AMBIGUOUS AS TO PAROLE v. DEPORTATION FOR FOREIGN NATIONALS WITH AN "INS" HOLD.

//

//

//

1   Marco Marroquin, H-62380
2   Box 689   C-117L
    California State Prison
3   Soledad, Ca 93960-0689

4         Petitioner, in pro per

5

6              THE SUPERIOR COURT OF CALIFORNIA

7              FOR THE COUNTY OF LOS ANGELES

8   MARCO MARROQUIN,                )    Case No. _____
9                                    )
         Petitioner,                 )
10                                   )
    vs.                              )    MOTION/REQUEST FOR JUDICIAL NOTICE
11                                   )
    B. CURRY, Warden (Acting?)       )
12                                   )
         Respondent.                 )
13  ─────────────────────────────────)

14  TO: THE HONORABLE JUDGE(S) OF THE LOS ANGELES COUNTY SUPERIOR COURT:

15       Pursuant to California Evidence Code sections 451, subdivision (a), 452

16  subdivision (a), (c) and (d), and 459 subdivision (a), Commodoe Home System,

17  Inc. v. Superior Court, (1982) 32 Cal.3d 211, 218-219, and Adamson v. Zipp, (1984)

18  163 Cal.App.3d Supp. 1, n.17, Petitioner hereby requests that this Court take

19  "Judicial Notice" of the attached documents (directly attached to the habeas

20  petition): (A), Petitioners Transcripts of the June 6, 2006 parole suitability

21  hearing, the subject of the instant petition: (B), SETTLEMENT AGREEMENT AND FULL

22  AND FINAL RELEASE OF ALL CLAIMS: (C), In re Robert Rosenkrantz (BH003529): (D),

23  Petitioner's "Sua Sponte" claim: (E), Coroner's Report, and, (F), Petitioner's

24  "Hearing Sheet".

25       The Court must take Judicial Notice of the factual findings of other courts,

26  even though the Court need not accept the truth of those findings. See, Mack

27  v. State Bar of California, (2001) 92 Cal.App.4th 957, 961, rehearing denied;

28  review denied; Duggal v. G.E. Capitol Communications Service, Inc., (2000) 81

Cal.App.4th 81, 82; People v. Moore, (1997) 59 Cal.App.4th 168, 178.

Petitioner obtained the attached copies of the exhibits from the prison legal library staff, law firms and a source that was in contact with the Swedish Consulate/Embassy. Review of the attached documents/cases will assist this Court in evaluating the arguments presented in Petitioner's habeas corpus, pages 1-29. The documents were attached to the instant habeas petition to avoid separation of papers and legal documentation.

Respectfully submitted,

Marco Marroquin

Dated: 10/19/06

CALIFORNIA PENAL CODE §3041(a)(b) CREATES A PREOTECTABLE LIBERTY INTEREST AT A PAROLE SUITABILITY HEARING, AND A "REASONABLE" EXPECTATION OF A RELEASE DATE. THE COMMANDING WORD "SHALL" CLEARLY ESTABLISHES THIS EXPECTATION.

Under California law, a convicted person sentenced to a term of 15/25 years "TO LIFE" shall be released on parole unless his release would pose an unreasonable risk to public safety or unreasonable risk to society if released from prison. Cal. P.C. §3041(a)(b); Cal. Code of Regs., Title 15, §§2400-2402.

It is well established that the words "...shall be released on parole..." create a liberty interest in parole release therefore constitutional due process standards are mandatory. Moody v. Daggett, 429 U.S. 78, 50 L.Ed.2d 236, 97 S.Ct. 274 (1976). A parole liberty interest involves values protected by the due process clauses of the Fifth and Fourteenth Amendments.

It is settled that a liberty interest has been created by California law; Perveler v. Estelle, (9th Cir. 1992) 974 F.2d 1132; Bergen v. Spaulding, (9th Cir. 1989) 881 F.2d 719, 721, (citing Greenholtz and Allen); Biggs v. Terhune, (9th Cir. 2003) 334 F.3d 910, 914-916; McQuillion v. Duncan, (9th Cir. 2002) 306 F.3d 895, 901-902: Sass, 2006, DJDAR 11931 (9th Cir.).

"Although we have never directly held that California parole scheme creates a protected liberty interest, we have repeatedly assumed that it does." See, Powell v. Gomez, 33 F.3d 39, 40 (9th Cir. 1994); "today we hold what we have previously assumed. Under the "clearly established" framework of Greenholtz and Allen, we hold that California's parole scheme gives rise to a cognizable liberty interest to release on parole. The scheme "creates a presumption that parole release will be granted" unless the statutorily defined determinations are made." Allen, 482 at 378 (quoting Greenholtz, 442 U.S. at 12); The California Court of Appeals in In re Deluna, 126 Cal.App.4th 585, 24 Cal.Rptr.3d 643 (2005), decided after Dannenberg, held that under Rosenkrantz, 29 Cal.4th at 661, and McQuillion v. Duncan, supra, that parole applicants continue to have a "liberty interest" in parole release. .

1

THE BOARD VIOLATED PETITIONER'S DUE PROCESS RIGHTS UNDER
THE FIFTH AND FOURTEENTH AMENDMENTS OF THE U.S. CONSTITUTION,
CALIFORNIA CONSTITUTION, ARTICLE I, Sec. 7(a), WHEN THEY
APPLIED TITLE 15 C.C.R. §§2400-2411 TO OVER-RIDE AND CONTROL
PENAL CODE Sec. §3041(a)(b).

Title 15 C.C.R. §§2400-2411 are in direct violation of the California

Constitution, Article II, §10(c) (Referendum Process). Proposition 7 did not

permit (to P.C. §190, et seq.) any additions, amendments, repealing or

superceeding; to be 'inclusive' to Proposition 7 without voters approval.

Government Code Section 11340(a); "The Administrative regulations are
authorized by statute, and consistent with other statutes of law,
section (f) requires the direct involvement of the Legislature and
the Executive Branch."

Government Code Section 11340.1(a); "The Legislature declares that
public interest established the Office of Administrative Law (OAL)
which shall be charged with review of adopted regulations, which
substitutes performance standards (e.g., the fulfillment or
accomplishment in a given case, the substantial performance) for
'prescriptive' (based on legal prescription or as approved by law)
standards. The intent that neither the OAL nor court shall substitute
its judgment for rule-making agency in the substantive content of
adopted regulations. With the intent of the Legislature the OAL is
a part of the Executive Branch of the state government, and reports
directly to the Legislature."

Government Code Section 11342.2: "The adoption of regulations is to
implement, interpret and make specific to carry out the provisions
of the statute ..."but" ... no regulation adopted is valid or effective
unless consistent and not in conflict with statutes or constitution
to effectuate the purpose, of the regulations." (Emphasis added).

Petitioner asserts that; The Department of Corrections (CDC) Regulations

Management Department writes the regulations. The OAL as to Gov. Code 11342.2

implements, interprets and makes specific the provisions for the regulations

statute. The Legislative Body chapters, presents to the Governor and is filed

with the Secretary of State as a statute of law for 15 C.C.R. regulations.

Petitioner asserts that; The Initiative Measure Proposition 7, did not

provide for any continuation (Gov. Code §9604) of rules and regulations of the

Administrative Procedures Act (APA) of 1976, nor the OAL enacted in 1979,

operative 7-1-1980, which gives the CDC and the BPH explicit authority for

2

administration of prisoners, (P.C.'s §§5058, 5076.2) under Gov. Code Section 11340, enabling statute.

The interpretation of Proposition 7, with no implied provisions or mandates to be carried through from one statute to another, "under circumstances" in which would be required or considered as re-instatements for continuation of statute (Gov. Code §9604) ... "but" ... as Petitioner asserted the BPH regulations are approved by the OAL under the Legislatures Constitutional grant of power (Cal. Const. Art. VI, §6; P.C. §6). The BPH added New Article II, Sections §§2400-2411 as filed 9-8-1981; Register 81 No. 37; the parole considerations criteria and guidelines, creating 'prodecural provisions and mandates' that cannot be applied to Proposition 7's Initiative Measure without voters approval.

In People v. Cooper, C.A.1st, No. A087483, Nov. 1, 2000; re: issue of application of time credits under P.C. §2933, the court held that:

> "Specifically, Cooper argued that since section 190, the Briggs initiative, was adopted by voters in 1978, it can only be amended upon approval of the voters. Hence, Section 2933 cannot apply to his sentence because it was adopted by the Legislature."

> Affirmed as modified. "The additions ... constituted a legislative change to the Briggs Initiative that required voter approval pursuant to Article II, Section 10, of the California Constitution." In re Oluwa, 207 Cal.App.3d 439 (1989).

Petitioner asserts that; Title 15, Division II, C.C.R. §§2400-2411 which are guidelines used by the BPH against inmates sentenced under Proposition 7's P.C. §190 et seq., are in direct violation of the California Constitutions Referendum Process. P.C. §3041 cannot be controlled by Division II criteria (as is exactly what is done by the Board, thus over-riding a clearly stated penal code), thus the only true (and legally correct) criteria for a parole date is that the inmate does not pose an unreasonable risk to society, see P.C. §3041(a)(b); this issue has already been decided (twice) by a state certified/licensed (expert) psychologist/psychiatrist.

An inspection of the parole hearing transcripts (passim) establish that,

"You have received absolutely zero 115s. That is extraordinarily rare." (Ex-"A" p.74). "You have no previous record whatsoever"; "You've participated in AA and NA since 95"; "Your psychiatrist's report was favorable"; "the report was positive"; "he indicated you showed genuine remorse"; "you would be better on parole — you would be in the top 2 percent for success"; "Your parole plans are good"; "You have excellent parole plans for Guatemala"; "...you had started your own business"; "Commissioner Keenan called you an entrepreneur"; "Commissioner Keenan and I believe that you can take care of yourself and your family no problem"; "...we're guiding and directing you because we believe in you..."; "We were particularly impressed..." (p.79); "Most impressive was your request to participate in individual counseling with Dr. Reed"; "...the insight and feeling that you developed..."; "You have done a lot of good work, we want you to keep the momentum going"; "you've been on the right path, you're doing a lot of good things": "We're behind you".

On page 75 (Ex-"A") the Board is requiring letters of support showing that he could potentially get a job in the Los angeles area.

It is clear that Petitioner has an INS hold on him and "will" be deported, also this issue was established at his first hearing when the Commissioners stated that "you will be deported, I can guarantee it".

In Martin v, Marshall, 2006 WL 1344584 (N.D. Cal.), page 8-9: "Section 2402(d)(8) provides that a prisoner may be suitable for release if "[t]he prisoner has made realistic plans for release or has developed marketable skills that can be put to use upon release." The subsection does not require that a prisoner have viable parole plans in the United States." "The Governor's reasoning would require petitioner to make plans to enter the United States illegally, then communicate those illegal plans to the Board in order to be granted a release date."

Although Petitioner asserts that Division II, Sections §§2400-2411 cannot

1   be applied to him, or any other similarly situated inmate, in violation of the

2   California Constitution (which thus violates Petitioner's due process and equal

3   protection rights under both the California and United States Constitutions),

4   he further asserts that "if" the sections 'for suitability' were applied to him

5   NONE of the criteria for a denial of a parole date would be met by the BPH.

6   Indeed, a reasoned reading of the Board's "DECISION" indicates or rather fails

7   to indicate any discernible reason or excuse for a denial of a parole release

8   date. The 'only' articulated wording that could possibly be implied as a 'reason'

9   for denial are: "First of all, we know that this was - this commitment offense

10  was a - a terrible offense". (Ex-"A" at p.73); "the motive for the crime was

11  very trivial in relation to the offense." (Ex-"A" at p.73).

12      These reasons/excuses are clearly within the framework of the Matrix which

13  the Board is supposed to follow. Indeed, because Title 15 C.C.R. §§2400-2411

14  enactment is in clear violation of the California Constitution the Board cannot

15  even apply the Matrix to his crime. Thus Petitioner falls within the equal

16  protection clauses of both the California and United States Constitution because

17  of unequal treatment. Prior to the passage of Proposition 7 in 1978 the Board

18  had a 'legally enacted Matrix' to follow for purposes of uniformity of sentences

19  and currently there is no legal Matrix. (Separate treatment, separate class of

20  individuals under the intent and meaning of equal protection.).

21      Furthermore, a regulation (Title 15 §§2400-2411) cannot over-ride a clearly

22  stated statutory enactment (Cal. P.C. §§3041 et seq.). See, Aerolineas Argentinas

23  v. U.S., 77 F.3d 1564 (Fed. Cir. 1996).

24      The BPH cannot apply or use §§2400-2411 to over-ride the Legislative intent

25  (as asserted herein) of Cal. P.C. §3041(b). §3041(b) is not ambiguous but rather

26  it is plain and clear in its meaning and who/when it applies and is a factual

27  representation of Legislative intent; That an inmate "shall" receive a parole

28  date at his first hearing, except for certain circumstances, basically stated:

5

that he is not a threat or risk to society and his crime was "not particularly egregious".

An agency may not confer power on itself. See, Gorbach v. Reno, 219 F.3d 1087 (8th Cir. 2000).

When an administrative regulation conflicts with a statute, the statute controls. (Government Code §11342.2).

Regulations that contravenes a statute is/are invalid. See, R & W Flammann GMBH v. U.S., 339 F.3d 1320 (Fed. Cir. 2003).

A statute by its very nature, trumps conflicting regulations. See, Caldera v. J.S. Alberici Const. Co. Inc., 153 F.3d 1381 (Fed. Cir. 1998).

An agencies regulations cannot legitimate the violations of constitutional or statutory rights. See, U.S. v. Marolf, 173 F.3d 1213 (9th Cir. 1999).

By the very nature of the language of P.C. §3041(a)(b) and the absence of provisions and mandates to control hearings for 15/25 years "to life" sentences the Board illegally, unconstitutionally and in violation of Federal and State Due Process and Equal Protection rights "attempts to control and over-ride" P.C. §3041(a)(b) through the application of unconstitutionally enacted rules and regulations, §§2400-2411, criteria of which NONE are legal requirements/guidelines under §3041 for consideration of suitability for parole release.

The Board has effectively amended P.C. §3041(a)(b) and the Legislative intent has been circumvented. The Board has 'unreasonably applied' U.S. Supreme Court law, when using unconstitutionally enacted rules and regulations to over-ride the language in Greenholtz and Allen; "SHALL" be released on parole. The Board's decisions/excuses are clearly "contrary" to established U.S. Supreme Court law, the California Constitution (Referendum Process) thus contrary to the holdings in Greenholtz and Allen's language of Due Process rights to a fair, impartial, legal and "meaningful" hearing.

//

6

THE BOARD VIOLATED PETITIONER'S EQUAL PROTECTION RIGHTS UNDER
THE CALIFORNIA CONSTITUTION, ARTICLE I, Sec. 7(a), AND, THE
FOURTEENTH AMENDMENT OF THE U.S. CONSTITUTION WHEN THEY FAILED
TO CONSIDER SETTING HIS TERM AND FAILURE TO FIX A PRIMARY
TERM, (SEPARATE AND DISTINCT TREATMENT OF A "CLASS OF ONE").

For an equal protection claim to proceed Petitioner must allege specific facts in support of his claim. A habeas petitioner has the burden of alleging specific facts that show a federal claim is presented, or the petition is subject to dismissal. Jones v. Gomez, 66 F.3d 199, 204-05 (9th Cir. 1995). Conclusory allegations do not warrant habeas relief. Id. at 204.

Petitioner's allegations are not conclusory, they state a prima facie equal protection claim under both the California and Federal Constitutions.

The Fourteenth Amendment Equal Protection Clause provides that no State shall deny to any person "the equal protection of the laws." (See also, California Constitution Article I, Sec. 7(a)). The Equal Protection Clause ensures that "all persons similarly situated should be treated alike." City of Cleburne v. Cleburne Living Center, 473 U.S. 432, 439 (1985). To prevail on an equal protection claim, Petitioner must initially show that he was treated differently from other similarly situated persons. City of Cleburne, supra, 473 U.S. at 439; Fraley v. United States Bureau of Prisons, 1 F.3d 924, 926 (9th Cir. 1993) (per curiam).

The mere fact that some inmates convicted of second degree murder may have been paroled sooner than Petitioner does not establish the basis for a federal equal protection claim. See, Sturm v. California Adult Authority, 395 F.2d 446, 448-49 (9th Cir. 1967) (holding that "the fact that other prisoners have had their sentence reduced, or been granted parole, affords no ground for complaint by petitioner.")

However Petitioner's equal protection claim lies elsewhere, other than a mere comparison between an inmate released earlier or paroled sooner than himself, as set forth herein.

7

## EQUAL PROTECTION UNDER "CLASS OF ONE"

In the case of In re MIKAEL SCHIOLD, Court of Appeals, First Appellate District, Division Five, Case No. A103107, attached hereto with MOTION FOR JUDICIAL NOTICE, as Exhibit "B-1-6". (With numbered paragraphs).

Schiold was transferred to the country of Sweden, under the "SETTLEMENT AGREEMENT AND FULL AND FINAL RELEASE OF ALL CLAIMS", on habeas corpus. Schiold and Respondents entered into an "agreement" transferring Schiold to Sweden (Paragraph #4 of Exhibit "B").

Case No. A103107 was agreed to as "stayed" pending Schiold's transfer. (Paragraphs #5,6,7).

Explicitely at paragraph #8: "Releasor (Schiold) agrees that he will be held in custody by the government of Sweden until January 1, 2007."

Page 5, paragraph 16 (of Exhibit "B") establishes that: the agreement and settlement, in order to stay the case, was signed by the Supervising Deputy Attorney General, Anya Binsacca, dated 10/22/2003.

Petitioner asserts that the State of California in collusion with the Attorney General's Office and the Board did in fact violate the equal protection clause of the Fourteenth Amendment of the U.S. Constitution, and, California Constitution Article I, Sec. 7(a), by "setting an immutable release date" for Schiold, when his term was set without being found suitable under §3041(b) and going directly to §3041(a).

The language in paragraph #8 of page #3 (Exhibit "B") of the settlement expressly states that "he will be held in custody by the government of Sweeden UNTIL January 1, 2007". Petitioner asserts that this date, January 1, 2007, established a 'term setting' under P.C. §3041(a). (Emphasis added).

One foreign national (Schiold) is being treated distinctly different than another foreign national (Petitioner Marroquin) (for that matter 'all' U.S. Citizens are being treated distinctly different than Schiold because they cannot

be transferred) and all similarly situated foreign nationals, thus creating separate and distinct "classes" of inmates for release criteria.

The fact that Schiold was first found to be suitable by the Board is irrelevant to the claim herein, the Governor then found Schiold to be unsuitable which nullified the Board's finding of suitability. See, Paragraphs #2,3,6 of Exhibit "B".

The most basic requirement for a claim of violation of equal protection under the Fourteenth Amendment of the U.S. Constitution lies on the issue of non-equal treatment of a "CLASS", or, a showing of separate and/or distinct difference in treatment, both criminally and civilly, among groups or "CLASSES" of persons.

The United States Supreme Court has established a "class of one" in the case of Village v. Willowbrook v. Olech, 528 U.S. 562, 145 L.Ed.2d 1060, 120 S.Ct. 1073 (2000) at pp.1074-75; "We granted certiorari to determine whether the equal Protection Clause gives rise to a cause of action on behalf of a "class of one" where the plaintiff did not allege membership in a class or group." (527 U.S. 1067, 120 S.Ct. 10, 144 L.Ed.2d 841 (1999)):

> "Whether the complaint alleges a class of one or a class of five is of no consequence because we concluded that the number of individuals in a class is immaterial for equal protection analysis."

Our cases have recognized successful equal protection claims brought by a "class of one", where the plaintiff alleges that he/she has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment. See, Sioux City Bridge Co. v. Dakota County, 260 U.S. 441, 43 S.Ct. 190, 67 L.Ed. 340 (1923); Allegheny Pittsburgh Coal Co. v. Commission of Webster City, 488 U.S. 336, 109 S.Ct. 633, 102 L.ED.2d 688 (1989). "In so doing, we have explained that 'the purpose of the equal protection clause of the Fourteenth Amendment is to secure every person within the State's jurisdiction against intentional and arbitrary discrimination, whether

1  occasioned by express terms of a statute or by its proper execution through duly

2  constituted agents." See, Sioux City Bridge Co, supra, at p.445, 43 S.Ct. 190

3  (quoting Sunday Lake Iron Co. v. Township of Wakefield, 247 U.S. 350, 352, 38

4  S.Ct. 495 (1918)). "it is clearly established that a state violates the equal

5  protection clause when it treats one set of persons differently from others who

6  are similarly situated." Wheeler v. Miller, 168 F.3d 241, 252 (5th Cir. 1999).

7      Petitioner has established separate treatment, discrimination and the Board's

8  failure to follow United States Supreme Court precedents thus their failure to

9  set Petitioner's term, as was done to Schiold, violates both the California and

10  United States Constitutions Equal Protection Clauses

### FAILURE TO CONSIDER TERM SETTING

12      At no time during the hearing, nor at any time during Petitioner's

13  incarceration has the Board considered the determinate term that Petitioner would

14  serve (as calculated by the unconstitutionally enacted Matrix) or the time he

15  has actually served as factors in the suitability equation. The Court of Appeals

16  in, In re Ramirez (12-12-01) 94 Cal.App.4th 549, at 569 held:

17      "The Board cannot ignore the determinate term prescribed for a
   commitment offense when it considers the gravity of the crime as a
18   factor weighing against a finding of suitability for parole. The Board
   must make its determination 'in a manner that will provide uniform
19   terms for offenses of similar gravity and magnitude in respect to their
   threat to the public.' (P.C. §3041(a)). Determining what would be a
20   'uniform' term for an inmate serving a determinate life term for
   offenses that include concurrent determinate terms is not an exact
21   science. However, the Board should strive to achieve at least a rough
   balance between the gravity of the offense, the time the inmate has
22   served, and the sentences prescribed by law for the commitment offense."

23      At page 570, the court said:

24      "The Board must also consider the length of time the inmate has served
   in relation to the terms prescribed by the Legislature for the offenses
25   under consideration, in order to arrive at a "uniform" term as
   contemplated by P.C. §3041(a)."

26      The gravity of Petitioner's offense must be measured not in terms of the

27  life maximum potential, but in relation to the determinate terms prescribed for

28  such offenses in 15 C.C.R. §2403(c). The Board must consider the appropriate

determinate term that would be set and the time he has already served. The Board has failed to follow the criteria of §2403(c). (Note*: Although Petitioner asserts that §§2400-2411 cannot be applied to him the Board is still in violation by not complying with rules and regulations that they are applying.)

### FAILURE TO FIX PRIMARY TERM

At no time during Petitioner's incarceration has the Board ever held a hearing to fix Petitioner's 'primary term' on his indeterminate sentence. A 'primary term' is not set in conjunction with or dependent upon a parole hearing. See, In re Rodriguez, (1975) 14 Ca.3d 639; People v. Scott, (1984) 150 Cal.App.3d 910, 918-919. Petitioner has a right to have his term fixed proportionately to his offense and his culpability.

The Los Angeles County Superior court, on June 26, 2006, In re Robert Rosenkrantz, Case No. BH003529, attached as Exhibit "C", specifically at page 3, lines 14-15 establish that the Board set Rosenkrantz term, "On September 9, 1999, petitioner was found <u>unsuitable for parole</u> but the panel set his prison term. A June 30, 2001 date was set for release. (Emphasis added).

Evaluating proportionality does not hinge on the life maximum, but is measuring the time actually served with the sentence deemed appropriate by the Board's sentencing regulations. The Board cannot abdicate this responsibility either by saying it has no authority to fix terms (see Schiold & Rosenkrantz) or by subsuming term-fixing under the parole function. Petitioner is entitled to the fixing of his primary term as an ultimate, immutable release date, under the Equal Protection (CLASS OF ONE) of the Fourteenth Amendment. See also, In re Rodriguez, supra; People v. Duran, (1983) 140 Cal.App.3d at 502-503; People v. Rodriguez, (1977) 19 Cal.3d 221, 230; Rosenkrantz, supra.

In McGinnis v. Royster, 93 S.Ct. 1055 (1973) the court held; at page 1057 that; "each inmate has both a 'minimum' parole date, which is the earliest date on which he 'may' be paroled at the discretion of the Parole Board, and a

11

'statutory release' date which is the earliest date he 'must' be paroled by the Parole Board. (fn.3), "he also has a maximum expiration date which is the date of the maximum sentence to which an inmate can be held if he receives no good time credits at all."

The case refers to an "indeterminate sentence" and establishes that there are actually three (3) dates to such a sentence; (1) the minimum parole date; (2) the statutory release date, (3) the maximum expiration date (i.e., death).

In, in re Jeanice D. (1980) 28 C.3d 210, at p.220, the California Supreme Court stated: 'The initiative, of course, was not drafted as part of the general DSL, but on the contrary, explicitly replaced the determinate sentence of 5,6, or 7 years established by the DSL for second degree murder with an Indeterminate "15 years to life" sentence.

The court noted that the DSL repealed the criteria, provisions and mandates of the ISL to govern indeterminate sentences. The court gave guidance at footnote 7 (28 C.3d 210) which the BPH still fail to take notice of (i.e., P.C. §3000).

Penal Code §190's 15 years to life sentence does not "expressly prescribe" 15 years to life to be a life sentence. See, P.C. §669; In re Collins, 99 C.A.2d 780, 781, 222 P.2d 686, citing, People v. Rivas, 85 C.A.2d 540, 193 P.2d 151. "When the term of imprisonment for second degree murder is pronounced it is "indeterminate" "until fixed" by the BPT so authorized.

While P.C. §1170 et seq., apply to determinate sentences, the current provisions of section §3041 governing parole for inmates serving indeterminate terms were added as part of the bill enacting the Determinate Sentencing Law, and were intended to serve the same purpose as the determinate sentencing provisions. (Stats., 1976 Ch. 1139, Sec. 281, p.5151; In re Stanworth, (1982) 33 Cal.3d 176, 182). Our Supreme Court has made it clear that the "uniform terms" called for by section §3041(a) are analytically equivalent to determinate sentences imposed under §1170 et seq. (People v. Jefferson, 21 Cal.4th 86, 96.)

THE BOARD VIOLATED PETITIONER'S DUE PROCESS RIGHTS UNDER
THE FIFTH AND FOURTEENTH AMENDMENTS OF THE U.S. CONSTITUTION
WHEN THEY DENIED HIM A PAROLE DATE BASED ON P.C. §3041(b),
BECAUSE HIS CONVICTION WAS "A TERRIBLE OFFENSE".

The key to understanding who, how and the "exception" to setting a parole
date is by tracing the statute back to when it was enacted ... (July 1, 1977)
(SB42), and what life prisoners the Board was required to hold hearings for.

The Uniform Determinate Sentencing Act (DSL) became effective July/1977,
§3041(a)(b) were enacted as part of the (DSL) and reads today as it did in 1977.
Requiring the Board to "normally" set parole dates one year before a life
prisoners M.E.P.D., (subd. (a)) with (subd. (b)) providing a narrow exception
to setting a parole release date for "particularly egregious offenses."

The class of life prisoners the Board was required to see after the enactment
of the DSL on July 1, 1977, were (1st) degree murders and 'kidnappers', of whom
both of these sentences had to serve seven (7) years before becoming eligible
for parole. P.C. §3041(a)(b) was enacted 16 months before Initiative Measure
Proposition 7, which increased the murder penalty of (1st) degree murder from
"life" to "25 years to life" and changed (2nd) degree murder from a "determinate"
term of 5, 6 or 7 years to an "indeterminate" sentence of "15 years to life."

Before Proposition 7, of November, 1978, the Board was required to see (2)
main classes of life offenses of (1st) degree murder and 'kidnapping'. P.C.
§3041(a) required the Board to "normally" set parole dates for those (2) classes
of life sentences. The "EXCEPTION" to setting a parole date when §3041(b) is
applied; offense(s) that were such in gravity; so especially grave; so
particularly egregious that public safety concerns required a longer period of
incarceration for these individuals and a parole date could not be set at the
initial hearing.

In People v. Anderson, 6 Cal.3d 628 (1972), the California Supreme Court
held that the 'then' California death penalty law was impermissibly cruel, and

128 prisoner's whose sentences were fixed at death now would have their sentences reduced to 'life' with the possibility of parole (there was no life without the possibility of parole in California at that time). (See, e.g., In re Stanworth, (1982) 33 Cal.3d 176. In 1966 Stanworth was sentenced to death following a plea of guilty to two (2) counts of 'first' (1st) degree murder. Stanworth was one of the prisoners who came off of death row and was given a term of life with a possibility of parole. In 1979 Stanworth was given a parole date after 13 years and served a total of 17 years at the time of his release on parole.

When the DSL was enacted, July 1, 1977, this group/class of 128 prisoners, that came off of death row, after serving 7 years were eligible for parole. However, Sec. (b) of P.C. §3041 enabled the Board to indefinitely deny parole because their offense(s) were of such gravity ("particularly egregious") in nature that public safety concerns allowed the Board to deny setting a uniform term under subd. (a) of §3041.

The offense(s) of the 128 prisoners that came off of death row were not comparable to 'normal' first (1st) degree murder or kidnapping offenses, under the provisions of the Uniform Proportionate Punishment for base terms in the Boards Matrix guidelines for similar offenses. All of the 128 prisoners convictions had "special circumstances" (initially warranting the death penalty sentence). P.C. §3041(a) requires the Board to establish criteria not only for the setting of a parole release date, but also criteria for the "EXCEPTION" to setting a parole date under §3041(b) and §3041.5(b)(2). This criteria to the "exception" is implemented in the Board's 1978 amended regulations, Title 15 C.C.R. §2281(c)(1)(A)(B)(C)(D), et seq..

The first amendment of subsection (c) filed 6/28/1979, (Register 79, No. 26): "Circumstances tending to show unsuitability", "the prisoner committed the offense in an especially heinous, atrocious or cruel manner."

The language and circumstances were adopted from Proposition 7's section

14

§190.2(a)(14). P.C. §190.2 ONLY applies to prisoners with a sentence of life without the possibility of parole or the death penalty, NOT for prisoners serving a (1st) or (2nd) degree murder sentence with the possibility of parole. Compare Title 15 C.C.R. §2281 and §2402.

The circumstances tending to show unsuitability ... are the "EXCEPTIONS" to setting a parole release date, which, prior to the sentences of 15/25 years to life of Proposition 7 (1978) had a VERY NARROW application. The "exception" was not NORMALLY applied but was meant to be (per legislative intent), applied to the 128 prisoners that came off of death row.

The Board is violating Petitioner's due process rights by unconstitutionally applying the "exception", §3041(b) to ALL 'to life' prisoners of Proposition 7. By applying P.C. §3041(b) to ALL 'to life' prisoners, making the EXCEPTION the NORM, the Board has effectively destroyed the proportionality contemplated by P.C. §3041(a).

By legislative intent, P.C. §3041(b) CANNOT be applied to (1st) or (2nd) degree murder sentences (15/25 years to life), "unless" the exception is proven.

In summary, the enactment of P.C. §3041(a) of 1977, provided that parole dates shall normally be set for (1st) and (2nd) degree murder sentences, with subdivision (b) serving as the NARROW EXCEPTION and only being applied to offenses that are not of the normal first or second degree murder ... the 128 prisoners that came off of death row had special circumstances that the "exception" was intended (by legislative intent) to apply to.

In People v. Thompson, 29 Cal.Rptr.2d 847 (Cal.App.2 Dist. 1994); a case involving a fire bombing of a residence after midnight and a 2 year old child was killed, the court held that;

"Given this deference to the Legislature, defendant is wise not to challenge the sentence imposed by the Legislature for those who are convicted under section 12310. That branch has determined this crime is particularly dangerous to human life and those who are convicted of causing death by igniting a destructive device should be sure to

suffer a penalty separate and apart from the murder statutes. The penalty challenged herein is calculated to advance a critically important social policy for the protection of the public at large, i.e., the deterrence of a PARTICULARLY EGREGIOUS type of life-endangering criminal conduct." (People v. Isitt (1976) 55 Cal.App.3d 23, 31, 127 Cal.Rptr. 279; People v. Laursen (1972) 8 Cal.3d 192, 198, 104 Cal.Rptr. 425, 501 P.2d 1145.).

At pp.851-852: "As noted above, the legislative determination has made that the crime involved in this case is a more serious crime than premeditated murder and deserves the augmented penalty associated with it. The use of destructive devices, Molotov coctails in this instance, which can inflict indiscriminate and multiple deaths, marks defendant as a greater danger to society than a person who premeditates the murder of a single individual." (Emphasis added throughout).

It is apparent that the court followed "legislative intent" for cases that were "particularly egregious" in sentencing Thompson. As asserted by Petitioner above, §3041(b) was enacted by the Legislature for such purposes that the "exceptions" to, separate and apart from the murder statutes, would apply. Thompson, [3] at 850.

A crime is "particularly egregious" when elements of 'special circumstances' were found that would authorize a sentence of life without the possibility of parole or the death penalty. In re Leslie Van Houten, 116 Cal.App.4th 339, (2004). (Note* In Van Houten, the jury found special circumstances, true at her trial).

Petitioner's conviction clearly falls within the Matrix (although under California Constitution Article II, §10(c) is illegal, see argument herein), that the Board is "supposed to follow", and, there were no special circumstances found to be true at his trial thus the Board cannot apply subdivision (b) of §3041 to his suitability hearing. Additionally, several courts have used the language of "ax murder", "execution style murder", when compared to "normal", "ordinary run", "common scenario", "conventional" when addressing NON particularly egregious murder cases. (Citations omitted).

Properly viewed, under the facts presented above, Petitioner's commitment offense simply cannot be so "particularly egregious" as to justify a denial of parole pursuant to P.C. §3041(a)(b).

16

Petitioner asserts that, in the Board's DECISION, there is not one word indicating the usage of _particularly egregious_ or any other language that could be remotely construed as such. The only language used to deny him a parole date were: "this commitment offense was a - a terrible offense"; "The motive for the crime was very trivial in relation to the offense."

In, In re Ramirez, Marin County Superior Court, Case No. SC109829A (9-13-2000), (94 Cal.App.4th 549), the court held that parole could not be withheld absent a factual finding that the offense was "particularly egregious."

Petitioner asserts that, The triviality of the crime claim is only supported by Title 15 C.C.R. §2400-2411, which were unconstitutionally enacted in violation of the Referendum Process, see Cal. Const. Art. II, §10(c).

The Board's decision was arbitrary and capricious as there was no legitimate, logical reason for the denial of a release date as Petitioner has served over the minimum term for a second degree offense and is now starting to serve a sentence of first degree murder.

Furthermore, the "Proposal" for the initiative measure Proposition 7 clearly states that the ONLY change to 2nd degree murder is the increase to 15 years "to life". Proposition 7 ONLY changes the number of years to be served, i.e., an increase in punishment. There is NO implied difference between the malice as to 5, 6 or 7 years for 2nd degree murder and 15 years "to life".

See, In re Jeanice D. (1980) 28 Cal.3d p.220, of which establishes 15 years "to life" as being a lesser crime than 1st degree murder, 25 years "to life".

Petitioner has a liberty interest in parole according to the legislative intent of the statute. In re Rosenkrantz (IV) 2002 DJDAR 727 (01-18-2002) ____ Cal.App.4th ____; In re Ramirez, supra; Greenholtz v. Nebraska Penal Inmates (1979) 442 U.S. 1, 7-11; Board of Pardons v. Allen, (1987) 482 U.S. 369, 376.

//

//

17

THE BOARD VIOLATED PETITIONER'S DUE PROCESS RIGHTS UNDER
THE FIFTH AND FOURTEENTH AMENDMENT OF THE U.S. CONSTITUTION,
AND, CALIFORNIA CONSTITUTION ARTICLE 7(a) WHEN THEY DENIED
PAROLE BASED ON A PREDETERMINED OUTCOME.

The Board's decision satisfies due process only if "some evidence supports the decision". Superintendent, Mass. Corr. Inst. v. Hill, 472 U.S. 445, 455, 105 S.Ct. 2768, 2774, 86 L.Ed.2d 356 (1985); Rosas v. Nielsen, 428 F.3d 1229, 1232 (9th Cir. 2005)(per curiam).

Although the Board's decision is almost always based on citation to the commitment offense of the original crime, there comes a point when the use of the crime to deny parole, without other evidence, is a violation of due process. The question that still remains unresolved by the courts is 'how many times can the Board use the crime to deny parole before the due process violation occurs'.

The crime is never going to change and although the Board or Governor is "INITIALLY JUSTIFIED" in relying on the gravity of an inmate's offense in denying parole, Rosas, 428 F.3d at 1232-33; Biggs, 334 F.3d at 916, "continued reliance" on unchanging factors, the circumstances of the offense and conduct prior to imprisonment, runs contrary to the rehabilitation goals espoused by the prison system and could result in a due process violation". Biggs, 334 F.3d at 916-17; Irons v. Warden of Cal. State Prison-Solano, 358 F.Supp.2d 936, 947 (E.D. Cal. 2005).

Petitioner asserts that the court in Biggs, Irons and Rosas have already decided the issue as to how many times the crime can be used for parole consideration when they used the language of "Initially justified".

Relying on Black's Law Dictionary, SIXTH EDITION, Centennial Edition (1891-1991), which is construed as the guideline for courts language, Petitioner refers to the following examples:

1). INITIAL: That which begins or stands at the beginning.

2. INITIAL APPEARANCE: After arrest, the first appearance of the accused

18

before a judge or magistrate.

3). INITIAL CARRIER: In the law of bailments, the carrier who first receives the goods...

4). INITIAL DETERMINATION: With respect to social security benefit claims, refers to first determination of agency...

5). INITIATE: Commence; start; originate; introduce.

Petitioner asserts that the key to understanding the courts reasoning when it stated "initially justified", under the dictionary's interpretation of "initially" means "FIRST". Thus the court has already determined that the crime cannot be used after the "initial" (first) parole board suitability hearing, thus the subsequent or second usage of the crime will cause a due process violation to exist.

Petitioner further asserts that the "some evidence" standard espoused by Hill, supra is not the authority under California law. Under the holdings in Jurasek v. Utah State Hospital, 158 F.3d 506 (10th Cir. 1998), the state may confer more comprehensive due process protections upon its citizens than does the federal government.

Petitioner relies on the California Evidence Code Section §115, under "PREPONDERANCE OF EVIDENCE" standard, where, the preponderance of evidence is to be applied to situations where there is no evidence standard set. (Such as parole hearings).

Therefore the State of California has conferred more, or a greater, evidence standard upon the Board, by making the 'minimum' evidence standard 'preponderance of evidence', rather than that espoused in Hill, supra, i.e., "some evidence".

Hill, supra, derived the "some evidence" standard from Powell, relating to a disciplinary hearing. Hill, addresses, at page 2774; "requiring a modicum of evidence to support a decision to revoke good time credits". (Emphasis added throughout).

19

At page 2774: [3]: "We hold that the requirements of due process are satisfied if some evidence supports the decision by the prison disciplinary board to revoke good time credits." (Emphasis added).

"This standard is met if 'there was some evidence from which the conclusion of the administrative tribunal could be deduced...'" United States ex rel. Vajtauer v. Commissioner of Immigration, 273 U.S., at 106, 47 S.Ct., at 304.

Nonetheless the State of California has, by legislative intent, conferred more, or a greater, due process protection during parole suitability hearings under Evidence code §115 "Preponderance of Evidence" standard.

The pertinent section of Evidence Code §115 states: "Except as otherwise provided by law, the burden of proof requires proof by a preponderance of evidence." (Stats. 1965, c. 299 §2, operative Jan. 1, 1967).

Clearly Evidence Code §115 applies to parole board hearings, under the "except as otherwise provided by law" section because parole board hearings did not have any standard of proof applied until Hill was attached under the "some evidence" standard, which is contrary to California law.

Petitioner contends that the Board's denial of a parole date based on his crime being a "terrible offense", and, "The motive for the crime was very trivial in relation to the offense" does not constitute "some evidence" or for that matter, under the California legal standard (Evidence Code §115) the Board's denial does not meet the preponderance of evidence standard, that Petitioner posed a threat to public safety at the time of the second hearing, the Psychologist report established otherwise.

A denial of parole based on factors other than those contemplated by California law (P.C. §3041(b)), i.e., public safety concerns, is a decision without "some" evidentiary support within the statutory framework.

As stated by the Court in Biggs v. Terhune, (9th Cir. 2003) 334 F.3d 910:

"To insure that a state-created parole scheme serves the public interest purposes of rehabilitation and deterrence, the Parole Board must be cognizant not only of the factors required by state statute to be considered, but also the concepts embodied in the Constitution requiring

1    due process of law." (Id., at 916).

2    However, the deferential "some evidence" standard has outer limits. See,

3    Coleman v. Board of Prison terms, No. 96-0783 LKK PAN, slip op. at 9 (E.D. Cal.

4    May 19, 2005). If it is established that a particular judgment was predetermined,

5    then a prisoner's due process rights will have been violated even if there is

6    "some evidence" to support the decision. See, Bakalis v. Golembeski, 35 F.3d

7    318, 326 (7th Cir. 1994) (a decision-making "body that has prejudged the outcome

8    cannot render a decision that comports with due process."); See also, In re

9    Rosenkrantz, 29 Cal.4th at 677, 128 Cal.Rptr.2d 104, 59 P.3d 174 (a parole

10   decision "must reflect an individualized consideration of the specified criteria

11   and cannot be arbitrary and capricious.").

12   Petitioner's case presents a stronger case for release than Biggs for several

13   reasons. First Petitioner's commitment offense was far less serious than Biggs.

14   Biggs was involved in a violent, manipulative, and premeditated murder while

15   Petitioner here acted in what he perceived at the time, as a threat to his life,

16   in response to the circumstances. Second, Biggs had not yet served the full term

17   of his sentence, while Petitioner here has exceeded, with credits, his sentence

18   for second degree murder and is now serving the time for a first degree sentence.

19   Petitioner here has demonstrated exemplary behavior and evidence of

20   rehabilitation for a significant period of time (not one instance of a rules

21   violation while incarcerated). Therefore, the sole reliance on Petitioner's

22   commitment offense in denying him parole impinges on Petitioner's constitutional

23   liberty interest in parole.

24   Petitioner asserts that the excuse "it was a terrible offense" is not even

25   found in the Matrix criteria and even though the second excuse is in the Matrix

26   (triviality of the reason for the crime) is insufficient to support even the

27   unconstitutional "some evidence" standard. Therefore the Board's denial is without

28   foundation or support under the "some evidence" standard, coupled with the Board's

21

requirement for parole plans in California and Petitioner's 'perfect' prison
record the Board's decision was in violation of and an unreasonable application
of U.S. Supreme Court law.

> THE BOARD VIOLATED PETITIONER'S DUE PROCESS RIGHTS UNDER
> THE FIFTH AND FOURTEENTH AMENDMENT OF THE U.S. CONSTITUTION
> BY HOLDING "PAROLE SUITABILITY" HEARINGS FOR A FOREIGN
> NATIONAL, THAT WILL BE DEPORTED, WHO CAN NEVER BE RELEASED
> ON PAROLE IN CALIFORNIA. PENAL CODE §3041(a)(b) IS
> UNCONSTITUTIONALLY VAGUE AND AMBIGUOUS AS TO PAROLE v.
> DEPORTATION FOR FOREIGN NATIONALS WITH AN "INS" HOLD.

Petitioner was given a parole suitability hearing, the second or subsequent,
(with an interpreter present), on June 6, 2006, the subject of this petition.

The rote language, at page 72 (DECISION), "...Mr. Marroquin is not yet
suitable for parole and would pose an unreasonable risk of danger to society
or a threat to public safety if released from prison." Petitioner was given a
one (1) year denial.

What is confounding in the record is that there is no reference to why
Petitioner is dangerous to society and the Psychiatrist report establishes just
the opposite. Petitioner's threat level assessment, by a state licensed
professional Psychiatrist sets his threat level at 98. To understand this figure
(98) simply means that in the assessment of dangerousness to re-offend, out of
100 inmates released there would be 98 inmates that would re-offend or commit
another crime before Petitioner did. Petitioner has an amazing 2% chance of
committing another crime and that in itself is sufficient to find Petitioner
suitable for parole.

The Board 'never' referred to any language of "particularly egregious" as
they always do. (See previous arguments).

Although at the first hearing (and second) there was a claim that
Petitioner shot the victim twice, and the letter from the police department claims
that Petitioner shot the victim in the stomach are not true statements of fact
as to what actually happened.

In actuality there were two (2) entry wounds and only one (1) shot was fired at the victim's arm which held the broken beer bottle. The Bullet deflected into the upper torso area which caused death many hours later. See (Ex-"D-E").

The Board failed to support its conclusory findings to deny parole with any material or relevant evidence, as is required by 15 C.C.R. §2000(b)(62) (Material Evidence), or (60) (Relevant Evidence). The Board's conclusions were not supported by reference to any evidence in the record bearing on the "suitability criteria". The Board failed to adhere to its own "preponderance" (see Evid. C. §115) of "material" and "relevant" evidence standard in the weighing of evidence during its pre-decisional process. (15 C.C.R. §2000(b)(49) (Good Cause). See, In re Powell (1988) 45 Cal.3d 894, at fn.10. (Inmate's right to procedural due process). The Board must follow its own heightened evidentiary standard. See, Terhune v. Superior Court (1998) 65 Cal.App.4th 864.

There was no evidence that Petitioner's offense was "egregious" enough to justify a denial of parole since the various elements of his crime are already provided for in the illegal Matrix. Indeed, as stated perviously, the egregious language was never mentioned by the Board). See, in re Ramirez, supra, 94 Cal.App.4th 549, at 570.

There was no evidence to justify denial based on the unsupported conclusion (See, "Ex-F") that Petitioner needs more self-help. The Board ignored the positive findings expertly prepared psychological reports indicating that Petitioner does not pose an unreasonable threat to public safety, (see, P.C. §3041). The Board's Commissioners are not legally permitted to assume the role of expert witnesses and therefore cannot reassess the findings or re-weigh the importance of an individually prepared and detailed report by a state licensed professional psychiatrist/psychologist staff member; by statutory code this is the sole domain of the CDC Psychiatric/Psychological staff. The hearing record is completely void of any listed 'expertise' regarding the Commissioners educational background

1   or state license for Psychological training that gives them the 'right' or

2   'authority' to over-ride a legitimately prepared psychological report based on

3   a 'whim/excuse', which is often done by the Board if the report is positive.

4       The Psychologists have cleared Petitioner of any need for additional therapy

5   "or" self-help. There must be a factual underpinning to support the Board's

6   determination. See, In re Caswell (10-10-01) 92 Cal.App.4th 1017, 1027; In re

7   Rosenkrantz, supra, 80 Cal.App.4th 409; In re Ramirez, 94 Cal.App.4th 1017.

8       There must be "specific facts" and a "rational basis" for a departure from

9   parole guidelines. Misasi v. U.S. Parole Comm., 835 F.2d 754 (10th Cir. 1987).

10      Therefore, absent such factual underpinnings, not even sufficient to meet

11  the "some evidence" standard, the Board's conclusions were unsupported and

12  therefore arbitrary and capricious. The decision to deny parole requires reversal

13  and Petitioner should be given a deportation date. (Note a parole date).

14      In the case of John E. Dannenberg, Case No. SC112688A, Filed May 8, 2001,

15  where the court held: citing to In re Powell, (1988) 45 Cal.3 894, that the Board

16  enjoys broad but not absolute discretion in parole-related matters. The Supreme

17  Court held in that case that there must be "some evidence" to support the Board's

18  determination. Id., at 904. The Marin County Court believed that the standards,

19  i.e., "some evidence" and "arbitrary and capricious" were indistinguishable.

## DEPORTATION V. PAROLE ISSUE

21      Petitioner was born in Guatemala, his mother still lives there, his wife

22  is going to move there with him. Petitioner has an INS hold. (See, Ex-A, passim).

23      What is most troubling to Petitioner is that the Board is requiring parole

24  plans and job offers for California when it is well established that he will

25  be deported, without question. Petitioner has a residence in Guatemala, a trade,

26  family support. (Ex-A, passim).

27      Petitioner asserts that, as a most basic understanding of P.C. §3041(b)

28  (threat level to the public), in the case at bar, Petitioner contends that when

1   he is paroled (which cannot legally happen) he will no longer be (and will never

2   be) under the parole authority, (he will never be turned over to a Parole Agent

3   but rather he will be turned over to the Federal Government's INS Agency, thus

4   under a Catch-22 situation, when he is paroled he will be free of parole because

5   California and Guatemala have no treaty for parole supervision. Thus all the

6   criteria/excuses from the Board to further his self-help, get "atta-boy chronos"

7   furnish parole plans and job offers in California are mere excuses under the

8   arbitrary and capricious standard and furthermore cannot be applied to Petitioner.

9   (Note* One "ah-s___" wipes out all "atta-boys".)

10      It is basically understood that the reason for any inmate's denial because

11  of a threat level to the public is to enhance the prisoner's sentence, given

12  the fact that a foreign national, like Petitioner, can "never" be found suitable

13  for parole simply because he can never be paroled (only deported), §3041(b),

14  consideration for public safety cannot be considered. In reality any foreign

15  national that is going to be deported should be found suitable for deportation

16  at his first hearing because (b) can never be applied to the determination.

17      The court in U.S. v. Cuero-Flores, 276 F.3d 113 (2nd Cir. 2002), held that;

18  when addressing a "special" parole issue; the court agreed with other circuits

19  that have held supervised release terminates when the parolee is deported.

20              STATEMENT IN SUPPORT OF PAROLE vs. DEPORTATION

21      California P.C. §3041(a)(b) is unconstitutionally vague and ambiguous as

22  to its application for foreign nationals that have an "INS" hold, inmates that

23  cannot be paroled but only deported thus the same criteria cannot be applied

24  to both classes of inmates, U.S. Citizens, and, foreign nationals. Proposition

25  7 did not address the issue of deportation vs. parole.

26      Of course, all second degree murders by their very nature involve a disregard

27  for the life of another; In re Rosenkrantz, (2000) 80 Cal.App.4th 409, 419 fn.13;

28  People v. Summers, (1983) 147 Cal.App.3d 180, 184-85 (195 Cal.Rptr. 21); People

                                      25

1  v. Matta, (1976) 57 Cal.App.2d 472, 480-81 (129 Cal.Rptr. 205; People v. Bayea,

2  (1974) 38 Cal.App.3d 176, 188-89 (113 Cal.Rptr. 254). See also, CALJIC No. 8.31.

3       As in In re Smith, (2003) 114 Cal.App.4th 343, there is no evidence that

4  petitioner tormented, terrorized or injured his victim before deciding to shoot

5  him or that he gratuitously increased and unnecessarily prolonged his suffering.

6  As asked in Scott, was the crime callous? Yes, however, are the facts of the

7  crime evidence that he acted with exceptionally callous disregard for the victim's

8  suffering or do the facts distinguish his crime from other murders as

9  exceptionally callous? The record establishes that there was no intent to murder

10 the victim, to the contrary Petitioner's victim was shot once, in the arm holding

11 the broken beer bottle, and the bullet traveled to the chest area. (See Ex. "D"

12 wherein it was what Petitioner "percieved" at that instant, an eminent threat

13 to his life).

14      The inquiry of whether an actual period of confinement is excessive and

15 disproportionate hinges not on the life "potential" but on the sentencing

16 regulations promulgated by the Board under authority of statute, but not in

17 violation of the California Constitutions Referendum Process, Article II, section

18 10(c). See P.C. §§3041, 3052, 5076.2, Title 15 C.C.R. §§2400-2411.

19      Petitioner submits that his parole suitability hearing constituted a

20 meaningless, pro forma charade, the outcome of which was preordained and, as

21 such, deprived him of substantive and procedural due process.

22      It is a proper function of judicial review to ensure that the Board has

23 honored in a "practical sense" the petitioner's right to "due consideration",

24 also "individualized consideration". See, Sturm, 11 Cal.3d at p.268.

25      In the case of In re Edward Ramirez, Court of Appeal, First Appellate

26 District, Division Three, Case No. A092699, filed 12/12/01; the Court addressed

27 similar issues as presented herein and in the DISPOSITION the Court ordered,

28 among other orders, that "the Board must consider Ramirez's psychological profile

as a factor favoring his application for a parole date..."

Nonetheless, P.C. §3041(a)(b) is vague and ambiguous as to suitability for "deportation" vs. suitability for "parole". The criteria to favor a positive parole decision cannot apply to a foreign national, without being in violation of the laws of California and the United States.

California P.C. §3041(a)(b) are clear in their legislative intent, for U.S. Citizens that will be found suitable for "parole", the "only" criteria (see Illegal Matrix argument) for a parole release date is that the inmate shall not pose an unreasonable risk to society. The Board does not have the authority to make this assessment and "must" follow the evaluation prepared by the state licensed Psychiatrist so authorized to make such an assessment. Additionally the Board has no authority in penal codes or rules and regulations to find a 'foreign national' (that has an INS hold or will be deported) suitable for parole but only suitable for deportation.

CONCLUSION

Petitioner asserts that his MEPD for a sentence of second degree murder has lapsed, his psychological evaluation concluded that his release (for deportation) would not pose an unreasonable (current) risk of danger to public safety, no contrary evidence exists, and Petitioner has a vested liberty interest in being deported protected by due process and equal protection that required the Board to find him suitable for deportation, at his first/initial hearing as §3041(a)(b) cannot apply to him under the vague and ambiguous doctrine.

Because the Board's recitation contrary, to U.S. Supreme Court law, their conclusion was inapposite to the record and unsupported by any evidence standard whatsoever, denial of suitability for release for deportation on that basis denied Petitioner his due process and equal protection rights.

Because the Board's grounds/excuses for its decision to deny release for deportation, boilerplate phrases and adjectives, were unsupported by any evidence,

inapposite to the record, applicable to all such offenses, irrelevant to suitability for deportation, and/or arbitrary in the extreme, and because the Board did not determine and could not have found any evidence supporting a notion that Petitioner's offense was "a terrible offense" compared to other life offenses such as Rosenkrantz and Van Houten, the denial of Petitioner's release for deportation based on the unchanging factors of his offense has abrogated his right to due process and equal protection and his liberty interest in release for deportation, and has converted his sentence to a first degree murder because he has already served the time prescribed by law, and the illegal matrix, for a second degree murder.

It is axiomatic that Petitioner, if someday granted a release date, under P.C. §3041(a)(b), which cannot be applied to a foreign national, he will be deported, thus the excuses for denial of a release date, for deportation, are meaningless, contrary to law and the Legislative intent of P.C. §3041(a)(b)'s vague and ambiguous language as to foreign nationals being deported vs. found suitable for release on parole.

### PRAYER/RELIEF REQUESTED

1). Order Respondents to show cause why Petitioner is not entitled to the relief requested:

2). Conduct an evidentiary hearing to determine a term of imprisonment proportionate to Petitioner's individual offense under the equal protection claim:

3). Order/direct the Board to set a date (immutable deportation date) consistent with Petitioner's MEPD, which has already lapsed, as was established by Legislative intent of P.C. §3041(a)(b), which cannot be applied to Petitioner:

4). Order that the Board does not have the authority to "parole" or even to "consider suitability for parole", of a foreign national that has an INS hold "or" will be deported, under P.C. §3041(a)(b):

5). Order that the Board can "only" find Petitioner releasable for

deportation under §3041(a)'s MEPD, as (b) cannot be applied:

6). Order that the Board cannot deny deportation of a foreign national (or even parole for an american citizen) based on him not having employment, further education, proof of job offers and ability to earn a living in Guatemala, "or" parole plans in California or elsewhere, under the criteria established in P.C. §3041(a)(b) as the Matrix was unconstitutionally enacted:

7). Order that the Board must find foreign nationals suitable for deportation at their "first hearing" because P.C. §3041(a)(b)'s vague and ambiguous language of unsuitability, danger to the public, do not apply outside of the borders of California or the United States due to the fact that California Penal Codes only have authority within California:

8). Grant Petitioner, and other similarly situated foreign nationals, such other relief as this Court deems just and proper in the interest of justice.

DECLARATION

I declare under penalty of perjury that the foregoing is true and correct, with attached exhibits and documents deemed to be true to the best of my knowledge and good faith belief. Executed this 19 day of October, 2006, at Soledad, California, State Prison, County of Monterey.


Marco Marroquin

29

# EXHIBIT "A"

COPY

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT, DIVISION FIVE

In re

MIKAEL SCHIOLD,

                              Petitioner-Appellee,

On Habeas Corpus.

A103107

SETTLEMENT AGREEMENT AND FULL
AND FINAL RELEASE OF ALL CLAIMS

"Releasor": MIKAEL SCHIOLD

"Releasees": GRAY DAVIS, IN HIS OFFICIAL CAPACITY AS
GOVERNOR OF THE STATE OF CALIFORNIA; THE
BOARD OF PRISON TERMS; MICHAEL E. KNOWLES,
IN HIS OFFICIAL CAPACITY AS THE WARDEN OF
MULE CREEK STATE PRISON; AND CAROL A. DALY,
IN HER OFFICIAL CAPACITY AS THE CHAIRPERSON
OF THE BOARD OF PRISON TERMS

1.    Releasor, petitioner-appellee Mikael Schiold, is currently in the custody of the California Department of Corrections pursuant to his conviction by guilty plea to second-degree murder while using a deadly weapon. Schiold's sentence is fifteen years to life plus one year. Schiold is identified by the Department of Corrections as inmate number D-31112.

2.    The Board of Prison Terms found Schiold suitable for parole on April 11, 2002. On September 6, 2002, the Governor reversed that decision and found Schiold unsuitable for parole.

3.    Schiold filed a petition for writ of habeas corpus in San Francisco

1

COPY

Superior Court, Case No. 4523, challenging the Governor's determination that he was unsuitable for parole. The Superior Court granted that petition, and respondents-appellants appealed to the First District Court of Appeal, Case No. A103107.

4.    Releasor and releasees desire to enter into this settlement agreement in order to provide for a recommendation that Schiold be transferred to the custody of Sweden under the Convention on the Transfer of Sentenced Persons in full settlement of all claims which are or might have been the subject of the petition in this case, upon the terms and conditions set forth below.

5.    This release is executed in consideration of the Board of Prison Terms submitting, with its approval, the application of Schiold for custodial transfer to Sweden under Government Code section 12012.1 and the Convention on the Transfer of Sentenced Persons.

6.    Releasor Schiold agrees that upon approval of the transfer by the United States Department of Justice, Sweden, and any other necessary entities, and upon transfer to Sweden, he will stipulate to vacate the San Francisco Superior Court's order granting the petition in Case No. 4523. Releasor Schiold further agrees that pursuant to the satisfaction of the conditions of this paragraph, he will then dismiss the petition in San Francisco Superior Court Case No. 4523.

7.    Releasor and releasees agree to stay Court of Appeal Case No. A103107 pending resolution of this settlement. The stay shall immediately terminate on October 29, 2003 if before that date releasees have not fully complied with their obligations set forth in paragraph 5. Moreover, the stay shall immediately terminate on December 25, 2003 if releasor Schiold is not in Sweden prior to that date. However, with respect to the immediately preceding sentence only, releasees may file a motion to continue the stay

2

COPY

past December 25, 2003 based upon a showing that the transfer process is proceeding expeditiously. If the stay terminates pursuant to the terms of this paragraph, releasor and releasees agree that the filing and service of the opening brief in Court of Appeal Case No. A103107 will be due two weeks after the stay terminates. Releasees agree to voluntarily dismiss that appeal upon releasor's dismissal of the petition described in paragraph 6.

8.    Releasor agrees that he will be held in custody by the government of Sweden until January 1, 2007.

9.    Releasees agree that so long as Schiold and the government of Sweden comply with this agreement, they will take no further action against releasor arising from his conviction in San Francisco County Superior Court Case No. 119276.

10.    Upon full satisfaction of the conditions set forth in paragraph 6, Schiold thereafter fully and forever releases and discharges: the respondents-appellants in the above-captioned case and in San Francisco Superior Court Case No. 4523; the State of California; the California Department of Corrections; the Chairperson of the Board of Prison Terms; and each of their employees, agents, servants, and other representatives, past and present, from all claims, demands, actions, and causes of action, including claims for attorneys' fees, court costs, and other costs of suit, that are or could have been the subject of the petition for writ of habeas corpus in San Francisco Superior Court Case No. 4523. This release expressly does not apply to the obligations set forth in this settlement agreement.

11.    In making this release, Schiold understands and agrees that he relies wholly upon his own judgment, belief and knowledge as to the nature, extent, effect, and duration of liability. The making of this release is without reliance upon any statement or representation of any of the releasees or their agents.

3

COPY

12.   It is expressly understood by Schiold that the approval and submitting of the application for transfer under the Convention on the Transfer of Sentenced Persons referenced in paragraph 5 of this release constitutes a compromise of a disputed claim, and that the releasees expressly deny any and all liability in the above-captioned case.

13.   This agreement shall constitute the entire agreement between releasor and releasees, including attorney's fees, arising from the actions described in paragraph 3, and it is expressly understood and agreed that this agreement has been freely and voluntarily entered into by all parties, and each of them.  It may not be altered, amended, modified, or otherwise changed in any respect except by writing duly executed by the parties to this agreement.

14.   This agreement shall be governed by and construed in accordance with the laws of the State of California.

15.   This release is freely and voluntarily made.  Schiold has not been influenced to any extent in making this release by any representations or statements made by any of the releasees or their agents except as set out herein.

///

///

4

COPY

16.    Facsimile signatures shall bind the parties to this agreement.

Date: 10/22/03

ETHAN A. BALOGH
KEKER & VAN NEST
Attorneys for Petitioner-Appellee Mikael Schiold

Date: 10/22/03

ANYA BINSACCA
Supervising Deputy Attorney General
Attorney for Releasees Gray Davis, in his official capacity as Governor of
the State of California; the Board of Prison Terms; Michael E. Knowles, in
his official capacity as the Warden of Mule Creek State Prison; and Carol A.
Daly, in her official capacity as the Chairperson of the Board of Prison
Terms

5

EX "B"   Page 5 of 6

EXHIBIT "C"