# EXHIBIT 1
# Part 2 of 3

CONFORMED COPY
OF ORIGINAL FILED
Los Angeles Superior Court

JUN 26 2006

John A. Clarke, Executive Officer/Clerk

By _____, Deputy

LAW OFFICES OF
PICONE & DEFILIPPIS
625 North First Street
San Jose, CA 95112

SUPERIOR COURT OF THE STATE OF CALIFORNIA

FOR THE COUNTY OF LOS ANGELES

In re, ) Case No.: BH003529
) ORDER RE: WRIT OF HABEAS CORPUS
ROBERT ROSENKRANTZ, )
)
Petitioner, )
)
On Habeas Corpus )
)
)

The court has read and considered petitioner's Writ of Habeas Corpus filed on August 17, 2005, as well as the return and denial filed in response to the court's order to show cause. Having independently reviewed the record, giving deference to the broad discretion of the Board of Prison Hearings ("Board") in parole matters, the court concludes that the Board's decision denying petitioner parole is not supported by "some evidence."

Petitioner is currently serving a sentence of 15 years to life with a two-year firearm enhancement following his 1986 conviction of second degree murder. Petitioner's minimum eligible parole date was January 23, 1996. Petitioner asserts constitutional claims, including the argument that the Board violated its regulations and petitioner's right to due process by its refusal to set a parole date despite its inability to find him unsuitable for parole or to deem him an unreasonable risk to public safety if paroled.

On April 25, 2005, the Board denied petitioner parole for one year. In denying petitioner parole, the Board relied upon the circumstances of the commitment offense. When determining

1

ep

unsuitability based on commitment offense, the Board may consider as a factor whether the victim was abused, defiled or mutilated during or after the offense. (See Cal. Code Regs., tit. 15, § 2402(c)(1)(C).) Here, the Board found that the victim was "abused" due to "the number of times he was shot and the manner in which he was shot." In addition, the Board concluded that the case "rises to the highest level of second-degree murder." The Board further stated in its decision that the Deputy District Attorney and the Los Angeles Sheriff's Department opposed parole. While the Board is required to consider such opposition (see Penal Code section 3042), that opposition is not a factor on which the Board may rely to deny parole as enumerated in title 15, section 2281 of the California Code of Regulations.

Towards the conclusion of the hearing, the Board summarily mentioned its concern that petitioner is a danger to his brother, Joey. The court finds that this assertion is not only unsupported by the record, but belied by the record, which contains documented evidence that contradicts any fear that the petitioner is a threat to his brother's safety. Furthermore, the court rejects the Board's inference that the absence of yearly supportive letters from petitioner's brother shows that petitioner is a danger to his brother. In fact, the petitioner's denial and traverse draws attention to a recent psychological evaluation addressing and dismissing the Board's concern for the safety of petitioner's brother. However, because this psychological evaluation was not evidence before the Board at the time of petitioner's hearing, the court may not properly rely upon it in reviewing the Board's decision. Regardless, the court finds that there is no evidence in the record that supports the conclusion that petitioner remains a danger to his brother.

The Board's sole reliance on the gravity of the offense to justify denial of parole can be initially justified as fulfilling the requirements set forth by state law. (*Biggs v. Terhune* (9th Cir. 2003) 334 F.3d 910, 916.) However, over time, should petitioner continue to demonstrate exemplary behavior and evidence of rehabilitation, denying a parole date simply because of the nature of the commitment offense raises serious questions involving his liberty interest in parole. (*Id.* at p. 917.) Here, petitioner's record is replete with reports of petitioner's exemplary conduct as well as his vocational and educational achievements over a period of many years. Indeed,

SUBSEQUENT PAROLE CONSIDERATION HEARING

STATE OF CALIFORNIA

BOARD OF PAROLE HEARINGS

In the matter of the Life )
Term Parole Consideration )
Hearing of: )          CDC Number H-62380
)
MARCO MARROQUIN )          INMATE
)
_____ )          COPY.

CORRECTIONAL TRAINING FACILITY

SOLEDAD, CALIFORNIA

JUNE 6, 2006

11:40 A.M.

PANEL PRESENT:

Ms. Linda Shelton, Presiding Commissioner
Mr. Bill Keenan, Deputy Commissioner

OTHERS PRESENT:

Mr. Marco Marroquin, Inmate
Ms. Aracelisa Zavala, Interpreter
Mr. Richard Rutledge, Attorney for Inmate
Mr. David Pearson, Deputy District Attorney
Correctional Officers Unidentified

CORRECTIONS TO THE DECISION HAVE BEEN MADE

_____          See Review of Hearing
_____          Transcript Memorandum

Berenice Billington, Peters Shorthand Reporting

ii

## INDEX

|                               | PAGE |
|-------------------------------|------|
| Proceedings                   | 1    |
| Case Factors                  | 8    |
| Pre-Commitment Factors        | 19   |
| Post-Commitment Factors       | 26   |
| Parole Plans                  | 41   |
| Closing Statements            | 66   |
| Recess                        | 71   |
| Decision                      | 72   |
| Adjournment                   | 81   |
| Transcriber Certification     | 82   |

--oOo--

1

```
 1                    P R O C E E D I N G S
 2          DEPUTY COMMISSIONER KEENAN:   We're on
 3    record.
 4          PRESIDING COMMISSIONER SHELTON:   All
 5    right.  Good afternoon, everyone.  We are here
 6    for a Subsequent Parole Consideration Hearing
 7    for Marco Marroquin, CDC number H-62380.
 8    Today's date is June 6, 2006.  The time is 11:40
 9    a.m.  We are located at CFT.  Mr. Marroquin was
10    received on January 14th, 1993, committed from
11    Los Angeles County.  His life term began
12    December 24, 1993, with a minimum eligible
13    parole date of December 24th, 2003.  The
14    controlling offense for which the Inmate is
15    committed is set forth in case number TA016787,
16    charging in count one, violation of PC 187,
17    murder in the second degree, along with
18    PC 12022.5(a), use of a firearm.  Mr. Marroquin
19    received a term of 15 years to life, plus a
20    three-year enhancement, equaling 18 years to
21    life.  Mr. Marroquin, this hearing is being
22    recorded for voice identification purposes, so
23    we will go around the room and state our first
24    name and our last name, spell our last name, and
25    when we get to you, please add your CDC number.
26    I will start and go to my left.  My name is
27    Linda Shelton, S-H-E-L-T-O-N, Commissioner.
```

2

1        DEPUTY COMMISSIONER KEENAN:  Bill Keenan,

2   K-double-E-N-A-N, Deputy Commissioner.

3        DEPUTY DISTRICT ATTORNEY PEARSON:  David

4   Pearson, P-E-A-R-S-O-N, Deputy District Attorney

5   from the County of Los Angeles.

6        ATTORNEY RUTLEDGE:  Richard Rutledge,

7   R-U-T-L-E-D-G-E, counsel for Mr. Marroquin.

8        INMATE MARROQUIN THROUGH THE INTERPRETER:

9   My name is Marco Marroquin, M-A-R-R-O-Q-U-I-N,

10  H-C2 - excuse me.

11       THE INTERPRETER:  H-62380 is Mr.

12  Marroquin's CDC number.  Aracelisa Zavala,

13  Z-A-V-A-L-A, Interpreter.

14       PRESIDING COMMISSIONER SHELTON:  And for

15  the record, we have two officers in the room for

16  security purposes who will not be participating

17  in this hearing.  All right, Mr. Marroquin, you

18  signed a form called BPT Form 1073 back in July

19  of 2005 with regards to any need for

20  accommodations for disabilities.  As well, you

21  signed a form today that your attorney went over

22  with you?

23       INMATE MARROQUIN THROUGH THE INTERPRETER:

24  Yes.

25       PRESIDING COMMISSIONER SHELTON:  Do you

26  wear glasses, senor?

27       INMATE MARROQUIN THROUGH THE INTERPRETER:

3

1    Yes, just to read.

2          PRESIDING COMMISSIONER SHELTON:   And your

3    glasses work okay for you?

4          INMATE MARROQUIN THROUGH THE INTERPRETER:

5    Yes.   Yeah.

6          PRESIDING COMMISSIONER SHELTON:   Do you

7    have any hearing problems?

8          INMATE MARROQUIN THROUGH THE INTERPRETER:

9    No.

10         PRESIDING COMMISSIONER SHELTON:   Do you

11   have any walking, sitting or standing problems?

12         INMATE MARROQUIN THROUGH THE INTERPRETER:

13   No.

14         PRESIDING COMMISSIONER SHELTON:   Is there

15   any reason that you wouldn't be able to complete

16   this hearing today?

17         INMATE MARROQUIN THROUGH THE INTERPRETER:

18   No.

19         PRESIDING COMMISSIONER SHELTON:   You're

20   perfectly comfortable with going forward?

21         INMATE MARROQUIN THROUGH THE INTERPRETER:

22   Perfectly.

23         PRESIDING COMMISSIONER SHELTON:   Thank

24   you.   Mr. Rutledge, have we accommodated any and

25   all disabilities?

26         ATTORNEY RUTLEDGE:   Yes, Commissioner.

27         PRESIDING COMMISSIONER SHELTON:   Okay.   I

4

1    think we're okay.  Does anybody have a problem

2    with leaving the air conditioning on at the

3    moment, are we - can we hear each other okay?

4    Except for Mr. Rutledge might have to speak up.

5         DEPUTY COMMISSIONER KEENAN:  I want to

6    get that microphone just a little closer.

7         PRESIDING COMMISSIONER SHELTON:  If it

8    gets sidetracking, we'll turn it off.  All

9    right.  Mr. Marroquin, you also have some

10   rights.  You have the right to an impartial

11   hearing.  Do you have any problem with

12   Commissioner Keenan or myself handling your

13   hearing today?

14        INMATE MARROQUIN THROUGH THE INTERPRETER:

15   No way.

16        PRESIDING COMMISSIONER SHELTON:  All

17   right.  You also understand that the process for

18   appealing a decision has to go through court

19   now, in case you don't - you want to appeal a

20   decision, and your attorney can help you do that

21   if you have any concerns about that.

22        INMATE MARROQUIN THROUGH THE INTERPRETER:

23   Thank you.

24        PRESIDING COMMISSIONER SHELTON:  All

25   right.  Counsel, have we met all of your

26   client's rights today -

27        ATTORNEY RUTLEDGE:  Yes.

5

1          PRESIDING COMMISSIONER SHELTON:   - so

2    far?  Okay.  Thank you.  Mr. Marroquin, you are

3    not required to admit to or discuss your

4    offense; however, this panel accepts as true the

5    findings of the court.  Do you know what that

6    means?

7          INMATE MARROQUIN THROUGH THE INTERPRETER:

8    Not exactly.

9          PRESIDING COMMISSIONER SHELTON:  What it

10   means is that we have court papers that said

11   what you did on your commitment offense, and we

12   have to go by that.

13         INMATE MARROQUIN THROUGH THE INTERPRETER:

14   That's fine.

15         PRESIDING COMMISSIONER SHELTON:  All

16   right.  It also means, like I said, you don't

17   have to talk about this either.  You and your

18   attorney can decide what you want to do there.

19         INMATE MARROQUIN THROUGH THE INTERPRETER:

20   There's no problem.

21         PRESIDING COMMISSIONER SHELTON:  All

22   right.  Commissioner, do we have any

23   confidential material?

24         DEPUTY COMMISSIONER KEENAN:  We do not.

25         PRESIDING COMMISSIONER SHELTON:  All

26   right.  Where do we have the Hearing Checklist

27   at?  I think I put it in front of you.  Do you

6

 1    have it, Mr. Pearson, the Hearing Checklist?

 2            DEPUTY DISTRICT ATTORNEY PEARSON:   Yes.

 3            PRESIDING COMMISSIONER SHELTON:   Here is

 4    it is.

 5            DEPUTY DISTRICT ATTORNEY PEARSON:   Yes, I

 6    do.

 7            PRESIDING COMMISSIONER SHELTON:   All

 8    right.  Both attorneys have seen the Hearing

 9    Checklist, and both of you have signed that you

10    have everything you need to move forward in

11    today's hearing?

12            ATTORNEY RUTLEDGE:   Correct.

13            PRESIDING COMMISSIONER SHELTON:   Mr.

14    Pearson?

15            DEPUTY DISTRICT ATTORNEY PEARSON:   Yes.

16            PRESIDING COMMISSIONER SHELTON:   Okay.

17    Great.  Thank you.  All right.  Mr. Rutledge,

18    are there any additional documents to be

19    submitted?

20            ATTORNEY RUTLEDGE:   I don't believe so.

21    There was some question regarding a certificate

22    that may or may not be in the file, but -

23            PRESIDING COMMISSIONER SHELTON:   We'll

24    get to that when we start covering - it was a

25    vocational certificate?

26            ATTORNEY RUTLEDGE:   Correct.

27            PRESIDING COMMISSIONER SHELTON:   Okay.

7

1    We can look for that as we get to that portion.

2    He may have some things there.  Mr. Marroquin,

3    do you have anything in that file that you

4    wanted to submit with permission from your

5    attorney?

6         INMATE MARROQUIN THROUGH THE INTERPRETER:

7    All I have here is documents that are already

8    (indiscernible).

9         PRESIDING COMMISSIONER SHELTON:  Okay.

10   Well, that's good to know.  In case we can't

11   find them here, we'll look in there.

12        INMATE MARROQUIN THROUGH THE INTERPRETER:

13   Correct.

14        PRESIDING COMMISSIONER SHELTON:  All

15   right.  Are there any preliminary objections?

16        ATTORNEY RUTLEDGE:  No.

17        PRESIDING COMMISSIONER SHELTON:  Will

18   your client be speaking with us today?

19        ATTORNEY RUTLEDGE:  Yes.

20        PRESIDING COMMISSIONER SHELTON:  All

21   righty.  Mr. Marroquin, please raise your right

22   hand.  Do you solemnly swear or affirm that the

23   testimony you give at this hearing will be the

24   truth, the whole truth, and nothing but the

25   truth?

26        INMATE MARROQUIN THROUGH THE INTERPRETER:

27   That is correct.

8

1    **PRESIDING COMMISSIONER SHELTON:** Thank

2    you, sir. All right. We're moving into the

3    next phase of this hearing where we'll be

4    discussing your commitment offense. We'll talk

5    about your prior record and we'll talk about

6    your social history. So I am going to enter

7    into the record a summary of the offense as

8    taken from the - actually, it's taken from the

9    November 2nd Board Report but has been carried

10   forward to the current review period of November

11   2005.

12           "Viewed in accordance with the usual

13           rules on appeal, the evidence established

14           that in August of 1991, the victim Luis

15           Silva, and his girlfriend agreed to buy a

16           car from Marroquin. Silva drove the car

17           for several days, and after discovering

18           that it had a lot of defects, he returned

19           the car to Marroquin. He did not want

20           the car back, and told Silva that he

21           wanted one thousand dollars for the days

22           the car was used. Silva replied that if

23           he had the money, he would pay him for

24           the car. Marroquin told Silva that he

25           would regret what he had done to him. On

26           January 13th, 1992, in the city of

27           Compton, Los Angeles County Sheriff's

9

1        Department deputies were flagged down by

2        two men.  They reported that an

3        individual, later identified as

4        Marroquin, had been shooting a gun.  Two

5        men, who also witnessed the incident,

6        directed LASO deputies to where Marroquin

7        was.  He was observed to be standing in

8        front of a Toyota truck holding the hood

9        open with a gun in his left hand.  He was

10       ordered to drop the gun.  Marroquin threw

11       the gun into a vacant lot.  In the

12       process of placing Marroquin in the

13       patrol car, other witnesses approached

14       the LASO deputies stating that someone

15       had been shot in the front of Villa

16       Bajavita Bar.  Bajavita spelled B-A-J-A-

17       V-I-T-A.  LASO deputies observed the

18       victim, a male, later identified as Luis

19       Silva, lying on his back.  Upon closer

20       observation, there appeared a gunshot

21       wound to the victim's left bicep.  The

22       victim was bleeding slightly, and his

23       jacket was stained with blood.  The

24       victim was then transported to Long Beach

25       Memorial Hospital where he was pronounced

26       dead on 1/14/92 at approximately 7:22

27       a.m.  Cause of death was listed as

10

1           internal hemorrhage.  A witness who was

2           selling hotdogs from a stand outside the

3           bar heard Marroquin swearing at Silva and

4           saying that he wanted to kill him.  The

5           witness did not see them fighting prior

6           to Marroquin pulling out the gun.  Also

7           the witness saw no menacing gestures on

8           the part of Silva, nor did she see

9           anything in Silva's hand.  The witness

10          did not see or hear Silva break a bottle

11          or use a bottle in a jabbing motion."

12   Mr. Marroquin, would you like to tell us about

13  that day?

14          INMATE MARROQUIN THROUGH THE INTERPRETER:

15  Correct.

16          PRESIDING COMMISSIONER SHELTON:  Go

17  ahead, sir.

18          INMATE MARROQUIN THROUGH THE INTERPRETER:

19  First of all in this case, I offer my apologies

20  sincerely as – as far as everything that

21  happened.  This problem, I take it as an

22  accident, because if I wanted to or if my

23  intentions were others, so much time would have

24  not lapsed.  I had forgotten about that.  But

25  what happens and I – I –

26          PRESIDING COMMISSIONER SHELTON:  Eye-yie-

27  yie.  Take your time.  Translation's difficult.

11

1       THE INTERPRETER: I'm so sorry. The
2 interpreter does not have a translation for the
3 word "maldigo," which is spelled M-A-L-D-I-G-O,
4 from the prisoner. She can give an explanation
5 of the word she is familiar with: "I hate the
6 moment, I -" oh, gosh. Instead of "blessing,"
7 the opposite of a blessing. It's a -
8       DEPUTY COMMISSIONER KEENAN: Curse?
9       THE INTERPRETER: "I curse the moment."
10 Thank you.
11       INMATE MARROQUIN THROUGH THE INTERPRETER:
12 I automatically, that incident, I found myself
13 in an opportune moment, or I went to that place,
14 that bar, and unfortunately, we bumped into each
15 other there, and it's impossible - not I
16 remember, but it's impossible that I was - if I
17 was aware if he was there first or if I was
18 there first, but this situation brought a lot of
19 harm to me, and there is no excuse that is worth
20 to take the life of another, just like I offer a
21 lot of apologies that I have harmed that family,
22 and also my family. But in this act, it was
23 something where I was the hurt one, and I want
24 to ask for permission and at the same time
25 apologize to all the members of the panel here,
26 but what happened to me, it could happen to
27 anyone. I was kidnapped - I was kidnapped, I

12

```
 1   was robbed, and it came to the point of death,
 2   and it's something that at the time I felt not
 3   only at the time but I keep feeling not only of
 4   a coward situ - cowardly situation, but it never
 5   crossed my mind, ever, that it would arrive to
 6   that point because I have sincerely felt since
 7   that moment very bad, and I really feel bad, and
 8   I automatically cannot assimilate all of this
 9   that happen.  I ad - I admit to my guilt one
10   hundred percent, and I really need an
11   explanation because you can't see the coin only
12   on one side.
13          PRESIDING COMMISSIONER SHELTON:  All
14   right.  Mr. Marroquin, we need to ask you a
15   couple of questions.  You're telling us how you
16   feel, which is fine.  I'm still confused about
17   what happened that day.  You mentioned that you
18   were kidnapped.  How?
19          INMATE MARROQUIN THROUGH THE INTERPRETER:
20   Exactly.
21          PRESIDING COMMISSIONER SHELTON:  How?
22          INMATE MARROQUIN THROUGH THE INTERPRETER:
23   I was sitting in a piece of furniture inside the
24   bar, and when I felt the pull from here, it was
25   two guys, and then they took me out.  Once I was
26   outside, I was attacked.  I was - I was able to,
27   I did whatever means possible to prevent to be
```

13

1  battered.  If I would have had a better defense,

2  if I would have found the weapon that he had in

3  his power, that is was something like - like a

4  knife, and during that movement, they stole

5  everything.  I would run this way, they would

6  follow me; I would run this way, and they follow

7  me, until finally they - they walked away, and

8  then I went - I went to the car.  When - once I

9  got to the car, it was a surprise - such a

10 surprise that those walkways that are behind the

11 homes, I am in front of my car when I see - when

12 I see the car come out again, and - and they get

13 off one - on one side of the car and the - the

14 other one on the other side of the car wanted to

15 attack me, and I cursed the moment when I was

16 already armed, and even that's - in that case I

17 still told them, "Please, I don't want any

18 problems."  I would walk, and they would follow

19 me.  How can it be possible if I'm walking on

20 the sidewalk and them inside the car driving at

21 my pace, if I wanted to, I would've shot them

22 there, but no, my intentions were none, nothing

23 was going through my mind.  What, yes, yes, with

24 true sincerity is that I felt not sure or

25 secure, but I did feel somewhat prepared, but as

26 I was getting there, because it was - because it

27 was two or three times that I was walking

14

```
 1   towards the bar and they were going along with
 2   me, and I would come back, and they would put
 3   the car in reverse again, and I wanted to see, I
 4   wanted to someone who can help me at that
 5   moment, and I cursed the day when I see - when I
 6   see people outside the bar, in front of the bar,
 7   and I said, "I see people, nothing's going to
 8   happen." When they noticed that I'm getting
 9   closer to the bar, they make a U-turn and they
10   park the car on the other side. When I see the
11   victim, when it starts running, with a bottle in
12   his hand, and on the edge of the sidewalk, he
13   breaks it, and he goes - lunges at me, and - and
14   true - excuse me - truly am sincere, I didn't
15   remember about the gun at that moment. I was
16   attacked two or three times with the bottle, and
17   I didn't remember about the gun, because I felt
18   he was going to kill me, and finally it
19   happened. I feel very bad.
20            PRESIDING COMMISSIONER SHELTON:  Senor,
21   you mentioned that they stole all of your
22   things.  What did they steal?
23            INMATE MARROQUIN THROUGH THE INTERPRETER:
24   My watch, a chain, they stole my money, and
25   prior to that, showed up there at the police.
26   How did it appear?  Well, because the police
27   confiscated it.
```

15

1        PRESIDING COMMISSIONER SHELTON:   From you

2   or from the victim?

3        INMATE MARROQUIN THROUGH THE INTERPRETER:

4   No, there at the police, they confiscated that

5   that belonged to me, what they had stole from

6   me.

7        PRESIDING COMMISSIONER SHELTON:   Okay.  I

8   understand.  Mr. Marroquin, how much did you

9   have to drink that day?

10        INMATE MARROQUIN THROUGH THE INTERPRETER:

11   Automatically, yes, I had drunk some — drank,

12   excuse me — some beers.

13        PRESIDING COMMISSIONER SHELTON:   How

14   many?

15        INMATE MARROQUIN THROUGH THE INTERPRETER:

16   I can't calculate, but a few.

17        PRESIDING COMMISSIONER SHELTON:   How

18   often do you drink?

19        INMATE MARROQUIN THROUGH THE INTERPRETER:

20   Back then I would drink my beers once in a

21   while.

22        PRESIDING COMMISSIONER SHELTON:   Every

23   day?

24        INMATE MARROQUIN THROUGH THE INTERPRETER:

25   No, no.  Sometimes on the weekends.  It was like

26   a — a habit, a stupid habit, and I apologize for

27   that, the word.

16

1          PRESIDING COMMISSIONER SHELTON:   Did you

2    - do you think you had an alcohol problem back

3    then?

4          INMATE MARROQUIN THROUGH THE INTERPRETER:

5    Correct.

6          PRESIDING COMMISSIONER SHELTON:   So when

7    you drank on the weekends, did you always when

8    you drank?

9          INMATE MARROQUIN THROUGH THE INTERPRETER:

10   Not exactly - not exactly would I get drunk, but

11   yes, yes, - well, I would be happy, yes.

12         PRESIDING COMMISSIONER SHELTON:   Why did

13   you have a gun?

14         INMATE MARROQUIN THROUGH THE INTERPRETER:

15   Automatically, there is no excuse that is worth

16   it, but - forgive me, not that I'm evading your

17   question, but I'm going to start from a point, a

18   confusing point.  When I was in - in trial, in

19   court, the DAs, they were accusing me that why

20   had I obtained the revolver seven days prior to

21   the crime, and that was incorrect, because

22   Sacramento had re - registered it to me seven

23   years before because of my record, and that -

24   and that is something I'm not able to

25   understand, why are they accusing of something

26   that they shouldn't, because the judge brought

27   it to their attention, to the district

17

1  attorneys, about it, because they knew exactly

2  that revolver was found, speaking vulgarly, it

3  wasn't hot, it wasn't a hot one, it was a

4  registered weapon.

5      PRESIDING COMMISSIONER SHELTON:  And let

6  me ask you, sir, why did you get a weapon seven

7  years before?

8      INMATE MARROQUIN THROUGH THE INTERPRETER:

9  In this case - well, to start off with, the area

10  when I lived at and it was something that you

11  would keep inside your home secured, and I'm

12  sorry, not that I'm going to judge you, but I

13  can use a very good word here and apply it, but

14  above the 90 percent of all Americans, North

15  Americans, they have a weapon in their home, and

16  what makes me think about that, because in the

17  court where I was at, the judge did ask a

18  hundred people that were present, "Who has a

19  weapon in their home?"  They all raised their

20  hand.

21      PRESIDING COMMISSIONER SHELTON:  Mr.

22  Marroquin, that day of that offense your weapon

23  wasn't in your home.

24      INMATE MARROQUIN THROUGH THE INTERPRETER:

25  Correct.  I - I would - had the custom to go to

26  over by Pomona to - to the shooting range, and

27  that's the motive for which I had in my

18

1   possession that weapon, that cursed weapon.

2           PRESIDING COMMISSIONER SHELTON:   So you

3   had already been to the shooting range, or you

4   were going to the shooting range?

5           INMATE MARROQUIN THROUGH THE INTERPRETER:

6   No, we had already gone.

7           PRESIDING COMMISSIONER SHELTON:   All

8   right.  Did you want to ask any questions about

9   the offense at this moment, or do you feel like

10  -

11          DEPUTY COMMISSIONER KEENAN:   Nothing,

12  thank you.

13          PRESIDING COMMISSIONER SHELTON:   All

14  right.  Let's - let's con - do you have anything

15  else you want to add with regards to this before

16  we move on?

17          INMATE MARROQUIN THROUGH THE INTERPRETER:

18  Well, you have the opinion and you have the say.

19          PRESIDING COMMISSIONER SHELTON:   That may

20  be true, but this is your opportunity to - to

21  talk as well, sir.  I don't have any opinion at

22  the current time, I'm listening to you.

23          INMATE MARROQUIN THROUGH THE INTERPRETER:

24  That's fine.  In this case, as - as I was

25  already judge, I'm being judge again — or tried,

26  I'm being tried again.  As I was already tried

27  twice, one in the courts and another one three

19

1    years ago.

2            PRESIDING COMMISSIONER SHELTON:    Mr.

3    Marroquin, I'm going to interrupt.    You're not

4    on trial here today, sir.    We're trying to

5    decide whether you have the ability to be

6    successful on parole, and we talk about this

7    offense because that's what got you in here -

8            INMATE MARROQUIN THROUGH THE INTERPRETER:

9    Okay.

10           PRESIDING COMMISSIONER SHELTON:    - and

11   that's a foundation for us moving forward, to

12   see what you have done with your life since

13   you've been here and if you have prepared

14   yourself for release.

15           INMATE MARROQUIN THROUGH THE INTERPRETER:

16   Okay.    In this case, being that this saying has

17   been - has changed now, I have a new knowledge

18   regarding this new life that I now have, I have

19   obtained a vocation of which I like so that I

20   can evolve in my future if I were to be released

21   tomorrow.

22           PRESIDING COMMISSIONER SHELTON:    Okay.

23   We are going to move in that direction now, so

24   we're going to move forward.    I think you

25   understand what we're talking about, I hope you

26   do, so we've talked about what got you in here,

27   we're going to talk about your prior record, and

20

1   according to this, sir, you have no prior

2   record.

3        INMATE MARROQUIN THROUGH THE INTERPRETER:

4   Correct.

5        PRESIDING COMMISSIONER SHELTON:   You

6   never got in trouble as a youth.

7        INMATE MARROQUIN THROUGH THE INTERPRETER:

8   Never.  Never gotten into any problems.  I been

9   - I been accused of it, they were - they -

10       PRESIDING COMMISSIONER SHELTON:   Okay.

11       INMATE MARROQUIN THROUGH THE INTERPRETER:

12  - got confused.

13       PRESIDING COMMISSIONER SHELTON:   Yeah,

14  there's nothing on your recording according to

15  this.  So that's good.

16       INMATE MARROQUIN THROUGH THE INTERPRETER:

17  I've never done anything.

18       PRESIDING COMMISSIONER SHELTON:   Now

19  let's talk about your growing-up time, and I'm

20  going to read what's here, and I want you to

21  help me out, tell me if it's true or not.  You

22  were -

23       INMATE MARROQUIN THROUGH THE INTERPRETER:

24  That's fine.

25       PRESIDING COMMISSIONER SHELTON:   You were

26  born July 30th, 1956, in Guatemala.

27       INMATE MARROQUIN THROUGH THE INTERPRETER:

21

1   Correct.

2        PRESIDING COMMISSIONER SHELTON:   And it

3   says here that you didn't cooperate well to tell

4   much about your social history.  I understand

5   you have two sisters and three brothers?

6        INMATE MARROQUIN THROUGH THE INTERPRETER:

7   Correct.

8        PRESIDING COMMISSIONER SHELTON:   And some

9   of your brothers and sisters are still in

10  Guatemala, and some are in Los Angeles.

11       INMATE MARROQUIN THROUGH THE INTERPRETER:

12  Correct.  I want to ask a question.

13       PRESIDING COMMISSIONER SHELTON:

14  Certainly.

15       INMATE MARROQUIN THROUGH THE INTERPRETER:

16  What was it that you said, I didn't understand?

17       PRESIDING COMMISSIONER SHELTON:   Did

18  somebody talk to you about your social history

19  before?

20       INMATE MARROQUIN THROUGH THE INTERPRETER:

21  In reception, yes.

22       PRESIDING COMMISSIONER SHELTON:   Okay.

23  Did you tell them all about yourself, or did you

24  didn't want to talk?

25       INMATE MARROQUIN THROUGH THE INTERPRETER:

26  No, I explained to the counsel - counselor.  He

27  asked about my family, and I told him

22

1  everything.

2          PRESIDING COMMISSIONER SHELTON:   Okay.

3  Well, we're going to have you tell us.  So how

4  old were you when you came over from Guatemala?

5          INMATE MARROQUIN THROUGH THE INTERPRETER:

6  I was very young.

7          PRESIDING COMMISSIONER SHELTON:  Did your

8  whole family — well, obvious — your parents came

9  over?

10          INMATE MARROQUIN THROUGH THE INTERPRETER:

11  No.

12          PRESIDING COMMISSIONER SHELTON:  So how

13  did you get to the United States?

14          INMATE MARROQUIN THROUGH THE INTERPRETER:

15  Just like a hundred percent of all people in the

16  United States, they come as immigrants.

17          PRESIDING COMMISSIONER SHELTON:  No.  But

18  I mean how did you get here?  Who did you come

19  with, and how old were you?

20          INMATE MARROQUIN THROUGH THE INTERPRETER:

21  All by myself.  On my own.

22          PRESIDING COMMISSIONER SHELTON:  How old

23  were you?

24          INMATE MARROQUIN THROUGH THE INTERPRETER:

25  I was very young.  I was like 18 years old.

26          PRESIDING COMMISSIONER SHELTON:  Okay.

27  Why did you want to come here?

23

1         INMATE MARROQUIN THROUGH THE INTERPRETER:
2    Unfortunately, to - to be better, to better
3    myself.
4         PRESIDING COMMISSIONER SHELTON:  Start a
5    new life?
6         INMATE MARROQUIN THROUGH THE INTERPRETER:
7    Exactly.
8         PRESIDING COMMISSIONER SHELTON:  Sir, do
9    you have any contact with your parents or your
10   brothers or sisters?
11        INMATE MARROQUIN THROUGH THE INTERPRETER:
12   Yes, and I thank God that I do have the support
13   of my family.  Unfortunately, they already
14   passed away.
15        PRESIDING COMMISSIONER SHELTON:  Your
16   parents passed away?  I'm sorry, sir.  Do you
17   have - who - is there - do you still have
18   brothers or sisters that live in Los Angeles?
19        INMATE MARROQUIN THROUGH THE INTERPRETER:
20   Yes.
21        PRESIDING COMMISSIONER SHELTON:  As well
22   as in Guatemala?
23        INMATE MARROQUIN THROUGH THE INTERPRETER:
24   Correct.
25        PRESIDING COMMISSIONER SHELTON:  Does
26   anybody come see you here?
27        INMATE MARROQUIN THROUGH THE INTERPRETER:

24

1    My wife and my children.

2            PRESIDING COMMISSIONER SHELTON:    All

3    right.   Let's talk about your wife and your

4    children.   How did you meet your wife?

5            INMATE MARROQUIN THROUGH THE INTERPRETER:

6    In school.

7            PRESIDING COMMISSIONER SHELTON:    Inside

8    the institution or before you came?

9            INMATE MARROQUIN THROUGH THE INTERPRETER:

10   Excuse me?

11           PRESIDING COMMISSIONER SHELTON:    Inside

12   the institution or before you came here?

13           INMATE MARROQUIN THROUGH THE INTERPRETER:

14   Oh, no, I've been married since I been 18.

15           PRESIDING COMMISSIONER SHELTON:    Very

16   good.

17           INMATE MARROQUIN THROUGH THE INTERPRETER:

18   Thank you.

19           PRESIDING COMMISSIONER SHELTON:    And you

20   are still married?

21           INMATE MARROQUIN THROUGH THE INTERPRETER:

22   Correct.   That is correct.

23           PRESIDING COMMISSIONER SHELTON:    Where

24   does your wife live?

25           INMATE MARROQUIN THROUGH THE INTERPRETER:

26   In Los Angeles.

27           PRESIDING COMMISSIONER SHELTON:    Okay.

25

1   How many children do you have?

2          INMATE MARROQUIN THROUGH THE INTERPRETER:

3   Three.

4          PRESIDING COMMISSIONER SHELTON:   How old

5   are they?

6          INMATE MARROQUIN THROUGH THE INTERPRETER:

7   The oldest is like 29, and the youngest is like

8   19.

9          PRESIDING COMMISSIONER SHELTON:   And do

10  you see them or - or talk to them?

11         INMATE MARROQUIN THROUGH THE INTERPRETER:

12  Correct.  I speak to them.

13         PRESIDING COMMISSIONER SHELTON:   And they

14  come visit you?

15         INMATE MARROQUIN THROUGH THE INTERPRETER:

16  Yes, they do come and see me, but I speak with

17  them more on the phone.  That's what I admire of

18  the United States, everybody's always busy,

19  keeps busy.

20         PRESIDING COMMISSIONER SHELTON:   Is there

21  anything else you would like to add for the

22  record, sir?

23         INMATE MARROQUIN THROUGH THE INTERPRETER:

24  Like what else can I add about my family?

25         PRESIDING COMMISSIONER SHELTON:   Anything

26  you would like.

27         INMATE MARROQUIN THROUGH THE INTERPRETER:

26

1   Very well.  My desire is to be with my family.

2   I know I have an INS hold.  I know I'll be

3   deported to Guatemala.  I had the opportunity to

4   prepare myself here in prison.  I have spoken to

5   my family regarding that, and my wife, she's

6   willing to go with me over there, and my

7   children remain here.

8          PRESIDING COMMISSIONER SHELTON:  All

9   right, sir, we're going to talk about your

10  parole plans shortly, so hold that thought

11  because we're going to - I want to cover all of

12  that in just a few minutes.  What we're going to

13  do now is we're going to turn to Commissioner

14  Keenan, and he's going to talk to you about

15  post-conviction factors, which means what you've

16  been doing, as you said, to prepare yourself in

17  the institution.  Commissioner?

18         DEPUTY COMMISSIONER KEENAN:  All right.

19  Mr. Marroquin, I see you a have a placement

20  score of 19.  There was a classification score

21  of zero going back as far as February of '01.

22  Your last hearing was on 11/21/02 and we

23  recommended that you remain disciplinary free,

24  and you have done that.  We recommended that you

25  upgrade vocationally, and I'll talk to you about

26  that more in just a minute, and that you

27  participate in self-help and available therapy,

27

1    and looking at your C-File, I see that you have

2    no 115s, you have two 128a's, the last one was

3    on 6/17/93.  Since your last hearing you have

4    participated in AA, you are involved in Adult

5    Basic Education.  Are you still in Adult Basic

6    Education?

7              INMATE MARROQUIN THROUGH THE INTERPRETER:

8    Yes.

9              DEPUTY COMMISSIONER KEENAN:  Okay.  Your

10   last TABE score was 3.8, that was the total, a

11   grade of 3.8, and that was on 12/29/05, and

12   there was a chrono in the C-File for that.  I

13   did see that on earlier tests you scored higher.

14   Prior to your last hearing -

15             THE INTERPRETER:  Yes, was the response -

16             DEPUTY COMMISSIONER KEENAN:  Okay.

17             THE INTERPRETER:  - to the comment.

18             DEPUTY COMMISSIONER KEENAN:  Prior to

19   your last hearing I do see that you completed a

20   course in the Cause, Prevention, Treatment and

21   Management of HIV, AIDS, Tuberculosis and

22   Hepatitis, and you have participated in AA, NA,

23   since '95, you've worked in the Yard Crew.

24   Let's see.  I saw in the current psychological

25   evaluation, that I'll get to shortly, that you

26   participated in individual counseling at some

27   point with a Dr. Reed, I think it was.

28

1          INMATE MARROQUIN THROUGH THE INTERPRETER:

2     Yes.

3          DEPUTY COMMISSIONER KEENAN:    Okay.    And

4     I'll read a little something about that when I

5     get to the psychological evaluation.

6          INMATE MARROQUIN THROUGH THE INTERPRETER:

7     Correct.

8          DEPUTY COMMISSIONER KEENAN:    And you have

9     completed a course that you took, a

10    correspondence course, you talked about this at

11    your last hearing, and I think you were still

12    working on it during your last hearing, it was

13    the diesel mechanics, and I have a certificate

14    here for Thompson Education Direct, a diploma,

15    awarded - awarded to Marco Marroquin Webster -

16    Wester?

17         INMATE MARROQUIN THROUGH THE INTERPRETER:

18    That is correct.

19         DEPUTY COMMISSIONER KEENAN:    In

20    recognition of the successful completion of the

21    program, Diesel Mechanics.    That was in August

22    of '04, it was run by Connie Dempsy, director of

23    education.    Okay.

24         INMATE MARROQUIN THROUGH THE INTERPRETER:

25    Correct.

26         DEPUTY COMMISSIONER KEENAN:    And also I

27    saw in the psychological evaluation that's what

29

1  you plan to do, you want to work in diesel

2  mechanics in Guatemala.

3       INMATE MARROQUIN THROUGH THE INTERPRETER:

4  Correct.

5       DEPUTY COMMISSIONER KEENAN:  All right.

6  Have I missed anything yet, or does that all

7  sound accurate so far?

8       INMATE MARROQUIN THROUGH THE INTERPRETER:

9  Everything seems to be accurate.  Thank you.

10      DEPUTY COMMISSIONER KEENAN:  Is there any

11  self-help or therapy that you participated in

12  that I haven't commented on?

13      INMATE MARROQUIN THROUGH THE INTERPRETER:

14  No, everything's fine.  If I can include

15  something?

16      DEPUTY COMMISSIONER KEENAN:  Sure.

17      THE INTERPRETER:  [To Inmate Marroquin]

18  criminal?

19      DEPUTY COMMISSIONER KEENAN:  Criminon?

20      INMATE MARROQUIN THROUGH THE INTERPRETER:

21  I took a course in Criminon.

22      DEPUTY COMMISSIONER KEENAN:  I didn't

23  notice that in the - in the file.

24      INMATE MARROQUIN THROUGH THE INTERPRETER:

25  Yes, that's something that I wanted to mention.

26  I don't know what's going on, but I did it

27  around a year ago, and they haven't corresponded

30

1  with the certificate or anything.

2          DEPUTY COMMISSIONER KEENAN:  Okay.

3                    (Off the record)

4          DEPUTY COMMISSIONER KEENAN:  Back on

5  record, Side 2.  Okay.  You - you were saying

6  that you weren't - participated in and completed

7  the Criminon program, was it?

8          INMATE MARROQUIN THROUGH THE INTERPRETER:

9  Correct.

10          DEPUTY COMMISSIONER KEENAN:  In '05 you

11  believe it was?

12          INMATE MARROQUIN THROUGH THE INTERPRETER:

13  Yes.

14          DEPUTY COMMISSIONER KEENAN:  Okay.  And

15  you were giving me an explanation before we got

16  cut off by the tape, something about why you

17  don't have a certificate or -

18          INMATE MARROQUIN THROUGH THE INTERPRETER:

19  Yes, I did that course and I learned a lot

20  because it has a very good orientation, and then

21  my instructor just stopped writing to me.  I've

22  sent her like three letters already, and there

23  hasn't been any response to them.  I know you

24  would be more informed regarding this, that the

25  name is Criminon.

26          DEPUTY COMMISSIONER KEENAN:  And - huh.

27  Have you gone through your Central File?

31

1          INMATE MARROQUIN THROUGH THE INTERPRETER:

2     Yes.

3          DEPUTY COMMISSIONER KEENAN:    You didn't

4     find it in there?

5          INMATE MARROQUIN THROUGH THE INTERPRETER:

6     No, it would be a bit difficult to find it there

7     because it would have to come to me, and then I

8     would have to give it to the counselor.

9          DEPUTY COMMISSIONER KEENAN:    Okay.    And -

10    all right.    Well, do you want to just state for

11    the record what the course is, how long it was,

12    and what you got out of it?

13         INMATE MARROQUIN THROUGH THE INTERPRETER:

14    What I got out of that course was - was very

15    important.    It speaks about how to take control

16    over one's self, how to appreciate nature, all

17    of it, and how to better yourself

18    psychologically, including to that, I had some -

19         THE INTERPRETER:    I need an explanation

20    from the prisoner.    [Speaks in Spanish to Inmate

21    Marroquin.]

22         INMATE MARROQUIN THROUGH THE INTERPRETER:

23    I had some appointments, thanks to Dr. Greer, or

24    something, Deere?

25         PRESIDING COMMISSIONER SHELTON:    Oh, Dr.

26    Reed?

27         INMATE MARROQUIN THROUGH THE INTERPRETER:

32

1   Yes, thank you.  And he was going with me, a few

2   appointments that I had, and he would conversate

3   with me, and that helped me out a lot.

4       DEPUTY COMMISSIONER KEENAN:  Okay.  How

5   long was the program?

6       INMATE MARROQUIN THROUGH THE INTERPRETER:

7   More or less, a little bit more than year.

8       DEPUTY COMMISSIONER KEENAN:  More than a

9   year?

10      INMATE MARROQUIN THROUGH THE INTERPRETER:

11  Yes.

12      DEPUTY COMMISSIONER KEENAN:  Okay.  Well,

13  it would be helpful if you could get a hole of

14  some - something from the program.

15      INMATE MARROQUIN THROUGH THE INTERPRETER:

16  Thank you.

17      DEPUTY COMMISSIONER KEENAN:  Something

18  from your instructors.

19      INMATE MARROQUIN THROUGH THE INTERPRETER:

20  Thank you.

21      DEPUTY COMMISSIONER KEENAN:  All right.

22  Are there any other self-help or therapy

23  programs that I've missed here, something that

24  you participated in that wasn't commented on

25  already?

26      INMATE MARROQUIN THROUGH THE INTERPRETER:

27  No, everything's correct.  The only problem is,

33

1    and not giving fault to anybody or blaming

2    anybody, but I have tried quite a bit to attend

3    other programs, but there are many people

4    waiting for these courses, and the only thing

5    that I have attended to and with great risk that

6    if you don't attend constantly or regularly to

7    it, is Alcoholics Anonymous, and that program,

8    if you don't pay attention to or give its

9    attention to go to the appointments, they just –

10   they take you out of the program immediately.

11          DEPUTY COMMISSIONER KEENAN:  I see that

12   you were the chairman of the program at one

13   point.

14          INMATE MARROQUIN THROUGH THE INTERPRETER:

15   Yes, in another prison.  Where I was previously,

16   I was the leader.  I was the chair of the

17   sessions, and my insistence in this is the

18   steps.  The most efficient and the effort that

19   you should take to them is to be constant in a

20   group of Alcoholics Anonymous.  It's now about

21   now I have this chrono and that's it, no.  My

22   mentality is that once I'm out, I will keep

23   going to Alcoholics Anonymous for the rest of my

24   life, because there is no other way how to

25   better something, not only something that you

26   want or desire, but to be tentative [sic] to it.

27   I have this knowledge of which has been very

34

1  useful.  That's – and if I was asked about this

2  years back, and I dare to speak with everyone's

3  permission here, if I were to ask all of you

4  here, including the officers, if they are

5  alcoholics and that if they don't have a

6  knowledge of it, they are automatically

7  mistaken.  All person who drinks one beer, one

8  drink of a beer, is an alcoholic, and that is

9  something very important of which I didn't know,

10  to accept that I was an alcoholic.  My mentality

11  was, "No, I'm not an alcoholic, I know how to

12  drink."  I was very mistaken.

13          **DEPUTY COMMISSIONER KEENAN:**  Okay.

14          **INMATE MARROQUIN:**  [Still speaking in

15  Spanish.]

16          **THE INTERPRETER:**  Wait.  Excuse me.

17  These are key questions that the doctors, the

18  psychiatrists, psychologist, and medical

19  doctors, they have asked me, "Mr. Marroquin, are

20  you an alcoholic?"  Yes.  I believe it's written

21  down there.

22          **DEPUTY COMMISSIONER KEENAN:**  Okay.  And

23  vocationally, you've done the Diesel Mechanic

24  course.  Have you picked up another work or

25  vocational skills while in the institution?

26          **INMATE MARROQUIN THROUGH THE INTERPRETER:**

27  No.  I focus myself precisely in that vocation

35

1    of which I like a lot.

2              DEPUTY COMMISSIONER KEENAN:   Okay.

3              INMATE MARROQUIN THROUGH THE INTERPRETER:

4    Of which I will support myself off of it.

5              DEPUTY COMMISSIONER KEENAN:   Now I saw

6    the certificate, but I don't see any other

7    surrounding paperwork that tells me anything

8    about how long the course was, how intensive.

9    How long was this course?

10             INMATE MARROQUIN THROUGH THE INTERPRETER:

11   Yes, it took a while, approximately close to two

12   years.

13             DEPUTY COMMISSIONER KEENAN:   And how

14   would it work?  They would send you reading

15   material every month, or every week, and you

16   would have to take tests on it, or - or - how

17   did that work?

18             INMATE MARROQUIN THROUGH THE INTERPRETER:

19   Yes, there was a package that that company sends

20   you, of which I want to emphasize, it's not a

21   state one, it's a paid one, private, in which my

22   family paid for.  Thanks to them, I was able to

23   get it, and they send you everything here so

24   that you can execute it.

25             DEPUTY COMMISSIONER KEENAN:   Okay.  And

26   ordinarily I would think, and - and I'm

27   certainly not a - an expert in diesel mechanics

36

1   or any kind of mechanics, but I would think that

2   a major portion of a course in mechanics would

3   be hands-on.

4        INMATE MARROQUIN THROUGH THE INTERPRETER:

5   I am completely agreeing with you.  A great part

6   of my life I worked.  I can say it in a way of

7   working on top of an engine.  My first

8   profession is I'm a driver in busses and - and

9   trucks.

10        DEPUTY COMMISSIONER KEENAN:  Okay.  All

11   right.  Do you have anything else from the - the

12   program you could show us?  Any kind of

13   documents from the program that would -

14        INMATE MARROQUIN THROUGH THE INTERPRETER:

15   No, not exactly here.  I have documents here

16   which you have.

17        DEPUTY COMMISSIONER KEENAN:  Okay.  Well,

18   the fact that it's all written and none of it is

19   hands-on, should that lead me to the conclusion

20   that your skills in this area are less than what

21   they need to be to get a job, or is there reason

22   for me think otherwise?

23        INMATE MARROQUIN THROUGH THE INTERPRETER:

24   No, they're something that helps me, because the

25   instructors from the University in Pennsylvania,

26   they congratulated me, and they asked me an

27   extra question, why is it that I knew so much if

37

1    I grew up there, and my grade was extremely

2    high.

3         DEPUTY COMMISSIONER KEENAN:  Okay.  And

4    was that class in Spanish or English?

5         INMATE MARROQUIN THROUGH THE INTERPRETER:

6    In English.

7         DEPUTY COMMISSIONER KEENAN:  Did you have

8    difficulty with it, because of the English?

9         INMATE MARROQUIN THROUGH THE INTERPRETER:

10   No.  I have a - I don't if you can call it a

11   problem or how you can call this, but I read

12   English very nicely, and my serious problem with

13   it is speaking it.

14        DEPUTY COMMISSIONER KEENAN:  Okay.  All

15   right.  And then moving to the psychological

16   evaluation prepared for this hearing by -

17        INMATE MARROQUIN THROUGH THE INTERPRETER:

18   Thank you.

19        DEPUTY COMMISSIONER KEENAN:  - by M.

20   Macober, M-A-C-O-M-B-E-R, Staff Psychologist,

21   dated 5/11/06, in assessing you, he goes over

22   various topics.  He notes initially that he

23   interviewed you with a Spanish translator, a

24   certified translator, he says.  Okay.  And notes

25   that your mental status is within normal limits,

26   judgment was intact, intact and self-awareness

27   were good.

38

1        "Inmate Marroquin has sought out and
2        obtained individual counseling with Dr.
3        Reed at CTF.  He has received several
4        hours of individual counseling dealing
5        with the commitment offense and other
6        related issues.  Dr. Reed indicated that
7        there were no mental or emotional
8        problems evidence in this case.  Inmate
9        Marroquin was under the influence of
10       alcohol at the time of the commitment
11       offense.  He's continued to attend
12       Alcoholics Anonymous over the years.
13       Although alcohol is readily available to
14       inmates in a prison setting, he has shown
15       self-control, maturity, and
16       responsibility by totally abstaining from
17       any use of alcohol during his 13 years of
18       incarceration.  Therefore, this is
19       certainly not a current problem in his
20       life."
21  And under "Current Diagnostic Impressions," he
22  notes Axis I, no contributory clinical disorder;
23  Axis II, no contributory personality disorder.
24  He says you have a GAF of 85, and I have
25  something from the DSM-IV that defines what that
26  means.  A GAF of 85, Global Assessment of
27  Functioning, an 85 falls within a range that is

39

1  described as absent, or minimal symptoms, good

2  functioning all areas, interested and involved

3  in a wide range of activities; socially

4  effective, generally satisfied with life, no

5  more than everyday problems or concerns.

6          INMATE MARROQUIN THROUGH THE INTERPRETER:

7  Thank you.

8          DEPUTY COMMISSIONER KEENAN:   And he talks

9  about a review of the life crime.   He says you

10  accept full responsibility for the commitment

11  offense, says the offense appears to be quite

12  situational; it's also related to the fact that

13  he had been drinking alcohol, resulting in the

14  use of poor judgment and release of inhibitions.

15  There's a section on − well, let me back up.   He

16  also notes that you indicate you were very sorry

17  that it happened, said that you did not intend

18  to kill the victim, that your feelings of sorrow

19  and remorse appear to be genuine.   Your

20  assessment of dangerousness, he notes that in

21  comparison to other inmates, the potential for

22  dangerous behavior is below average; that's

23  within the institution.   He says:

24          "In considering the potential for

25          dangerous behavior if released to the

26          community, the Level of Service Inventory

27          Revised was administered.   This is an

```
 1            actuarial measure that assesses criminal
 2            background, substance abuse history,
 3            social relationships, academic and
 4            vocational achievement, family
 5            relationships, and other factors to
 6            determine current risk level on parole.
 7            He does not have a history of prior
 8            arrests, his score places him at a 1.8
 9            cumulative frequency for prison inmates.
10            This means that if 100 men were released
11            on parole, he would do better than 98 of
12            them.  This is a very low risk level.  As
13            a result, he poses no more risk to
14            society than the average citizen in the
15            community.  At this point in his life
16            there are no significant risk factors in
17            this case."  And in his final sentence he
18            says: "The prognosis for successful
19            adjustment in the community is very
20            good."
21   Is there anything you'd like to say about that
22   report?
23            INMATE MARROQUIN THROUGH THE INTERPRETER:
24   That's correct.
25            DEPUTY COMMISSIONER KEENAN:  Turn it back
26   to the chairperson.
27            PRESIDING COMMISSIONER SHELTON:  All
```

41

1   right.  Doing okay on time?

2          THE INTERPRETER:  I'm fine.  I really

3   don't know if my replacement is here or not.

4          PRESIDING COMMISSIONER SHELTON:  Okay.  I

5   think what we'll do is we'll – we'll discuss

6   parole plans, and then we'll take a recess so

7   that we can change translators.

8          INMATE MARROQUIN THROUGH THE INTERPRETER:

9   All right.

10         PRESIDING COMMISSIONER SHELTON:  Let's

11  talk about your parole plans, sir.  I have here

12  in the record that it says – as we discussed, we

13  kind of started discussing this already, you

14  would like to live with your wife, and it says

15  brother.  Does your – does your wife live with

16  your brother right now?

17         INMATE MARROQUIN THROUGH THE INTERPRETER:

18  Excuse me?

19         PRESIDING COMMISSIONER SHELTON:  Does

20  your – do – is it – is it your wife and her

21  brother, does she live with her brother or – it

22  says here, brother.

23         INMATE MARROQUIN THROUGH THE INTERPRETER:

24  No, that's mistaken.

25         PRESIDING COMMISSIONER SHELTON:  That's

26  wrong.  Okay.  Then I will note that.  Okay.  So

27  you would like to live with your wife, and her

42

1    name is Lily.

2            INMATE MARROQUIN THROUGH THE INTERPRETER:

3    Yes, correct.

4            PRESIDING COMMISSIONER SHELTON:  She

5    lives in Los Angeles, as you mentioned.

6            INMATE MARROQUIN THROUGH THE INTERPRETER:

7    Correct.

8            PRESIDING COMMISSIONER SHELTON:  Does

9    anybody else live with your wife right now?

10   Your children or –

11           INMATE MARROQUIN THROUGH THE INTERPRETER:

12   My children live with her, and they live with

13   her, vice-versa.

14           PRESIDING COMMISSIONER SHELTON:  How old

15   are they?

16           INMATE MARROQUIN THROUGH THE INTERPRETER:

17   The oldest is 29, more or less, and the youngest

18   is 19.

19           PRESIDING COMMISSIONER SHELTON:  And

20   those – they still live at home?

21           INMATE MARROQUIN THROUGH THE INTERPRETER:

22   Yes.  My children are lovely.

23           PRESIDING COMMISSIONER SHELTON:  They're

24   taking care of mom.

25           INMATE MARROQUIN THROUGH THE INTERPRETER:

26   Exactly, yes.

27           PRESIDING COMMISSIONER SHELTON:  Now we

43

1   talked about the fact that you have an INS hold,

2   so if you had to go back to Guatemala, where

3   would you live?

4           INMATE MARROQUIN THROUGH THE INTERPRETER:

5   I would automatically live in my home.

6           PRESIDING COMMISSIONER SHELTON:   And you

7   have a home in Guatemala?

8           INMATE MARROQUIN THROUGH THE INTERPRETER:

9   Exactly, yes.

10          PRESIDING COMMISSIONER SHELTON:   And

11  who's in that home right now?

12          INMATE MARROQUIN THROUGH THE INTERPRETER:

13  Part of my family is over there, and part of my

14  wife's family, and so they're taking care of

15  everything over there, because it's community

16  property.

17          PRESIDING COMMISSIONER SHELTON:   And you

18  think that since you received your diesel

19  mechanic certificate that you could find work in

20  Guatemala?

21          INMATE MARROQUIN THROUGH THE INTERPRETER:

22  Oh, yes, perfectly.   I did it with that purpose.

23          PRESIDING COMMISSIONER SHELTON:   What

24  about here?

25          INMATE MARROQUIN THROUGH THE INTERPRETER:

26  Excuse?

27          PRESIDING COMMISSIONER SHELTON:   If - if

44

1   you were to go live with your wife, do you have

2   any work lined up here?  Can you get a job as a

3   diesel mechanic in Los Angeles?

4        INMATE MARROQUIN THROUGH THE INTERPRETER:

5   No, I don't have anything planned for here,

6   don't have anything, absolutely anything.

7        PRESIDING COMMISSIONER SHELTON:  Now you

8   mentioned earlier, and I want to make sure it's

9   on the record, that if you went back to

10  Guatemala your wife plans to move with you?

11       INMATE MARROQUIN THROUGH THE INTERPRETER:

12  Correct.

13       PRESIDING COMMISSIONER SHELTON:  And your

14  children would stay here and continue on as

15  they're doing?

16       INMATE MARROQUIN THROUGH THE INTERPRETER:

17  Correct.

18       PRESIDING COMMISSIONER SHELTON:  Okay.  I

19  have some letters here that I want to review.

20       INMATE MARROQUIN THROUGH THE INTERPRETER:

21  I hope that they are there.

22       PRESIDING COMMISSIONER SHELTON:  Some are

23  here.

24       INMATE MARROQUIN THROUGH THE INTERPRETER:

25  Thank you.

26       PRESIDING COMMISSIONER SHELTON:  A letter

27  from Lily, which, if I recall, is your wife.

45

1    This was dated May of 2006.

2              INMATE MARROQUIN THROUGH THE INTERPRETER:

3    Correct.

4              PRESIDING COMMISSIONER SHELTON:   She

5    would like to live in Guatemala City with you.

6    Your children are adults, and they would stay in

7    Los Angeles.   You would receive full support

8    from family, and she lists the address here

9    where you would live in Guatemala City, Sector

10   C-2, San Jose La Rosas.

11             INMATE MARROQUIN THROUGH THE INTERPRETER:

12   Correct.

13             PRESIDING COMMISSIONER SHELTON:   And you

14   were both born there, in Guatemala City?

15             INMATE MARROQUIN THROUGH THE INTERPRETER:

16   Yes.

17             PRESIDING COMMISSIONER SHELTON:   And your

18   family is there for support.   This is a letter

19   from your three children: Emerald, 18; Joshua,

20   19; and Marco, 27.   "We are here to support him

21   100 percent.

22             INMATE MARROQUIN THROUGH THE INTERPRETER:

23   Thank you.

24             PRESIDING COMMISSIONER SHELTON:   "We will

25   travel frequently to visit you in Guatemala,"

26   and they're very supportive of your release,

27   sir.   Then we have a single letter from your

46

1  daughter.  She said she was 18 years old and

2  she's been left without you for almost 13 years.

3  She misses you, wants you to come home, and

4  obviously she loves you very much.

5       INMATE MARROQUIN:  Gracias.

6       PRESIDING COMMISSIONER SHELTON:  Here's a

7  letter from Joshua.  He says it's really been

8  hard as a man growing up with no father.  He

9  would like for you to have one more chance.  And

10  this is your - this is your oldest son.  I know

11  this is hard, but you know, I'm really impressed

12  how much your children and your wife love you.

13  So that's a good thing.

14       INMATE MARROQUIN THROUGH THE INTERPRETER:

15  Thank you very much, ma'am.

16       PRESIDING COMMISSIONER SHELTON:  It's a

17  good thing.  This is from your oldest son.  He's

18  the one that said he had to take over, stepping

19  into your role and being a dad in your absence

20  for his brother and sister, and he said he's

21  willing to support you in any way that you need.

22  And this is a duplicate letter from your - from

23  your wife, and a notarized letter from your

24  wife, indicating that you have 100 percent

25  family support.

26       INMATE MARROQUIN THROUGH THE INTERPRETER:

27  That is correct, ma'am.

47

1        PRESIDING COMMISSIONER SHELTON:    Did I

2  leave anything out on the letters?    Did - are

3  these all the letters that you were talking

4  about?

5        INMATE MARROQUIN THROUGH THE INTERPRETER:

6  Everything's correct.

7        PRESIDING COMMISSIONER SHELTON:    All

8  right.    Good.    One last thing we need to touch

9  on is that we send out what are called 3042

10  letters to agencies that are interested in your

11  situation, your case, and as you know, we have a

12  representative from the District Attorney's

13  Office in Los Angeles who will be allowed to

14  speak in a few minutes, and for the record, I

15  need to let you know that we received a letter

16  from the Los Angeles County Sheriff's

17  Department, and I need to read this to enter it

18  to the record.    They offer an opinion as well.

19  It says:

20        "During the early morning of January 13th,

21        1992, inmate Marco Marroquin and Louis

22        Silva were at a bar in the incorporated

23        area of Compton.    The two got into an

24        argument in which Marroquin became angry

25        at perceived insults against his family.

26        As the argument became more heated,

27        Silvia - Silva threatened to kick

48

```
 1              Marroquin's ass.  Marroquin left the bar
 2              and retrieved a .38 caliber pistol which
 3              he kept hidden in the engine compartment
 4              of his vehicle.  He returned to the bar
 5              and approached Silva as he came out.
 6              Marroquin pulled the pistol from his back
 7              pocket, leveled it at Silva - Silva, and
 8              declared, "You son of a bitch." He then
 9              fired once, striking Silva in the
10              abdomen."  I think it was indicated he
11              was struck in his arm in the previous
12              report.  "A witness followed Marroquin
13              back to his truck and ordered Marroquin
14              to put down the gun and surrender to the
15              police.  Marroquin retorted, "Fuck you,
16              I'll shoot you too."  Marroquin was
17              arrested in the parking lot by responding
18              deputies.  Victim Silva was transported
19              to a area hospital where he died.  Based
20              on these facts, it is the opinion of this
21              department that parole of inmate
22              Marroquin is inappropriate and should be
23              denied."
24   For the record I would indicate that I think
25   some of the - some of this letter is a tad bit
26   inaccurate with a summary of the offense.  I
27   think we covered it previously, it had a little
```

49

1    more accuracy to it, and it's only fair to put

2    that in the record as well.  Before we move on,

3    and actually what we're going to do is take a

4    recess in a moment so we can check on our second

5    translator for you, sir.  Is there anything that

6    you would like to add with regards to your

7    parole plans?

8            INMATE MARROQUIN THROUGH THE INTERPRETER:

9    First of all, my plan is to get out of this

10   nightmare, and then be in my country working,

11   like I did start doing 30 years ago, because I

12   know that life in Latin America is strongly in

13   poverty, and for that reason is why I have this

14   small tool to be able to survive.  My intention

15   is, I'm old, and it's a bit difficult for them

16   to give me work, and for which that reason I

17   want to establish a mechanic shop and be able to

18   live my last days.  That is my plan, to go back

19   to my country and work on my - on my own, set up

20   a mechanics shop.  I - I can add a whole lot of

21   other things, but

22           PRESIDING COMMISSIONER SHELTON:  Okay.

23           INMATE MARROQUIN THROUGH THE INTERPRETER:

24   I thank you for this moment.

25           PRESIDING COMMISSIONER SHELTON:  I

26   understand.

27           INMATE MARROQUIN THROUGH THE INTERPRETER:

1    Thank you.

2             PRESIDING COMMISSIONER SHELTON:    Let's

3    recess, and we'll come back together as soon as

4    we make sure we have all the translation

5    assistance that we need.   The time is 12:55 p.m.

6                      (Off the record)

7             DEPUTY COMMISSIONER KEENAN:    Back on

8    record.   All parties previously identified are

9    present.

10            PRESIDING COMMISSIONER SHELTON:    All

11   right.   Okay.   Mr. Marroquin, we are back on the

12   record, it is 10 after 1, and for the record, we

13   have the same translator as we had before, and

14   we will be maintaining her for services the rest

15   of this hearing.

16            INMATE MARROQUIN THROUGH THE INTERPRETER:

17   Okay.

18            PRESIDING COMMISSIONER SHELTON:    We are

19   now moving into the portion of the hearing where

20   we can ask you questions, and that means the

21   commissioner and I can ask you questions, the

22   deputy DA can ask you questions, as can your

23   counsel.

24            INMATE MARROQUIN THROUGH THE INTERPRETER:

25   Correct.

26            PRESIDING COMMISSIONER SHELTON:    All

27   right.   I want to see if I have any questions.

51

1    I probably do.  You know, I'm not familiar with

2    the Criminon program.  Could you tell me what

3    that's about?

4           INMATE MARROQUIN THROUGH THE INTERPRETER:

5    That program teaches you how to appreciate in

6    any angle that you see it how to manage

7    yourself, how to act, how you should appreciate

8    things, what animals meant to us, vegetation,

9    why a park is constructive, why mistreat it, why

10   cause harm to humanity, why cause harm to

11   animals, to the environment.

12          PRESIDING COMMISSIONER SHELTON:   What was

13   the —

14          INMATE MARROQUIN THROUGH THE INTERPRETER:

15   Everything referring to that.

16          PRESIDING COMMISSIONER SHELTON:   What was

17   the most important thing you learned?

18          INMATE MARROQUIN THROUGH THE INTERPRETER:

19   I can tell you what the most important.  The

20   most important — and it sounds a little bit

21   ridiculous, but everything.  Everything.

22          PRESIDING COMMISSIONER SHELTON:   It

23   sounds to me like you really liked it.  Your

24   eyes light up when you talk about this class.

25          INMATE MARROQUIN THROUGH THE INTERPRETER:

26   Yes.  I had a — an education not precisely

27   different to what was in that book, but I was

52

1   speaking completely like ignorant, how you

2   construct yourself and how to construct others,

3   and the easiest thing is obedience.    To

4   contradict another person is not something good.

5   I mean, if I were to tell you we get finished

6   today, I would dare to and if you allow me to

7   invite you because it's the studies of how to

8   manage the mind, and it's very important.

9           PRESIDING COMMISSIONER SHELTON:    Let me

10  ask you another question, sir.    What was the

11  most important you learned in your counseling

12  with Dr. Reed?

13          INMATE MARROQUIN THROUGH THE INTERPRETER:

14  When I had these small sessions with the doctor

15  and – and he counseled me as far as how to

16  manage myself and illuminating the way, asking

17  me questions from different angles, and the

18  thing you should appreciate is to be fine or

19  okay with your brain, and so many other things.

20          PRESIDING COMMISSIONER SHELTON:    Thank

21  you, sir.    I have no other questions at this

22  time.    Commissioner?

23          DEPUTY COMMISSIONER KEENAN:    I do have a

24  question.    I was looking at a past psychological

25  evaluation and it said that you completed a

26  Positive Parenting program.    Do you recall

27  anything about that?

53

1          INMATE MARROQUIN THROUGH THE INTERPRETER:

2    Yes, correct.

3          DEPUTY COMMISSIONER KEENAN:   You did Pos

4    - it's called Positive Parenting?

5          INMATE MARROQUIN THROUGH THE INTERPRETER:

6    Yes, that's the name of it, yes.

7          DEPUTY COMMISSIONER KEENAN:   Okay.  And -

8    I think that's it.

9          PRESIDING COMMISSIONER SHELTON:   Okay.

10   Mr. Pearson, do you have any questions?

11         DEPUTY DISTRICT ATTORNEY PEARSON:   Just a

12   couple questions.

13         PRESIDING COMMISSIONER SHELTON:   To me,

14   please.

15         DEPUTY DISTRICT ATTORNEY PEARSON:   Oh,

16   I'm sorry.  Yeah, you saw my eyes, didn't you?

17         PRESIDING COMMISSIONER SHELTON:   Yes, I

18   did.

19         DEPUTY DISTRICT ATTORNEY PEARSON:   I'd

20   like to ask the inmate, before he got in prison

21   what sort of work did he do on the outside?

22         INMATE MARROQUIN THROUGH THE INTERPRETER:

23   Correct.  I worked for many years in a - marmel

24   company?

25         THE INTERPRETER:  Marble.  Marble.

26         PRESIDING COMMISSIONER SHELTON:   Marble.

27         THE INTERPRETER:  Marble?

54

1          PRESIDING COMMISSIONER SHELTON:   Marble.

2          INMATE MARROQUIN THROUGH THE INTERPRETER:

3   I worked in that company like for seven years,

4   and so that we can understand each other, I

5   really refined myself there.  I don't have - I

6   don't know if the word is correctly expressed,

7   but I learned everything there, and then I gave

8   myself the opportunity to work on my own -

9          PRESIDING COMMISSIONER SHELTON:   What did

10  you do?

11         INMATE MARROQUIN THROUGH THE INTERPRETER:

12  - and I established my own company.

13         PRESIDING COMMISSIONER SHELTON:   What did

14  you do in the marble company?

15         INMATE MARROQUIN THROUGH THE INTERPRETER:

16  Everything.

17         PRESIDING COMMISSIONER SHELTON:   For

18  example -

19         INMATE MARROQUIN THROUGH THE INTERPRETER:

20  Everything.  There's only one remaining to make

21  sculptures, images, but from there, floors,

22  offices, decorations, buildings, everything,

23  everything, one hundred percent.

24         PRESIDING COMMISSIONER SHELTON:   And then

25  your new company?

26         INMATE MARROQUIN THROUGH THE INTERPRETER:

27  And I expanded from there.

55

1          THE INTERPRETER:  I'm sorry.

2          PRESIDING COMMISSIONER SHELTON:  Tell us

3   about your new company, the company you started.

4          INMATE MARROQUIN THROUGH THE INTERPRETER:

5   in my company, I would get contracts, and I

6   really feel bad, but on Friday I'd pick up a fax

7   of which I had gotten a contract in San

8   Clemente, and I never - it never crossed my mind

9   that on that weekend my mal - that bad thing

10  that happened to me was going to happen, and I

11  expanded.  Everything would go well in the

12  company, and it was thanks to my father, who

13  rest in peace, taught me how to work the honest,

14  responsible, not to - to somebody's else's

15  stuff.

16         PRESIDING COMMISSIONER SHELTON:  Okay.

17  Do you have any other questions?

18         DEPUTY DISTRICT ATTORNEY PEARSON:  Yes.

19  I want to know, did his wife - I know she worked

20  raising the children, but did she work outside

21  the home, and if so, what did she do?

22         PRESIDING COMMISSIONER SHELTON:  Did your

23  wife work outside the home?

24         INMATE MARROQUIN THROUGH THE INTERPRETER:

25  Yes.

26         PRESIDING COMMISSIONER SHELTON:  What did

27  she do?

56

1        INMATE MARROQUIN THROUGH THE INTERPRETER:

2   She - there's this well-known city of which I'm

3   sure you'll remember, and she worked there in

4   Palos Verdes.  Back then, she - she cleaned

5   homes.  She was a housekeeper.  Housekeeper,

6   that's what she would do.

7        PRESIDING COMMISSIONER SHELTON:  And

8   that's how she raised your children while you

9   were here?

10        INMATE MARROQUIN THROUGH THE INTERPRETER:

11  Exactly.  Exactly.

12        DEPUTY DISTRICT ATTORNEY PEARSON:  I

13  don't know about this question, but if he was

14  out of here, free, and went to a party, what

15  kind of alcoholic beverages would he drink?

16  Like beer or wine or whiskey, or something else?

17        INMATE MARROQUIN THROUGH THE INTERPRETER:

18  I like that question.  Everything that contains

19  alcohol is somebody - something that gets you

20  drunk, and speaking with the permission that you

21  obtained and that you deserve, I shall never be

22  stupid.  Never.

23        DEPUTY DISTRICT ATTORNEY PEARSON:  I have

24  nothing further.

25        PRESIDING COMMISSIONER SHELTON:  Counsel,

26  do you have any questions of your client?

27        ATTORNEY RUTLEDGE:  Just briefly, thank

57

1   you.  You were asked and so I want to make sure

2   we understand, your ability to be a diesel

3   mechanic, it doesn't matter in Guatemala or

4   here, you still have the same abilities,

5   correct?

6       INMATE MARROQUIN THROUGH THE INTERPRETER:

7   Correct.

8       ATTORNEY RUTLEDGE:  Your plan is to go to

9   Guatemala, but if by some chance you were to

10  stay here, you'd be able to be a diesel

11  mechanic, correct?

12      INMATE MARROQUIN THROUGH THE INTERPRETER:

13  I automatically come to the conclusion my stay

14  is defined already, and that's in Guatemala.

15      ATTORNEY RUTLEDGE:  I understand.  And

16  also just to clarify, you explained that you

17  actually did a lot of hands-on mechanic work

18  prior to taking this course; is that right?

19      INMATE MARROQUIN THROUGH THE INTERPRETER:

20  Yes, correct.  I was a driver in Guatemala, and

21  I know that you all couldn't understand me

22  exactly, but my thoughts about the United States

23  is the Unites States –

24      THE INTERPRETER:  [addressing Inmate.]

25  Greyhound?

26      INMATE MARROQUIN:  [Resuming in Spanish.]

27      INMATE MARROQUIN THROUGH THE INTERPRETER:

58

1    And a Greyhound driver for those buses that

2    travel within the city, those drivers are only

3    drivers, while with us over there, in Hispanic

4    countries, the driver there is a mechanic.  The

5    driver is a mechanic, and the mechanic is the

6    driver, because if the engine breaks down, the

7    driver needs to fix it, and as far as that, I

8    have that complement in my brain that I have

9    very good knowledge regarding engines because I

10    would constantly fix them or repair them.

11        ATTORNEY RUTLEDGE:  You had mentioned

12    that in - in the past you had gone to the

13    shooting range.  Had you done that more than one

14    time, or is that the only time that you had

15    gone?

16        DEPUTY COMMISSIONER KEENAN:  Excuse me.

17    We're about to run out of tape.

18              (Off the record)

19        DEPUTY COMMISSIONER KEENAN:  Back on

20    record.  Tape 2, Side 1.

21        ATTORNEY RUTLEDGE:  Thank you,

22    Commissioner.  I had asked when you spoke about

23    going to the shooting range, was that the only

24    time you had ever gone, or had you gone other

25    times before?

26        INMATE MARROQUIN THROUGH THE INTERPRETER:

27    Only time that I was invited, and really, with

59

1   your permission, I'm speaking repentness only

2   belongs to God, but in this case with me, I

3   repent .even the day I was born.

4       ATTORNEY RUTLEDGE:  Well, let's back up a

5   little bit.  Now when you got done at the

6   shooting range, where did you put the pistol?

7       INMATE MARROQUIN THROUGH THE INTERPRETER:

8   I have that knowledge it was prohibited, but

9   there's a .saying: there is no — I'm not sure on

10  the saying — there is no but that is really

11  worth, but I was instructed, and you know

12  exactly that a weapon that is loaded, it was

13  completely prohibited, and so then I had in fact

14  instructions from Sacramento that if I was going

15  to be transporting it from one — that if I was.

16  going to transport it from one place to another,

17  that I had to maintain both things separated

18  from each other, and excuse me, but it isn't a

19  document there states that I had the weapon

20  inside the machine?

21      INMATE MARROQUIN:  No.  No.

22      THE INTERPRETER:  No.

23      INMATE MARROQUIN THROUGH THE INTERPRETER:

24  I had part of it in the glove compartment, and

25  the other one, I had it back here, that in order

26  — and in order to unite them one with the other,

27  I would need to stop and go behind the back part