# EXHIBIT 1
# Part 3 of 3

60

1   of the seat and put them together, and those

2   instructions came in a piece of paper that

3   Sacramento sent to me, and I automatically - and

4   automatically I had that understanding that you

5   couldn't transport both things together when you

6   were transporting from one place to another.

7   The piece of paper says that I had the hood

8   open, and that I had the weapon there, no.  No,

9   that isn't correct, and I'm not taking the case

10  apart, because a crime is a crime.

11       THE INTERPRETER:  I need a clarification

12  from the prisoner.  [Addressing Inmate.]

13       INMATE MARROQUIN THROUGH THE INTERPRETER:

14  Excuse me.  I'm not minimizing the case.  That

15  isn't my intention, but the papers from the

16  accusing party - I call it the accusing party

17  because that's how I understand it, because they

18  say one thing and it's different from other

19  versions.  I was - I testified, I was questioned

20  in front of a judge, and including the jury

21  panel, the district attorney, everything, but if

22  you allow me to give you an example -

23       ATTORNEY RUTLEDGE:  Let me stop there

24  because I want to point by point.

25       INMATE MARROQUIN THROUGH THE INTERPRETER:

26  Yes, but allow me, please.  Allow me just a

27  moment.  The papers say that it was two shots.

61

1   It was one.  The papers say that I was given 15

2   years to life, and that was from the judge, but

3   it states there that it's 21, and no, that isn't

4   correct.  That's not correct.  If you allow me,

5   I can show you something.

6         PRESIDING COMMISSIONER SHELTON:  Senor,

7   the papers says 18.

8         INMATE MARROQUIN THROUGH THE INTERPRETER:

9   Yes, but there are others right here.  Eighteen

10  plus three, that's 21.

11        PRESIDING COMMISSIONER SHELTON:  It's 15

12  plus three.

13        INMATE MARROQUIN THROUGH THE INTERPRETER:

14  Well, yes, but I'm only making emphasis of how

15  everything is turned around.

16        ATTORNEY RUTLEDGE:  Okay.  Well, let me -

17  that's why we want to make sure that we

18  understand what you were explaining.  So you had

19  said that two gentlemen pulled you away from was

20  that the inside of a bar?

21        INMATE MARROQUIN THROUGH THE INTERPRETER:

22  Exactly.

23        ATTORNEY RUTLEDGE:  And one of those two

24  gentlemen was the individual that you had had a

25  conflict with regarding the car?  The one that

26  was shot?

27        INMATE MARROQUIN THROUGH THE INTERPRETER:

62

1    Unfortunately, (indiscernible) there pulled me,

2    picked me up and pushed me out.  That is the

3    victim.

4         ATTORNEY RUTLEDGE:  Okay.  And so then

5    outside there was the — they got into their car,

6    you tried to get away, and that's when all

7    (indiscernible)?

8         INMATE MARROQUIN THROUGH THE INTERPRETER:

9    Exactly.

10        ATTORNEY RUTLEDGE:  Okay.  And at some

11   point that's when you grabbed a weapon; is that

12   right?

13        INMATE MARROQUIN THROUGH THE INTERPRETER:

14   I don't understand.  How's that?

15        ATTORNEY RUTLEDGE:  Okay.  Well, somehow

16   you got the gun in your hand.

17        INMATE MARROQUIN THROUGH THE INTERPRETER:

18   Correct.

19        ATTORNEY RUTLEDGE:  Where were these two

20   gentlemen when you had the gun in your hand?

21        INMATE MARROQUIN THROUGH THE INTERPRETER:

22   I was alone.  They had left.  They had left.  I

23   came to the car, I sat down, and I was there for

24   a little bit when I see that they show up, on

25   top of me, and then I — I run.  I'm armed and

26   they follow me.  When they see that I'm running,

27   they follow me, I walk and they're right next to

63

1   me.   I would come back, and they come and the

2   (indiscernible) and we were doing that back and

3   forth, and I went fast to where the people were,

4   and they turned around in the street.   That's

5   where I was attacked the second time.

6          ATTORNEY RUTLEDGE:   Okay.   So there had

7   been the altercation at the bar, the

8   (indiscernible), you sat in the car, then they

9   approached you again, so you tried to get away,

10  and you (indiscernible) the people at the bar

11  because you thought that they would be some type

12  of protection.

13         INMATE MARROQUIN THROUGH THE INTERPRETER:

14  I wanted to be where there was people at.

15         ATTORNEY RUTLEDGE:   Okay.   And that's

16  when you indicated that the - the victim in the

17  case approached you with a beer bottle, a broken

18  beer bottle, and that's when you shot?

19         INMATE MARROQUIN THROUGH THE INTERPRETER:

20  Exactly.

21         ATTORNEY RUTLEDGE:   So - so the people

22  that were at the bar wouldn't have necessarily

23  seen the people that were outside of the bar

24  would not necessarily see all these things that

25  happened prior to the last incident?

26         INMATE MARROQUIN THROUGH THE INTERPRETER:

27  That people - or better yet said, when somebody

64

1    sees a problem, you automatically nobody wants

2    to - how do you say - help another person, or

3    not really help, but get involved, so on the

4    second time, in front of the bar, we had the

5    problem, we had the problem.

6          ATTORNEY RUTLEDGE:  Okay.

7          INMATE MARROQUIN THROUGH THE INTERPRETER:

8    The attorney in court had the bottle in his hand

9    and asked if that would kill someone.  I - I

10   felt death three times like that.

11         ATTORNEY RUTLEDGE:  Now let's switch

12   gears a little bit.  The - the person that was

13   shot you had known before and you felt that that

14   person owed you money; is that right?

15         THE INTERPRETER:  And you felt that

16   person was a threat.

17         ATTORNEY RUTLEDGE:  No, owed you money.

18         INMATE MARROQUIN THROUGH THE INTERPRETER:

19   Yes.

20         ATTORNEY RUTLEDGE:  Now if you start your

21   - your business and somebody doesn't pay you and

22   you get upset, how are you going to handle that?

23         INMATE MARROQUIN THROUGH THE INTERPRETER:

24   That's why it's very clear, and I've said it and

25   it's been said, others - that had already gone

26   by, months had gone by.  I didn't care about

27   that anymore.  No, I didn't care about that.

65

1      ATTORNEY RUTLEDGE:  Okay.  But - but if

2  that happens, how are you going to handle it?

3      INMATE MARROQUIN THROUGH THE INTERPRETER:

4  You mean once again, if it's somebody new?

5      ATTORNEY RUTLEDGE:  If you start your

6  business, you put a lot of work into what you

7  did and that person doesn't pay you, how are you

8  going to handle it?  What are you going to do?

9      INMATE MARROQUIN THROUGH THE INTERPRETER:

10  I come up with the perfect conclusion.  How can

11  it be possible to - possible to commit a

12  stupidity after 15 years here for something

13  stupid that I did and do it again?  That's

14  impossible.  Impossible.  No.

15      ATTORNEY RUTLEDGE:  It sounds like the -

16  the - the course - and correct me if I'm wrong,

17  it sounds like the course that the commissioner

18  about you about, that if you don't have

19  (indiscernible) gave you a great appreciation

20  for life; is that right?

21      INMATE MARROQUIN THROUGH THE INTERPRETER:

22  Exactly.

23      ATTORNEY RUTLEDGE:  And it - would your

24  feelings be that life is more valuable

25  (indiscernible)?

26      INMATE MARROQUIN THROUGH THE INTERPRETER:

27  Life has no price.

66

1          ATTORNEY RUTLEDGE:   Thank you.

2          PRESIDING COMMISSIONER SHELTON:   Thank

3    you very much.  All right.  At this time we will

4    move into closing statements, and we'll start

5    with you, Mr. Pearson.  Do you have a closing

6    statement?

7          DEPUTY DISTRICT ATTORNEY PEARSON:   Yes.

8    This is a killing that didn't need to happen,

9    which of course is a lot of them that we see,

10   but it certainly didn't need to happen.  I

11   understand the Inmate getting angry in the

12   situation there, it was a frustrating situation,

13   somebody's cheating him of what is it?  A

14   thousand dollars or something as I understand

15   it, and I can see that, see being very angry,

16   but he had a golden opportunity to walk away

17   from this thing without anything happening,

18   that's when he went back to his vehicle.  He

19   could have just gotten in the car and driven

20   away, and that would have been the end of that,

21   at least for that confrontation time, he

22   could've done something else, maybe sued the

23   person in - in court, or done something, hired

24   somebody to try and collect it for him, or done

25   something else, but instead he chose to get the

26   weapon and load it, and from what he's

27   describing there it sounds like maybe this is a

67

1    — apparently a pistol where you have a clip that

2    you remove from the pistol that may or may not

3    have bullets in — in the remainder of the gun,

4    and I gather they had instructed that he's not

5    to have them together, keep the clip one place

6    and the — and the gun somewhere else.  This is

7    what I would interpret him saying.  Instead, he

8    put the two obviously together, came back,

9    confronted the person that was giving him the

10   trouble, and pulled the — attempted to pull the

11   slide up and put one of the bullets into the

12   chamber so it would be fireable, and it didn't

13   go in apparently, and so he tried clicking the

14   gun, and then pulled it back again and put the

15   chamber — or the — the — the — what am I saying

16   here, the — the clip back into the gun where it

17   this hit — the weapon — or bullet went into the

18   chamber there and he fired it, hitting the — the

19   victim here and causing him the — the injury

20   that ultimately caused the man's death.  So it

21   took some doing there, and he could've not done

22   that again when it — when the clip didn't go in

23   and he wasn't able to load the gun, he could've

24   stopped at that point and I suppose just walked

25   away with maybe a threat to the person.  And the

26   second time he could've too, but instead he — he

27   persisted, and fired the gun, so there's a lot

68

1  of thought and effort went into this, and I - I

2  think premeditation went into it, and I believe

3  that the - it sounded like it might've been a

4  jury trial, I'm not sure, but it sounds like the

5  - the trier of fact heard all of these facts and

6  rejected his self-defense argument here, that

7  the person had a - a broken bottle or something

8  there that would have threatened him.

9  Apparently the trier of fact did not accept that

10  and convicted him, forgetting the so-called

11  self-defense situation.  The aggravating factor

12  here, of course, was the alcohol.  I guess he

13  was under the influence at the time, which

14  probably clouded his judgment and his thinking

15  into making some really deadly decisions here,

16  causing the victim's death.  So I think the

17  danger here is, he thinks clear when he's here

18  in prison, and I - I liked his reasoning here

19  with a lot of what he was telling the - the

20  Board, I thought it made sense, but I'm afraid

21  if he gets back out, and it sounds like he's

22  very much down on alcohol now, gets back into

23  the community and has alcohol available to him

24  and freely offered to him by probably a lot of -

25  a lot of friends and - and acquaintances that he

26  has, "Oh, go ahead, just have one, you'll be

27  okay, oh, just another one," and you're under

69

1   the influence again and you get in some sort of

2   conflict, we could potentially have another

3   deadly situation, and that's what concerns me,

4   that this is what happens when he's readily

5   available as far as the alcohol with that sort

6   of a - a background that he has and a mindset.

7   So I would urge the - the Board at this time to

8   reject his request for parole and - and I'll

9   leave it at that.

10          PRESIDING COMMISSIONER SHELTON:   All

11   right.  Thank you, sir.  Mr. Rutledge, closing

12   statement?

13          ATTORNEY RUTLEDGE:   Thank you,

14   Commissioner.  I think the - the people bring up

15   a good point regarding the alcohol, and I think

16   Mr. Marroquin has expressed to the Board his

17   contempt at this point for alcohol and - but

18   it's easy to - to say that and have it just be

19   words, but I think he's - he's demonstrated in a

20   couple of different way that he actually feels

21   that way.  One is that he's continued with AA,

22   and as the Commissioners brought out, he even

23   was the chairman, and even beyond that, we all

24   know that there's pruno in prison, and it was

25   brought out in the psychological report that

26   he's rejected it.  He's had the opportunity to

27   go have a drink in here if he wanted to have a

70

1   drink, and he hasn't, and so he's showing that

2   his actions are following up with what his words

3   are.  If we look at the fact that he had no

4   prior criminal history, he's done his self-help.

5   The Board asked him to obtain a vocation, he

6   basically certified what he already knew how to

7   do so that the Board would have some evidence to

8   show that he knows how to do what he said that

9   he could do.  He's got good parole plans, he

10  knows that he's going to get deported, he's made

11  arrangements with his wife, he has a home to go

12  to, he's - I think he's somewhat of an

13  entrepreneur, he started his marble business,

14  and now he's wanted to move on to doing that -

15  being a diesel mechanic.  I think that's all

16  very commendable, and based on that, I would

17  request that he be given a date.  Thank you.

18          PRESIDING COMMISSIONER SHELTON:  Mr.

19  Marroquin, this is your time to tell us why you

20  think we should parole you or give you a parole

21  date.

22          INMATE MARROQUIN THROUGH THE INTERPRETER:

23  Very well.  Really with any given - at no time,

24  with nothing, can you pay for a life.  I have

25  committed a crime, and that crime hurts me a

26  lot.  It has been inside my mind for 15 years,

27  and maybe for some - a few more years of life I

71

1   shall have until I die.  I don't ask, I offer as
2   much to the community and the family of the
3   victim that I have harmed two families.  I offer
4   my true condolences to that family that I
5   harmed, including - including my own family.
6   It's two lives - excuse me - it's two families
7   that I have harmed.  I feel so miserable, and
8   even after 15 years my plan to survive the
9   little that I have left is in Guatemala.  It
10  depends on you.  Sincerely I'm not going to
11  thank for it, my family will, but there's no way
12  that I can have in my mind that I have already
13  paid for this, no.  Once again I will repeat
14  myself.  You cannot pay for a life, and really,
15  I would like to go back to Guatemala.  Thank you
16  from the gentleman's words.  I don't know what
17  his name is, but the district attorney, right?
18  And here my attorney, you as an interpreter, and
19  you as members that can decide for my life.  I
20  would like to add more, much more, but I know
21  time is valuable to you, and thank you very
22  much.
23          PRESIDING COMMISSIONER SHELTON:  Thank
24  you, sir.  We will now recess for deliberations.
25  It is 1:50 p.m.
26                  R E C E S S
27                   --oOo--

72

1          CALIFORNIA BOARD OF PAROLE HEARINGS

2                    D E C I S I O N

3          DEPUTY COMMISSIONER KEENAN:   Back on

4     record.

5          PRESIDING COMMISSIONER SHELTON:   All

6     right.   For the record, it is 2:25.  We are here

7     in the matter of Marco Marroquin, CDC number

8     H-62380.  Everyone has returned to the hearing

9     room that was here during the hearing.  The

10    panel has received and reviewed all the

11    information and relied on the following

12    circumstances in concluding that Mr. Marroquin

13    is not yet suitable for parole and would pose an

14    unreasonable risk of danger to society or a

15    threat to public safety if released from prison.

16    I'm going to take things a little out of order

17    here, sir.  We're giving you one year.  The last

18    hearing you had three years.  You have done an

19    extraordinarily wonderful job.  There's a few

20    more things we think you need to do to assure

21    that you can get through this parole process,

22    and the reason I say that is this.  We're not

23    the only ones you have to impress.  There's

24    another Board hearing, or a panel that does a

25    review, and then it goes to the Governor.  They

26    don't get to see you.  We get to see you.  We're

27    M. MARROQUIN    H-62380   DECISION PAGE 1   6/6/06

73

1   impressed by your presentation, we're impressed

2   by what you've done, and I'm going to go through

3   this stuff, but we know that there's other

4   things that people are going to ask that we want

5   you to get done ahead of time. Does — do you

6   understand what I'm saying to you?

7          INMATE MARROQUIN THROUGH THE INTERPRETER:

8   Correct.

9          PRESIDING COMMISSIONER SHELTON:  All

10  right. I'm going to go through this and I'm —

11  we have a couple of things that we are going to

12  need you to do this next year. Again, we are

13  totally impressed by your presentation today, we

14  believe you to be telling us the truth, and we

15  have a couple of things that we need you to do

16  to assure that you're a — you're a step closer,

17  okay? First of all, we know that this was —

18  this commitment offense was a — a terrible

19  offense. You know, you had an opportunity to

20  walk away. You didn't. I know you mentioned

21  you felt your life was being threatened, but I

22  think there was a time where you could've walked

23  away. You said you sat in your car for a little

24  bit. The motive for this crime was very trivial

25  in relation to the offense. These statements

26  were drawn from the summary of the crime that

27  M. MARROQUIN   H-62380   DECISION PAGE 2   6/6/06

74

1   was noted in the November 2002 Board Report and

2   carried on to the - let me get the month right

3   here - November 2005 Board Report.  You have no

4   previous record whatsoever.  That be on the

5   record.  It appears that your social history was

6   not unstable, and again, you had no prior

7   criminality.  I want to talk about your

8   institutional behavior.  You have received

9   absolutely zero 115s.  That is extraordinarily

10  rare, Mr. Marroquin.  That shows exemplary

11  behavior.  You received two 128a's, the last one

12  being in June of '93.  Again, exemplary

13  behavior.  You've been participating in AA and

14  NA since '95.  And I'm going to mix some of

15  these things, because we talk about

16  institutional behavior both positively and

17  negatively, but one of the things that we would

18  ask you to do is to try to participate in

19  another self-help program or two.  You've done -

20  what you've participated in is excellent, but we

21  think other people may review your file without

22  you sitting in front of them and say, "You

23  should've done, could've done more self-help

24  programs."  So do what you can to get into

25  anything you can this next year.

26          INMATE MARROQUIN THROUGH THE INTERPRETER:

27  M. MARROQUIN  H-62380    DECISION PAGE 3    6/6/06

75

1    Correct.

2            PRESIDING COMMISSIONER SHELTON:    You

3    understand, sir?  All right.  Your

4    psychiatrist's report was favorable.  Dr.

5    Macomber indicated that you had a GAF rating of

6    85.  The report was positive.  He indicated you

7    showed genuine remorse, and he felt that if

8    paroled, you would be better on parole - you

9    would be in the top 2 percent for success.  He

10   says that there are no risk factors, and the

11   prognosis for your success is good.  Your parole

12   plans are good.  This is one other area that we

13   need you to something for yourself.  You have

14   excellent parole plans for Guatemala.  There is

15   a very slim chance that you could possibly be

16   paroled here.  You have a home here and your

17   family here, so that side's okay.  What you need

18   to do is to see if you can get any kind of

19   support letter showing that you could

20   potentially get a job in Los Angeles if you

21   needed to.  Comprende?

22           INMATE MARROQUIN THROUGH THE INTERPRETER:

23   Yes.  But?

24           PRESIDING COMMISSIONER SHELTON:    No, no

25   buts.  No buts.  You need to find - you need to

26   at least - you have two skills that I'm aware

27   M. MARROQUIN  H-62380    DECISION PAGE 4    6/6/06

76

1  of, sir.  You've got your diesel mechanic skill,

2  and by your own words you indicated that you had

3  worked in marble and you had started your own

4  business.  We know that you have the ability to

5  provide for yourself.  Commissioner Keenan and I

6  believe that you can take care of yourself and

7  your family no problem, but you've got to

8  convince other people of that too, so get

9  something that says that you can have - or you

10  can find work, you have the abilities to find

11  work.  I mean, Commissioner Keenan called you an

12  entrepreneur.  That means you can survive on

13  your own with your skills and your intellect,

14  but you need to show that that can happen here,

15  just on that off chance that you don't go to

16  Guatemala right out the door.  Now that doesn't

17  mean that if you do - if you do get paroled here

18  someday, you do well on parole here, then

19  eventually you can go to Guatemala.

20          INMATE MARROQUIN THROUGH THE INTERPRETER:

21  Can I answer to that?

22          PRESIDING COMMISSIONER SHELTON:

23  Certainly.

24          INMATE MARROQUIN THROUGH THE INTERPRETER:

25  I have an INS hold, so I can consider that that

26  - there's nobody, nor an attorney, or even a

27  M. MARROQUIN  H-62380    DECISION PAGE 5    6/6/06

77

1   judge, over the control that INS has, because I

2   will be deported.  It's very difficult for me to

3   think that I (indiscernible) work, function, but

4   to work or function in my mind are making

5   illusions that I'm going to stay here.

6        PRESIDING COMMISSIONER SHELTON:  Okay.

7        INMATE MARROQUIN THROUGH THE INTERPRETER:

8   For me, that's something impossible.

9        PRESIDING COMMISSIONER SHELTON:  I

10  understand.

11       INMATE MARROQUIN THROUGH THE INTERPRETER:

12  Deporting (indiscernible).

13       PRESIDING COMMISSIONER SHELTON:  Mr.

14  Marroquin, I understand, but the world is full

15  of strange happenings and decisions and

16  nothing's for sure until it happens.  I'm just

17  saying on the – on the off chance, you need to

18  be prepared – this is – okay.  This – this is my

19  turn.  You need to be prepared for the world to

20  go upside-down sideways.  It already has in your

21  life.

22       INMATE MARROQUIN THROUGH THE INTERPRETER:

23  Correct.

24       PRESIDING COMMISSIONER SHELTON:  Se?

25       INMATE MARROQUIN THROUGH THE INTERPRETER:

26  Now I understand you.

27  M. MARROQUIN  H-62380    DECISION PAGE 6    6/6/06

78

1          PRESIDING COMMISSIONER SHELTON:   Okay.

2     That's all I'm telling you is that we're guiding

3     and directing you because we believe in you, all

4     right?  We believe in you, but this is a crazy

5     world, and you need to be prepared for whatever

6     way the ball bounces, okay?

7          INMATE MARROQUIN THROUGH THE INTERPRETER:

8     That is correct.  Like saying - well, it's like

9     putting into knowledge, or if I may be allowed

10    to ask you, what do you think, analyze or know,

11    what knowledge can you have regarding today?

12         PRESIDING COMMISSIONER SHELTON:   I

13    understand.  Okay.

14         INMATE MARROQUIN THROUGH THE INTERPRETER:

15    Regarding (indiscernible).

16         PRESIDING COMMISSIONER SHELTON:   Se,

17    senor.  Yeah.  Yeah.  Yo say.  We were talking

18    about that earlier.  Bien.  Se bien.

19         INMATE MARROQUIN THROUGH THE INTERPRETER:

20    That's fine.

21         PRESIDING COMMISSIONER SHELTON:   Es bien.

22    Okay.  We also want to acknowledge for the

23    record 32 - the 3042 responses from the District

24    Attorney's Office in Los Angeles and the Los

25    Angeles County Sheriff's Department, and again,

26    I want to reiterate the good things that you

27    M. MARROQUIN  H-62380    DECISION PAGE 7    6/6/06

79

1    have done, I want to go through this again, that

2    you have an excellent report from the

3    psychiatrist.  You worked hard for a two-year

4    period to receive your diploma as a diesel

5    mechanic, and you received that in August '04.

6    We were particularly impressed that you

7    continued and continued working on that and

8    followed through with the directions of your

9    last Board hearing.  Again, you have not

10   received any 115s during the time you were here,

11   you've been in AA and NA since 1995, you have

12   been and continue to participate in Adult Basic

13   Education, you took a Positive Parenting class,

14   you took classes on cause and prevention and

15   treatment of hepatitis, you worked on the Yard

16   Crew.  Most impressive was your request to

17   participate in individual counseling with Dr.

18   Reed.  What I especially enjoyed talking with

19   you about was the insight and feeling that you

20   developed participating in the Criminon course.

21   You participated in that last year, and for over

22   a year's period of time, and as I mentioned to

23   you during the hearing, I believe when you tell

24   us what you got out of that, because your eyes

25   lit up, you became animated, and it's like you

26   discovered a whole new sense of self and sense

27   M. MARROQUIN   H-62380    DECISION PAGE 8    6/6/06

80

1   of what life means.  So this year is a very
2   important year for you, sir, very, very
3   important.  You have done a lot of good work, we
4   want you to keep the momentum going, we want you
5   to keep it rolling, because the more you have
6   under your belt, the more you can convince other
7   people like us you have an opportunity for
8   success outside this institution.  Commissioner,
9   do you have anything to add?
10          DEPUTY COMMISSIONER KEENAN:  I would just
11   concur on your comments and note also you've
12   been on the right path, you're doing a lot of
13   good things, and I would say, you know, since
14   you have other people looking at your case in
15   the future, keep it up.  More is better.  That
16   would be my advice to you.  More is better.
17          PRESIDING COMMISSIONER SHELTON:  And
18   don't −
19          INMATE MARROQUIN THROUGH THE INTERPRETER:
20   Thank you.
21          PRESIDING COMMISSIONER SHELTON:  Don't
22   give it up.  Don't give up.  Keep on rolling.
23   All right, sir, good luck to you.  We're behind
24   you.
25          INMATE MARROQUIN THROUGH THE INTERPRETER:
26   Thank you very much.
27   M. MARROQUIN   H-62380    DECISION PAGE 9    6/6/06

81

1          PRESIDING COMMISSIONER SHELTON:   The time

2   is 2:40, and that concludes this hearing.

3   Seriously, good luck.

4          INMATE MARROQUIN THROUGH THE INTERPRETER:

5   Thank you.

6                    --oOo--

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23   PAROLE DENIED ONE YEAR

                                    OCT 0 4 2006

24   THIS DECISION WILL BE FINAL ON:_____

25   YOU WILL BE PROMPTLY NOTIFIED, IF PRIOR TO THAT

26   DATE, THE DECISION IS MODIFIED.

27   M. MARROQUIN   H-62380   DECISION PAGE 10   6/6/06

82

CERTIFICATE AND
DECLARATION OF TRANSCRIBER


I, BERENICE BILLINGTON, a duly designated

transcriber, PETERS SHORTHAND REPORTING, do hereby

declare and certify under penalty of perjury that I

have transcribed tape(s) which total two in number and

cover a total of pages numbered 1 - 81, and which

recording was duly recorded at CORRECTIONAL TRAINING

FACILITY, SOLEDAD, CALIFORNIA, in the matter of the

SUBSEQUENT PAROLE CONSIDERATION HEARING OF MARCO

MARROQUIN, CDC NO. H-62380, ON JUNE 6, 2006, and that

the foregoing pages constitute a true, complete, and

accurate transcription of the aforementioned tapes to

the best of my ability.

I hereby certify that I am a disinterested

party in the above-mentioned matter and have no

interest in the outcome of the hearing.

Dated AUGUST 27, 2006, at Sacramento,

California.


_____
BERENICE BILLINGTON
TRANSCRIBER
**PETERS SHORTHAND REPORTING**

# EXHIBIT "B"

1   petitioner is a model prisoner in every respect. A parole decision supported by some evidence

2   may nonetheless abrogate due process if it did not consider and weigh all favorable evidence.

3   (*In re Capistran* (2003) 107 Cal.App.4th 1299, 1306.)

4        The court finds that petitioner's continual parole denials have been based mainly on the

5   gravity of the commitment offense, the circumstances of which can never change. Therefore, the

6   Board's continued sole reliance on the commitment offense will essentially convert petitioner's

7   original sentence of life with the possibility of parole into a sentence of life without the

8   possibility of parole. Petitioner has no chance of obtaining parole unless the Board holds that his

9   crime was not serious enough to warrant a denial of parole. (*Irons v. Warden* (E.D. Cal. 2005)

10  358 F.Supp.2d 936, 947.)

11       Prior Board panels have found petitioner suitable for parole. Petitioner was found

12  suitable for parole on June 18, 1996, but a review unit later disapproved the parole grant. At

13  subsequent hearings in 1996, 1997 and 1998, petitioner was found unsuitable for parole based on

14  the gravity of his offense. On September 9, 1999, petitioner was found unsuitable for parole but

15  the panel set his prison term. On November 18, 1999, Governor Davis reversed petitioner's

16  parole grant. On June 30, 2000, a new panel found petitioner suitable for parole, but Governor

17  Davis reversed its decision on October 28, 2000. Petitioner has now served in excess of the

18  maximum term for both second degree and first degree murder. Therefore, the commitment

19  offense should no longer function as a factor for unsuitability and in that case, it should no longer

20  operate as "some evidence" to support the Board's parole denial. Petitioner has reached the

21  point in which the denial of parole can no longer be justified by reliance on his commitment

22  offense. The Board's continued reliance on the circumstances of the offense runs contrary to the

23  rehabilitative goals espoused by the prison system and has violated petitioner's due process.

24  //

25  //

26  //

27  //

28  //

ep

3

1    Therefore, this court orders that the petition for writ of habeas corpus be, and hereby is,

2    granted.

3

4    June 26, 2006

5

6                                                                DAVID S. WESLEY

7                                                                Judge of the Superior Court

8    Clerk to give notice.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

ep

# CALIFORNIA APPELLATE COURTS



### Case Information

Supreme
Court

Welcome

Search

E-mail

Calendar

Help

Opinions

C|C

home

## Supreme Court

Change court

Court data last updated: 08/10/2006 10:53 AM

Case Summary    Docket    Briefs
Disposition    Parties and Attorneys    Lower Court

## Docket (Register of Actions)

**ROSENKRANTZ (ROBERT) ON H.C.**
**Case Number S145504**

| Date | Description | Notes |
|---|---|---|
| 08/02/2006 | Petition for review with request for stay filed (criminal) | Amanda Lloyd, Deputy Attorney General |
| 08/02/2006 | Exhibit(s) lodged | one bound volume |
| 08/02/2006 | Answer to petition for review filed | Robert Rosenkrantz, petitioner Marc Elliott Grossman, counsel Answer submitted to the court with red covers and labeled "Petitioner's opposition to supersedeas/stay" |
| 08/03/2006 | Petition for review and application for stay denied | |

Click here to request automatic e-mail notifications about this case.

© 2004 Judicial Council of California

LAW OFFICES OF
~~ONE & DEFILIPPIS
~5 North First Street
~~n Jose, CA 951~2

# CALIFORNIA APPELLATE COURTS



Case Information

2

## 2nd Appellate District

Change court

Welcome

Search

E-mail

Calendar

Help

Opinions

CIC
Home

Court data last updated: 08/10/2006 11:11 AM

Case Summary   Docket   Scheduled Actions   Briefs
Disposition   Parties and Attorneys   Trial Court

## Docket (Register of Actions)

The People v. Rosenkrantz et al.
Division 1
Case Number B192676

| Date | Description | Notes |
|---|---|---|
| 07/28/2006 | Request for stay filed. | |
| 07/28/2006 | Order filed. | The Court has read and considered Rosenkratz's ptn...and the AG's ptn for writ of supersedeas B192676. The parties are ordered as follows: (1) By ltr brfs via fax or personal delivery on opposing cnsl and filed by 3 p.m., on 7/31/06 and explain (*see order*) (2) If rprtr's transcript of any of the relevant proceedings (including hrng on petn for writ of hc and all subsequent hrngs) have been preprd, they are to be lodged w/this Crt as soon as possible but not later than 3 p.m. on 7/31/06; if the transcpts have not been prepared, they shall be immediately obtained and lodged as soon as possible. (3) Opo to Rosenkratz's emerg. ptn case no. B192599 is to be srvd via fax or by personal srvc on Rosenkrantz's cnsl and filed by 3p.m. on 7/31/06. |
| 07/28/2006 | Received: | cc of notice of appeal by AG w/received stamp of 7/28/06 from Superior Court Crim Appeals Unit |
| 07/31/2006 | Received: | cc of FILED stamped notice of appeal (7/28/06) by AG from LA Sup Crt - CRIM Appeals Unit |
| 07/31/2006 | Letter brief filed. | Attorney: Grossman, Marc Party: Rosenkrantz, Robert |
| 07/31/2006 | Letter brief filed. | Attorney: Office of the Attorney General Party: The People |
| 07/31/2006 | Petition summarily denied | Writ of supersedeas/stay has been read and considered. The petition |

10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

EXHIBIT  "D"

## MEMORANDUM OF POINTS AND AUTHORITIES

### I

#### FAILURE OF THE TRIAL JUDGE, SUA SPONTE, TO GIVE REQUIRED MANDATORY INSTRUCTION OF LESSER INCLUDED OFFENSE OF MANSLAUGHTER OVER DEFENSE COUNSEL'S OBJECTION.

In 1927, California Penal Code section §1181 was amended by adding subdivision 6, which empowered either the trial court or an appellate court to modify the judgment to a lesser degree of a lessor offense. In 1951, the section was amended to read as at present, authorizing the court to "modify" the verdict, finding or judgment. The purpose of these amendments was to obviate the necessity of a new trial when the trial court, on a motion for a new trial, or an appellate court, on appeal, believed that the evidence established the lesser offense, but not the greater.

Petitioner alleges that the trial court erred in not giving the lesser included manslaughter instruction, sua sponte, over defense counsel's objection. The trial record reflects the following facts:

The Court: (RT 672), Two days ago I gave counsel a packet of instructions; and the packet of instructions included the law of first degree murder, second degree murder, voluntary manslaughter self-defense as well as justifiable homicide in the course of self-defense and instructions related there to.

This morning I have added to your packet involuntary manslaughter instructions based upon misdemeanor manslaughter -- excuse me -- yes, based upon a misdemeanor battery theory and also a killing with undo -- by gross negligence, the 8.45 instruction.

1

1    The Court: (RT 673), The defense from Mr. Marroquin

2  has been strictly self-defense.

3    I have a duty under the law to instruct on all of the

4  issues; However, if I instruct on the manslaughter instructions,

5  voluntary or involuntary, it may be harmful to the defendants

6  case ...

7    Mr. Browne: (RT 674), ... for tactical reasons, your

8  Honor, I am not going to request the 192 instructions, the

9  argument will be based on a self-defense theory purely.

10    The Court: (RT 675), So you don't wish either the

11  voluntary or the involuntary manslaughter instructions?

12    Mr. Browne: For the record and for those tactical

13  reasons, I do not wish that they be given.

14    The Court: And I saw Mr. Marroquin nod his head.

15    Petitioner's defense was based on a theory of self-defense

16  and the issue of "need not retreat". The trial record establishes

17  the facts relating to "an argument", "broken beer bottles" and

18  "fear". While the record shows that the trial court judge offered

19  the manslaughter instructions and that this instruction was

20  refused by the trial counsel for "tactical" reasons, it was

21  judicial error not to give the lesser included instruction,

22  sua sponte, over counsels objection.

23    The sua sponte rule seems undoubtedly designed to promote

24  the ends of justice by providing some judicial safeguards for

25  defendants from the possible vagaries of ineptness of counsel

26  under the adversary system, so held the court in, People v.

27  Wade, 53 Cal.2d at p. 334, 1 Cal.Rptr. at p. 692, 348 P.2d at

28  p. 125.

2

1    In the case of <u>People v. Thompkins</u>, 240 Cal. Rptr. 516

2  (Cal. App. 4 Dist. 1987) the court held at page 517 at (4) "It

3  was error, when instructing on attempted murder, to fail to

4  give instruction on lesser included offense of attempted

5  voluntary manslaughter, <u>**EVEN**</u> if defense counsel expressly waived

6  instruction on attempted voluntary manslaughter."

7    The court further stated at p. 523 [4] "The **OBLIGATION**

8  to instruct on lesser included offenses exists <u>**EVEN**</u> <u>**WHEN**</u> as

9  a matter of trial tactics a defendant not only fails to request

10  the instruction **BUT** expressly objects to its being given." <u>People</u>

11  <u>v. Sedeno</u>, 10 Cal.3d 703, 716, 112 Cal. Rptr. 1, 518 P.2d 913.

12  The Court further stated, at p. 523;

13           "We sympathize with the burden sua sponte
             instructional requirements create for trial courts.
14           Where defense counsel drafts "pinpoint" instructions
             which focus on issues highlighted by the theory of
15           defense, <u>however</u>, the burden on the trial court is
             minimal. It consists primarily of understanding the
16           relevant legal principles well enough to determine
             whether the proffered instructions constitute accurate
17           statements of law. In this regard, we assume
             prosecutors will always be available to alert the
18           court to any inaccuracies in the defense offerings."

19    The recently published case of <u>People v. Ceja</u>, 94 daily

20  Journal D.A.R. 9081, June 29, 1994 bears many similarities to

21  the case at bar; Both cases were in the same neighborhood,

22  Compton, both had similar .380 caliber guns, both victims had

23  Corona beer bottles in their hands, both defendants were in

24  fear of their lives, although no weapon was found on the victim

25  in the <u>Ceja, supra</u> case this is not the facts in Petitioner's

26  case.

27    With respect to the murder count, Petitioner contends the

28  trial court committed reversible error by failing to instruct

                                3

                                            EX "D" Page 3 of 8

1 on the lesser included offenses of voluntary and involuntary
2 manslaughter over defense objection when in fact it was offered
3 because the trial judge believed their was sufficient evidence
4 to support that finding by a jury. The jury was instructed on
5 justifiable self-defense as a complete defense to the murder
6 charge.

7    A trial court must instruct the jury on every theory that
8 is supported by substantial evidence and does not err when it
9 refuses to instruct on theories not so supported. People v.
10 Flannel, (1979) 25 Cal.3d 668, 685. see also People v. Glenn,
11 (1991) 29 Cal. App.3d 1461, 1465.

12    A genuine but unreasonably held belief in the need to defend
13 negates the malice and reduces the offense to manslaughter.
14 The California Supreme Court in the very recent case of In re
15 Christian, 94 Daily Journal D.A.R. 6607 upheld the continued
16 viability of the imperfect self-defense and concluded that
17 "[w]hen the trier of fact finds that a defendant killed another
18 person because the defendant actually but reasonably believed
19 he was in imminent danger of death or great bodily injury, the
20 defendant is deemed to have acted without malice and cannot
21 be convicted of murder." (Id. at p. 6612; see also People v.
22 DeLeon, (1992) 10 Cal. App. 4th 815, 821-825).

23    While the defendant testified that the victim came at him
24 with what he believed to be a knife and again came at him with
25 a broken bottle, even though witnesses testimony conflicts at
26 this point to finding no broken bottle, then finding broken
27 bottle(s), a witness to the actual attack by the victim.
28 Additionally, defendant testified he did not want to fight or

4

1   hurt the victim but was frightened, "I felt the kiss of death".
2   The jury might well have concluded that the defendant was
3   mistaken about the victim being armed but also have concluded
4   that the defendant honestly but reasonably believed his life
5   was in danger, making the killing at most voluntary or
6   involuntary manslaughter.

7      While a defendant may be mistaken and still claim
8   self-defense, that mistake must be reasonable. See State v.
9   Kelly, (N.J. 1984) 478 A.2d 364, 373; State v. Vasquez, (N.J.
10  Super. A.D. 1993) 628 A.2d 346, 356. An actual but unreasonable
11  mistake about the threat of imminent peril, on the other hand,
12  would not support self-defense yet would support imperfect
13  self-defense. The imperfect self-defense doctrine allows for
14  a situation where a reasonable man would not conclude a set
15  of keys held in the victim's hand was a gun, but the jury
16  nonetheless could decide the defendant actually but unreasonably
17  held such a belief.

18     In one sense, imperfect self-defense is a "lesser included"
19  defense of perfect self-defense. They share common elements;
20  the defendant killed because of an "actual" belief he was in
21  imminent danger of death or great bodily injury. Perfect
22  self-defense, however, requires proof of an additional element;
23  the defendant's belief was reasonable. For this reason, one
24  cannot establish the elements of perfect self-defense without
25  proving imperfect self-defense. For this same reason, if there
26  is sufficient evidence of all the elements required to justify
27  a perfect self-defense instruction, by definition there is
28  sufficient evidence supporting an instruction for the "lesser

1    included" defense of imperfect self-defense. This is the logic

2    which impelled the disposition of this same issue in People

3    v. DeLeon, supra, 10 Cal.App. 4th 815. Adherence to this ruling

4    in DeLeon requires trial courts to instruct on imperfect

5    self-defense whenever they instruct a jury on self-defense.

6       At issue in the case at bar is the fact that the trial

7    court judge found sufficient evidence, on his own, to offer

8    the lesser included instructions of voluntary and/or involuntary

9    manslaughter. All though the record shows that the defense

10   counsel objected to this instruction this is not the issue as

11   the rule states "it is the duty of the trial court judge to

12   give the instruction, sua sponte", even over objection when

13   the evidence is sufficient to warrant the instruction.

14      The following cases deal with the issue before this

15   Honorable Court:

16      U.S. v. Schweihs, 971 F.2d 1302 (7th Cir. 1992) and U.S.

17   v. Washington, 819 F.2d 221 (9th Cir. 1987) have both held that:

18      1) Defendant is entitled to instruction on any defense

19   recognized in law and supported by sufficient evidence to allow

20   reasonable jury to find in defendant's favor.

21      2) District Court must give instruction regarding

22   any legitimate theory of defense that is supported by evidence,

23   and failure to do so is reversible error.

24      In the case of U.S. v. Zuniga, 989 F.2d 1109 (9th Cir.

25   1993) which dealt with an alibi issue, Petitioner contends that

26   the legal principle is the same. Petitioner will substitute

27   the word "manslaughter" for the case word "alibi" in the

28   following statement. "Even if the alibi (manslaughter) evidence

6

1    is weak, insufficient, inconsistent, or of doubtful credibility,

2    alibi (manslaughter) instructions should be given."

3         Defendant in criminal trial is entitled to have jury

4    consider any theory of defense that is supported by law and

5    that has some foundation in evidence. U.S. v. Carter, 910 F.2d

6    1524 (7th Cir. 1990).

7         If evidence would permit jury to find defendant guilty

8    of a lessor included offense, defendant is entitled to

9    instruction on that defense. U.S. v. Cavanaugh, 948 F.2d 405

10   (8th Cir. 1991) and U.S. v. Sotelo-Rivera, 906 F.2d 1324 (9th

11   Cir. 1990).

12        "Failure to give jury instruction on defense when some

13   evidence supported it is reversible error." People of Territory

14   of Guam v. Agualo, 948 F.2d 1116 (9th Cir. 1991); U.S. v. Duncan,

15   850 F.2d 1104 (6th Cir. 1988); U.S. v. Coin, 753 F.2d 1510 (9th

16   Cir. 1985).

17        "The equal protection clause essentially requires that

18   all persons similar situated be treated alike". Mahone v. Addicks

19   Utility Dist. of Harris County, 836 F.2d 921 (5th Cir. 1988);

20   City of Cleburne v. Cleburne Living Center, 473 U.S. 432, 87

21   L.Ed.2d 313, 105 S.Ct. 3249, 1985.

22        The words "Duty", "Must give", "Obligated to by law" are

23   but a few of the words in the case at bar describing the duty

24   owed to Petitioner at trial by the trial court judge. These

25   words show the "Existence of a legal duty owed" to this

26   Petitioner. These words present a "Peremptory duty", City of

27   Milwaukee v. Saxbe, 546 F.2d 693, 700 (7th Cir. 1976), these

28   words do not permit "DISCRETION", and have been imposed by a

7

1  constitutional mandate that has been "CLEARLY ESTABLISHED" by

2  judicial decision. Harlow v. Fitzgerald, 457 U.S., 800, 819

3  (1982).

4      This "DUTY" "so plainly prescribed as to be free from

5  doubt", Tagupa v. East-West Center, Inc., 642 F.2d 1197, 1129

6  (9th Cir. 1981).

7      Petitioner contends that it was judicial error and that

8  there was no discretion permitted for the trial judge's failure

9  to give the instruction, sua sponte, over counsel's objection

10 and contends that this Honorable Court may, in the interest

11 of justice, modify the verdict to an involuntary manslaughter

12 finding based on the facts in the record and the People v. Ceja,

13 supra, case as herein stated.

14

15                          II

16           FAILURE OF THE PROSECUTOR TO CORRECT
           "KNOWN" PERJURED TESTIMONY, AND FAILURE
17         TO EFFECTIVELY CORRECT THAT PERJURY.

18      Witness, Guadalupe Suazo at (RT 147) states that he never

19 told the Deputies that he saw Petitioner and victim arguing

20 inside the bar prior to the killing. At (RT 151) he again denies

21 that he told the Deputies about what he saw and heard regarding

22 the argument in the bar.

23      Witness, Angeli Lespia, (RT 176) states that she never

24 told police that defendant and victim had a verbal argument.

25      Deputy Young testified at (RT 226) "The suspect said that

26 they had an argument inside the bar over disrespecting his

27 family", victim threatened to "kick the suspects ass". At (RT

28 233) he further testifies that he interviewed both the guard

8

# EXHIBIT "E"

1         COURT OF APPEAL OF THE STATE OF CALIFORNIA

2            SECOND APPELLATE DISTRICT

3

4  THE PEOPLE OF THE STATE OF CALIFORNIA,   )
                                    )

5           PLAINTIFF-RESPONDENT,   )
                                    )

6       VS.                       ) SUPERIOR COURT
                                    ) CASE NO. TA016787

7  MARCO TULIO MARROQUIN,             )
                                    )

8           DEFENDANT-APPELLANT.   )

9

10

11   APPEAL FROM THE SUPERIOR COURT OF LOS ANGELES COUNTY

12    HONORABLE ELIZABETH A. BARON, JUDGE PRESIDING

13          REPORTER'S TRANSCRIPT ON APPEAL

14

15  APPEARANCES:

16  FOR PLAINTIFF-RESPONDENT:   DANIEL E. LUNGREN,
                            STATE ATTORNEY GENERAL

17                            300 SOUTH SPRING STREET
                            NORTH TOWER, SUITE 5001

18                            LOS ANGELES, CALIFORNIA  90013

19

20  FOR DEFENDANT-APPELLANT:   IN PROPRIA PERSONA

21

22

23

24  VOLUME III OF V
     (PAGES 370 TO 535, INCLUSIVE)

25

26                       DONNA L. DERICHSWEILER, CSR #2696
                       OFFICIAL REPORTER

27                       200 W. COMPTON BLVD., DEPT. D
                       COMPTON, CALIFORNIA  90220

28

(DONNA L. DERICHSWEILER, CSR)

(CORONER)

1    BY MS. CALLAHAN:

2         Q    CAN YOU PLEASE STEP DOWN FROM WHERE YOU ARE

3    SEATED, DR. REDDY, AND APPROACH THE DIAGRAM THAT IS TO YOUR

4    IMMEDIATE LEFT.  CAN YOU PLEASE TAKE THE RED AND BLUE PEN WITH

5    YOU.

6              WITH THE RED PEN, CAN YOU PLEASE SHOW US WHERE

7    THAT BULLET FIRST ENTERED ON THE DIAGRAM YOU HAVE IN FRONT OF

8    YOU, P-19.

9         A    THIS IS THE LEFT SIDE OF THE BODY.  THIS IS THE

10   RIGHT SIDE.  THE BULLET ENTERED SOMEWHERE HERE.

11             (WITNESS INDICATES.)

12             THE BULLET ENTERED THE LEFT UPPER ARM RIGHT ABOUT

13   HERE AND EXITED RIGHT NEXT TO IT AND THEN REENTERED ABOUT HERE

14   INTO THE ABDOMEN.

15             (WITNESS INDICATES.)

16        Q    CAN YOU PLEASE MARK ON THE ABDOMEN THE APPROXIMATE

17   AREA IN RED PEN WHERE THE BULLET ENTERED.

18        A    (WITNESS COMPLIES.)

19        Q    CAN YOU PLEASE SHOW --

20        A    IT WAS A LITTLE CLOSER.

21             (WITNESS INDICATES.)

22        Q    CAN YOU PLEASE SHOW WHERE, WITH THE BLUE PEN,

23   WHERE THE BULLET TRAVELED AFTER IT ENTERED.

24        A    IT TRAVELED THIS WAY AND THEN THIS WAY.

25             (WITNESS INDICATES.)

26        MS. CALLAHAN:  YOUR HONOR, I HAVE A PARTIAL PHOTO OF AN

27   AUTOPSY PHOTOGRAPH THAT I HAVE PREVIOUSLY SHOWN TO THIS WITNESS

28   IN FULL.

1            I WOULD LIKE TO MARK THE PARTIAL PHOTO WHICH

2    DEPICTS  THE LEFT SIDE OR PORTIONS OF THE LEFT SIDE OF THE

3    INDIVIDUAL'S BODY AS P-20.

4            THE COURT:  IT WILL BE SO MARKED.

5            MS. CALLAHAN:  I HAVE SHOWN IT TO COUNSEL.

6            Q    I AM SHOWING YOU P-20 FOR IDENTIFICATION.

7            DO YOU RECOGNIZE THAT PHOTOGRAPH AS SOMETHING I

8    SHOWED YOU PREVIOUSLY?

9            A    YES.

10           Q    IS THIS ONE OF THE PHOTOGRAPHS THAT WAS TAKEN IN

11   CONNECTION WITH THE AUTOPSY OF LUIS SILVA?

12           A    YES.

13           Q    HOW DID YOU KNOW THAT?

14           A    I VERIFIED THE CORONER'S CASE NUMBER GIVEN TO THIS

15   CASE WAS PLACED ON THE BODY ACTUALLY; SO I SAW THE NUMBER THAT

16   VERIFIES.

17           Q    IS THAT PORTION OF THE NUMBER PART OF THE

18   PHOTOGRAPH THAT IS MISSING?

19           A    YES.

20           Q    CAN YOU PLEASE STEP DOWN FROM THE WITNESS STAND

21   AND STEP OVER TO THE PHOTOGRAPH AND SHOW THE JURORS WHERE THE

22   PROBE IS AND WHAT THE PROBE MEANS IN THAT PHOTOGRAPH.

23           MR. BROWNE:  MAY I, YOUR HONOR?

24           THE COURT:  YES.

25           THE WITNESS:  THIS IS THE PROBE DR. MUKADUM PLACED ON

26   THE GUNSHOT WOUND STARTING FROM THE ENTRANCE AND LEAVING THE

27   ARM AND THEN ENTERING INTO THE ABDOMEN AGAIN.

28              (WITNESS INDICATES.)

1       Q       YES, MA'AM.

2       A       APPROXIMATELY ABOUT 7,000 AUTOPSIES.

3       Q       AND THAT IS OVER A PERIOD OF HOW MANY YEARS?

4       A       TWELVE YEARS.  ACTUALLY SIXTEEN YEARS.

5       Q       WERE THEY ALL PERFORMED FOR THE LOS ANGELES COUNTY

6   MEDICAL EXAMINER?

7       A       MOST OF THEM, YES.

8       Q       NOW, YOU HAVE INDICATED THAT THE DECEASED WAS

9   APPROXIMATELY FIVE FEET TWO INCHES TALL; IS THAT CORRECT?

10      A       THAT'S CORRECT.

11      Q       AND WEIGHED ABOUT 160 POUNDS?

12      A       YES.

13      Q       NOW, YOU MENTIONED THERE WERE TWO WOUNDS.  ONE

14  APPEARED TO BE A FLESH WOUND IN THE LEFT ARM, WOULD THAT BE A

15  FAIR CHARACTERIZATION?

16      A       IT IS A PERFORATING WOUND.

17      Q       BUT IT WENT THROUGH FLESH, DID IT NOT?

18      A       YES.

19      Q       AND IT WAS APPROXIMATELY, WHAT, AN INCH OR SO FROM

20  THE CENTER OF HIS ARM IF WE WERE LOOKING RIGHT DOWN THE MEDIAL

21  PORTION OF HIS ARM?

22      A       I DON'T KNOW.  HE MEASURED FOUR INCHES ABOVE THE

23  ELBOW.  FROM HERE IT WOULD BE FOUR INCHES.

24              (WITNESS INDICATES.)

25      Q       THE HEIGHT OF IT.  I AM NOW CONCERNED WITH THE

26  DISTANCE FROM THE REAR OF HIS ARM TO THE FRONT OF HIS ARM.

27      A       LET ME LOOK FOR YOU EXACTLY.

28      Q       PLEASE.

1    A    HE DIDN'T SAY WHERE IT IS; BUT ACCORDING TO THE

2    PHOTOGRAPHS AND PICTURES, FROM HERE TO HERE LIKE I SHOWED

3    THERE.

4         (WITNESS INDICATES.)

5    Q    WHAT WOULD THAT BE IN TERMS OF INCHES FROM THE

6    CENTER OF HIS ARM?

7    A    IT IS NOT MENTIONED.

8    Q    NO WAY OF KNOWING?

9    A    WELL, YOU CAN SEE THE PHOTOGRAPHS AND DIAGRAMS,

10   THEY ARE RIGHT, YOU KNOW, CLOSE TO EACH OTHER.

11   Q    YOU DON'T HAVE AN ESTIMATE?

12   A    EXCUSE ME?

13   Q    YOU DON'T HAVE AN ESTIMATE OF THAT DISTANCE?

14   A    I CAN'T ESTIMATE.

15   Q    VERY WELL.

16        NOW, THERE WAS, AS I SAY, A MENTION OF TWO WOUNDS;

17   AND THEY, OF COURSE, TO CLEAR UP ANY CONFUSION, WERE ALL CAUSED

18   BY THE SAME ROUND; IS THAT CORRECT?

19   A    YES.

20   Q    NOW, YOU MENTIONED THAT THE ARM HAD TO BE CLOSE TO

21   THE BODY AT THE TIME THE GUN WAS FIRED.

22   A    YES.

23   Q    WHAT MAKES YOU SAY THAT?

24   A    BECAUSE THE BULLET ENTERED THE BODY.  IF IT IS FAR

25   AWAY, IT IS UNLIKELY TO ENTER THE BODY.

26   Q    AND IN THAT PARTICULAR DIRECTION -- TRAJECTORY, I

27   SHOULD SAY, THAT ALSO INDICATES IT WAS RATHER CLOSE TO THE

28   BODY?

1      A      YES.

2      Q      AND THAT COULD HAVE BEEN ANYWHERE FROM DIRECTLY

3  TOUCHING IT OR WITHIN A FEW INCHES?

4      A      YES.

5      Q      NOW, IN THE TRAJECTORY THAT YOU HAVE ILLUSTRATED

6  ON PEOPLE'S 19, WHICH IS UP ON THE BOARD THERE, YOU HAVE MADE A

7  LINE THAT APPEARS TO GO THROUGH THE LEFT ARM AND ENTER THE

8  BODY.

9              DO YOU SEE THAT?

10     A      YES.

11     Q      AND THEN THE LINE SEEMS TO TAKE ANOTHER

12  DIRECTION.

13             ARE YOU INDICATING BY THAT LINE THAT THE WOUND

14  ENTERED AND THEN STARTED TO MOVE UPWARD?

15     A      YES.

16     Q      WHAT CAUSED THAT?

17     A      BENDING OF THE BODY.

18     Q      NOW, YOU HAVE ALSO INDICATED THAT YOU BELIEVE THE

19  WEAPON --

20     A      ONE MOMENT.  I WANTED TO SAY SOMETHING.  BENDING

21  OF THE BODY, SOMETIMES THE BULLET MAY RICOCHET, HITTING A

22  PORTION OF THE ORGAN IN THE BODY.  RICOCHET MEANS THAT IT IS

23  GOING STRAIGHT AND THEN REFLECT IN A DIFFERENT DIRECTION.

24     Q      AND ARE YOU INDICATING THAT THE BODY MOST LIKELY

25  BENT AT THE WAIST?

26     A      IT COULD BE ANY OF THOSE THINGS.  IT COULD BE

27  BENDING OF THE BODY, RICOCHET OF THE BULLET.

28     Q      IF IT WAS BENDING OF THE BODY, WOULD IT HAVE BEEN

1          WHEN YOU SAY IT ENTERED -- OR RATHER THE CAUSE OF

2    DEATH WAS A GUNSHOT WOUND TO THE ABDOMEN?

3          A    YES.

4          Q    AND, OF COURSE, THAT CAUSED SOME BLEEDING?

5          A    YES.

6          Q    IN FACT, THE BLEEDING WAS THE CAUSE OF DEATH,

7    WASN'T IT?

8          A    BLEEDING AND ALSO DESTRUCTION OF THE TISSUES.  ONE

9    OF THE KIDNEYS ACTUALLY HAS TO BE REMOVED AND A PORTION OF THE

10   COLON HAS TO BE REMOVED; SO THAT ALSO IS A MAJOR REASON.

11         Q    WITH RESPECT TO THE TRAJECTORY AGAIN OF THE ENTRY

12   WOUND, COULD YOU TELL US IN YOUR BEST ESTIMATE APPROXIMATELY

13   WHAT HEIGHT THE WEAPON WAS THAT FIRED THE BULLET?

14         A    NO.

15         Q    COULD YOU TELL US WHETHER OR NOT THE BODY OR SOME

16   PORTION OF THE VICTIM WAS IN MOTION AT THE TIME THE WEAPON WAS

17   FIRED?

18         A    IT'S POSSIBLE.

19         Q    WOULD THAT KIND OF A TRAJECTORY, THAT KIND OF A

20   WOUND, CAUSE IMMEDIATE EXPIRATION OR IMMEDIATE DEATH?

21         A    YES, IT'S POSSIBLE, YES.

22         Q    IN THIS CASE, DO YOU KNOW WHEN DEATH OCCURED?

23         A    YEAH, I CAN LOOK UP.  IT IS ALL DOCUMENTED IN THE

24   HOSPITAL AND ALL THAT.

25         Q    IF YOU COULD.

26         A    THE DATE AND TIME OF THE INJURY HE RECEIVED,

27   ACCORDING TO THIS INFORMATION, 1-13-92 AT 0020 HOURS.

28         Q    THAT WOULD HAVE BEEN 20 MINUTES AFTER MIDNIGHT?

1    A    YEAH, SOON AFTER MIDNIGHT.

2    Q    AND --

3    A    AND THEN HE DIED AT 1-13 -- SAME DAY, 1-13-92, AT

4    739 HOURS.

5    Q    THAT WOULD HAVE BEEN APPROXIMATELY 7:30 THAT

6    MORNING; SO APPROXIMATELY SEVEN HOURS LATER?

7    A    YES.

8         CAN I SAY ONE MORE THING?

9    Q    SURE.

10   A    ALL THESE SEVEN HOURS HE WAS IN SURGERY.  THEY

11   TRIED TO DO SURGERY TO HIM OF THE BULLET INJURY.

12   Q    I THINK WE ALL UNDERSTAND.

13        NOW, BASED ON YOUR EXPERIENCE, WOULD A PERSON

14   RECEIVING SUCH A WOUND BE ABLE TO MOVE, TAKE A STEP OR TWO OR

15   THREE OR WHATEVER FROM THE MOMENT OF HIS WOUND TO THE POINT

16   WHERE HE MAY HAVE BEEN FOUND ON THE GROUND?

17   A    IT'S POSSIBLE.

18   Q    IS THERE ANY WAY OF ESTIMATING HOW MANY OR HOW FAR

19   OF A DISTANCE HE COULD HAVE MOVED IN TERMS OF STEPS?

20   A    I CAN'T -- EACH PERSON IS DIFFERENT.  SOME

21   PEOPLE --

22   Q    WHAT YOU CAN SAY, HOWEVER, THAT MOVEMENT IS

23   POSSIBLE?

24   A    MOVEMENT IS POSSIBLE, YES.

25   Q    AND HOW FAR WE DON'T KNOW?

26   A    I DON'T KNOW.  AND HOW MUCH, I DON'T KNOW.

27   MR. BROWNE:  I HAVE NOTHING FURTHER AT THIS TIME.

28   THE COURT:  MISS CALLAHAN?

EXHIBIT "F"

BOARD OF PRISON TERMS                                          STATE OF CALIFORNIA
LIFE PRISONER HEARING DECISION FACE SHEET

☐ PAROLE GRANTED – (YES)
☐ CDC: Do not release prisoner before
    Governor's Review

☒ PAROLE DENIED – (NO)  *1 (one) year*

| Records Use Only |
|---|
| Parole Release Date |
| YR    MO    DAY |
| Attach Prison Calculation Sheet |

☐ AGREED UNSUITABLE (Attach 1001A Form) FOR: _____  YEAR(S)
☐ HEARING POSTPONED/REASON: _____

## PANEL RECOMMENDATIONS AND REQUESTS

**The Board Recommends:**

☐ No more 115's or 128A's          ☒ Stay discipline free          ☒ Earn positive chronos
☐ Work to reduce custody level     ☐ Learn a trade*                ☐ Get a GED*
☒ Get self-help*                   ☐ Get therapy*

☐ Recommend transfer to _____
☐ Other _____
    *These programs are recommended if they are offered at your prison and you are eligible / able to participate.

Penal Code 3042 Notices        ☒ Sent        Date:  4-21-06

Commitment Offense(s)

187 2ND W/ 12022.5(A)                          MURDER 2ND W/ USE OF F'ARM
Code(s)                                        Crime(s)

TA016787                                        01
Case(s)                                        Count(s)

| Date Inmate Came to CDC | Date Life Term Began | Minimum Eligible Parole Date |
|---|---|---|
| 1-14-93 | 12-24-93 | 12-24-03 |

☐ Initial Hearing        ☒ Subsequent (Hearing No,) 1        Date of Last Hearing  11-21-02

CDC Representative

Attorney for Prisoner  RICHARD RUTLEDGE        Address

D.A. Representative                            County  LOS ANGELES

This form and the Board's decision at the end of the hearing on only proposed and NOT FINAL.  It will not become final until it is reviewed

Chair  *Linda Shelton*                         Date  6/6/06
Panel Member  *Bill Akers*                     Date  6/6/06
Panel Member                                   Date

| NAME | CDC# | PRISON | CALENDAR | DATE |
|---|---|---|---|---|
| MARROQUIN, MARCO | H-62380 | CTF-SOLEDAD | JUNE 2006 | 6-6-06 |

BPT 1001 (Rev. 08/03)                1                EX "F"  Page 1 of 1

PROOF OF SERVICE BY MAIL

C.C.R. 1013(a)(1)(a)(2)

I, Marco Marroquin, declare that;

I am over 18 years of age, that I am the pro per Petitioner to the hereto attached cause of action, and that I reside at CTF-Central, California State Prison, CA. My complete mailing address is; Marco Marroquin, H-62380, Box 689 C-117L, California State Prison, Soledad, CA 93960-0689

On October _19_, 2006, I placed the enclosed/attached documents: (A), Petitioners Transcripts of the June 6, 2006 parole suitability hearing, the subject of the instant petition: (B), SETTLEMENT AGREEMENT AND FULL AND FINAL RELEASE OF ALL CLAIMS: (C), In re Robert Rosenkrantz (BH003529): (D), Petitioner's "Sua Sponte" claim: (E), Coroner's Report, and, (F), Petitioner's "Hearing Sheet". in the hands of prison officials for mail room processing, with postage fully prepaid, as directed by prison regulations, addressed to the following:

District Attorney
of Los Angeles
200 W. Compton, Blvd
Compton, CA. 90220

Superior Court of Compton
County of Los Angeles
200 W. Compton Blvd
Compton, CA. 90220

I declare under penalty of perjury that the foregoing is true and correct. Executed this _19_ of October, 2006, at Soledad, California (State Prison), County of Monterey.

Marco Marroquin