# EXHIBIT 3
# Part 1 of 2

COPY

MC-275

Name   MARCO MARROQUIN

Address   P.O.Box  689   F-316 L

CTF CENTRAL FACILITY

SOLEDAD, CA 93960-0689

CDC or ID Number   H-62380

## CALIFORNIA APPELLATE COURTS

## SECOND APPELLATE DISTRICT
(Court)

PETITION FOR WRIT OF HABEAS CORPUS

| MARCO MARROQUIN | No. _____ |
| Petitioner | |
| vs. | (To be supplied by the Clerk of the Court) |
| B. CURRY, Warden (Acting) | |
| Respondent | |

## INSTRUCTIONS—READ CAREFULLY

- If you are challenging an order of commitment or a criminal conviction and are filing this petition in the Superior Court, you should file it in the county that made the order.

- If you are challenging the conditions of your confinement and are filing this petition in the Superior Court, you should file it in the county in which you are confined.

- Read the entire form *before* answering any questions.

- This petition must be clearly handwritten in ink or typed. You should exercise care to make sure all answers are true and correct. Because the petition includes a verification, the making of a statement that you know is false may result in a conviction for perjury.

- Answer all applicable questions in the proper spaces. If you need additional space, add an extra page and indicate that your answer is "continued on additional page."

- If you are filing this petition in the Superior Court, you need file only the original unless local rules require additional copies. Many courts require more copies.

- If you are filing this petition in the Court of Appeal, file the original and four copies of the petition and, if separately bound, one copy of any supporting documents.

- If you are filing this petition in the California Supreme Court, file the original and ten copies of the petition and, if separately bound, two copies of any supporting documents.

- Notify the Clerk of the Court in writing if you change your address after filing your petition.

- In most cases, the law requires service of a copy of the petition on the district attorney, city attorney, or city prosecutor. See Penal Code section 1475 and Government Code section 72193. You may serve the copy by mail.

Approved by the Judicial Council of California for use under Rule 60 of the California Rules of Court [as amended effective January 1, 2005]. Subsequent amendments to Rule 60 may change the number of copies to be furnished to the Supreme Court and Court of Appeal

Form Approved by the
Judicial Council of California
MC-275 [Rev July 1, 2005]

**PETITION FOR WRIT OF HABEAS CORPUS**

Penal Code, § 1473 et seq.
Cal. Rules of Court, rule 60(a)

American LegalNet, Inc.
www.USCourtForms.com

This petition concerns:

☐ A conviction         ☐ Parole

☐ A sentence         ☐ Credits

☐ Jail or prison conditions      ☐ Prison discipline

☒ Other *(specify):* **Denial of suitability at a parole suitability hearing. (2nd, hearing).**

1  Your name: **Marco Marroquin**

2  Where are you incarcerated? **California State Prison at Soledad, CA, Hgh. 101 North.**

3  Why are you in custody?  ☒ Criminal Conviction  ☐ Civil Commitment

*Answer subdivisions a. through i. to the best of your ability.*

a.  State reason for civil commitment or, if criminal conviction, state nature of offense and enhancements (for example, "robbery with use of a deadly weapon").

**Convicted of second degree murder with gun use enhancement. Note: Conviction is not at issue, petition relates to parole suitability due process violations.**

b  Penal or other code sections: **§§187 and 12022.5.**

c  Name and location of sentencing or committing court: **Superior court, Compton, California**

d  Case number: **TA016787**

e.  Date convicted or committed: **1/4/93**

f  Date sentenced: **Confusion on my part as to date of conviction and sentence above.**

g  Length of sentence: **15 years to life plus 3 years.**

h.  When do you expect to be released? **Undetermined with "to Life" top on sentence.**

i.  Were you represented by counsel in the trial court? ☒ Yes.  ☐ No.  If yes, state the attorney's name and address:

**Unknown at this time, documentation lost of period of years.**

4  What was the LAST plea you entered? *(check one)*

☒ Not guilty  ☐ Guilty  ☐ Nolo Contendere  ☐ Other:

5.  If you pleaded not guilty, what kind of trial did you have?

☒ Jury  ☐ Judge without a jury  ☐ Submitted on transcript  ☐ Awaiting trial

6.  GROUNDS FOR RELIEF

**Ground 1:** State briefly the ground on which you base your claim for relief  For example, "the trial court imposed an illegal enhancement."  *(If you have additional grounds for relief, use a separate page for each ground. State ground 2 on page four  For additional grounds, make copies of page four and number the additional grounds in order )*

**Due process and equal protection violations; see attached petition.**

a.  Supporting facts:

Tell your story briefly without citing cases or law. If you are challenging the legality of your conviction, describe the facts upon which your conviction is based. *If necessary, attach additional pages.* CAUTION: You must state facts, not conclusions  For example, if you are claiming incompetence of counsel you must state facts specifically setting forth what your attorney did or failed to do and how that affected your trial. Failure to allege sufficient facts will result in the denial of your petition. (See *In re Swain* (1949) 34 Cal.2d 300, 304.) A rule of thumb to follow is: *who* did exactly *what* to violate your rights at what time *(when)* or place *(where)*. *(If available, attach declarations, relevant records, transcripts, or other documents supporting your claim.)*

**See attached petition and Motion for Judicial Notice attached hereto.**

b.  Supporting cases, rules, or other authority (optional):

*(Briefly discuss, or list by name and citation, the cases or other authorities that you think are relevant to your claim. If necessary, attach an extra page.)*

**See attached petition and Motion for Judicial Notice attached hereto.**

7.  **Ground 2 or Ground** _____  (*if applicable*):

Due process and equal protection violations; see attached petition.

a.  Supporting facts:

See attached petition and Motion for Judicial Notice attached hereto.

b.  Supporting cases, rules, or other authority:

See attached petition and Motion for Judicial Notice attached hereto.

8  Did you appeal from the conviction, sentence, or commitment?  [XX] Yes  [ ] No.  If yes, give the following information

a  Name of court ("Court of Appeal" or "Appellate Dept. of Superior Court"):
**Does not apply to this petition; documents lost over period of years.**

b  Result **Relief denied** _____  c  Date of decision: **Unavailable**

d  Case number or citation of opinion, if known: **Unknown**

e  Issues raised:  (1) _____ **Unavailable at this time.** _____

   (2) _____ **//** _____

   (3) _____ **//** _____

f  Were you represented by counsel on appeal?  [XX] Yes.  [ ] No.  If yes, state the attorney's name and address, if known:

**Unavailable, documents lost of period of years.**

9  Did you seek review in the California Supreme Court?  [XX] Yes.  [ ] No.  If yes, give the following information:

a  Result: **Relief denied** _____  b  Date of decision: **Unavailable**

c  Case number or citation of opinion, if known: **Unavailable**

d  Issues raised:  (1) _____ **Unavailable** _____

   (2) _____ **//** _____

   (3) _____ **//** _____

10  If your petition makes a claim regarding your conviction, sentence, or commitment that you or your attorney did not make on appeal, explain why the claim was not made on appeal:

**Does not apply to this petition, parole suitability denial issue only presented.**

11  Administrative Review:

a  If your petition concerns conditions of confinement or other claims for which there are administrative remedies, failure to exhaust administrative remedies may result in the denial of your petition, even if it is otherwise meritorious. (See *In re Muszalski* (1975) 52 Cal.App.3d 500 [125 Cal.Rptr. 286].) Explain what administrative review you sought or explain why you did not seek such review:

**Does not apply to this petition.**

b  Did you seek the highest level of administrative review available?  [ ] Yes.  [XX] No: **Does not apply.**

*Attach documents that show you have exhausted your administrative remedies.*

12. Other than direct appeal, have you filed any other petitions, applications, or motions with respect to this conviction, commitment, or issue in any court? ☒ Yes. If yes, continue with number 13. ☐ No. If no, skip to number 15.

13. a. (1) Name of court: **U.S. District Court, Central District of California.**

   (2) Nature of proceeding (for example, "habeas corpus petition"): **Habeas Corpus petition**

   (3) Issues raised: (a) **Unavailable**

   (b) **//**

   (4) Result *(Attach order or explain why unavailable):* **Relied denied, documents lost of time.**

   (5) Date of decision: **Unavailable**

 b. (1) Name of court: **Does not apply to this petition.**

   (2) Nature of proceeding: **//**

   (3) Issues raised: (a) **//**

   (b) **//**

   (4) Result *(Attach order or explain why unavailable):* **//**

   (5) Date of decision: **//**

 c. *For additional prior petitions, applications, or motions, provide the same information on a separate page.*

14. If any of the courts listed in number 13 held a hearing, state name of court, date of hearing, nature of hearing, and result:
**No hearings or evidentiary hearings held on appeal of conviction.**

15. Explain any delay in the discovery of the claimed grounds for relief and in raising the claims in this petition. (See *In re Swain* (1949) 34 Cal.2d 300, 304.)
**The instant petition addresses due process and equal protection violations at a parole suitability hearing held on June 6, 2006, a second hearing.**

16. Are you presently represented by counsel? ☐ Yes. ☒ No. If yes, state the attorney's name and address, if known:
**Petitioner is being assisted by fellow inmate Samuel A. Dubyak, D-54700, Petitioner is basically illiterate in the English language, Guatemalan National.**

17. Do you have any petition, appeal, or other matter pending in any court? ☒ Yes. ☐ No. If yes, explain:
**Petitioner is currently in the Northern District Federal Court on his previous, 2003, denial of suitability.**

18. If this petition might lawfully have been made to a lower court, state the circumstances justifying an application to this court:
**This is the Court of proper jurisdiction for habeas corpus from inmates convicted in the county of Los angeles.**

I, the undersigned, say: I am the petitioner in this action. I declare under penalty of perjury under the laws of the State of California that the foregoing allegations and statements are true and correct, except as to matters that are stated on my information and belief, and as to those matters, I believe them to be true.

Date: **2 / 12 / 2007**

▶ _(signature)_

(SIGNATURE OF PETITIONER)

MINUTE ORDER
SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES

DATE PRINTED: 01/12/07

----------------------------------------------------------------------

CASE NO. TA016787

THE PEOPLE OF THE STATE OF CALIFORNIA
                    VS.
DEFENDANT 01:  MARCO  MARROQUIN

----------------------------------------------------------------------

COUNT 01: 187(A) PC FEL  - MURDER.


ON 12/22/06 AT  830 AM  IN SOUTH CENTRAL DISTRICT DEPT SCO

CASE CALLED FOR HABEAS CORPUS PETITION

PARTIES: GARY E DAIGH (JUDGE)  JAIME CORONA  (CLERK)
         NONE       (REP)  DALE A DAVIDSON  (DDA)

DEFENDANT IS NOT PRESENT IN COURT, AND NOT REPRESENTED BY COUNSEL

THE COURT HAS READ AND CONSIDERED DEFENDANTS PETITION FOR
WRIT OF HABEAS CORPUS FILE STAMPED ON 10/24/06, BUT NOT RECEIVED
BY THIS COURT UNTIL WEEKS THEREAFTER. IN IT THE DEFENDANT
ALLEGES HE WAS IMPROPERLY DENIEDPAROLE AT HIS 6/6/06 PAROLE
BOARD HEARING. ATTACHED TO DEFENDANTS PETITION IS THE TRANSCRIPT
OF THE PAROLE HEARING. IN IT THE BOARDFULLY CONSIDERED
DEFENDANTS LACK OF RECORD, GRAVITY OF THE MURDER DEFENDANT
COMMITTED, HIS FAMILY HISTORY AND POST-PAROLE PLANS. THE
PAROLE BOARD CONCLUDED THAT DEFENDANTS RELEASE AT THIS TIME

WOULD POSE AN UNREASONABLE RISK OF DANGER TO SCOIETY. THIS
DECISION IS SUPPORTED BY THE CIRCUMSTANCES OF THE CRIME
ITSELF AND THE REFUSAL BY THE DEFENDANT TO TAKE FULL
RESPONSIBILIES FOR HIS ACTIONS.

THE DEFENDANTS PAROLE BOARD TESTIMONY MAKES CLEAR THAT HE
BLAMES OTHER PERSONS WHO "KIDNAPPED AND ROBBED" HIM THAT NIGHT
AND THE VICTIMS ACTIONS ACTIONS FOR HIS CONVICTION. THE
CONTINUED SELF DEFENSE EXPLANATION FOR DEFENDANTS ACTIONS
ON THE NIGHT OF THE MURDER DID NOT IMPRESS THE PAROLE BOARD
OR THIS COURT. IT CONCLUSION THAT THE DEFENDANT IS A DANGER
TO THE COMMUNITY, IF RELEASED, IS AMPLY SUPPORTED BY THE
EVIDENCE. PETITION DENIED.

A COPY OF THIS MINUTE ORDERED IS MAILED VIA U.S MAIL TO THE


                                    HABEAS CORPUS PETITION
                PAGE NO.   1       HEARING DATE: 12/22/06

CASE NO. TA016787
DEF NO.  01

DATE PRINTED 01/12/07

FOLLOWING-

MR. MARCO MARROQUIN CDC#H-62380
BOX 689 G-144U
CALIFORNIA STATE PRISON
SOLEDAD, CA. 93960

CC;
DA
PD
FILE

NEXT SCHEDULED EVENT:

PROCEEDINGS TERMINATED

HABEAS CORPUS PETITION
HEARING DATE: 12/22/06

CALIFORNIA COURT OF APPEALS

SECOND APPELLATE DISTRICT

Petitioner herein appeals to the Honorable Second Appellate District Court of California from the Order made by the Superior Court of California, County of Los Angeles, dated January 12, 2007, attached hereto for reference.

The Superior Court apparently did not even read Petitioner's second parole hearing denial of which the instant habeas petition was based. Petitioner contends that his "first" petition to the Superior Court years ago had as a portion of Petitioner's prison address, as Box 689 "G-144U". Upon examining page 2 of the courts order it is apparent that the Court simply referred to past information in their computer file and produced the instant decision based on the "first" petitions information.

Petitioner's habeas form at page (1), (Second/instant petition), clearly had Petitioner's new and at the time of the second petition his address as Box 689 "C-117". There is only one court documentation that contained the "G-144U" address and that was the "first" petition several years ago, which is currently under consideration in the United States District Court (Northern District) in San Francisco.

Nonetheless the Superior Court's 'decision' was contrary to and an unreasonable application of U.S. Supreme Court law and an apparent violation of Petitioner's right of "meaningful" access to the court for a proper and just adjudication, on the merits, of his claims.

The semi-post card denial was ultimately based on the circumstances of the crime and Petitioner's refusal to take full responsibility for his actions, with the Superior Court apparently relying on Petitioner's "first" parole board denial, the petition of which was filed years ago.

First, it is established in the record that Petitioner was convicted of a second degree murder and not an offense that warranted the death penalty or

1

1    life without the possibility of parole as set forth in full in the second petition

2    attached hereto.

3        Secondly, while so many courts, including the Governor and the Board rely

4    on an inmate "taking full responsibility for his actions" (showing remorse is

5    the ultimate issue) creates an equal protection violation in and of itself. Under

6    California law, Penal Code §5011(b) (Legislative intent being at issue), state

7    in pertinent part:

8            (b) The Board of Prison Terms shall not require, when setting parole
             dates, an admission of guilt to any crime for which an inmate was
9            committed. (Stats...).

10       Although not at issue (yet) is the fact that every denial from the Governor

11   (and Boards decision, at issue herein), relies on a failure to show sufficient

12   remorse or failure to take full responsibility for the crime.

13       Although the Board cites to their rules and regulations that they will not

14   take into consideration the fact that the inmate refuses to discuss the crime

15   or make an admission the Board does employ the rote/form language that "until

16   the inmate shows 'insight', ...". The only logical reason for the denial was

17   that Petitioner's perception of the offense did not compare to the Board's wishes.

18   Petitioner has always admitted his culpability in the instant offense and has

19   shown signs of remorse, although obviously insufficient signs of remorse for

20   the Board or Superior Court.

21       Under the Fourteenth Amendment of the U.S. Constitution and California

22   Constitution Article I, Section 7(a) we find the Equal Protection Clauses. It

23   is established that under the Boards "guidelines" for suitability, that showing

24   signs of remorse is a positive feature of finding suitability. Thus if a person

25   refuses to show remorse or through his claim of actual innocence, he cannot show

26   remorse he fails to have this one positive feature considered in his suitability

27   equation, discrimination by the Board because Petitioner's version of the offense

28   does not comport with their version. Case precedents support the fact that a

2

1  denial cannot be based or relied upon to support a finding that Petitioner's

2  version is different. A "class of one" has been created through separate and

3  distinct treatment for parole suitability, see Petitioner's case citations and

4  argument in the herein attached petition under Term Setting, see, habeas corpus

5  petition attached, at pages 8-12 for U.S. Supreme Court case precedents.

6      The Superior Court came to the 'conclusion' that the instant offense was

7  committed due to the issue of kidnapping and robbery by the victim and his

8  friends. Petitioner asserts that while this issue of what Petitioner, through

9  his translation comes out as a kidnapping, the issue that caused the shooting

10  was the 'perceived' threat on his life by the victim coming at him with a broken

11  beer bottle, see trial transcripts. The issue of the broken beer bottle is

12  established in the list of evidence and direct testimony from police that

13  discovered the broken neck of the beer bottle. Under Flannel and Ceja, California

14  Court of Appeal cases (citations omitted), the Ceja case was adjudicated by this

15  Court, it was what Petitioner perceived at the time, an eminent threat to his

16  life, even if totally unjustified it is what he saw in his reasoning at that

17  instant. (see attached exhibit # "1").

18      In Flannel and Ceja it was discussed that it could be perceived that a man

19  making a gesture toward him, with keys in his hand could be perceived as a knife

20  or gun and although being harmless keys it is what Ceja and/or Flannel perceived

21  at the time. (Thus making the offense one of manslaughter). The offense of

22  manslaughter vs. second degree murder is not at issue but that the Superior Court

23  somehow converts the offense to one of perceived kidnapping from one of perceived

24  deadly assault with a broken beer bottle, resulting in Petitioner shooting the

25  victim in the arm, is unjustified. Note* The bullet traveled into the victim's

26  torso, the victim was not nor ever shot twice nor shot directly in the body.

27  Somehow the Board and Superior Court judge Petitioner's "lack of taking full

28  responsibility for his actions" because he claims self defense for what he

3

1   perceived at the time. Petitioner's current Psychological Evaluation is replete
2   with Petitioner showing remorse, and the Board's trial transcripts show the same
3   fact, that Petitioner does show remorse, although P.C. §5011(b), by Legislative
4   intent, does not require a showing of remorse for a parole suitability trial.

5       The Superior Court's form/rote language that the Board's, "It conclusion
6   (sic) that the defendant is a danger to the community, if released, "is amply
7   supported by the evidence". (See attached exhibit # "1").

8       Nowhere does the Superior Court even hint at what evidence they are referring
9   to for support of their semi-post card denial. There is no evidence in the
10  (current) record, what-so-ever to support such a decision and "some evidence"
11  in the record is not the standard of proof in California, see Evidence Code §115
12  and Hamdi v. Rumsfeld in the instant petition.

13      Additionally, the Superior Court failed to adjudicate the claims presented
14  by Petitioner, thus under California Rules of Court those claims are deemed to
15  be true and correct, as Petitioner understands the issue.

16      The Superior Court failed to consider the fact that Petitioner can never
17  be "paroled" but only deported, not even giving a reference to this issue the
18  Court simply recited from the Board's denial, "The parole board concluded that
19  defendants release at this time would pose an unreasonable risk of danger to
20  scoiety (sic)."

21      Although one could argue that society means a threat to Guatemalan society
22  it must be understood that California law and parole stop at the border,
23  California cannot impose its ideas, culture or values on another countries
24  society, to bootstrap and bolster its excuses for denial of suitability for
25  parole. Petitioner cannot be paroled but only deported, he has an INS hold, he
26  will never be turned over to a parole agent, he will never be among California
27  or Unites States society.

28      The Superior Court's semi-post card denial based on what Petitioner perceives

4

1   with reasonable belief, due to the address of G-144U, that the court never gave

2   full or even minuscule consideration to his second hearing denial petition and

3   if they would have fairly adjudicated the claims the court would have came to

4   an obviously different and fair consideration/conclusion of his constitutional

5   issues.

6        Thus, Petitioner herein submits his 'complete' habeas petition as was

7   delivered to the Superior Court, for this Court's adjudication, as though set

8   forth in full.

                          Respectfully submitted,

                          _Marco Marroquin_ (signature)

                          Marco Marroquin

Dated: February _12_ , 2007


(By, fellow inmate Samuel A. Dubyak,
due to lack of understanding by
Petitioner of the English language
and legal matters).

To the Honorable Judges:

Comes now, Marco Marroquin, Petitioner in pro per, and hereby petitions this Court for a writ of habeas corpus and by this verified petition he sets forth the following facts and causes for issuance of the writ.

I.

Petitioner is presently incarcerated and confined from his liberty by the Warden in the state prison at Soledad, CA. Petitioner is serving a sentence of 15 years to life plus 3 years, pursuant to a judgment imposed by the Honorable Elizabeth Baron, Judge of the Los Angeles County Superior Court.

II.

Petitioner hereby incorporates all relevant exhibits, numbered and referenced throughout this petition, and via Motion for Judicial Notice.

III.

Petitioner asserts that under the California Indeterminate Sentencing Laws, he is entitled to a term fixed proportionately to his individual culpability and fair, and individualized, consideration for parole under Cal. P.C. §3041(a)(b) along with rules and regulations and case citations listed herein.

IV.

An indeterminate sentence which does not have a term fixed is deemed to be the maximum term for purposes of constitutional analysis. Since no indeterminately sentenced prisoners in California have a term fixed (see, exceptions under CLASS OF ONE) all have had their punishment summarily fixed at the maximum.

V.

The Legislature has specified three categories of culpability for the offense of murder in California. The most serious is one of "special circumstances" first degree murder, involving malice, premeditation, and the concurrent commission of an additional serious felony, and has a punishment of either the death penalty

or life without the possibility of parole. The second most serious is first degree murder, involving malice and premeditation, and has a punishment of 25 years-to-life. The last category is second degree murder, involving only malice, and a punishment of 15 years-to-life.

VI.

Since no terms are fixed (except the CLASS OF ONE), all have been set at "life"; this is contrary to the California Supreme Courts determination that each offender is entitled to a term fixed proportionately to individual culpability.

VII.

The failure to fix terms (except CLASS OF ONE) and summary denial of parole dates for life prisoners by the BPH show a defacto policy of refusing to follow the California Penal Codes, the California Constitutions Article I, section 7(a) Equal Protection Clause, also, United States Constitutions Fourteenth Amendment, Equal Protection.

VIII.

Petitioner has no plain, speedy or adequate remedy at law to protect his constitutional rights on these issues other than by this petition.

//

//

//

1

<u>STATEMENT OF THE CASE</u>

2

3    In August of 1991, Luis Silva and his girlfriend, Delcia Lopez, agreed to

4    buy a car from Petitioner for two thousand dollars. Silva was given possession

5    of the car, and was supposed to pay Petitioner every two weeks. After the first

6    two weeks however, Silva returned the car, saying that it had a lot of defects.

7    Silva and Petitioner disagreed and argued when Silva tried to give the keys back

8    to Petitioner. Petitioner asked Silva to pay him for the time that he had the

9    car, but Silva refused to pay. Petitioner told Silva that he would regret what

     he had done to him.

10    At approximately 10 P.M. on January 12, 1992, Petitioner and another man

11    entered the La Bajadita Bar in Compton. Before entering, the security guard

12    checked the two men for weapons and found none. A short time later, Silva also

13    entered the bar, but did not sit with Petitioner. Both men ordered beer. From

14    that point forward, the defense and prosecution cases go in different directions,

15    with vastly different evidence and completely different testimony in support

16    of their theories of the case.

17    The prosecutions case continues with none of the employees at the bar

18    recalling any argument between Petitioner and Silva, or even seeing the men

19    approach each other while inside the bar. At some point, Silva left the bar to

20    move his car. About two minutes after Silva left, Petitioner also left the bar,

21    with the man that he had entered with, and walked along Compton towards Williams

22    street.

23    About 10 minutes later, Petitioner and his companion returned to the bar

24    and tried to re-enter it. However, when the security guard searched Petitioner,

25    he discovered a gun and told Petitioner that he could not go inside the bar with

26    a weapon. Petitioner and his companion then moved away to a distance of about

27    three parked cars from the entrance to the bar and remained there.

28    Silva, after moving his car, returned in the direction of the bar. As Silva

reached the curb, Petitioner came toward him, according to the security guard. Petitioner called Silva a son of a bitch and they argued about a car. Petitioner said to Silva that he would have to pay Petitioner for the car. Silva said that he did not want any problems with Petitioner, and did not threaten Petitioner in any manner. Petitioner then called Silva a son of a big whore. The guard did not see if Silva had anything in his hands, and that Silva's hands were at his sides.

The security guard saw Petitioner point a gun at Silva and say that i'm going to kill you. Petitioner pulled the trigger the first time and the gun did not fire; he pulled it a second time and it fired. The guard did not see if Silva was shot when Petitioner fired the gun. As Silva bent over, the guard pulled him down to the ground and placed him in front of the doorway. Petitioner turned and walked towards Williams street with his friend. There was no one else on the street at that time.

The security guard contacted Deputy Reynolds and directed the officers to Petitioner where he was standing by a white Toyota pickup with a gun in his hand.

A search of the immediate area and the victim's person revealed no weapons. One shell casing was later found about 10-12 feet from where Silva had been lying. No broken bottles were found at that time, however testimony showed the presence of two broken bottles in the immediate area. One unbroken Budweiser bottle was found.

Petitioner stated that Silva had argued with him about a family problem, that Silva had threatened to kick his ass and that he went to get his gun because he was afraid of Silva. Petitioner kept the gun in the battery section of the engine compartment of his truck. He put the gun in his back waistband and walked in the direction of the bar to get something to eat at the stand outside of the bar. When he got to the bar, Silva came out and began arguing again; he then pulled out his gun and shot Silva. Petitioner's defense was that Silva had tried

iv

to cut him with a broken bottle.

The cause of death was listed as a gunshot wound to the abdomen, the evidence established that the initial point of entry was a flesh wound to the arm and the projectile deflecting into the body.

The defense case describes problems between Silva and Petitioner's girlfriend and her brothers. It seems that Silva was living with Delcia, Petitioner's girlfriend's sister, but was married to one of Delcia's cousins. This resulted in Delcia and her brothers throwing Silva out of their house.

The night of the incident, Petitioner was in the bar talking with a friend called "Pink Floyd", who was also a friend of Silva. When Petitioner was seated in the bar, Silva came up and said to Floyd, "stop talking to trash", referring to Petitioner. Silva then picked Petitioner up by his collar, and when Floyd said, "you're not going to fight in here", Silva then said, "tell him to go outside if he's a man". Silva then pushed Petitioner and said to him, "let's go out, faggot". Silva accused Petitioner of being a gigolo because someone was supporting him, and also accused him of trying to defraud Silva by asking for money for the use of the car.

They went outside the bar where Floyd stood between them and prevented them from fighting. Petitioner walked towards his car, intending to leave. He heard steps behind him and turned to see Silva coming at him with something in his right hand that could have been a knife. Petitioner kicked Silva's hand and Silva turned and ran away. Petitioner was very frightened because he believed Silva had tried to kill him. Petitioner then got his gun from his truck and loaded it. He looked toward the front of the bar and saw Silva's car driving away.

Thinking that Silva had left, Petitioner then returned towards the bar. As he walked towards the bar, Silva drove by in his car and yelled to him, challenging him to a fight. Silva then made a U-turn and parked on the opposite side of the street. Silva then came running toward Petitioner and, as he

approached, he reached down and broke a bottle he was holding by the neck.

Silva attacked Petitioner several times with the broken neck of the bottle, but Petitioner was able to jump out of the way. Silva continued to taunt and insult Petitioner. After Floyd again tried to intervene, Silva lunged a final time at Petitioner with the broken bottle and Petitioner shot him in the arm. At the moment that he pulled the trigger, Petitioner thought that Silva was going to stab him with the bottle neck.

Victor Matute testified that he arrived at the La Bajadita Bar on January 12, 1992, between 10 P.M. and midnight. As he approached the door, he saw three people arguing on the sidewalk. It appeared that two of the people wanted to fight the other person. He then saw one of the people try to hit the third person with a bottle. The third person moved to the side to avoid being hit. He then saw the third person shoot the person with the bottle.

Finally, Los Angeles County Deputy Sheriff Reynolds testified that on the night of the shooting, Guadalupe Suazo, the manager of the La Bajadita Bar, told him he had seen Petitioner and Silva argue for a minute inside the bar. Bertha Angeli, the owner of La Bajadita, also indicated to him that she had seen Petitioner and Silva arguing in the bar that night.

//

//

//

### INDEX OF ISSUES RAISED

**I.**

CALIFORNIA PENAL CODE §3041(a)(b) CREATES A PROTECTABLE LIBERTY INTEREST AT A PAROLE SUITABILITY HEARING, AND A "REASONABLE" EXPECTATION OF A RELEASE DATE. THE COMMANDING WORD "SHALL" CLEARLY ESTABLISHES THIS EXPECTATION.

**II.**

THE BOARD VIOLATED PETITIONER'S DUE PROCESS RIGHTS UNDER THE FIFTH AND FOURTEENTH AMENDMENTS OF THE U.S. CONSTITUTION, CALIFORNIA CONSTITUTION, ARTICLE I, Sec. 7(a), WHEN THEY APPLIED TITLE 15 C.C.R. §§2400-2411 TO OVER-RIDE AND CONTROL PENAL CODE Sec. §3041(a)(b).

**III.**

THE BOARD VIOLATED PETITIONER'S EQUAL PROTECTION RIGHTS UNDER THE CALIFORNIA CONSTITUTION, ARTICLE I, Sec. 7(a), AND, THE FOURTEENTH AMENDMENT OF THE U.S. CONSTITUTION WHEN THEY FAILED TO CONSIDER SETTING HIS TERM AND FAILURE TO FIX A PRIMARY TERM, (SEPARATE AND DISTINCT TREATMENT OF A "CLASS OF ONE").

**IV.**

THE BOARD VIOLATED PETITIONER'S DUE PROCESS RIGHTS UNDER THE FIFTH AND FOURTEENTH AMENDMENTS OF THE U.S. CONSTITUTION WHEN THEY DENIED HIM A PAROLE DATE BASED ON P.C. §3041(b), BECAUSE HIS CONVICTION WAS "A TERRIBLE OFFENSE".

**V.**

THE BOARD VIOLATED PETITIONER'S DUE PROCESS RIGHTS UNDER THE FIFTH AND FOURTEENTH AMENDMENTS OF THE U.S. CONSTITUTION AND, CALIFORNIA CONSTITUTION ARTICLE I, Sec. 7(a) WHEN THEY DENIED PAROLE BASED ON A PREDETERMINED OUTCOME.

**VI.**

THE BOARD VIOLATED PETITIONER'S DUE PROCESS RIGHTS UNDER THE FIFTH AND FOURTEENTH AMENDMENT OF THE U.S. CONSTITUTION BY HOLDING "PAROLE SUITABILITY" HEARINGS FOR A FOREIGN NATIONAL, THAT WILL BE DEPORTED, WHO CAN NEVER BE RELEASED ON PAROLE IN CALIFORNIA. PENAL CODE §3041(a)(b) IS UNCONSTITUTIONALLY VAGUE AND AMBIGUOUS AS TO PAROLE v. DEPORTATION FOR FOREIGN NATIONALS WITH AN "INS" HOLD.

//

//

//

1  Marco Marroquin, H-62380
   Box 689   C-117L
2  California State Prison
   Soledad, Ca 93960-0689
3
              Petitioner, in pro per
4

5

6                    THE SUPERIOR COURT OF CALIFORNIA

7                    FOR THE COUNTY OF LOS ANGELES

8  MARCO MARROQUIN,                  )    Case No. _____
                                     )
9              Petitioner,           )
                                     )
10  vs.                              )    MOTION/REQUEST FOR JUDICIAL NOTICE
                                     )
11  B. CURRY, Warden (Acting?)       )
                                     )
12             Respondent.           )
                                     )
13  ─────────────────────────────────)

14  TO: THE HONORABLE JUDGE(S) OF THE LOS ANGELES COUNTY SUPERIOR COURT:

15      Pursuant to California Evidence Code sections 451, subdivision (a), 452

16  subdivision (a), (c) and (d), and 459 subdivision (a), Commodoe Home System,

17  Inc. v. Superior Court, (1982) 32 Cal.3d 211, 218-219, and Adamson v. Zipp, (1984)

18  163 Cal.App.3d Supp. 1, n.17, Petitioner hereby requests that this Court take

19  "Judicial Notice" of the attached documents (directly attached to the habeas

20  petition): (A), Petitioners Transcripts of the June 6, 2006 parole suitability

21  hearing, the subject of the instant petition: (B), SETTLEMENT AGREEMENT AND FULL

22  AND FINAL RELEASE OF ALL CLAIMS: (C), In re Robert Rosenkrantz (BH003529): (D),

23  Petitioner's "Sua Sponte" claim: (E), Coroner's Report, and, (F), Petitioner's

24  "Hearing Sheet".

25      The Court must take Judicial Notice of the factual findings of other courts,

26  even though the Court need not accept the truth of those findings. See, Mack

27  v. State Bar of California, (2001) 92 Cal.App.4th 957, 961, rehearing denied;

28  review denied; Duggal v. G.E. Capitol Communications Service, Inc., (2000) 81

Cal.App.4th 81, 82; People v. Moore, (1997) 59 Cal.App.4th 168, 178.

Petitioner obtained the attached copies of the exhibits from the prison legal library staff, law firms and a source that was in contact with the Swedish Consulate/Embassy. Review of the attached documents/cases will assist this Court in evaluating the arguments presented in Petitioner's habeas corpus, pages 1-29. The documents were attached to the instant habeas petition to avoid separation of papers and legal documentation.

Respectfully submitted,

Marco Marroquin

Dated: 2/12/2007

CALIFORNIA PENAL CODE §3041(a)(b) CREATES A PREOTECTABLE LIBERTY INTEREST AT A PAROLE SUITABILITY HEARING, AND A "REASONABLE" EXPECTATION OF A RELEASE DATE. THE COMMANDING WORD "SHALL" CLEARLY ESTABLISHES THIS EXPECTATION.

Under California law, a convicted person sentenced to a term of 15/25 years "TO LIFE" shall be released on parole unless his release would pose an unreasonable risk to public safety or unreasonable risk to society if released from prison. Cal. P.C. §3041(a)(b); Cal. Code of Regs., Title 15, §§2400-2402.

It is well established that the words "...shall be released on parole..." create a liberty interest in parole release therefore constitutional due process standards are mandatory. Moody v. Daggett, 429 U.S. 78, 50 L.Ed.2d 236, 97 S.Ct. 274 (1976). A parole liberty interest involves values protected by the due process clauses of the Fifth and Fourteenth Amendments.

It is settled that a liberty interest has been created by California law; Perveler v. Estelle, (9th Cir. 1992) 974 F.2d 1132; Bergen v. Spaulding, (9th Cir. 1989) 881 F.2d 719, 721, (citing Greenholtz and Allen); Biggs v. Terhune, (9th Cir. 2003) 334 F.3d 910, 914-916; McQuillion v. Duncan, (9th Cir. 2002) 306 F.3d 895, 901-902: Sass, 2006, DJDAR 11931 (9th Cir.).

"Although we have never directly held that California parole scheme creates a protected liberty interest, we have repeatedly assumed that it does." See, Powell v. Gomez, 33 F.3d 39, 40 (9th Cir. 1994); "today we hold what we have previously assumed. Under the "clearly established" framework of Greenholtz and Allen, we hold that California's parole scheme gives rise to a cognizable liberty interest to release on parole. The scheme "creates a presumption that parole release will be granted" unless the statutorily defined determinations are made." Allen, 482 at 378 (quoting Greenholtz, 442 U.S. at 12); The California Court of Appeals in In re Deluna, 126 Cal.App.4th 585, 24 Cal.Rptr.3d 643 (2005), decided after Dannenberg, held that under Rosenkrantz, 29 Cal.4th at 661, and McQuillion v. Duncan, supra, that parole applicants continue to have a "liberty interest" in parole release.

1

THE BOARD VIOLATED PETITIONER'S DUE PROCESS RIGHTS UNDER
THE FIFTH AND FOURTEENTH AMENDMENTS OF THE U.S. CONSTITUTION,
CALIFORNIA CONSTITUTION, ARTICLE I, Sec. 7(a), WHEN THEY
APPLIED TITLE 15 C.C.R. §§2400-2411 TO OVER-RIDE AND CONTROL
PENAL CODE Sec. §3041(a)(b).

2

3

4

Title 15 C.C.R. §§2400-2411 are in direct violation of the California

5

Constitution, Article II, §10(c) (Referendum Process). Proposition 7 did not

6

permit (to P.C. §190, et seq.) any additions, amendments, repealing or

7

superceeding; to be 'inclusive' to Proposition 7 without voters approval.

8

Government Code Section 11340(a); "The Administrative regulations are
authorized by statute, and consistent with other statutes of law,
section (f) requires the direct involvement of the Legislature and
the Executive Branch."

9

10

11

Government Code Section 11340.1(a); "The Legislature declares that
public interest established the Office of Administrative Law (OAL)
which shall be charged with review of adopted regulations, which
substitutes performance standards (e.g., the fulfillment or
accomplishment in a given case, the substantial performance) for
'prescriptive' (based on legal prescription or as approved by law)
standards. The intent that neither the OAL nor court shall substitute
its judgment for rule-making agency in the substantive content of
adopted regulations. With the intent of the Legislature the OAL is
a part of the Executive Branch of the state government, and reports
directly to the Legislature."

12

13

14

15

16

Government Code Section 11342.2: "The adoption of regulations is to
implement, interpret and make specific to carry out the provisions
of the statute ..."but" ... no regulation adopted is valid or effective
unless consistent and not in conflict with statutes or constitution
to effectuate the purpose, of the regulations." (Emphasis added).

17

18

19

Petitioner asserts that; The Department of Corrections (CDC) Regulations

20

Management Department writes the regulations. The OAL as to Gov. Code 11342.2

21

implements, interprets and makes specific the provisions for the regulations

22

statute. The Legislative Body chapters, presents to the Governor and is filed

23

with the Secretary of State as a statute of law for 15 C.C.R. regulations.

24

Petitioner asserts that; The Initiative Measure Proposition 7, did not

25

provide for any continuation (Gov. Code §9604) of rules and regulations of the

26

Administrative Procedures Act (APA) of 1976, nor the OAL enacted in 1979,

27

operative 7-1-1980, which gives the CDC and the BPH explicit authority for

28

2

1  administration of prisoners, (P.C.'s §§5058, 5076.2) under Gov. Code Section

2  11340, enabling statute.

3      The interpretation of Proposition 7, with no implied provisions or mandates

4  to be carried through from one statute to another, "under circumstances" in which

5  would be required or considered as re-instatements for continuation of statute

6  (Gov. Code §9604) ... "but" ... as Petitioner asserted the BPH regulations are

7  approved by the OAL under the Legislatures Constitutional grant of power (Cal.

8  Const. Art. VI, §6; P.C. §6). The BPH added New Article II, Sections §§2400-2411

9  as filed 9-8-1981; Register 81 No. 37; the parole considerations criteria and

10 guidelines, creating 'prodecural provisions and mandates' that cannot be applied

11 to Proposition 7's Initiative Measure without voters approval.

12     In People v. Cooper, C.A.1st, No. A087483, Nov. 1, 2000; re: issue of

13 application of time credits under P.C. §2933, the court held that:

14         "Specifically, Cooper argued that since section 190, the Briggs
        initiative, was adopted by voters in 1978, it can only be amended upon
15         approval of the voters. Hence, Section 2933 cannot apply to his sentence
        because it was adopted by the Legislature."
16

17         Affirmed as modified. "The additions ... constituted a legislative
        change to the Briggs Initiative that required voter approval pursuant
        to Article II, Section 10, of the California Constitution." In re Oluwa,
18         207 Cal.App.3d 439 (1989).

19     Petitioner asserts that; Title 15, Division II, C.C.R. §§2400-2411 which

20 are guidelines used by the BPH against inmates sentenced under Proposition 7's

21 P.C. §190 et seq., are in direct violation of the California Constitutions

22 Referendum Process. P.C. §3041 cannot be controlled by Division II criteria (as

23 is exactly what is done by the Board, thus over-riding a clearly stated penal

24 code), thus the only true (and legally correct) criteria for a parole date is

25 that the inmate does not pose an unreasonable risk to society, see P.C.

26 §3041(a)(b); this issue has already been decided (twice) by a state

27 certified/licensed (expert) psychologist/psychiatrist.

28     An inspection of the parole hearing transcripts (passim) establish that,

"You have received absolutely zero 115s. That is extraordinarily rare." (Ex-"A" p.74). "You have no previous record whatsoever"; "You've participated in AA and NA since 95"; "Your psychiatrist's report was favorable"; "the report was positive"; "he indicated you showed genuine remorse"; "you would be better on parole - you would be in the top 2 percent for success"; "Your parole plans are good"; "You have excellent parole plans for Guatemala"; "...you had started your own business"; "Commissioner Keenan called you an entrepreneur"; "Commissioner Keenan and I believe that you can take care of yourself and your family no problem"; "...we're guiding and directing you because we believe in you..."; "We were particularly impressed..." (p.79); "Most impressive was your request to participate in individual counseling with Dr. Reed"; "...the insight and feeling that you developed..."; "You have done a lot of good work, we want you to keep the momentum going"; "you've been on the right path, you're doing a lot of good things": "We're behind you".

On page 75 (Ex-"A") the Board is requiring letters of support showing that he could potentially get a job in the Los angeles area.

It is clear that Petitioner has an INS hold on him and "will" be deported, also this issue was established at his first hearing when the Commissioners stated that "you will be deported, I can guarantee it".

In Martin v, Marshall, 2006 WL 1344584 (N.D. Cal.), page 8-9: "Section 2402(d)(8) provides that a prisoner may be suitable for release if "[t]he prisoner has made realistic plans for release or has developed marketable skills that can be put to use upon release." The subsection does not require that a prisoner have viable parole plans in the United States." "The Governor's reasoning would require petitioner to make plans to enter the United States illegally, then communicate those illegal plans to the Board in order to be granted a release date."

Although Petitioner asserts that Division II, Sections §§2400-2411 cannot

4

be applied to him, or any other similarly situated inmate, in violation of the California Constitution (which thus violates Petitioner's due process and equal protection rights under both the California and United States Constitutions), he further asserts that "if" the sections 'for suitability' were applied to him NONE of the criteria for a denial of a parole date would be met by the BPH. Indeed, a reasoned reading of the Board's "DECISION" indicates or rather fails to indicate any discernible reason or excuse for a denial of a parole release date. The 'only' articulated wording that could possibly be implied as a 'reason' for denial are: "First of all, we know that this was - this commitment offense was a - a terrible offense". (Ex-"A" at p.73); "the motive for the crime was very trivial in relation to the offense." (Ex-"A" at p.73).

These reasons/excuses are clearly within the framework of the Matrix which the Board is supposed to follow. Indeed, because Title 15 C.C.R. §§2400-2411 enactment is in clear violation of the California Constitution the Board cannot even apply the Matrix to his crime. Thus Petitioner falls within the equal protection clauses of both the California and United States Constitution because of unequal treatment. Prior to the passage of Proposition 7 in 1978 the Board had a 'legally enacted Matrix' to follow for purposes of uniformity of sentences and currently there is no legal Matrix. (Separate treatment, separate class of individuals under the intent and meaning of equal protection.).

Furthermore, a regulation (Title 15 §§2400-2411) cannot over-ride a clearly stated statutory enactment (Cal. P.C. §§3041 et seq.). See, Aerolineas Argentinas v. U.S., 77 F.3d 1564 (Fed. Cir. 1996).

The BPH cannot apply or use §§2400-2411 to over-ride the Legislative intent (as asserted herein) of Cal. P.C. §3041(b). §3041(b) is not ambiguous but rather it is plain and clear in its meaning and who/when it applies and is a factual representation of Legislative intent; That an inmate "shall" receive a parole date at his first hearing, except for certain circumstances, basically stated:

that he is not a threat or risk to society and his crime was "not particularly egregious".

An agency may not confer power on itself. See, Gorbach v. Reno, 219 F.3d 1087 (8th Cir. 2000).

When an administrative regulation conflicts with a statute, the statute controls. (Government Code §11342.2).

Regulations that contravenes a statute is/are invalid. See, R & W Flammann GMBH v. U.S., 339 F.3d 1320 (Fed. Cir. 2003).

A statute by its very nature, trumps conflicting regulations. See, Caldera v. J.S. Alberici Const. Co. Inc., 153 F.3d 1381 (Fed. Cir. 1998).

An agencies regulations cannot legitimate the violations of constitutional or statutory rights. See, U.S. v. Marolf, 173 F.3d 1213 (9th Cir. 1999).

By the very nature of the language of P.C. §3041(a)(b) and the absence of provisions and mandates to control hearings for 15/25 years "to life" sentences the Board illegally, unconstitutionally and in violation of Federal and State Due Process and Equal Protection rights "attempts to control and over-ride" P.C. §3041(a)(b) through the application of unconstitutionally enacted rules and regulations, §§2400-2411, criteria of which NONE are legal requirements/guidelines under §3041 for consideration of suitability for parole release.

The Board has effectively amended P.C. §3041(a)(b) and the Legislative intent has been circumvented. The Board has 'unreasonably applied' U.S. Supreme Court law, when using unconstitutionally enacted rules and regulations to over-ride the language in Greenholtz and Allen; "SHALL" be released on parole. The Board's decisions/excuses are clearly "contrary" to established U.S. Supreme Court law, the California Constitution (Referendum Process) thus contrary to the holdings in Greenholtz and Allen's language of Due Process rights to a fair, impartial, legal and "meaningful" hearing.

//

6

THE BOARD VIOLATED PETITIONER'S EQUAL PROTECTION RIGHTS UNDER THE CALIFORNIA CONSTITUTION, ARTICLE I, Sec. 7(a), AND, THE FOURTEENTH AMENDMENT OF THE U.S. CONSTITUTION WHEN THEY FAILED TO CONSIDER SETTING HIS TERM AND FAILURE TO FIX A PRIMARY TERM, (SEPARATE AND DISTINCT TREATMENT OF A "CLASS OF ONE").

For an equal protection claim to proceed Petitioner must allege specific facts in support of his claim. A habeas petitioner has the burden of alleging specific facts that show a federal claim is presented, or the petition is subject to dismissal. Jones v. Gomez, 66 F.3d 199, 204-05 (9th Cir. 1995). Conclusory allegations do not warrant habeas relief. Id. at 204.

Petitioner's allegations are not conclusory, they state a prima facie equal protection claim under both the California and Federal Constitutions.

The Fourteenth Amendment Equal Protection Clause provides that no State shall deny to any person "the equal protection of the laws." (See also, California Constitution Article I, Sec. 7(a)). The Equal Protection Clause ensures that "all persons similarly situated should be treated alike." City of Cleburne v. Cleburne Living Center, 473 U.S. 432, 439 (1985). To prevail on an equal protection claim, Petitioner must initially show that he was treated differently from other similarly situated persons. City of Cleburne, supra, 473 U.S. at 439; Fraley v. United States Bureau of Prisons, 1 F.3d 924, 926 (9th Cir. 1993) (per curiam).

The mere fact that some inmates convicted of second degree murder may have been paroled sooner than Petitioner does not establish the basis for a federal equal protection claim. See, Sturm v. California Adult Authority, 395 F.2d 446, 448-49 (9th Cir. 1967) (holding that "the fact that other prisoners have had their sentence reduced, or been granted parole, affords no ground for complaint by petitioner.")

However Petitioner's equal protection claim lies elsewhere, other than a mere comparison between an inmate released earlier or paroled sooner than himself, as set forth herein.

7

## EQUAL PROTECTION UNDER "CLASS OF ONE"

In the case of In re MIKAEL SCHIOLD, Court of Appeals, First Appellate District, Division Five, Case No. A103107, attached hereto with MOTION FOR JUDICIAL NOTICE, as Exhibit "B-1-6". (With numbered paragraphs).

Schilod was transferred to the country of Sweden, under the "SETTLEMENT AGREEMENT AND FULL AND FINAL RELEASE OF ALL CLAIMS", on habeas corpus. Schiold and Respondents entered into an "agreement" transferring Schiold to Sweden (Paragraph #4 of Exhibit "B").

Case No. A103107 was agreed to as "stayed" pending Schiold's transfer. (Paragraphs #5,6,7).

Explicitely at paragraph #8: "Releasor (Schiold) agrees that he will be held in custody by the government of Sweden until January 1, 2007."

Page 5, paragraph 16 (of Exhibit "B") establishes that: the agreement and settlement, in order to stay the case, was signed by the Supervising Deputy Attorney General, Anya Binsacca, dated 10/22/2003.

Petitioner asserts that the State of California in collusion with the Attorney General's Office and the Board did in fact violate the equal protection clause of the Fourteenth Amendment of the U.S. Constitution, and, California Constitution Article I, Sec. 7(a), by "setting an immutable release date" for Schiold, when his term was set without being found suitable under §3041(b) and going directly to §3041(a).

The language in paragraph #8 of page #3 (Exhibit "B") of the settlement expressly states that "he will be held in custody by the government of Sweeden UNTIL January 1, 2007". Petitioner asserts that this date, January 1, 2007, established a 'term setting' under P.C. §3041(a). (Emphasis added).

One foreign national (Schiold) is being treated distinctly different than another foreign national (Petitioner Marroquin) (for that matter 'all' U.S. Citizens are being treated distinctly different than Schiold because they cannot

be transferred) and all similarly situated foreign nationals, thus creating separate and distinct "classes" of inmates for release criteria.

The fact that Schiold was first found to be suitable by the Board is irrelevant to the claim herein, the Governor then found Schiold to be unsuitable which nullified the Board's finding of suitability. See, Paragraphs #2,3,6 of Exhibit "B".

The most basic requirement for a claim of violation of equal protection under the Fourteenth Amendment of the U.S. Constitution lies on the issue of non-equal treatment of a "CLASS", or, a showing of separate and/or distinct difference in treatment, both criminally and civilly, among groups or "CLASSES" of persons.

The United States Supreme Court has established a "class of one" in the case of Village v. Willowbrook v. Olech, 528 U.S. 562, 145 L.Ed.2d 1060, 120 S.Ct. 1073 (2000) at pp.1074-75; "We granted certiorari to determine whether the equal Protection Clause gives rise to a cause of action on behalf of a "class of one" where the plaintiff did not allege membership in a class or group." (527 U.S. 1067, 120 S.Ct. 10, 144 L.Ed.2d 841 (1999)):

> "Whether the complaint alleges a class of one or a class of five is
> of no consequence because we concluded that the number of individuals
> in a class is immaterial for equal protection analysis."

Our cases have recognized successful equal protection claims brought by a "class of one", where the plaintiff alleges that he/she has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment. See, Sioux City Bridge Co. v. Dakota County, 260 U.S. 441, 43 S.Ct. 190, 67 L.Ed. 340 (1923); Allegheny Pittsburgh Coal Co. v. Commission of Webster City, 488 U.S. 336, 109 S.Ct. 633, 102 L.ED.2d 688 (1989). "In so doing, we have explained that 'the purpose of the equal protection clause of the Fourteenth Amendment is to secure every person within the State's jurisdiction against intentional and arbitrary discrimination, whether

9

occasioned by express terms of a statute or by its proper execution through duly constituted agents." See, Sioux City Bridge Co, supra, at p.445, 43 S.Ct. 190 (quoting Sunday Lake Iron Co. v. Township of Wakefield, 247 U.S. 350, 352, 38 S.Ct. 495 (1918)). "it is clearly established that a state violates the equal protection clause when it treats one set of persons differently from others who are similarly situated." Wheeler v. Miller, 168 F.3d 241, 252 (5th Cir. 1999).

Petitioner has established separate treatment, discrimination and the Board's failure to follow United States Supreme Court precedents thus their failure to set Petitioner's term, as was done to Schiold, violates both the California and United States Constitutions Equal Protection Clauses

### FAILURE TO CONSIDER TERM SETTING

At no time during the hearing, nor at any time during Petitioner's incarceration has the Board considered the determinate term that Petitioner would serve (as calculated by the unconstitutionally enacted Matrix) or the time he has actually served as factors in the suitability equation. The Court of Appeals in, In re Ramirez (12-12-01) 94 Cal.App.4th 549, at 569 held:

> "The Board cannot ignore the determinate term prescribed for a commitment offense when it considers the gravity of the crime as a factor weighing against a finding of suitability for parole. The Board must make its determination 'in a manner that will provide uniform terms for offenses of similar gravity and magnitude in respect to their threat to the public.' (P.C. §3041(a)). Determining what would be a 'uniform' term for an inmate serving a determinate life term for offenses that include concurrent determinate terms is not an exact science. However, the Board should strive to achieve at least a rough balance between the gravity of the offense, the time the inmate has served, and the sentences prescribed by law for the commitment offense."

At page 570, the court said:

> "The Board must also consider the length of time the inmate has served in relation to the terms prescribed by the Legislature for the offenses under consideration, in order to arrive at a "uniform" term as contemplated by P.C. §3041(a)."

The gravity of Petitioner's offense must be measured not in terms of the life maximum potential, but in relation to the determinate terms prescribed for such offenses in 15 C.C.R. §2403(c). The Board must consider the appropriate

determinate term that would be set and the time he has already served. The Board has failed to follow the criteria of §2403(c). (Note*: Although Petitioner asserts that §§2400-2411 cannot be applied to him the Board is still in violation by not complying with rules and regulations that they are applying.)

### FAILURE TO FIX PRIMARY TERM

At no time during Petitioner's incarceration has the Board ever held a hearing to fix Petitioner's 'primary term' on his indeterminate sentence. A 'primary term' is not set in conjunction with or dependent upon a parole hearing. See, In re Rodriguez, (1975) 14 Ca.3d 639; People v. Scott, (1984) 150 Cal.App.3d 910, 918-919. Petitioner has a right to have his term fixed proportionately to his offense and his culpability.

The Los Angeles County Superior court, on June 26, 2006, In re Robert Rosenkrantz, Case No. BH003529, attached as Exhibit "C", specifically at page 3, lines 14-15 establish that the Board set Rosenkrantz term, "On September 9, 1999, petitioner was found unsuitable for parole but the panel set his prison term. A June 30, 2001 date was set for release. (Emphasis added).

Evaluating proportionality does not hinge on the life maximum, but is measuring the time actually served with the sentence deemed appropriate by the Board's sentencing regulations. The Board cannot abdicate this responsibility either by saying it has no authority to fix terms (see Schiold & Rosenkrantz) or by subsuming term-fixing under the parole function. Petitioner is entitled to the fixing of his primary term as an ultimate, immutable release date, under the Equal Protection (CLASS OF ONE) of the Fourteenth Amendment. See also, In re Rodriguez, supra; People v. Duran, (1983) 140 Cal.App.3d at 502-503; People v. Rodriguez, (1977) 19 Cal.3d 221, 230; Rosenkrantz, supra.

In McGinnis v. Royster, 93 S.Ct. 1055 (1973) the court held; at page 1057 that; "each inmate has both a 'minimum' parole date, which is the earliest date on which he 'may' be paroled at the discretion of the Parole Board, and a

11

'statutory release' date which is the earliest date he 'must' be paroled by the Parole Board. (fn.3), "he also has a maximum expiration date which is the date of the maximum sentence to which an inmate can be held if he receives no good time credits at all."

The case refers to an "indeterminate sentence" and establishes that there are actually three (3) dates to such a sentence; (1) the minimum parole date; (2) the statutory release date, (3) the maximum expiration date (i.e., death).

In, in re Jeanice D. (1980) 28 C.3d 210, at p.220, the California Supreme Court stated: 'The initiative, of course, was not drafted as part of the general DSL, but on the contrary, explicitly replaced the determinate sentence of 5,6, or 7 years established by the DSL for second degree murder with an Indeterminate "15 years to life" sentence.

The court noted that the DSL repealed the criteria, provisions and mandates of the ISL to govern indeterminate sentences. The court gave guidance at footnote 7 (28 C.3d 210) which the BPH still fail to take notice of (i.e., P.C. §3000).

Penal Code §190's 15 years to life sentence does not "expressly prescribe" 15 years to life to be a life sentence. See, P.C. §669; In re Collins, 99 C.A.2d 780, 781, 222 P.2d 686, citing, People v. Rivas, 85 C.A.2d 540, 193 P.2d 151. "When the term of imprisonment for second degree murder is pronounced it is "indeterminate" "until fixed" by the BPT so authorized.

While P.C. §1170 et seq., apply to determinate sentences, the current provisions of section §3041 governing parole for inmates serving indeterminate terms were added as part of the bill enacting the Determinate Sentencing Law, and were intended to serve the same purpose as the determinate sentencing provisions. (Stats., 1976 Ch. 1139, Sec. 281, p.5151; In re Stanworth, (1982) 33 Cal.3d 176, 182). Our Supreme Court has made it clear that the "uniform terms" called for by section §3041(a) are analytically equivalent to determinate sentences imposed under §1170 et seq. (People v. Jefferson, 21 Cal.4th 86, 96.)

12

THE BOARD VIOLATED PETITIONER'S DUE PROCESS RIGHTS UNDER THE FIFTH AND FOURTEENTH AMENDMENTS OF THE U.S. CONSTITUTION WHEN THEY DENIED HIM A PAROLE DATE BASED ON P.C. §3041(b), BECAUSE HIS CONVICTION WAS "A TERRIBLE OFFENSE".

The key to understanding who, how and the "exception" to setting a parole date is by tracing the statute back to when it was enacted ... (July 1, 1977) (SB42), and what life prisoners the Board was required to hold hearings for.

The Uniform Determinate Sentencing Act (DSL) became effective July/1977, §3041(a)(b) were enacted as part of the (DSL) and reads today as it did in 1977. Requiring the Board to "normally" set parole dates one year before a life prisoners M.E.P.D., (subd. (a)) with (subd. (b)) providing a narrow exception to setting a parole release date for "particularly egregious offenses."

The class of life prisoners the Board was required to see after the enactment of the DSL on July 1, 1977, were (1st) degree murders and 'kidnappers', of whom both of these sentences had to serve seven (7) years before becoming eligible for parole. P.C. §3041(a)(b) was enacted 16 months before Initiative Measure Proposition 7, which increased the murder penalty of (1st) degree murder from "life" to "25 years to life" and changed (2nd) degree murder from a "determinate" term of 5, 6 or 7 years to an "indeterminate" sentence of "15 years to life."

Before Proposition 7, of November, 1978, the Board was required to see (2) main classes of life offenses of (1st) degree murder and 'kidnapping'. P.C. §3041(a) required the Board to "normally" set parole dates for those (2) classes of life sentences. The "EXCEPTION" to setting a parole date when §3041(b) is applied; offense(s) that were such in gravity; so especially grave; so particularly egregious that public safety concerns required a longer period of incarceration for these individuals and a parole date could not be set at the initial hearing.

In People v. Anderson, 6 Cal.3d 628 (1972), the California Supreme Court held that the 'then' California death penalty law was impermissibly cruel, and

128 prisoner's whose sentences were fixed at death now would have their sentences reduced to 'life' with the possibility of parole (there was no life without the possibility of parole in California at that time). (See, e.g., In re Stanworth, (1982) 33 Cal.3d 176. In 1966 Stanworth was sentenced to death following a plea of guilty to two (2) counts of 'first' (1st) degree murder. Stanworth was one of the prisoners who came off of death row and was given a term of life with a possibility of parole. In 1979 Stanworth was given a parole date after 13 years and served a total of 17 years at the time of his release on parole.

When the DSL was enacted, July 1, 1977, this group/class of 128 prisoners, that came off of death row, after serving 7 years were eligible for parole. However, Sec. (b) of P.C. §3041 enabled the Board to indefinitely deny parole because their offense(s) were of such gravity ("particularly egregious") in nature that public safety concerns allowed the Board to deny setting a uniform term under subd. (a) of §3041.

The offense(s) of the 128 prisoners that came off of death row were not comparable to 'normal' first (1st) degree murder or kidnapping offenses, under the provisions of the Uniform Proportionate Punishment for base terms in the Boards Matrix guidelines for similar offenses. All of the 128 prisoners convictions had "special circumsnatnces" (initially warranting the death penalty sentence). P.C. §3041(a) requires the Board to establish criteria not only for the setting of a parole release date, but also criteria for the "EXCEPTION" to setting a parole date under §3041(b) and §3041.5(b)(2). This criteria to the "exception" is implemented in the Board's 1978 amended regulations, Title 15 C.C.R. §2281(c)(1)(A)(B)(C)(D), et seq..

The first amendment of subsection (c) filed 6/28/1979, (Register 79, No. 26): "Circumstances tending to show unsuitability", "the prisoner committed the offense in an especially henious, atrocious or cruel manner."

The language and circumstances were adopted from Proposition 7's section

§190.2(a)(14). P.C. §190.2 ONLY applies to prisoners with a sentence of life without the possibility of parole or the death penalty, NOT for prisoners serving a (1st) or (2nd) degree murder sentence with the possibility of parole. Compare Title 15 C.C.R. §2281 and §2402.

The circumstances tending to show unsuitability ... are the "EXCEPTIONS" to setting a parole release date, which, prior to the sentences of 15/25 years to life of Proposition 7 (1978) had a VERY NARROW application. The "exception" was not NORMALLY applied but was meant to be (per legislative intent), applied to the 128 prisoners that came off of death row.

The Board is violating Petitioner's due process rights by unconstitutionally applying the "exception", §3041(b) to ALL 'to life' prisoners of Proposition 7. By applying P.C. §3041(b) to ALL 'to life' prisoners, making the EXCEPTION the NORM, the Board has effectively destroyed the proportionality contemplated by P.C. §3041(a).

By legislative intent, P.C. §3041(b) CANNOT be applied to (1st) or (2nd) degree murder sentences (15/25 years to life), "unless" the exception is proven.

In summary, the enactment of P.C. §3041(a) of 1977, provided that parole dates shall normally be set for (1st) and (2nd) degree murder sentences, with subdivision (b) serving as the NARROW EXCEPTION and only being applied to offenses that are not of the normal first or second degree murder ... the 128 prisoners that came off of death row had special circumstances that the "exception" was intended (by legislative intent) to apply to.

In People v. Thompson, 29 Cal.Rptr.2d 847 (Cal.App.2 Dist. 1994); a case involving a fire bombing of a residence after midnight and a 2 year old child was killed, the court held that;

> "Given this deference to the Legislature, defendant is wise not to challenge the sentence imposed by the Legislature for those who are convicted under section 12310. That branch has determined this crime is particularly dangerous to human life and those who are convicted of causing death by igniting a destructive device should be sure to

suffer a penalty <u>separate and apart from the murder statutes</u>. The penalty challenged herein is calculated to advance a critically important social policy for the protection of the public at large, i.e., the deterrence of a <u>PARTICULARLY EGREGIOUS</u> type of life-endangering criminal conduct." (People v. Isitt (1976) 55 Cal.App.3d 23, 31, 127 Cal.Rptr. 279; People v. Laursen (1972) 8 Cal.3d 192, 198, 104 Cal.Rptr. 425, 501 P.2d 1145.).

At pp.851-852: "As noted above, the legislative determination has made that the crime involved in this case is a <u>more serious crime than premeditated murder</u> and deserves the augmented penalty associated with it. The use of destructive devices, Molotov coctails in this instance, which can inflict indiscriminate and multiple deaths, marks defendant as a greater danger to society than a person who premeditates the murder of a single individual." (Emphasis added throughout).

It is apparent that the court followed "legislative intent" for cases that were "particularly egregious" in sentencing Thompson. As asserted by Petitioner above, §3041(b) was enacted by the Legislature for such purposes that the "exceptions" to, separate and apart from the murder statutes, would apply. Thompson, [3] at 850.

A crime is "particularly egregious" when elements of 'special circumstances' were found that would authorize a sentence of life without the possibility of parole or the death penalty. In re Leslie Van Houten, 116 Cal.App.4th 339, (2004). (Note* In Van Houten, the jury found special circumstances, true at her trial).

Petitioner's conviction clearly falls within the Matrix (although under California Constitution Article II, §10(c) is illegal, see argument herein), that the Board is "supposed to follow", and, there were no special circumstances found to be true at his trial thus the Board cannot apply subdivision (b) of §3041 to his suitability hearing. Additionally, several courts have used the language of "ax murder", "execution style murder", when compared to "normal", "ordinary run", "common scenario", "conventional" when addressing <u>NON</u> particularly egregious murder cases. (Citations omitted).

Properly viewed, under the facts presented above, Petitioner's commitment offense simply cannot be so "particularly egregious" as to justify a denial of parole pursuant to P.C. §3041(a)(b).

1    Petitioner asserts that, in the Board's DECISION, there is not one word

2  indicating the usage of <u>particularly egregious</u> or any other language that could

3  be remotely construed as such. The only language used to deny him a parole date

4  were: "this commitment offense was a - a terrible offense"; "The motive for the

5  crime was very trivial in relation to the offense."

6    In, In re Ramirez, Marin County Superior Court, Case No. SC109829A

7  (9-13-2000), (94 Cal.App.4th 549), the court held that parole could not be

8  withheld absent a factual finding that the offense was "particularly egregious."

9    Petitioner asserts that, The triviality of the crime claim is only supported

10  by Title 15 C.C.R. §2400-2411, which were unconstitutionally enacted in violation

11  of the Referendum Process, see Cal. Const. Art. II, §10(c).

12    The Board's decision was arbitrary and capricious as there was no legitimate,

13  logical reason for the denial of a release date as Petitioner has served over

14  the minimum term for a second degree offense and is now starting to serve a

15  sentence of first degree murder.

16    Furthermore, the "Proposal" for the initiative measure Proposition 7 clearly

17  states that the ONLY change to 2nd degree murder is the increase to 15 years

18  "to life". Proposition 7 ONLY changes the number of years to be served, i.e.,

19  an increase in punishment. There is NO implied difference between the malice

20  as to 5, 6 or 7 years for 2nd degree murder and 15 years "to life".

21    See, In re Jeanice D. (1980) 28 Cal.3d p.220, of which establishes 15 years

22  "to life" as being a lesser crime than 1st degree murder, 25 years "to life".

23    Petitioner has a liberty interest in parole according to the legislative

24  intent of the statute. In re Rosenkrantz (IV) 2002 DJDAR 727 (01-18-2002) ____

25  Cal.App.4th ___; In re Ramirez, supra; Greenholtz v. Nebraska Penal Inmates (1979)

26  442 U.S. 1, 7-11; Board of Pardons v. Allen, (1987) 482 U.S. 369, 376.

27                                //

28                                //

THE BOARD VIOLATED PETITIONER'S DUE PROCESS RIGHTS UNDER THE FIFTH AND FOURTEENTH AMENDMENT OF THE U.S. CONSTITUTION, AND, CALIFORNIA CONSTITUTION ARTICLE 7(a) WHEN THEY DENIED PAROLE BASED ON A PREDETERMINED OUTCOME.

The Board's decision satisfies due process only if "some evidence supports the decision". Superintendent, Mass. Corr. Inst. v. Hill, 472 U.S. 445, 455, 105 S.Ct. 2768, 2774, 86 L.Ed.2d 356 (1985); Rosas v. Nielsen, 428 F.3d 1229, 1232 (9th Cir. 2005)(per curiam).

Although the Board's decision is almost always based on citation to the commitment offense of the original crime, there comes a point when the use of the crime to deny parole, without other evidence, is a violation of due process. The question that still remains unresolved by the courts is 'how many times can the Board use the crime to deny parole before the due process violation occurs'.

The crime is never going to change and although the Board or Governor is "INITIALLY JUSTIFIED" in relying on the gravity of an inmate's offense in denying parole, Rosas, 428 F.3d at 1232-33; Biggs, 334 F.3d at 916, "continued reliance" on unchanging factors, the circumstances of the offense and conduct prior to imprisonment, runs contrary to the rehabilitation goals espoused by the prison system and could result in a due process violation". Biggs, 334 F.3d at 916-17; Irons v. Warden of Cal. State Prison-Solano, 358 F.Supp.2d 936, 947 (E.D. Cal. 2005).

Petitioner asserts that the court in Biggs, Irons and Rosas have already decided the issue as to how many times the crime can be used for parole consideration when they used the language of "Initially justified".

Relying on Black's Law Dictionary, SIXTH EDITION, Centennial Edition (1891-1991), which is construed as the guideline for courts language, Petitioner refers to the following examples:

1). INITIAL: That which begins or stands at the beginning.

2. INITIAL APPEARANCE: After arrest, the first appearance of the accused

18

before a judge or magistrate.

3). INITIAL CARRIER: In the law of bailments, the carrier who <u>first</u> receives the goods...

4). INITIAL DETERMINATION: With respect to social security benefit claims, refers to <u>first</u> determination of agency...

5). INITIATE: <u>Commence</u>; <u>start</u>; <u>originate</u>; <u>introduce</u>.

Petitioner asserts that the key to understanding the courts reasoning when it stated "initially justified", under the dictionary's interpretation of "initially" means "<u>FIRST</u>". Thus the court has already determined that the crime cannot be used after the "initial" (first) parole board suitability hearing, thus the subsequent or second usage of the crime will cause a due process violation to exist.

Petitioner further asserts that the "some evidence" standard espoused by <u>Hill</u>, supra is not the authority under California law. Under the holdings in <u>Jurasek v. Utah State Hospital</u>, 158 F.3d 506 (10th Cir. 1998), the state may confer more comprehensive due process protections upon its citizens than does the federal government.

Petitioner relies on the California Evidence Code Section §115, under "PREPONDERANCE OF EVIDENCE" standard, where, the preponderance of evidence is to be applied to situations where there is no evidence standard set. (Such as parole hearings).

Therefore the State of California has conferred more, or a greater, evidence standard upon the Board, by making the 'minimum' evidence standard 'preponderance of evidence', rather than that espoused in <u>Hill</u>, supra, i.e., "some evidence".

<u>Hill</u>, supra, derived the "some evidence" standard from <u>Powell</u>, relating to a disciplinary hearing. <u>Hill</u>, addresses, at page 2774; "requiring a modicum of evidence to support a decision to revoke <u>good time credits</u>". (Emphasis added throughout).

At page 2774: [3]: "We hold that the requirements of due process are satisfied if some evidence supports the decision by the prison disciplinary board to revoke good time credits." (Emphasis added).

"This standard is met if 'there was some evidence from which the conclusion of the administrative tribunal could be deduced...'" United States ex rel. Vajtauer v. Commissioner of Immigration, 273 U.S., at 106, 47 S.Ct., at 304.

Nonetheless the State of California has, by legislative intent, conferred more, or a greater, due process protection during parole suitability hearings under Evidence code §115 "Preponderance of Evidence" standard.

The pertinent section of Evidence Code §115 states: "Except as otherwise provided by law, the burden of proof requires proof by a preponderance of evidence." (Stats. 1965, c. 299 §2, operative Jan. 1, 1967).

Clearly Evidence Code §115 applies to parole board hearings, under the "except as otherwise provided by law" section because parole board hearings did not have any standard of proof applied until Hill was attached under the "some evidence" standard, which is contrary to California law.

Petitioner contends that the Board's denial of a parole date based on his crime being a "terrible offense", and, "The motive for the crime was very trivial in relation to the offense" does not constitute "some evidence" or for that matter, under the California legal standard (Evidence Code §115) the Board's denial does not meet the preponderance of evidence standard, that Petitioner posed a threat to public safety at the time of the second hearing, the Psychologist report established otherwise.

A denial of parole based on factors other than those contemplated by California law (P.C. §3041(b)), i.e., public safety concerns, is a decision without "some" evidentiary support within the statutory framework.

As stated by the Court in Biggs v. Terhune, (9th Cir. 2003) 334 F.3d 910:

"To insure that a state-created parole scheme serves the public interest purposes of rehabilitation and deterrence, the Parole Board must be cognizant not only of the factors required by state statute to be considered, but also the concepts embodied in the Constitution requiring

20

1    due process of law." (Id., at 916).

2    However, the deferential "some evidence" standard has outer limits. See,

3    Coleman v. Board of Prison terms, No. 96-0783 LKK PAN, slip op. at 9 (E.D. Cal.

4    May 19, 2005). If it is established that a particular judgment was predetermined,

5    then a prisoner's due process rights will have been violated even if there is

6    "some evidence" to support the decision. See, Bakalis v. Golembeski, 35 F.3d

7    318, 326 (7th Cir. 1994) (a decision-making "body that has prejudged the outcome

8    cannot render a decision that comports with due process."); See also, In re

9    Rosenkrantz, 29 Cal.4th at 677, 128 Cal.Rptr.2d 104, 59 P.3d 174 (a parole

10   decision "must reflect an individualized consideration of the specified criteria

11   and cannot be arbitrary and capricious.").

12   Petitioner's case presents a stronger case for release than Biggs for several

13   reasons. First Petitioner's commitment offense was far less serious than Biggs.

14   Biggs was involved an a violent, manipulative, and premeditated murder while

15   Petitioner here acted in what he perceived at the time, as a threat to his life,

16   in response to the circumstances. Second, Biggs had not yet served the full term

17   of his sentence, while Petitioner here has exceeded, with credits, his sentence

18   for second degree murder and is now serving the time for a first degree sentence.

19   Petitioner here has demonstrated exemplary behavior and evidence of

20   rehabilitation for a significant period of time (not one instance of a rules

21   violation while incarcerated). Therefore, the sole reliance on Petitioner's

22   commitment offense in denying him parole impinges on Petitioner's constitutional

23   liberty interest in parole.

24   Petitioner asserts that the excuse "it was a terrible offense" is not even

25   found in the Matrix criteria and even though the second excuse is in the Matrix

26   (triviality of the reason for the crime) is insufficient to support even the

27   unconstitutional "some evidence" standard. Therefore the Board's denial is without

28   foundation or support under the "some evidence" standard, coupled with the Board's

requirement for parole plans in California and Petitioner's 'perfect' prison record the Board's decision was in violation of and an unreasonable application of U.S. Supreme Court law.

> THE BOARD VIOLATED PETITIONER'S DUE PROCESS RIGHTS UNDER THE FIFTH AND FOURTEENTH AMENDMENT OF THE U.S. CONSTITUTION BY HOLDING "PAROLE SUITABILITY" HEARINGS FOR A FOREIGN NATIONAL, THAT WILL BE DEPORTED, WHO CAN NEVER BE RELEASED ON PAROLE IN CALIFORNIA. PENAL CODE §3041(a)(b) IS UNCONSTITUTIONALLY VAGUE AND AMBIGUOUS AS TO PAROLE v. DEPORTATION FOR FOREIGN NATIONALS WITH AN "INS" HOLD.

Petitioner was given a parole suitability hearing, the second or subsequent, (with an interpreter present), on June 6, 2006, the subject of this petition.

The rote language, at page 72 (DECISION), "...Mr. Marroquin is not yet suitable for parole and would pose an unreasonable risk of danger to society or a threat to public safety if released from prison." Petitioner was given a one (1) year denial.

What is confounding in the record is that there is no reference to why Petitioner is dangerous to society and the Psychiatrist report establishes just the opposite. Petitioner's threat level assessment, by a state licensed professional Psychiatrist sets his threat level at 98. To understand this figure (98) simply means that in the assessment of dangerousness to re-offend, out of 100 inmates released there would be 98 inmates that would re-offend or commit another crime before Petitioner did. Petitioner has an amazing 2% chance of committing another crime and that in itself is sufficient to find Petitioner suitable for parole.

The Board 'never' referred to any language of "particularly egregious" as they always do. (See previous arguments).

Although at the first hearing (and second) there was a claim that Petitioner shot the victim twice, and the letter from the police department claims that Petitioner shot the victim in the stomach are not true statements of fact as to what actually happened.

In actuality there were two (2) entry wounds and only one (1) shot was fired at the victim's arm which held the broken beer bottle. The Bullet deflected into the upper torso area which caused death many hours later. See (Ex-"D-E").

The Board failed to support its conclusory findings to deny parole with any material or relevant evidence, as is required by 15 C.C.R. §2000(b)(62) (Material Evidence), or (60) (Relevant Evidence). The Board's conclusions were not supported by reference to any evidence in the record bearing on the "suitability criteria". The Board failed to adhere to its own "preponderance" (see Evid. C. §115) of "material" and "relevant" evidence standard in the weighing of evidence during its pre-decisional process. (15 C.C.R. §2000(b)(49) (Good Cause). See, In re Powell (1988) 45 Cal.3d 894, at fn.10. (Inmate's right to procedural due process). The Board must follow its own heightened evidentiary standard. See, Terhune v. Superior Court (1998) 65 Cal.App.4th 864.

There was no evidence that Petitioner's offense was "egregious" enough to justify a denial of parole since the various elements of his crime are already provided for in the illegal Matrix. Indeed, as stated perviously, the egregious language was never mentioned by the Board). See, in re Ramirez, supra, 94 Cal.App.4th 549, at 570.

There was no evidence to justify denial based on the unsupported conclusion (See, "Ex-F") that Petitioner needs more self-help. The Board ignored the positive findings expertly prepared psychological reports indicating that Petitioner does not pose an unreasonable threat to public safety, (see, P.C. §3041). The Board's Commissioners are not legally permitted to assume the role of expert witnesses and therefore cannot reassess the findings or re-weigh the importance of an individually prepared and detailed report by a state licensed professional psychiatrist/psychologist staff member; by statutory code this is the sole domain of the CDC Psychiatric/Psychological staff. The hearing record is completely void of any listed 'expertise' regarding the Commissioners educational background

23

or state license for Psychological training that gives them the 'right' or 'authority' to over-ride a legitimately prepared psychological report based on a 'whim/excuse', which is often done by the Board if the report is positive.

The Psychologists have cleared Petitioner of any need for additional therapy "or" self-help. There must be a factual underpinning to support the Board's determination. See, In re Caswell (10-10-01) 92 Cal.App.4th 1017, 1027; In re Rosenkrantz, supra, 80 Cal.App.4th 409; In re Ramirez, 94 Cal.App.4th 1017.

There must be "specific facts" and a "rational basis" for a departure from parole guidelines. Misasi v. U.S. Parole Comm., 835 F.2d 754 (10th Cir. 1987).

Therefore, absent such factual underpinnings, not even sufficient to meet the "some evidence" standard, the Board's conclusions were unsupported and therefore arbitrary and capricious. The decision to deny parole requires reversal and Petitioner should be given a deportation date. (Note a parole date).

In the case of John E. Dannenberg, Case No. SC112688A, Filed May 8, 2001, where the court held: citing to In re Powell, (1988) 45 Cal.3 894, that the Board enjoys broad but not absolute discretion in parole-related matters. The Supreme Court held in that case that there must be "some evidence" to support the Board's determination. Id., at 904. The Marin County Court believed that the standards, i.e., "some evidence" and "arbitrary and capricious" were indistinguishable.

### DEPORTATION V. PAROLE ISSUE

Petitioner was born in Guatemala, his mother still lives there, his wife is going to move there with him. Petitioner has an INS hold. (See, Ex-A, passim).

What is most troubling to Petitioner is that the Board is requiring parole plans and job offers for California when it is well established that he will be deported, without question. Petitioner has a residence in Guatemala, a trade, family support. (Ex-A, passim).

Petitioner asserts that, as a most basic understanding of P.C. §3041(b) (threat level to the public), in the case at bar, Petitioner contends that when

1  he is paroled (which cannot legally happen) he will no longer be (and will never

2  be) under the parole authority, (he will never be turned over to a Parole Agent

3  but rather he will be turned over to the Federal Government's INS Agency, thus

4  under a Catch-22 situation, when he is paroled he will be free of parole because

5  California and Guatemala have no treaty for parole supervision. Thus all the

6  criteria/excuses from the Board to further his self-help, get "atta-boy chronos"

7  furnish parole plans and job offers in California are mere excuses under the

8  arbitrary and capricious standard and furthermore cannot be applied to Petitioner.

9  (Note* One "ah-s___" wipes out all "atta-boys".)

10     It is basically understood that the reason for any inmate's denial because

11  of a threat level to the public is to enhance the prisoner's sentence, given

12  the fact that a foreign national, like Petitioner, can "never" be found suitable

13  for parole simply because he can never be paroled (only deported), §3041(b),

14  consideration for public safety cannot be considered. In reality any foreign

15  national that is going to be deported should be found suitable for deportation

16  at his first hearing because (b) can never be applied to the determination.

17     The court in U.S. v. Cuero-Flores, 276 F.3d 113 (2nd Cir. 2002), held that;

18  when addressing a "special" parole issue; the court agreed with other circuits

19  that have held supervised release terminates when the parolee is deported.

20              STATEMENT IN SUPPORT OF PAROLE vs. DEPORTATION

21     California P.C. §3041(a)(b) is unconstitutionally vague and ambiguous as

22  to its application for foreign nationals that have an "INS" hold, inmates that

23  cannot be paroled but only deported thus the same criteria cannot be applied

24  to both classes of inmates, U.S. Citizens, and, foreign nationals. Proposition

25  7 did not address the issue of deportation vs. parole.

26     Of course, all second degree murders by their very nature involve a disregard

27  for the life of another; In re Rosenkrantz, (2000) 80 Cal.App.4th 409, 419 fn.13;

28  People v. Summers, (1983) 147 Cal.App.3d 180, 184-85 (195 Cal.Rptr. 21); People

1   v. Matta, (1976) 57 Cal.App.2d 472, 480-81 (129 Cal.Rptr. 205; People v. Bayea,

2   (1974) 38 Cal.App.3d 176, 188-89 (113 Cal.Rptr. 254). See also, CALJIC No. 8.31.

3       As in In re Smith, (2003) 114 Cal.App.4th 343, there is no evidence that

4   petitioner tormented, terrorized or injured his victim before deciding to shoot

5   him or that he gratuitously increased and unnecessarily prolonged his suffering.

6   As asked in Scott, was the crime callous? Yes, however, are the facts of the

7   crime evidence that he acted with exceptionally callous disregard for the victim's

8   suffering or do the facts distinguish his crime from other murders as

9   exceptionally callous? The record establishes that there was no intent to murder

10  the victim, to the contrary Petitioner's victim was shot once, in the arm holding

11  the broken beer bottle, and the bullet traveled to the chest area. (See Ex. "D"

12  wherein it was what Petitioner "percieved" at that instant, an eminent threat

13  to his life).

14      The inquiry of whether an actual period of confinement is excessive and

15  disproportionate hinges not on the life "potential" but on the sentencing

16  regulations promulgated by the Board under authority of statute, but not in

17  violation of the California Constitutions Referendum Process, Article II, section

18  10(c). See P.C. §§3041, 3052, 5076.2, Title 15 C.C.R. §§2400-2411.

19      Petitioner submits that his parole suitability hearing constituted a

20  meaningless, pro forma charade, the outcome of which was preordained and, as

21  such, deprived him of substantive and procedural due process.

22      It is a proper function of judicial review to ensure that the Board has

23  honored in a "practical sense" the petitioner's right to "due consideration",

24  also "individualized consideration". See, Sturm, 11 Cal.3d at p.268.

25      In the case of In re Edward Ramirez, Court of Appeal, First Appellate

26  District, Division Three, Case No. A092699, filed 12/12/01; the Court addressed

27  similar issues as presented herein and in the DISPOSITION the Court ordered,

28  among other orders, that "the Board must consider Ramirez's psychological profile

1    as a factor favoring his application for a parole date..."

2    Nonetheless, P.C. §3041(a)(b) is vague and ambiguous as to suitability for

3    "deportation" vs. suitability for "parole". The criteria to favor a positive

4    parole decision cannot apply to a foreign national, without being in violation

5    of the laws of California and the United States.

6    California P.C. §3041(a)(b) are clear in their legislative intent, for U.S.

7    Citizens that will be found suitable for "parole", the "only" criteria (see

8    Illegal Matrix argument) for a parole release date is that the inmate shall not

9    pose an unreasonable risk to society. The Board does not have the authority to

10    make this assessment and "must" follow the evaluation prepared by the state

11    licensed Psychiatrist so authorized to make such an assessment. Additionally

12    the Board has no authority in penal codes or rules and regulations to find a

13    'foreign national' (that has an INS hold or will be deported) suitable for parole

14    but only suitable for deportation.

CONCLUSION

16    Petitioner asserts that his MEPD for a sentence of second degree murder

17    has lapsed, his psychological evaluation concluded that his release (for

18    deportation) would not pose an unreasonable (current) risk of danger to public

19    safety, no contrary evidence exists, and Petitioner has a vested liberty interest

20    in being deported protected by due process and equal protection that required

21    the Board to find him suitable for deportation, at his first/initial hearing

22    as §3041(a)(b) cannot apply to him under the vague and ambiguous doctrine.

23    Because the Board's recitation contrary, to U.S. Supreme Court law, their

24    conclusion was inapposite to the record and unsupported by any evidence standard

25    whatsoever, denial of suitability for release for deportation on that basis denied

26    Petitioner his due process and equal protection rights.

27    Because the Board's grounds/excuses for its decision to deny release for

28    deportation, boilerplate phrases and adjectives, were unsupported by any evidence,

inapposite to the record, applicable to all such offenses, irrelevant to suitability for deportation, and/or arbitrary in the extreme, and because the Board did not determine and could not have found any evidence supporting a notion that Petitioner's offense was "a terrible offense" compared to other life offenses such as Rosenkrantz and Van Houten, the denial of Petitioner's release for deportation based on the unchanging factors of his offense has abrogated his right to due process and equal protection and his liberty interest in release for deportation, and has converted his sentence to a first degree murder because he has already served the time prescribed by law, and the illegal matrix, for a second degree murder.

It is axiomatic that Petitioner, if someday granted a release date, under P.C. §3041(a)(b), which cannot be applied to a foreign national, he will be deported, thus the excuses for denial of a release date, for deportation, are meaningless, contrary to law and the Legislative intent of P.C. §3041(a)(b)'s vague and ambiguous language as to foreign nationals being deported vs. found suitable for release on parole.

### PRAYER/RELIEF REQUESTED

1). Order Respondents to show cause why Petitioner is not entitled to the relief requested:

2). Conduct an evidentiary hearing to determine a term of imprisonment proportionate to Petitioner's individual offense under the equal protection claim:

3). Order/direct the Board to set a date (immutable deportation date) consistent with Petitioner's MEPD, which has already lapsed, as was established by Legislative intent of P.C. §3041(a)(b), which cannot be applied to Petitioner:

4). Order that the Board does not have the authority to "parole" or even to "consider suitability for parole", of a foreign national that has an INS hold "or" will be deported, under P.C. §3041(a)(b):

5). Order that the Board can "only" find Petitioner releasable for

deportation under §3041(a)'s MEPD, as (b) cannot be applied:

6). Order that the Board cannot deny deportation of a foreign national (or even parole for an american citizen) based on him not having employment, further education, proof of job offers and ability to earn a living in Guatemala, "or" parole plans in California or elsewhere, under the criteria established in P.C. §3041(a)(b) as the Matrix was unconstitutionally enacted:

7). Order that the Board must find foreign nationals suitable for deportation at their "first hearing" because P.C. §3041(a)(b)'s vague and ambiguous language of unsuitability, danger to the public, do not apply outside of the borders of California or the United States due to the fact that California Penal Codes only have authority within California:

8). Grant Petitioner, and other similarly situated foreign nationals, such other relief as this Court deems just and proper in the interest of justice.

<u>DECLARATION</u>

I declare under penalty of perjury that the foregoing is true and correct, with attached exhibits and documents deemed to be true to the best of my knowledge and good faith belief. Executed this 1⁄2 day of February, 2005, at Soledad, California, State Prison, County of Monterey.

Marco Marroquin

SUBSEQUENT PAROLE CONSIDERATION HEARING

STATE OF CALIFORNIA

BOARD OF PAROLE HEARINGS

In the matter of the Life )
Term Parole Consideration )
Hearing of:               )        CDC Number H-62380
                          )
MARCO MARROQUIN           )        INMATE
                          )
                          )        COPY.
_____)

CORRECTIONAL TRAINING FACILITY

SOLEDAD, CALIFORNIA

JUNE 6, 2006

11:40 A.M.

PANEL PRESENT:

Ms. Linda Shelton, Presiding Commissioner
Mr. Bill Keenan, Deputy Commissioner

OTHERS PRESENT:

Mr. Marco Marroquin, Inmate
Ms. Aracelisa Zavala, Interpreter
Mr. Richard Rutledge, Attorney for Inmate
Mr. David Pearson, Deputy District Attorney
Correctional Officers Unidentified

CORRECTIONS TO THE DECISION HAVE BEEN MADE

_____                See Review of Hearing
_____                Transcript Memorandum

Berenice Billington, Peters Shorthand Reporting

ii

## INDEX

PAGE

Proceedings ........................................ 1

Case Factors ...................................... 8

Pre-Commitment Factors ........................... 19

Post-Commitment Factors .......................... 26

Parole Plans ..................................... 41

Closing Statements ............................... 66

Recess ........................................... 71

Decision ......................................... 72

Adjournment ...................................... 81

Transcriber Certification ........................ 82

--oOo--

1

1           P R O C E E D I N G S

2      DEPUTY COMMISSIONER KEENAN: We're on

3 record.

4      PRESIDING COMMISSIONER SHELTON: All

5 right. Good afternoon, everyone. We are here

6 for a Subsequent Parole Consideration Hearing

7 for Marco Marroquin, CDC number H-62380.

8 Today's date is June 6, 2006. The time is 11:40

9 a.m. We are located at CFT. Mr. Marroquin was

10 received on January 14th, 1993, committed from

11 Los Angeles County. His life term began

12 December 24, 1993, with a minimum eligible

13 parole date of December 24th, 2003. The

14 controlling offense for which the Inmate is

15 committed is set forth in case number TA016787,

16 charging in count one, violation of PC 187,

17 murder in the second degree, along with

18 PC 12022.5(a), use of a firearm. Mr. Marroquin

19 received a term of 15 years to life, plus a

20 three-year enhancement, equaling 18 years to

21 life. Mr. Marroquin, this hearing is being

22 recorded for voice identification purposes, so

23 we will go around the room and state our first

24 name and our last name, spell our last name, and

25 when we get to you, please add your CDC number.

26 I will start and go to my left. My name is

27 Linda Shelton, S-H-E-L-T-O-N, Commissioner.

2

1          DEPUTY COMMISSIONER KEENAN:  Bill Keenan,

2     K-double-E-N-A-N, Deputy Commissioner.

3          DEPUTY DISTRICT ATTORNEY PEARSON:  David

4     Pearson, P-E-A-R-S-O-N, Deputy District Attorney

5     from the County of Los Angeles.

6          ATTORNEY RUTLEDGE:  Richard Rutledge,

7     R-U-T-L-E-D-G-E, counsel for Mr. Marroquin.

8          INMATE MARROQUIN THROUGH THE INTERPRETER:

9     My name is Marco Marroquin, M-A-R-R-O-Q-U-I-N,

10    H-C2 - excuse me.

11         THE INTERPRETER:  H-62380 is Mr.

12    Marroquin's CDC number.  Aracelisa Zavala,

13    Z-A-V-A-L-A, Interpreter.

14         PRESIDING COMMISSIONER SHELTON:  And for

15    the record, we have two officers in the room for

16    security purposes who will not be participating

17    in this hearing.  All right, Mr. Marroquin, you

18    signed a form called BPT Form 1073 back in July

19    of 2005 with regards to any need for

20    accommodations for disabilities.  As well, you

21    signed a form today that your attorney went over

22    with you?

23         INMATE MARROQUIN THROUGH THE INTERPRETER:

24    Yes.

25         PRESIDING COMMISSIONER SHELTON:  Do you

26    wear glasses, senor?

27         INMATE MARROQUIN THROUGH THE INTERPRETER:

3

1   Yes, just to read.

2        PRESIDING COMMISSIONER SHELTON:   And your

3   glasses work okay for you?

4        INMATE MARROQUIN THROUGH THE INTERPRETER:

5   Yes.  Yeah.

6        PRESIDING COMMISSIONER SHELTON:   Do you

7   have any hearing problems?

8        INMATE MARROQUIN THROUGH THE INTERPRETER:

9   No.

10        PRESIDING COMMISSIONER SHELTON:   Do you

11   have any walking, sitting or standing problems?

12        INMATE MARROQUIN THROUGH THE INTERPRETER:

13   No.

14        PRESIDING COMMISSIONER SHELTON:   Is there

15   any reason that you wouldn't be able to complete

16   this hearing today?

17        INMATE MARROQUIN THROUGH THE INTERPRETER:

18   No.

19        PRESIDING COMMISSIONER SHELTON:   You're

20   perfectly comfortable with going forward?

21        INMATE MARROQUIN THROUGH THE INTERPRETER:

22   Perfectly.

23        PRESIDING COMMISSIONER SHELTON:   Thank

24   you.  Mr. Rutledge, have we accommodated any and

25   all disabilities?

26        ATTORNEY RUTLEDGE:  Yes, Commissioner.

27        PRESIDING COMMISSIONER SHELTON:   Okay.   I

4

1  think we're okay.  Does anybody have a problem

2  with leaving the air conditioning on at the

3  moment, are we - can we hear each other okay?

4  Except for Mr. Rutledge might have to speak up.

5        DEPUTY COMMISSIONER KEENAN:  I want to

6  get that microphone just a little closer.

7        PRESIDING COMMISSIONER SHELTON:  If it

8  gets sidetracking, we'll turn it off.  All

9  right.  Mr. Marroquin, you also have some

10  rights.  You have the right to an impartial

11  hearing.  Do you have any problem with

12  Commissioner Keenan or myself handling your

13  hearing today?

14        INMATE MARROQUIN THROUGH THE INTERPRETER:

15  No way.

16        PRESIDING COMMISSIONER SHELTON:  All

17  right.  You also understand that the process for

18  appealing a decision has to go through court

19  now, in case you don't - you want to appeal a

20  decision, and your attorney can help you do that

21  if you have any concerns about that.

22        INMATE MARROQUIN THROUGH THE INTERPRETER:

23  Thank you.

24        PRESIDING COMMISSIONER SHELTON:  All

25  right.  Counsel, have we met all of your

26  client's rights today -

27        ATTORNEY RUTLEDGE:  Yes.

5

1        PRESIDING COMMISSIONER SHELTON:    — so

2    far?  Okay.  Thank you.  Mr. Marroquin, you are

3    not required to admit to or discuss your

4    offense; however, this panel accepts as true the

5    findings of the court.  Do you know what that

6    means?

7        INMATE MARROQUIN THROUGH THE INTERPRETER:

8    Not exactly.

9        PRESIDING COMMISSIONER SHELTON:    What it

10   means is that we have court papers that said

11   what you did on your commitment offense, and we

12   have to go by that.

13       INMATE MARROQUIN THROUGH THE INTERPRETER:

14   That's fine.

15       PRESIDING COMMISSIONER SHELTON:    All

16   right.  It also means, like I said, you don't

17   have to talk about this either.  You and your

18   attorney can decide what you want to do there.

19       INMATE MARROQUIN THROUGH THE INTERPRETER:

20   There's no problem.

21       PRESIDING COMMISSIONER SHELTON:    All

22   right.  Commissioner, do we have any

23   confidential material?

24       DEPUTY COMMISSIONER KEENAN:    We do not.

25       PRESIDING COMMISSIONER SHELTON:    All

26   right.  Where do we have the Hearing Checklist

27   at?  I think I put it in front of you.  Do you

6

1    have it, Mr. Pearson, the Hearing Checklist?

2            DEPUTY DISTRICT ATTORNEY PEARSON:    Yes.

3            PRESIDING COMMISSIONER SHELTON:    Here is

4    it is.

5            DEPUTY DISTRICT ATTORNEY PEARSON:    Yes, I

6    do.

7            PRESIDING COMMISSIONER SHELTON:    All

8    right.  Both attorneys have seen the Hearing

9    Checklist, and both of you have signed that you

10   have everything you need to move forward in

11   today's hearing?

12           ATTORNEY RUTLEDGE:    Correct.

13           PRESIDING COMMISSIONER SHELTON:    Mr.

14   Pearson?

15           DEPUTY DISTRICT ATTORNEY PEARSON:    Yes.

16           PRESIDING COMMISSIONER SHELTON:    Okay.

17   Great.  Thank you.  All right.  Mr. Rutledge,

18   are there any additional documents to be

19   submitted?

20           ATTORNEY RUTLEDGE:    I don't believe so.

21   There was some question regarding a certificate

22   that may or may not be in the file, but –

23           PRESIDING COMMISSIONER SHELTON:    We'll

24   get to that when we start covering – it was a

25   vocational certificate?

26           ATTORNEY RUTLEDGE:    Correct.

27           PRESIDING COMMISSIONER SHELTON:    Okay.

7

1  We can look for that as we get to that portion.

2  He may have some things there.  Mr. Marroquin,

3  do you have anything in that file that you

4  wanted to submit with permission from your

5  attorney?

6          INMATE MARROQUIN THROUGH THE INTERPRETER:

7  All I have here is documents that are already

8  (indiscernible).

9          PRESIDING COMMISSIONER SHELTON:  Okay.

10  Well, that's good to know.  In case we can't

11  find them here, we'll look in there.

12          INMATE MARROQUIN THROUGH THE INTERPRETER:

13  Correct.

14          PRESIDING COMMISSIONER SHELTON:  All

15  right.  Are there any preliminary objections?

16          ATTORNEY RUTLEDGE:  No.

17          PRESIDING COMMISSIONER SHELTON:  Will

18  your client be speaking with us today?

19          ATTORNEY RUTLEDGE:  Yes.

20          PRESIDING COMMISSIONER SHELTON:  All

21  righty.  Mr. Marroquin, please raise your right

22  hand.  Do you solemnly swear or affirm that the

23  testimony you give at this hearing will be the

24  truth, the whole truth, and nothing but the

25  truth?

26          INMATE MARROQUIN THROUGH THE INTERPRETER:

27  That is correct.

1          PRESIDING COMMISSIONER SHELTON:    Thank

2    you, sir.  All right.  We're moving into the

3    next phase of this hearing where we'll be

4    discussing your commitment offense.  We'll talk

5    about your prior record and we'll talk about

6    your social history.  So I am going to enter

7    into the record a summary of the offense as

8    taken from the - actually, it's taken from the

9    November 2nd Board Report but has been carried

10   forward to the current review period of November

11   2005.

12          "Viewed in accordance with the usual

13          rules on appeal, the evidence established

14          that in August of 1991, the victim Luis

15          Silva, and his girlfriend agreed to buy a

16          car from Marroquin.  Silva drove the car

17          for several days, and after discovering

18          that it had a lot of defects, he returned

19          the car to Marroquin.  He did not want

20          the car back, and told Silva that he

21          wanted one thousand dollars for the days

22          the car was used.  Silva replied that if

23          he had the money, he would pay him for

24          the car.  Marroquin told Silva that he

25          would regret what he had done to him.  On

26          January 13th, 1992, in the city of

27          Compton, Los Angeles County Sheriff's

9

1    Department deputies were flagged down by

2    two men.  They reported that an

3    individual, later identified as

4    Marroquin, had been shooting a gun.  Two

5    men, who also witnessed the incident,

6    directed LASO deputies to where Marroquin

7    was.  He was observed to be standing in

8    front of a Toyota truck holding the hood

9    open with a gun in his left hand.  He was

10   ordered to drop the gun.  Marroquin threw

11   the gun into a vacant lot.  In the

12   process of placing Marroquin in the

13   patrol car, other witnesses approached

14   the LASO deputies stating that someone

15   had been shot in the front of Villa

16   Bajavita Bar.  Bajavita spelled B-A-J-A-

17   V-I-T-A.  LASO deputies observed the

18   victim, a male, later identified as Luis

19   Silva, lying on his back.  Upon closer

20   observation, there appeared a gunshot

21   wound to the victim's left bicep.  The

22   victim was bleeding slightly, and his

23   jacket was stained with blood.  The

24   victim was then transported to Long Beach

25   Memorial Hospital where he was pronounced

26   dead on 1/14/92 at approximately 7:22

27   a.m.  Cause of death was listed as

1        internal hemorrhage.  A witness who was

2        selling hotdogs from a stand outside the

3        bar heard Marroquin swearing at Silva and

4        saying that he wanted to kill him.  The

5        witness did not see them fighting prior

6        to Marroquin pulling out the gun.  Also

7        the witness saw no menacing gestures on

8        the part of Silva, nor did she see

9        anything in Silva's hand.  The witness

10       did not see or hear Silva break a bottle

11       or use a bottle in a jabbing motion."

12  Mr. Marroquin, would you like to tell us about

13  that day?

14        **INMATE MARROQUIN THROUGH THE INTERPRETER:**

15  Correct.

16        **PRESIDING COMMISSIONER SHELTON:**  Go

17  ahead, sir.

18        **INMATE MARROQUIN THROUGH THE INTERPRETER:**

19  First of all in this case, I offer my apologies

20  sincerely as - as far as everything that

21  happened.  This problem, I take it as an

22  accident, because if I wanted to or if my

23  intentions were others, so much time would have

24  not lapsed.  I had forgotten about that.  But

25  what happens and I - I -

26        **PRESIDING COMMISSIONER SHELTON:**  Eye-yie-

27  yie.  Take your time.  Translation's difficult.

11

1          THE INTERPRETER:   I'm so sorry.   The

2    interpreter does not have a translation for the

3    word "maldigo," which is spelled M-A-L-D-I-G-O,

4    from the prisoner.   She can give an explanation

5    of the word she is familiar with: "I hate the

6    moment, I -" oh, gosh.   Instead of "blessing,"

7    the opposite of a blessing.   It's a -

8          DEPUTY COMMISSIONER KEENAN:   Curse?

9          THE INTERPRETER:   "I curse the moment."

10   Thank you.

11         INMATE MARROQUIN THROUGH THE INTERPRETER:

12   I automatically, that incident, I found myself

13   in an opportune moment, or I went to that place,

14   that bar, and unfortunately, we bumped into each

15   other there, and it's impossible - not I

16   remember, but it's impossible that I was - if I

17   was aware if he was there first or if I was

18   there first, but this situation brought a lot of

19   harm to me, and there is no excuse that is worth

20   to take the life of another, just like I offer a

21   lot of apologies that I have harmed that family,

22   and also my family.   But in this act, it was

23   something where I was the hurt one, and I want

24   to ask for permission and at the same time

25   apologize to all the members of the panel here,

26   but what happened to me, it could happen to

27   anyone.   I was kidnapped - I was kidnapped, I

1  was robbed, and it came to the point of death,

2  and it's something that at the time I felt not

3  only at the time but I keep feeling not only of

4  a coward situ - cowardly situation, but it never

5  crossed my mind, ever, that it would arrive to

6  that point because I have sincerely felt since

7  that moment very bad, and I really feel bad, and

8  I automatically cannot assimilate all of this

9  that happen. I ad - I admit to my guilt one

10 hundred percent, and I really need an

11 explanation because you can't see the coin only

12 on one side.

13        PRESIDING COMMISSIONER SHELTON:  All

14 right.  Mr. Marroquin, we need to ask you a

15 couple of questions.  You're telling us how you

16 feel, which is fine.  I'm still confused about

17 what happened that day.  You mentioned that you

18 were kidnapped.  How?

19        INMATE MARROQUIN THROUGH THE INTERPRETER:

20 Exactly.

21        PRESIDING COMMISSIONER SHELTON:  How?

22        INMATE MARROQUIN THROUGH THE INTERPRETER:

23 I was sitting in a piece of furniture inside the

24 bar, and when I felt the pull from here, it was

25 two guys, and then they took me out.  Once I was

26 outside, I was attacked.  I was - I was able to,

27 I did whatever means possible to prevent to be

13

1    battered.  If I would have had a better defense,

2    if I would have found the weapon that he had in

3    his power, that is was something like - like a

4    knife, and during that movement, they stole

5    everything.  I would run this way, they would

6    follow me; I would run this way, and they follow

7    me, until finally they - they walked away, and

8    then I went - I went to the car.  When - once I

9    got to the car, it was a surprise - such a

10   surprise that those walkways that are behind the

11   homes, I am in front of my car when I see - when

12   I see the car come out again, and - and they get

13   off one - on one side of the car and the - the

14   other one on the other side of the car wanted to

15   attack me, and I cursed the moment when I was

16   already armed, and even that's - in that case I

17   still told them, "Please, I don't want any

18   problems."  I would walk, and they would follow

19   me.  How can it be possible if I'm walking on

20   the sidewalk and them inside the car driving at

21   my pace, if I wanted to, I would've shot them

22   there, but no, my intentions were none, nothing

23   was going through my mind.  What, yes, yes, with

24   true sincerity is that I felt not sure or

25   secure, but I did feel somewhat prepared, but as

26   I was getting there, because it was - because it

27   was two or three times that I was walking

14

1    towards the bar and they were going along with

2    me, and I would come back, and they would put

3    the car in reverse again, and I wanted to see, I

4    wanted to someone who can help me at that

5    moment, and I cursed the day when I see - when I

6    see people outside the bar, in front of the bar,

7    and I said, "I see people, nothing's going to

8    happen."  When they noticed that I'm getting

9    closer to the bar, they make a U-turn and they

10   park the car on the other side.  When I see the

11   victim, when it starts running, with a bottle in

12   his hand, and on the edge of the sidewalk, he

13   breaks it, and he goes - lunges at me, and - and

14   true - excuse me - truly am sincere, I didn't

15   remember about the gun at that moment.  I was

16   attacked two or three times with the bottle, and

17   I didn't remember about the gun, because I felt

18   he was going to kill me, and finally it

19   happened.  I feel very bad.

20          PRESIDING COMMISSIONER SHELTON:  Senor,

21   you mentioned that they stole all of your

22   things.  What did they steal?

23          INMATE MARROQUIN THROUGH THE INTERPRETER:

24   My watch, a chain, they stole my money, and

25   prior to that, showed up there at the police.

26   How did it appear?  Well, because the police

27   confiscated it.

15

1         PRESIDING COMMISSIONER SHELTON:  From you

2  or from the victim?

3         INMATE MARROQUIN THROUGH THE INTERPRETER:

4  No, there at the police, they confiscated that

5  that belonged to me, what they had stole from

6  me.

7         PRESIDING COMMISSIONER SHELTON:  Okay.  I

8  understand.  Mr. Marroquin, how much did you

9  have to drink that day?

10        INMATE MARROQUIN THROUGH THE INTERPRETER:

11  Automatically, yes, I had drunk some - drank,

12  excuse me - some beers.

13        PRESIDING COMMISSIONER SHELTON:  How

14  many?

15        INMATE MARROQUIN THROUGH THE INTERPRETER:

16  I can't calculate, but a few.

17        PRESIDING COMMISSIONER SHELTON:  How

18  often do you drink?

19        INMATE MARROQUIN THROUGH THE INTERPRETER:

20  Back then I would drink my beers once in a

21  while.

22        PRESIDING COMMISSIONER SHELTON:  Every

23  day?

24        INMATE MARROQUIN THROUGH THE INTERPRETER:

25  No, no.  Sometimes on the weekends.  It was like

26  a - a habit, a stupid habit, and I apologize for

27  that, the word.

16

1        PRESIDING COMMISSIONER SHELTON:  Did you

2  - do you think you had an alcohol problem back

3  then?

4        INMATE MARROQUIN THROUGH THE INTERPRETER:

5  Correct.

6        PRESIDING COMMISSIONER SHELTON:  So when

7  you drank on the weekends, did you always when

8  you drank?

9        INMATE MARROQUIN THROUGH THE INTERPRETER:

10  Not exactly - not exactly would I get drunk, but

11  yes, yes, - well, I would be happy, yes.

12        PRESIDING COMMISSIONER SHELTON:  Why did

13  you have a gun?

14        INMATE MARROQUIN THROUGH THE INTERPRETER:

15  Automatically, there is no excuse that is worth

16  it, but - forgive me, not that I'm evading your

17  question, but I'm going to start from a point, a

18  confusing point.  When I was in - in trial, in

19  court, the DAs, they were accusing me that why

20  had I obtained the revolver seven days prior to

21  the crime, and that was incorrect, because

22  Sacramento had re - registered it to me seven

23  years before because of my record, and that -

24  and that is something I'm not able to

25  understand, why are they accusing of something

26  that they shouldn't, because the judge brought

27  it to their attention, to the district

17

1   attorneys, about it, because they knew exactly

2   that revolver was found, speaking vulgarly, it

3   wasn't hot, it wasn't a hot one, it was a

4   registered weapon.

5       PRESIDING COMMISSIONER SHELTON:   And let

6   me ask you, sir, why did you get a weapon seven

7   years before?

8       INMATE MARROQUIN THROUGH THE INTERPRETER:

9   In this case - well, to start off with, the area

10  when I lived at and it was something that you

11  would keep inside your home secured, and I'm

12  sorry, not that I'm going to judge you, but I

13  can use a very good word here and apply it, but

14  above the 90 percent of all Americans, North

15  Americans, they have a weapon in their home, and

16  what makes me think about that, because in the

17  court where I was at, the judge did ask a

18  hundred people that were present, "Who has a

19  weapon in their home?"  They all raised their

20  hand.

21      PRESIDING COMMISSIONER SHELTON:   Mr.

22  Marroquin, that day of that offense your weapon

23  wasn't in your home.

24      INMATE MARROQUIN THROUGH THE INTERPRETER:

25  Correct.  I - I would - had the custom to go to

26  over by Pomona to - to the shooting range, and

27  that's the motive for which I had in my

18

1  possession that weapon, that cursed weapon.

2       PRESIDING COMMISSIONER SHELTON:    So you

3  had already been to the shooting range, or you

4  were going to the shooting range?

5       INMATE MARROQUIN THROUGH THE INTERPRETER:

6  No, we had already gone.

7       PRESIDING COMMISSIONER SHELTON:    All

8  right.  Did you want to ask any questions about

9  the offense at this moment, or do you feel like

10  —

11       DEPUTY COMMISSIONER KEENAN:    Nothing,

12  thank you.

13       PRESIDING COMMISSIONER SHELTON:    All

14  right.  Let's — let's con — do you have anything

15  else you want to add with regards to this before

16  we move on?

17       INMATE MARROQUIN THROUGH THE INTERPRETER:

18  Well, you have the opinion and you have the say.

19       PRESIDING COMMISSIONER SHELTON:    That may

20  be true, but this is your opportunity to — to

21  talk as well, sir.  I don't have any opinion at

22  the current time, I'm listening to you.

23       INMATE MARROQUIN THROUGH THE INTERPRETER:

24  That's fine.  In this case, as — as I was

25  already judge, I'm being judge again — or tried,

26  I'm being tried again.  As I was already tried

27  twice, one in the courts and another one three

19

1  years ago.

2      PRESIDING COMMISSIONER SHELTON:   Mr.

3  Marroquin, I'm going to interrupt.  You're not

4  on trial here today, sir.  We're trying to

5  decide whether you have the ability to be

6  successful on parole, and we talk about this

7  offense because that's what got you in here –

8      INMATE MARROQUIN THROUGH THE INTERPRETER:

9  Okay.

10      PRESIDING COMMISSIONER SHELTON:   – and

11  that's a foundation for us moving forward, to

12  see what you have done with your life since

13  you've been here and if you have prepared

14  yourself for release.

15      INMATE MARROQUIN THROUGH THE INTERPRETER:

16  Okay.  In this case, being that this saying has

17  been – has changed now, I have a new knowledge

18  regarding this new life that I now have, I have

19  obtained a vocation of which I like so that I

20  can evolve in my future if I were to be released

21  tomorrow.

22      PRESIDING COMMISSIONER SHELTON:   Okay.

23  We are going to move in that direction now, so

24  we're going to move forward.  I think you

25  understand what we're talking about, I hope you

26  do, so we've talked about what got you in here,

27  we're going to talk about your prior record, and

20

1  according to this, sir, you have no prior

2  record.

3         INMATE MARROQUIN THROUGH THE INTERPRETER:

4  Correct.

5         PRESIDING COMMISSIONER SHELTON:  You

6  never got in trouble as a youth.

7         INMATE MARROQUIN THROUGH THE INTERPRETER:

8  Never.  Never gotten into any problems.  I been

9  - I been accused of it, they were - they -

10        PRESIDING COMMISSIONER SHELTON:  Okay.

11        INMATE MARROQUIN THROUGH THE INTERPRETER:

12  - got confused.

13        PRESIDING COMMISSIONER SHELTON:  Yeah,

14  there's nothing on your recording according to

15  this.  So that's good.

16        INMATE MARROQUIN THROUGH THE INTERPRETER:

17  I've never done anything.

18        PRESIDING COMMISSIONER SHELTON:  Now

19  let's talk about your growing-up time, and I'm

20  going to read what's here, and I want you to

21  help me out, tell me if it's true or not.  You

22  were -

23        INMATE MARROQUIN THROUGH THE INTERPRETER:

24  That's fine.

25        PRESIDING COMMISSIONER SHELTON:  You were

26  born July 30th, 1956, in Guatemala.

27        INMATE MARROQUIN THROUGH THE INTERPRETER:

1   Correct.

2           PRESIDING COMMISSIONER SHELTON:   And it

3   says here that you didn't cooperate well to tell

4   much about your social history.   I understand

5   you have two sisters and three brothers?

6           INMATE MARROQUIN THROUGH THE INTERPRETER:

7   Correct.

8           PRESIDING COMMISSIONER SHELTON:   And some

9   of your brothers and sisters are still in

10  Guatemala, and some are in Los Angeles.

11          INMATE MARROQUIN THROUGH THE INTERPRETER:

12  Correct.   I want to ask a question.

13          PRESIDING COMMISSIONER SHELTON:

14  Certainly.

15          INMATE MARROQUIN THROUGH THE INTERPRETER:

16  What was it that you said, I didn't understand?

17          PRESIDING COMMISSIONER SHELTON:   Did

18  somebody talk to you about your social history

19  before?

20          INMATE MARROQUIN THROUGH THE INTERPRETER:

21  In reception, yes.

22          PRESIDING COMMISSIONER SHELTON:   Okay.

23  Did you tell them all about yourself, or did you

24  didn't want to talk?

25          INMATE MARROQUIN THROUGH THE INTERPRETER:

26  No, I explained to the counsel - counselor.   He

27  asked about my family, and I told him

22

1  everything.

2          PRESIDING COMMISSIONER SHELTON:  Okay.

3  Well, we're going to have you tell us.  So how

4  old were you when you came over from Guatemala?

5          INMATE MARROQUIN THROUGH THE INTERPRETER:

6  I was very young.

7          PRESIDING COMMISSIONER SHELTON:  Did your

8  whole family - well, obvious - your parents came

9  over?

10          INMATE MARROQUIN THROUGH THE INTERPRETER:

11  No.

12          PRESIDING COMMISSIONER SHELTON:  So how

13  did you get to the United States?

14          INMATE MARROQUIN THROUGH THE INTERPRETER:

15  Just like a hundred percent of all people in the

16  United States, they come as immigrants.

17          PRESIDING COMMISSIONER SHELTON:  No.  But

18  I mean how did you get here?  Who did you come

19  with, and how old were you?

20          INMATE MARROQUIN THROUGH THE INTERPRETER:

21  All by myself.  On my own.

22          PRESIDING COMMISSIONER SHELTON:  How old

23  were you?

24          INMATE MARROQUIN THROUGH THE INTERPRETER:

25  I was very young.  I was like 18 years old.

26          PRESIDING COMMISSIONER SHELTON:  Okay.

27  Why did you want to come here?

23

1          INMATE MARROQUIN THROUGH THE INTERPRETER:

2    Unfortunately, to - to be better, to better

3    myself.

4          PRESIDING COMMISSIONER SHELTON:   Start a

5    new life?

6          INMATE MARROQUIN THROUGH THE INTERPRETER:

7    Exactly.

8          PRESIDING COMMISSIONER SHELTON:   Sir, do

9    you have any contact with your parents or your

10   brothers or sisters?

11         INMATE MARROQUIN THROUGH THE INTERPRETER:

12   Yes, and I thank God that I do have the support

13   of my family.  Unfortunately, they already

14   passed away.

15         PRESIDING COMMISSIONER SHELTON:   Your

16   parents passed away?  I'm sorry, sir.  Do you

17   have - who - is there - do you still have

18   brothers or sisters that live in Los Angeles?

19         INMATE MARROQUIN THROUGH THE INTERPRETER:

20   Yes.

21         PRESIDING COMMISSIONER SHELTON:   As well

22   as in Guatemala?

23         INMATE MARROQUIN THROUGH THE INTERPRETER:

24   Correct.

25         PRESIDING COMMISSIONER SHELTON:   Does

26   anybody come see you here?

27         INMATE MARROQUIN THROUGH THE INTERPRETER:

24

1  My wife and my children.

2      PRESIDING COMMISSIONER SHELTON:  All

3  right.  Let's talk about your wife and your

4  children.  How did you meet your wife?

5      INMATE MARROQUIN THROUGH THE INTERPRETER:

6  In school.

7      PRESIDING COMMISSIONER SHELTON:  Inside

8  the institution or before you came?

9      INMATE MARROQUIN THROUGH THE INTERPRETER:

10  Excuse me?

11      PRESIDING COMMISSIONER SHELTON:  Inside

12  the institution or before you came here?

13      INMATE MARROQUIN THROUGH THE INTERPRETER:

14  Oh, no, I've been married since I been 18.

15      PRESIDING COMMISSIONER SHELTON:  Very

16  good.

17      INMATE MARROQUIN THROUGH THE INTERPRETER:

18  Thank you.

19      PRESIDING COMMISSIONER SHELTON:  And you

20  are still married?

21      INMATE MARROQUIN THROUGH THE INTERPRETER:

22  Correct.  That is correct.

23      PRESIDING COMMISSIONER SHELTON:  Where

24  does your wife live?

25      INMATE MARROQUIN THROUGH THE INTERPRETER:

26  In Los Angeles.

27      PRESIDING COMMISSIONER SHELTON:  Okay.

25

1    How many children do you have?

2          INMATE MARROQUIN THROUGH THE INTERPRETER:

3    Three.

4          PRESIDING COMMISSIONER SHELTON:    How old

5    are they?

6          INMATE MARROQUIN THROUGH THE INTERPRETER:

7    The oldest is like 29, and the youngest is like

8    19.

9          PRESIDING COMMISSIONER SHELTON:    And do

10   you see them or - or talk to them?

11         INMATE MARROQUIN THROUGH THE INTERPRETER:

12   Correct.   I speak to them.

13         PRESIDING COMMISSIONER SHELTON:    And they

14   come visit you?

15         INMATE MARROQUIN THROUGH THE INTERPRETER:

16   Yes, they do come and see me, but I speak with

17   them more on the phone.   That's what I admire of

18   the United States, everybody's always busy,

19   keeps busy.

20         PRESIDING COMMISSIONER SHELTON:    Is there

21   anything else you would like to add for the

22   record, sir?

23         INMATE MARROQUIN THROUGH THE INTERPRETER:

24   Like what else can I add about my family?

25         PRESIDING COMMISSIONER SHELTON:    Anything

26   you would like.

27         INMATE MARROQUIN THROUGH THE INTERPRETER:

26

1    Very well.  My desire is to be with my family.

2    I know I have an INS hold.  I know I'll be

3    deported to Guatemala.  I had the opportunity to

4    prepare myself here in prison.  I have spoken to

5    my family regarding that, and my wife, she's

6    willing to go with me over there, and my

7    children remain here.

8            PRESIDING COMMISSIONER SHELTON:  All

9    right, sir, we're going to talk about your

10   parole plans shortly, so hold that thought

11   because we're going to - I want to cover all of

12   that in just a few minutes.  What we're going to

13   do now is we're going to turn to Commissioner

14   Keenan, and he's going to talk to you about

15   post-conviction factors, which means what you've

16   been doing, as you said, to prepare yourself in

17   the institution.  Commissioner?

18           DEPUTY COMMISSIONER KEENAN:  All right.

19   Mr. Marroquin, I see you a have a placement

20   score of 19.  There was a classification score

21   of zero going back as far as February of '01.

22   Your last hearing was on 11/21/02 and we

23   recommended that you remain disciplinary free,

24   and you have done that.  We recommended that you

25   upgrade vocationally, and I'll talk to you about

26   that more in just a minute, and that you

27   participate in self-help and available therapy,

1   and looking at your C-File, I see that you have

2   no 115s, you have two 128a's, the last one was

3   on 6/17/93.  Since your last hearing you have

4   participated in AA, you are involved in Adult

5   Basic Education.  Are you still in Adult Basic

6   Education?

7           INMATE MARROQUIN THROUGH THE INTERPRETER:

8   Yes.

9           DEPUTY COMMISSIONER KEENAN:  Okay.  Your

10  last TABE score was 3.8, that was the total, a

11  grade of 3.8, and that was on 12/29/05, and

12  there was a chrono in the C-File for that.  I

13  did see that on earlier tests you scored higher.

14  Prior to your last hearing –

15          THE INTERPRETER:  Yes, was the response –

16          DEPUTY COMMISSIONER KEENAN:  Okay.

17          THE INTERPRETER:  – to the comment.

18          DEPUTY COMMISSIONER KEENAN:  Prior to

19  your last hearing I do see that you completed a

20  course in the Cause, Prevention, Treatment and

21  Management of HIV, AIDS, Tuberculosis and

22  Hepatitis, and you have participated in AA, NA,

23  since '95, you've worked in the Yard Crew.

24  Let's see.  I saw in the current psychological

25  evaluation, that I'll get to shortly, that you

26  participated in individual counseling at some

27  point with a Dr. Reed, I think it was.

28

1       INMATE MARROQUIN THROUGH THE INTERPRETER:
2   Yes.

3       DEPUTY COMMISSIONER KEENAN:    Okay.    And
4   I'll read a little something about that when I
5   get to the psychological evaluation.

6       INMATE MARROQUIN THROUGH THE INTERPRETER:
7   Correct.

8       DEPUTY COMMISSIONER KEENAN:    And you have
9   completed a course that you took, a
10  correspondence course, you talked about this at
11  your last hearing, and I think you were still
12  working on it during your last hearing, it was
13  the diesel mechanics, and I have a certificate
14  here for Thompson Education Direct, a diploma,
15  awarded – awarded to Marco Marroquin Webster –
16  Wester?

17      INMATE MARROQUIN THROUGH THE INTERPRETER:
18  That is correct.

19      DEPUTY COMMISSIONER KEENAN:    In
20  recognition of the successful completion of the
21  program, Diesel Mechanics.    That was in August
22  of '04, it was run by Connie Dempsy, director of
23  education.    Okay.

24      INMATE MARROQUIN THROUGH THE INTERPRETER:
25  Correct.

26      DEPUTY COMMISSIONER KEENAN:    And also I
27  saw in the psychological evaluation that's what

1   you plan to do, you want to work in diesel

2   mechanics in Guatemala.

3        INMATE MARROQUIN THROUGH THE INTERPRETER:

4   Correct.

5        DEPUTY COMMISSIONER KEENAN:  All right.

6   Have I missed anything yet, or does that all

7   sound accurate so far?

8        INMATE MARROQUIN THROUGH THE INTERPRETER:

9   Everything seems to be accurate.  Thank you.

10       DEPUTY COMMISSIONER KEENAN:  Is there any

11  self-help or therapy that you participated in

12  that I haven't commented on?

13       INMATE MARROQUIN THROUGH THE INTERPRETER:

14  No, everything's fine.  If I can include

15  something?

16       DEPUTY COMMISSIONER KEENAN:  Sure.

17       THE INTERPRETER:  [To Inmate Marroquin]

18  criminal?

19       DEPUTY COMMISSIONER KEENAN:  Criminon?

20       INMATE MARROQUIN THROUGH THE INTERPRETER:

21  I took a course in Criminon.

22       DEPUTY COMMISSIONER KEENAN:  I didn't

23  notice that in the - in the file.

24       INMATE MARROQUIN THROUGH THE INTERPRETER:

25  Yes, that's something that I wanted to mention.

26  I don't know what's going on, but I did it

27  around a year ago, and they haven't corresponded

30

1  with the certificate or anything.

2         DEPUTY COMMISSIONER KEENAN:  Okay.

3               (Off the record)

4         DEPUTY COMMISSIONER KEENAN:  Back on

5  record, Side 2.  Okay.  You – you were saying

6  that you weren't – participated in and completed

7  the Criminon program, was it?

8         INMATE MARROQUIN THROUGH THE INTERPRETER:

9  Correct.

10         DEPUTY COMMISSIONER KEENAN:  In '05 you

11  believe it was?

12         INMATE MARROQUIN THROUGH THE INTERPRETER:

13  Yes.

14         DEPUTY COMMISSIONER KEENAN:  Okay.  And

15  you were giving me an explanation before we got

16  cut off by the tape, something about why you

17  don't have a certificate or –

18         INMATE MARROQUIN THROUGH THE INTERPRETER:

19  Yes, I did that course and I learned a lot

20  because it has a very good orientation, and then

21  my instructor just stopped writing to me.  I've

22  sent her like three letters already, and there

23  hasn't been any response to them.  I know you

24  would be more informed regarding this, that the

25  name is Criminon.

26         DEPUTY COMMISSIONER KEENAN:  And – huh.

27  Have you gone through your Central File?

1        INMATE MARROQUIN THROUGH THE INTERPRETER:

2   Yes.

3        DEPUTY COMMISSIONER KEENAN:   You didn't

4   find it in there?

5        INMATE MARROQUIN THROUGH THE INTERPRETER:

6   No, it would be a bit difficult to find it there

7   because it would have to come to me, and then I

8   would have to give it to the counselor.

9        DEPUTY COMMISSIONER KEENAN:   Okay.  And –

10  all right.  Well, do you want to just state for

11  the record what the course is, how long it was,

12  and what you got out of it?

13       INMATE MARROQUIN THROUGH THE INTERPRETER:

14  What I got out of that course was – was very

15  important.  It speaks about how to take control

16  over one's self, how to appreciate nature, all

17  of it, and how to better yourself

18  psychologically, including to that, I had some –

19       THE INTERPRETER:   I need an explanation

20  from the prisoner.   [Speaks in Spanish to Inmate

21  Marroquin.]

22       INMATE MARROQUIN THROUGH THE INTERPRETER:

23  I had some appointments, thanks to Dr. Greer, or

24  something, Deere?

25       PRESIDING COMMISSIONER SHELTON:   Oh, Dr.

26  Reed?

27       INMATE MARROQUIN THROUGH THE INTERPRETER:

32

1   Yes, thank you.  And he was going with me, a few

2   appointments that I had, and he would conversate

3   with me, and that helped me out a lot.

4           DEPUTY COMMISSIONER KEENAN:   Okay.  How

5   long was the program?

6           INMATE MARROQUIN THROUGH THE INTERPRETER:

7   More or less, a little bit more than year.

8           DEPUTY COMMISSIONER KEENAN:   More than a

9   year?

10          INMATE MARROQUIN THROUGH THE INTERPRETER:

11  Yes.

12          DEPUTY COMMISSIONER KEENAN:   Okay.  Well,

13  it would be helpful if you could get a hole of

14  some - something from the program.

15          INMATE MARROQUIN THROUGH THE INTERPRETER:

16  Thank you.

17          DEPUTY COMMISSIONER KEENAN:   Something

18  from your instructors.

19          INMATE MARROQUIN THROUGH THE INTERPRETER:

20  Thank you.

21          DEPUTY COMMISSIONER KEENAN:   All right.

22  Are there any other self-help or therapy

23  programs that I've missed here, something that

24  you participated in that wasn't commented on

25  already?

26          INMATE MARROQUIN THROUGH THE INTERPRETER:

27  No, everything's correct.  The only problem is,

33

```
 1   and not giving fault to anybody or blaming

 2   anybody, but I have tried quite a bit to attend

 3   other programs, but there are many people

 4   waiting for these courses, and the only thing

 5   that I have attended to and with great risk that

 6   if you don't attend constantly or regularly to

 7   it, is Alcoholics Anonymous, and that program,

 8   if you don't pay attention to or give its

 9   attention to go to the appointments, they just -

10   they take you out of the program immediately.

11           DEPUTY COMMISSIONER KEENAN:  I see that

12   you were the chairman of the program at one

13   point.

14           INMATE MARROQUIN THROUGH THE INTERPRETER:

15   Yes, in another prison.  Where I was previously,

16   I was the leader.  I was the chair of the

17   sessions, and my insistence in this is the

18   steps.  The most efficient and the effort that

19   you should take to them is to be constant in a

20   group of Alcoholics Anonymous.  It's now about

21   now I have this chrono and that's it, no.  My

22   mentality is that once I'm out, I will keep

23   going to Alcoholics Anonymous for the rest of my

24   life, because there is no other way how to

25   better something, not only something that you

26   want or desire, but to be tentative [sic] to it.

27   I have this knowledge of which has been very
```