# EXHIBIT 3
# Part 2 of 2

1  useful.  That's - and if I was asked about this
2  years back, and I dare to speak with everyone's
3  permission here, if I were to ask all of you
4  here, including the officers, if they are
5  alcoholics and that if they don't have a
6  knowledge of it, they are automatically
7  mistaken.  All person who drinks one beer, one
8  drink of a beer, is an alcoholic, and that is
9  something very important of which I didn't know,
10  to accept that I was an alcoholic.  My mentality
11  was, "No, I'm not an alcoholic, I know how to
12  drink."  I was very mistaken.
13          DEPUTY COMMISSIONER KEENAN:  Okay.
14          INMATE MARROQUIN:  [Still speaking in
15  Spanish.]
16          THE INTERPRETER:  Wait.  Excuse me.
17  These are key questions that the doctors, the
18  psychiatrists, psychologist, and medical
19  doctors, they have asked me, "Mr. Marroquin, are
20  you an alcoholic?"  Yes.  I believe it's written
21  down there.
22          DEPUTY COMMISSIONER KEENAN:  Okay.  And
23  vocationally, you've done the Diesel Mechanic
24  course.  Have you picked up another work or
25  vocational skills while in the institution?
26          INMATE MARROQUIN THROUGH THE INTERPRETER:
27  No.  I focus myself precisely in that vocation

1  of which I like a lot.

2      DEPUTY COMMISSIONER KEENAN:  Okay.

3      INMATE MARROQUIN THROUGH THE INTERPRETER:

4  Of which I will support myself off of it.

5      DEPUTY COMMISSIONER KEENAN:  Now I saw

6  the certificate, but I don't see any other

7  surrounding paperwork that tells me anything

8  about how long the course was, how intensive.

9  How long was this course?

10     INMATE MARROQUIN THROUGH THE INTERPRETER:

11 Yes, it took a while, approximately close to two

12 years.

13     DEPUTY COMMISSIONER KEENAN:  And how

14 would it work?  They would send you reading

15 material every month, or every week, and you

16 would have to take tests on it, or − or − how

17 did that work?

18     INMATE MARROQUIN THROUGH THE INTERPRETER:

19 Yes, there was a package that that company sends

20 you, of which I want to emphasize, it's not a

21 state one, it's a paid one, private, in which my

22 family paid for.  Thanks to them, I was able to

23 get it, and they send you everything here so

24 that you can execute it.

25     DEPUTY COMMISSIONER KEENAN:  Okay.  And

26 ordinarily I would think, and − and I'm

27 certainly not a − an expert in diesel mechanics

36

1    or any kind of mechanics, but I would think that

2    a major portion of a course in mechanics would

3    be hands-on.

4          INMATE MARROQUIN THROUGH THE INTERPRETER:

5    I am completely agreeing with you.  A great part

6    of my life I worked.  I can say it in a way of

7    working on top of an engine.  My first

8    profession is I'm a driver in busses and - and

9    trucks.

10          DEPUTY COMMISSIONER KEENAN:   Okay.   All

11    right.  Do you have anything else from the - the

12    program you could show us?  Any kind of

13    documents from the program that would -

14          INMATE MARROQUIN THROUGH THE INTERPRETER:

15    No, not exactly here.  I have documents here

16    which you have.

17          DEPUTY COMMISSIONER KEENAN:   Okay.  Well,

18    the fact that it's all written and none of it is

19    hands-on, should that lead me to the conclusion

20    that your skills in this area are less than what

21    they need to be to get a job, or is there reason

22    for me think otherwise?

23          INMATE MARROQUIN THROUGH THE INTERPRETER:

24    No, they're something that helps me, because the

25    instructors from the University in Pennsylvania,

26    they congratulated me, and they asked me an

27    extra question, why is it that I knew so much if

1    I grew up there, and my grade was extremely

2    high.

3        DEPUTY COMMISSIONER KEENAN:  Okay.  And

4    was that class in Spanish or English?

5        INMATE MARROQUIN THROUGH THE INTERPRETER:

6    In English.

7        DEPUTY COMMISSIONER KEENAN:  Did you have

8    difficulty with it, because of the English?

9        INMATE MARROQUIN THROUGH THE INTERPRETER:

10   No.  I have a - I don't if you can call it a

11   problem or how you can call this, but I read

12   English very nicely, and my serious problem with

13   it is speaking it.

14       DEPUTY COMMISSIONER KEENAN:  Okay.  All

15   right.  And then moving to the psychological

16   evaluation prepared for this hearing by -

17       INMATE MARROQUIN THROUGH THE INTERPRETER:

18   Thank you.

19       DEPUTY COMMISSIONER KEENAN:  - by M.

20   Macober, M-A-C-O-M-B-E-R, Staff Psychologist,

21   dated 5/11/06, in assessing you, he goes over

22   various topics.  He notes initially that he

23   interviewed you with a Spanish translator, a

24   certified translator, he says.  Okay.  And notes

25   that your mental status is within normal limits,

26   judgment was intact, intact and self-awareness

27   were good.

1           "Inmate Marroquin has sought out and
2           obtained individual counseling with Dr.
3           Reed at CTF.   He has received several
4           hours of individual counseling dealing
5           with the commitment offense and other
6           related issues.   Dr. Reed indicated that
7           there were no mental or emotional
8           problems evidence in this case.   Inmate
9           Marroquin was under the influence of
10          alcohol at the time of the commitment
11          offense.   He's continued to attend
12          Alcoholics Anonymous over the years.
13          Although alcohol is readily available to
14          inmates in a prison setting, he has shown
15          self-control, maturity, and
16          responsibility by totally abstaining from
17          any use of alcohol during his 13 years of
18          incarceration.   Therefore, this is
19          certainly not a current problem in his
20          life."
21   And under "Current Diagnostic Impressions," he
22   notes Axis I, no contributory clinical disorder;
23   Axis II, no contributory personality disorder.
24   He says you have a GAF of 85, and I have
25   something from the DSM-IV that defines what that
26   means.   A GAF of 85, Global Assessment of
27   Functioning, an 85 falls within a range that is

1    described as absent, or minimal symptoms, good

2    functioning all areas, interested and involved

3    in a wide range of activities; socially

4    effective, generally satisfied with life, no

5    more than everyday problems or concerns.

6         INMATE MARROQUIN THROUGH THE INTERPRETER:

7    Thank you.

8         DEPUTY COMMISSIONER KEENAN:    And he talks

9    about a review of the life crime.    He says you

10   accept full responsibility for the commitment

11   offense, says the offense appears to be quite

12   situational; it's also related to the fact that

13   he had been drinking alcohol, resulting in the

14   use of poor judgment and release of inhibitions.

15   There's a section on — well, let me back up.    He

16   also notes that you indicate you were very sorry

17   that it happened, said that you did not intend

18   to kill the victim, that your feelings of sorrow

19   and remorse appear to be genuine.    Your

20   assessment of dangerousness, he notes that in

21   comparison to other inmates, the potential for

22   dangerous behavior is below average; that's

23   within the institution.    He says:

24        "In considering the potential for

25         dangerous behavior if released to the

26         community, the Level of Service Inventory

27         Revised was administered.    This is an

1           actuarial measure that assesses criminal

2           background, substance abuse history,

3           social relationships, academic and

4           vocational achievement, family

5           relationships, and other factors to

6           determine current risk level on parole.

7           He does not have a history of prior

8           arrests, his score places him at a 1.8

9           cumulative frequency for prison inmates.

10          This means that if 100 men were released

11          on parole, he would do better than 98 of

12          them.  This is a very low risk level.  As

13          a result, he poses no more risk to

14          society than the average citizen in the

15          community.  At this point in his life

16          there are no significant risk factors in

17          this case."  And in his final sentence he

18          says:  "The prognosis for successful

19          adjustment in the community is very

20          good."

21      Is there anything you'd like to say about that

22      report?

23          INMATE MARROQUIN THROUGH THE INTERPRETER:

24      That's correct.

25          DEPUTY COMMISSIONER KEENAN:  Turn it back

26      to the chairperson.

27          PRESIDING COMMISSIONER SHELTON:  All

41

1    right.   Doing okay on time?

2         THE INTERPRETER:  I'm fine.  I really

3    don't know if my replacement is here or not.

4         PRESIDING COMMISSIONER SHELTON:  Okay.  I

5    think what we'll do is we'll — we'll discuss

6    parole plans, and then we'll take a recess so

7    that we can change translators.

8         INMATE MARROQUIN THROUGH THE INTERPRETER:

9    All right.

10        PRESIDING COMMISSIONER SHELTON:  Let's

11   talk about your parole plans, sir.  I have here

12   in the record that it says — as we discussed, we

13   kind of started discussing this already, you

14   would like to live with your wife, and it says

15   brother.  Does your — does your wife live with

16   your brother right now?

17        INMATE MARROQUIN THROUGH THE INTERPRETER:

18   Excuse me?

19        PRESIDING COMMISSIONER SHELTON:  Does

20   your — do — is it — is it your wife and her

21   brother, does she live with her brother or — it

22   says here, brother.

23        INMATE MARROQUIN THROUGH THE INTERPRETER:

24   No, that's mistaken.

25        PRESIDING COMMISSIONER SHELTON:  That's

26   wrong.  Okay.  Then I will note that.  Okay.  So

27   you would like to live with your wife, and her

42

1   name is Lily.

2         INMATE MARROQUIN THROUGH THE INTERPRETER:

3   Yes, correct.

4         PRESIDING COMMISSIONER SHELTON:   She

5   lives in Los Angeles, as you mentioned.

6         INMATE MARROQUIN THROUGH THE INTERPRETER:

7   Correct.

8         PRESIDING COMMISSIONER SHELTON:   Does

9   anybody else live with your wife right now?

10  Your children or –

11        INMATE MARROQUIN THROUGH THE INTERPRETER:

12  My children live with her, and they live with

13  her, vice-versa.

14        PRESIDING COMMISSIONER SHELTON:   How old

15  are they?

16        INMATE MARROQUIN THROUGH THE INTERPRETER:

17  The oldest is 29, more or less, and the youngest

18  is 19.

19        PRESIDING COMMISSIONER SHELTON:   And

20  those – they still live at home?

21        INMATE MARROQUIN THROUGH THE INTERPRETER:

22  Yes.  My children are lovely.

23        PRESIDING COMMISSIONER SHELTON:   They're

24  taking care of mom.

25        INMATE MARROQUIN THROUGH THE INTERPRETER:

26  Exactly, yes.

27        PRESIDING COMMISSIONER SHELTON:   Now we

43

1    talked about the fact that you have an INS hold,

2    so if you had to go back to Guatemala, where

3    would you live?

4            INMATE MARROQUIN THROUGH THE INTERPRETER:

5    I would automatically live in my home.

6            PRESIDING COMMISSIONER SHELTON:   And you

7    have a home in Guatemala?

8            INMATE MARROQUIN THROUGH THE INTERPRETER:

9    Exactly, yes.

10           PRESIDING COMMISSIONER SHELTON:   And

11   who's in that home right now?

12           INMATE MARROQUIN THROUGH THE INTERPRETER:

13   Part of my family is over there, and part of my

14   wife's family, and so they're taking care of

15   everything over there, because it's community

16   property.

17           PRESIDING COMMISSIONER SHELTON:   And you

18   think that since you received your diesel

19   mechanic certificate that you could find work in

20   Guatemala?

21           INMATE MARROQUIN THROUGH THE INTERPRETER:

22   Oh, yes, perfectly.  I did it with that purpose.

23           PRESIDING COMMISSIONER SHELTON:   What

24   about here?

25           INMATE MARROQUIN THROUGH THE INTERPRETER:

26   Excuse?

27           PRESIDING COMMISSIONER SHELTON:   If - if

44

1    you were to go live with your wife, do you have

2    any work lined up here?  Can you get a job as a

3    diesel mechanic in Los Angeles?

4         INMATE MARROQUIN THROUGH THE INTERPRETER:

5    No, I don't have anything planned for here,

6    don't have anything, absolutely anything.

7         PRESIDING COMMISSIONER SHELTON:  Now you

8    mentioned earlier, and I want to make sure it's

9    on the record, that if you went back to

10   Guatemala your wife plans to move with you?

11        INMATE MARROQUIN THROUGH THE INTERPRETER:

12   Correct.

13        PRESIDING COMMISSIONER SHELTON:  And your

14   children would stay here and continue on as

15   they're doing?

16        INMATE MARROQUIN THROUGH THE INTERPRETER:

17   Correct.

18        PRESIDING COMMISSIONER SHELTON:  Okay.  I

19   have some letters here that I want to review.

20        INMATE MARROQUIN THROUGH THE INTERPRETER:

21   I hope that they are there.

22        PRESIDING COMMISSIONER SHELTON:  Some are

23   here.

24        INMATE MARROQUIN THROUGH THE INTERPRETER:

25   Thank you.

26        PRESIDING COMMISSIONER SHELTON:  A letter

27   from Lily, which, if I recall, is your wife.

1    This was dated May of 2006.

2         INMATE MARROQUIN THROUGH THE INTERPRETER:

3    Correct.

4         PRESIDING COMMISSIONER SHELTON:  She

5    would like to live in Guatemala City with you.

6    Your children are adults, and they would stay in

7    Los Angeles.  You would receive full support

8    from family, and she lists the address here

9    where you would live in Guatemala City, Sector

10   C-2, San Jose La Rosas.

11        INMATE MARROQUIN THROUGH THE INTERPRETER:

12   Correct.

13        PRESIDING COMMISSIONER SHELTON:  And you

14   were both born there, in Guatemala City?

15        INMATE MARROQUIN THROUGH THE INTERPRETER:

16   Yes.

17        PRESIDING COMMISSIONER SHELTON:  And your

18   family is there for support.  This is a letter

19   from your three children: Emerald, 18; Joshua,

20   19; and Marco, 27.  "We are here to support him

21   100 percent.

22        INMATE MARROQUIN THROUGH THE INTERPRETER:

23   Thank you.

24        PRESIDING COMMISSIONER SHELTON:  "We will

25   travel frequently to visit you in Guatemala,"

26   and they're very supportive of your release,

27   sir.  Then we have a single letter from your

46

1  daughter.  She said she was 18 years old and
2  she's been left without you for almost 13 years.
3  She misses you, wants you to come home, and
4  obviously she loves you very much.

5          INMATE MARROQUIN:  Gracias.

6          PRESIDING COMMISSIONER SHELTON:  Here's a
7  letter from Joshua.  He says it's really been
8  hard as a man growing up with no father.  He
9  would like for you to have one more chance.  And
10  this is your – this is your oldest son.  I know
11  this is hard, but you know, I'm really impressed
12  how much your children and your wife love you.
13  So that's a good thing.

14          INMATE MARROQUIN THROUGH THE INTERPRETER:
15  Thank you very much, ma'am.

16          PRESIDING COMMISSIONER SHELTON:  It's a
17  good thing.  This is from your oldest son.  He's
18  the one that said he had to take over, stepping
19  into your role and being a dad in your absence
20  for his brother and sister, and he said he's
21  willing to support you in any way that you need.
22  And this is a duplicate letter from your – from
23  your wife, and a notarized letter from your
24  wife, indicating that you have 100 percent
25  family support.

26          INMATE MARROQUIN THROUGH THE INTERPRETER:
27  That is correct, ma'am.

1          PRESIDING COMMISSIONER SHELTON:  Did I

2    leave anything out on the letters?  Did - are

3    these all the letters that you were talking

4    about?

5          INMATE MARROQUIN THROUGH THE INTERPRETER:

6    Everything's correct.

7          PRESIDING COMMISSIONER SHELTON:  All

8    right.  Good.  One last thing we need to touch

9    on is that we send out what are called 3042

10   letters to agencies that are interested in your

11   situation, your case, and as you know, we have a

12   representative from the District Attorney's

13   Office in Los Angeles who will be allowed to

14   speak in a few minutes, and for the record, I

15   need to let you know that we received a letter

16   from the Los Angeles County Sheriff's

17   Department, and I need to read this to enter it

18   to the record.  They offer an opinion as well.

19   It says:

20          "During the early morning of January 13th,

21          1992, inmate Marco Marroquin and Louis

22          Silva were at a bar in the incorporated

23          area of Compton.  The two got into an

24          argument in which Marroquin became angry

25          at perceived insults against his family.

26          As the argument became more heated,

27          Silvia - Silva threatened to kick

48

1       Marroquin's ass.  Marroquin left the bar
2       and retrieved a .38 caliber pistol which
3       he kept hidden in the engine compartment
4       of his vehicle.  He returned to the bar
5       and approached Silva as he came out.
6       Marroquin pulled the pistol from his back
7       pocket, leveled it at Silva - Silva, and
8       declared, "You son of a bitch."  He then
9       fired once, striking Silva in the
10      abdomen."  I think it was indicated he
11      was struck in his arm in the previous
12      report.  "A witness followed Marroquin
13      back to his truck and ordered Marroquin
14      to put down the gun and surrender to the
15      police.  Marroquin retorted, "Fuck you,
16      I'll shoot you too."  Marroquin was
17      arrested in the parking lot by responding
18      deputies.  Victim Silva was transported
19      to a area hospital where he died.  Based
20      on these facts, it is the opinion of this
21      department that parole of inmate
22      Marroquin is inappropriate and should be
23      denied."
24  For the record I would indicate that I think
25  some of the - some of this letter is a tad bit
26  inaccurate with a summary of the offense.  I
27  think we covered it previously, it had a little

1    more accuracy to it, and it's only fair to put

2    that in the record as well.  Before we move on,

3    and actually what we're going to do is take a

4    recess in a moment so we can check on our second

5    translator for you, sir.  Is there anything that

6    you would like to add with regards to your

7    parole plans?

8          INMATE MARROQUIN THROUGH THE INTERPRETER:

9    First of all, my plan is to get out of this

10   nightmare, and then be in my country working,

11   like I did start doing 30 years ago, because I

12   know that life in Latin America is strongly in

13   poverty, and for that reason is why I have this

14   small tool to be able to survive.  My intention

15   is, I'm old, and it's a bit difficult for them

16   to give me work, and for which that reason I

17   want to establish a mechanic shop and be able to

18   live my last days.  That is my plan, to go back

19   to my country and work on my – on my own, set up

20   a mechanics shop.  I – I can add a whole lot of

21   other things, but

22         PRESIDING COMMISSIONER SHELTON:  Okay.

23         INMATE MARROQUIN THROUGH THE INTERPRETER:

24   I thank you for this moment.

25         PRESIDING COMMISSIONER SHELTON:    I

26   understand.

27         INMATE MARROQUIN THROUGH THE INTERPRETER:

1   Thank you.

2        PRESIDING COMMISSIONER SHELTON:   Let's

3   recess, and we'll come back together as soon as

4   we make sure we have all the translation

5   assistance that we need.   The time is 12:55 p.m.

6                (Off the record)

7        DEPUTY COMMISSIONER KEENAN:   Back on

8   record.   All parties previously identified are

9   present.

10       PRESIDING COMMISSIONER SHELTON:   All

11  right.   Okay.   Mr. Marroquin, we are back on the

12  record, it is 10 after 1, and for the record, we

13  have the same translator as we had before, and

14  we will be maintaining her for services the rest

15  of this hearing.

16       INMATE MARROQUIN THROUGH THE INTERPRETER:

17  Okay.

18       PRESIDING COMMISSIONER SHELTON:   We are

19  now moving into the portion of the hearing where

20  we can ask you questions, and that means the

21  commissioner and I can ask you questions, the

22  deputy DA can ask you questions, as can your

23  counsel.

24       INMATE MARROQUIN THROUGH THE INTERPRETER:

25  Correct.

26       PRESIDING COMMISSIONER SHELTON:   All

27  right.   I want to see if I have any questions.

51

1   I probably do.  You know, I'm not familiar with

2   the Criminon program.  Could you tell me what

3   that's about?

4           INMATE MARROQUIN THROUGH THE INTERPRETER:

5   That program teaches you how to appreciate in

6   any angle that you see it how to manage

7   yourself, how to act, how you should appreciate

8   things, what animals meant to us, vegetation,

9   why a park is constructive, why mistreat it, why

10  cause harm to humanity, why cause harm to

11  animals, to the environment.

12          PRESIDING COMMISSIONER SHELTON:   What was

13  the —

14          INMATE MARROQUIN THROUGH THE INTERPRETER:

15  Everything referring to that.

16          PRESIDING COMMISSIONER SHELTON:   What was

17  the most important thing you learned?

18          INMATE MARROQUIN THROUGH THE INTERPRETER:

19  I can tell you what the most important.   The

20  most important — and it sounds a little bit

21  ridiculous, but everything.  Everything.

22          PRESIDING COMMISSIONER SHELTON:   It

23  sounds to me like you really liked it.   Your

24  eyes light up when you talk about this class.

25          INMATE MARROQUIN THROUGH THE INTERPRETER:

26  Yes.  I had a — an education not precisely

27  different to what was in that book, but I was

52

1   speaking completely like ignorant, how you

2   construct yourself and how to construct others,

3   and the easiest thing is obedience.  To

4   contradict another person is not something good.

5   I mean, if I were to tell you we get finished

6   today, I would dare to and if you allow me to

7   invite you because it's the studies of how to

8   manage the mind, and it's very important.

9        PRESIDING COMMISSIONER SHELTON:  Let me

10  ask you another question, sir.  What was the

11  most important you learned in your counseling

12  with Dr. Reed?

13        INMATE MARROQUIN THROUGH THE INTERPRETER:

14  When I had these small sessions with the doctor

15  and - and he counseled me as far as how to

16  manage myself and illuminating the way, asking

17  me questions from different angles, and the

18  thing you should appreciate is to be fine or

19  okay with your brain, and so many other things.

20        PRESIDING COMMISSIONER SHELTON:  Thank

21  you, sir.  I have no other questions at this

22  time.  Commissioner?

23        DEPUTY COMMISSIONER KEENAN:  I do have a

24  question.  I was looking at a past psychological

25  evaluation and it said that you completed a

26  Positive Parenting program.  Do you recall

27  anything about that?

53

1          INMATE MARROQUIN THROUGH THE INTERPRETER:
2    Yes, correct.

3          DEPUTY COMMISSIONER KEENAN:    You did Pos

4    - it's called Positive Parenting?

5          INMATE MARROQUIN THROUGH THE INTERPRETER:

6    Yes, that's the name of it, yes.

7          DEPUTY COMMISSIONER KEENAN:    Okay.    And -

8    I think that's it.

9          PRESIDING COMMISSIONER SHELTON:    Okay.

10   Mr. Pearson, do you have any questions?

11         DEPUTY DISTRICT ATTORNEY PEARSON:    Just a

12   couple questions.

13         PRESIDING COMMISSIONER SHELTON:    To me,

14   please.

15         DEPUTY DISTRICT ATTORNEY PEARSON:    Oh,

16   I'm sorry.    Yeah, you saw my eyes, didn't you?

17         PRESIDING COMMISSIONER SHELTON:    Yes, I

18   did.

19         DEPUTY DISTRICT ATTORNEY PEARSON:    I'd

20   like to ask the inmate, before he got in prison

21   what sort of work did he do on the outside?

22         INMATE MARROQUIN THROUGH THE INTERPRETER:

23   Correct.    I worked for many years in a - marmel

24   company?

25         THE INTERPRETER:    Marble.    Marble.

26         PRESIDING COMMISSIONER SHELTON:    Marble.

27         THE INTERPRETER:    Marble?

54

1          PRESIDING COMMISSIONER SHELTON:    Marble.

2          INMATE MARROQUIN THROUGH THE INTERPRETER:

3    I worked in that company like for seven years,

4    and so that we can understand each other, I

5    really refined myself there.   I don't have - I

6    don't know if the word is correctly expressed,

7    but I learned everything there, and then I gave

8    myself the opportunity to work on my own -

9          PRESIDING COMMISSIONER SHELTON:    What did

10    you do?

11          INMATE MARROQUIN THROUGH THE INTERPRETER:

12    - and I established my own company.

13          PRESIDING COMMISSIONER SHELTON:    What did

14    you do in the marble company?

15          INMATE MARROQUIN THROUGH THE INTERPRETER:

16    Everything.

17          PRESIDING COMMISSIONER SHELTON:    For

18    example -

19          INMATE MARROQUIN THROUGH THE INTERPRETER:

20    Everything.   There's only one remaining to make

21    sculptures, images, but from there, floors,

22    offices, decorations, buildings, everything,

23    everything, one hundred percent.

24          PRESIDING COMMISSIONER SHELTON:    And then

25    your new company?

26          INMATE MARROQUIN THROUGH THE INTERPRETER:

27    And I expanded from there.

55

1          THE INTERPRETER:  I'm sorry.

2          PRESIDING COMMISSIONER SHELTON:  Tell us

3     about your new company, the company you started.

4          INMATE MARROQUIN THROUGH THE INTERPRETER:

5     in my company, I would get contracts, and I

6     really feel bad, but on Friday I'd pick up a fax

7     of which I had gotten a contract in San

8     Clemente, and I never - it never crossed my mind

9     that on that weekend my mal - that bad thing

10    that happened to me was going to happen, and I

11    expanded.  Everything would go well in the

12    company, and it was thanks to my father, who

13    rest in peace, taught me how to work the honest,

14    responsible, not to - to somebody's else's

15    stuff.

16         PRESIDING COMMISSIONER SHELTON:  Okay.

17    Do you have any other questions?

18         DEPUTY DISTRICT ATTORNEY PEARSON:  Yes.

19    I want to know, did his wife - I know she worked

20    raising the children, but did she work outside

21    the home, and if so, what did she do?

22         PRESIDING COMMISSIONER SHELTON:  Did your

23    wife work outside the home?

24         INMATE MARROQUIN THROUGH THE INTERPRETER:

25    Yes.

26         PRESIDING COMMISSIONER SHELTON:  What did

27    she do?

1    INMATE MARROQUIN THROUGH THE INTERPRETER:

2    She – there's this well-known city of which I'm

3    sure you'll remember, and she worked there in

4    Palos Verdes.  Back then, she – she cleaned

5    homes.  She was a housekeeper.  Housekeeper,

6    that's what she would do.

7         PRESIDING COMMISSIONER SHELTON:  And

8    that's how she raised your children while you

9    were here?

10        INMATE MARROQUIN THROUGH THE INTERPRETER:

11   Exactly.  Exactly.

12        DEPUTY DISTRICT ATTORNEY PEARSON:   I

13   don't know about this question, but if he was

14   out of here, free, and went to a party, what

15   kind of alcoholic beverages would he drink?

16   Like beer or wine or whiskey, or something else?

17        INMATE MARROQUIN THROUGH THE INTERPRETER:

18   I like that question.  Everything that contains

19   alcohol is somebody – something that gets you

20   drunk, and speaking with the permission that you

21   obtained and that you deserve, I shall never be

22   stupid.  Never.

23        DEPUTY DISTRICT ATTORNEY PEARSON:  I have

24   nothing further.

25        PRESIDING COMMISSIONER SHELTON:  Counsel,

26   do you have any questions of your client?

27        ATTORNEY RUTLEDGE:  Just briefly, thank

57

1   you.  You were asked and so I want to make sure

2   we understand, your ability to be a diesel

3   mechanic, it doesn't matter in Guatemala or

4   here, you still have the same abilities,

5   correct?

6           INMATE MARROQUIN THROUGH THE INTERPRETER:

7   Correct.

8           ATTORNEY RUTLEDGE:  Your plan is to go to

9   Guatemala, but if by some chance you were to

10  stay here, you'd be able to be a diesel

11  mechanic, correct?

12          INMATE MARROQUIN THROUGH THE INTERPRETER:

13  I automatically come to the conclusion my stay

14  is defined already, and that's in Guatemala.

15          ATTORNEY RUTLEDGE:  I understand.  And

16  also just to clarify, you explained that you

17  actually did a lot of hands-on mechanic work

18  prior to taking this course; is that right?

19          INMATE MARROQUIN THROUGH THE INTERPRETER:

20  Yes, correct.  I was a driver in Guatemala, and

21  I know that you all couldn't understand me

22  exactly, but my thoughts about the United States

23  is the Unites States –

24          THE INTERPRETER:  [addressing Inmate.]

25  Greyhound?

26          INMATE MARROQUIN:  [Resuming in Spanish.]

27          INMATE MARROQUIN THROUGH THE INTERPRETER:

58

1  And a Greyhound driver for those buses that
2  travel within the city, those drivers are only
3  drivers, while with us over there, in Hispanic
4  countries, the driver there is a mechanic.  The
5  driver is a mechanic, and the mechanic is the
6  driver, because if the engine breaks down, the
7  driver needs to fix it, and as far as that, I
8  have that complement in my brain that I have
9  very good knowledge regarding engines because I
10  would constantly fix them or repair them.
11       ATTORNEY RUTLEDGE:  You had mentioned
12  that in ÷ in the past you had gone to the
13  shooting range.  Had you done that more than one
14  time, or is that the only time that you had
15  gone?
16       DEPUTY COMMISSIONER KEENAN:  Excuse me.
17  We're about to run out of tape.
18              (Off the record)
19       DEPUTY COMMISSIONER KEENAN:  Back on
20  record.  Tape 2, Side 1.
21       ATTORNEY RUTLEDGE:  Thank you,
22  Commissioner.  I had asked when you spoke about
23  going to the shooting range, was that the only
24  time you had ever gone, or had you gone other
25  times before?
26       INMATE MARROQUIN THROUGH THE INTERPRETER:
27  Only time that I was invited, and really, with

59

1   your permission, I'm speaking repentness only

2   belongs to God, but in this case with me, I

3   repent even the day I was born.

4        ATTORNEY RUTLEDGE:  Well, let's back up a

5   little bit.  Now when you got done at the

6   shooting range, where did you put the pistol?

7        INMATE MARROQUIN THROUGH THE INTERPRETER:

8   I have that knowledge it was prohibited, but

9   there's a saying: there is no - I'm not sure on

10  the saying - there is no but that is really

11  worth, but I was instructed, and you know

12  exactly that a weapon that is loaded, it was

13  completely prohibited, and so then I had in fact

14  instructions from Sacramento that if I was going

15  to be transporting it from one - that if I was

16  going to transport it from one place to another,

17  that I had to maintain both things separated

18  from each other, and excuse me, but it isn't a

19  document there states that I had the weapon

20  inside the machine?

21       INMATE MARROQUIN:  No.  No.

22       THE INTERPRETER:  No.

23       INMATE MARROQUIN THROUGH THE INTERPRETER:

24  I had part of it in the glove compartment, and

25  the other one, I had it back here, that in order

26  - and in order to unite them one with the other,

27  I would need to stop and go behind the back part

60

1    of the seat and put them together, and those

2    instructions came in a piece of paper that

3    Sacramento sent to me, and I automatically - and

4    automatically I had that understanding that you

5    couldn't transport both things together when you

6    were transporting from one place to another.

7    The piece of paper says that I had the hood

8    open, and that I had the weapon there, no.  No,

9    that isn't correct, and I'm not taking the case

10   apart, because a crime is a crime.

11          THE INTERPRETER:  I need a clarification

12   from the prisoner.  [Addressing Inmate.]

13          INMATE MARROQUIN THROUGH THE INTERPRETER:

14   Excuse me.  I'm not minimizing the case.  That

15   isn't my intention, but the papers from the

16   accusing party - I call it the accusing party

17   because that's how I understand it, because they

18   say one thing and it's different from other

19   versions.  I was - I testified, I was questioned

20   in front of a judge, and including the jury

21   panel, the district attorney, everything, but if

22   you allow me to give you an example -

23          ATTORNEY RUTLEDGE:  Let me stop there

24   because I want to point by point.

25          INMATE MARROQUIN THROUGH THE INTERPRETER:

26   Yes, but allow me, please.  Allow me just a

27   moment.  The papers say that it was two shots.

61

1  It was one.  The papers say that I was given 15

2  years to life, and that was from the judge, but

3  it states there that it's 21, and no, that isn't

4  correct.  That's not correct.  If you allow me,

5  I can show you something.

6      PRESIDING COMMISSIONER SHELTON:  Senor,

7  the papers says 18.

8      INMATE MARROQUIN THROUGH THE INTERPRETER:

9  Yes, but there are others right here.  Eighteen

10  plus three, that's 21.

11      PRESIDING COMMISSIONER SHELTON:  It's 15

12  plus three.

13      INMATE MARROQUIN THROUGH THE INTERPRETER:

14  Well, yes, but I'm only making emphasis of how

15  everything is turned around.

16      ATTORNEY RUTLEDGE:  Okay.  Well, let me -

17  that's why we want to make sure that we

18  understand what you were explaining.  So you had

19  said that two gentlemen pulled you away from was

20  that the inside of a bar?

21      INMATE MARROQUIN THROUGH THE INTERPRETER:

22  Exactly.

23      ATTORNEY RUTLEDGE:  And one of those two

24  gentlemen was the individual that you had had a

25  conflict with regarding the car?  The one that

26  was shot?

27      INMATE MARROQUIN THROUGH THE INTERPRETER:

62

1    Unfortunately, (indiscernible) there pulled me,

2    picked me up and pushed me out.  That is the

3    victim.

4        ATTORNEY RUTLEDGE:  Okay.  And so then

5    outside there was the - they got into their car,

6    you tried to get away, and that's when all

7    (indiscernible)?

8        INMATE MARROQUIN THROUGH THE INTERPRETER:

9    Exactly.

10        ATTORNEY RUTLEDGE:  Okay.  And at some

11    point that's when you grabbed a weapon; is that

12    right?

13        INMATE MARROQUIN THROUGH THE INTERPRETER:

14    I don't understand.  How's that?

15        ATTORNEY RUTLEDGE:  Okay.  Well, somehow

16    you got the gun in your hand.

17        INMATE MARROQUIN THROUGH THE INTERPRETER:

18    Correct.

19        ATTORNEY RUTLEDGE:  Where were these two

20    gentlemen when you had the gun in your hand?

21        INMATE MARROQUIN THROUGH THE INTERPRETER:

22    I was alone.  They had left.  They had left.  I

23    came to the car, I sat down, and I was there for

24    a little bit when I see that they show up, on

25    top of me, and then I - I run.  I'm armed and

26    they follow me.  When they see that I'm running,

27    they follow me, I walk and they're right next to

63

1  me.  I would come back, and they come and the

2  (indiscernible) and we were doing that back and

3  forth, and I went fast to where the people were,

4  and they turned around in the street.  That's

5  where I was attacked the second time.

6       ATTORNEY RUTLEDGE:  Okay.  So there had

7  been the altercation at the bar, the

8  (indiscernible), you sat in the car, then they

9  approached you again, so you tried to get away,

10 and you (indiscernible) the people at the bar

11 because you thought that they would be some type

12 of protection.

13      INMATE MARROQUIN THROUGH THE INTERPRETER:

14 I wanted to be where there was people at.

15      ATTORNEY RUTLEDGE:  Okay.  And that's

16 when you indicated that the - the victim in the

17 case approached you with a beer bottle, a broken

18 beer bottle, and that's when you shot?

19      INMATE MARROQUIN THROUGH THE INTERPRETER:

20 Exactly.

21      ATTORNEY RUTLEDGE:  So - so the people

22 that were at the bar wouldn't have necessarily

23 seen the people that were outside of the bar

24 would not necessarily see all these things that

25 happened prior to the last incident?

26      INMATE MARROQUIN THROUGH THE INTERPRETER:

27 That' people - or better yet said, when somebody

64

1   sees a problem, you automatically nobody wants

2   to - how do you say - help another person, or

3   not really help, but get involved, so on the

4   second time, in front of the bar, we had the

5   problem, we had the problem.

6         ATTORNEY RUTLEDGE:  Okay.

7         INMATE MARROQUIN THROUGH THE INTERPRETER:

8   The attorney in court had the bottle in his hand

9   and asked if that would kill someone.  I - I

10  felt death three times like that.

11       ATTORNEY RUTLEDGE:  Now let's switch

12  gears a little bit.  The - the person that was

13  shot you had known before and you felt that that

14  person owed you money; is that right?

15       THE INTERPRETER:  And you felt that

16  person was a threat.

17       ATTORNEY RUTLEDGE:  No, owed you money.

18       INMATE MARROQUIN THROUGH THE INTERPRETER:

19  Yes.

20       ATTORNEY RUTLEDGE:  Now if you start your

21  - your business and somebody doesn't pay you and

22  you get upset, how are you going to handle that?

23       INMATE MARROQUIN THROUGH THE INTERPRETER:

24  That's why it's very clear, and I've said it and

25  it's been said, others - that had already gone

26  by, months had gone by.  I didn't care about

27  that anymore.  No, I didn't care about that.

65

1        **ATTORNEY RUTLEDGE:**  Okay.  But – but if
2   that happens, how are you going to handle it?
3        **INMATE MARROQUIN THROUGH THE INTERPRETER:**
4   You mean once again, if it's somebody new?
5        **ATTORNEY RUTLEDGE:**  If you start your
6   business, you put a lot of work into what you
7   did and that person doesn't pay you, how are you
8   going to handle it?  What are you going to do?
9        **INMATE MARROQUIN THROUGH THE INTERPRETER:**
10  I come up with the perfect conclusion.  How can
11  it be possible to – possible to commit a
12  stupidity after 15 years here for something
13  stupid that I did and do it again?  That's
14  impossible.  Impossible.  No.
15        **ATTORNEY RUTLEDGE:**  It sounds like the –
16  the – the course – and correct me if I'm wrong,
17  it sounds like the course that the commissioner
18  about you about, that if you don't have
19  (indiscernible) gave you a great appreciation
20  for life; is that right?
21        **INMATE MARROQUIN THROUGH THE INTERPRETER:**
22  Exactly.
23        **ATTORNEY RUTLEDGE:**  And it – would your
24  feelings be that life is more valuable
25  (indiscernible)?
26        **INMATE MARROQUIN THROUGH THE INTERPRETER:**
27  Life has no price.

66

1      ATTORNEY RUTLEDGE:  Thank you.

2      PRESIDING COMMISSIONER SHELTON:  Thank

3  you very much.  All right.  At this time we will

4  move into closing statements, and we'll start

5  with you, Mr. Pearson.  Do you have a closing

6  statement?

7      DEPUTY DISTRICT ATTORNEY PEARSON:  Yes.

8  This is a killing that didn't need to happen,

9  which of course is a lot of them that we see,

10  but it certainly didn't need to happen.  I

11  understand the Inmate getting angry in the

12  situation there, it was a frustrating situation,

13  somebody's cheating him of what is it?  A

14  thousand dollars or something as I understand

15  it, and I can see that, see being very angry,

16  but he had a golden opportunity to walk away

17  from this thing without anything happening,

18  that's when he went back to his vehicle.  He

19  could have just gotten in the car and driven

20  away, and that would have been the end of that,

21  at least for that confrontation time, he

22  could've done something else, maybe sued the

23  person in - in court, or done something, hired

24  somebody to try and collect it for him, or done

25  something else, but instead he chose to get the

26  weapon and load it, and from what he's

27  describing there it sounds like maybe this is a

67

1    - apparently a pistol where you have a clip that
2    you remove from the pistol that may or may not
3    have bullets in - in the remainder of the gun,
4    and I gather they had instructed that he's not
5    to have them together, keep the clip one place
6    and the - and the gun somewhere else.  This is
7    what I would interpret him saying.  Instead, he
8    put the two obviously together, came back,
9    confronted the person that was giving him the
10   trouble, and pulled the - attempted to pull the
11   slide up and put one of the bullets into the
12   chamber so it would be fireable, and it didn't
13   go in apparently, and so he tried clicking the
14   gun, and then pulled it back again and put the
15   chamber - or the - the - the - what am I saying
16   here, the - the clip back into the gun where it
17   this hit - the weapon - or bullet went into the
18   chamber there and he fired it, hitting the - the
19   victim here and causing him the - the injury
20   that ultimately caused the man's death.  So it
21   took some doing there, and he could've not done
22   that again when it - when the clip didn't go in
23   and he wasn't able to load the gun, he could've
24   stopped at that point and I suppose just walked
25   away with maybe a threat to the person.  And the
26   second time he could've too, but instead he - he
27   persisted, and fired the gun, so there's a lot

68

1   of thought and effort went into this, and I - I
2   think premeditation went into it, and I believe
3   that the - it sounded like it might've been a
4   jury trial, I'm not sure, but it sounds like the
5   - the trier of fact heard all of these facts and
6   rejected his self-defense argument here, that
7   the person had a - a broken bottle or something
8   there that would have threatened him.
9   Apparently the trier of fact did not accept that
10  and convicted him, forgetting the so-called
11  self-defense situation.  The aggravating factor
12  here, of course, was the alcohol.  I guess he
13  was under the influence at the time, which
14  probably clouded his judgment and his thinking
15  into making some really deadly decisions here,
16  causing the victim's death.  So I think the
17  danger here is, he thinks clear when he's here
18  in prison, and I - I liked his reasoning here
19  with a lot of what he was telling the - the
20  Board, I thought it made sense, but I'm afraid
21  if he gets back out, and it sounds like he's
22  very much down on alcohol now, gets back into
23  the community and has alcohol available to him
24  and freely offered to him by probably a lot of -
25  a lot of friends and - and acquaintances that he
26  has, "Oh, go ahead, just have one, you'll be
27  okay, oh, just another one," and you're under

69

1  the influence again and you get in some sort of

2  conflict, we could potentially have another

3  deadly situation, and that's what concerns me,

4  that this is what happens when he's readily

5  available as far as the alcohol with that sort

6  of a - a background that he has and a mindset.

7  So I would urge the - the Board at this time to

8  reject his request for parole and - and I'll

9  leave it at that.

10         PRESIDING COMMISSIONER SHELTON:   All

11  right.  Thank you, sir.  Mr. Rutledge, closing

12  statement?

13         ATTORNEY RUTLEDGE:   Thank you,

14  Commissioner.  I think the - the people bring up

15  a good point regarding the alcohol, and I think

16  Mr. Marroquin has expressed to the Board his

17  contempt at this point for alcohol and - but

18  it's easy to - to say that and have it just be

19  words, but I think he's - he's demonstrated in a

20  couple of different way that he actually feels

21  that way.  One is that he's continued with AA,

22  and as the Commissioners brought out, he even

23  was the chairman, and even beyond that, we all

24  know that there's pruno in prison, and it was

25  brought out in the psychological report that

26  he's rejected it.  He's had the opportunity to

27  go have a drink in here if he wanted to have a

70

1    drink, and he hasn't, and so he's showing that

2    his actions are following up with what his words

3    are.  If we look at the fact that he had no

4    prior criminal history, he's done his self-help.

5    The Board asked him to obtain a vocation, he

6    basically certified what he already knew how to

7    do so that the Board would have some evidence to

8    show that he knows how to do what he said that

9    he could do.  He's got good parole plans, he

10   knows that he's going to get deported, he's made

11   arrangements with his wife, he has a home to go

12   to, he's - I think he's somewhat of an

13   entrepreneur, he started his marble business,

14   and now he's wanted to move on to doing that -

15   being a diesel mechanic.  I think that's all

16   very commendable, and based on that, I would

17   request that he be given a date.  Thank you.

18         PRESIDING COMMISSIONER SHELTON:  Mr.

19   Marroquin, this is your time to tell us why you

20   think we should parole you or give you a parole

21   date.

22         INMATE MARROQUIN THROUGH THE INTERPRETER:

23   Very well.  Really with any given - at no time,

24   with nothing, can you pay for a life.  I have

25   committed a crime, and that crime hurts me a

26   lot.  It has been inside my mind for 15 years,

27   and maybe for some - a few more years of life I

71

1   shall have until I die.  I don't ask, I offer as

2   much to the community and the family of the

3   victim that I have harmed two families.  I offer

4   my true condolences to that family that I

5   harmed, including - including my own family.

6   It's two lives - excuse me - it's two families

7   that I have harmed.  I feel so miserable, and

8   even after 15 years my plan to survive the

9   little that I have left is in Guatemala.  It

10  depends on you.  Sincerely I'm not going to

11  thank for it, my family will, but there's no way

12  that I can have in my mind that I have already

13  paid for this, no.  Once again I will repeat

14  myself.  You cannot pay for a life, and really,

15  I would like to go back to Guatemala.  Thank you

16  from the gentleman's words.  I don't know what

17  his name is, but the district attorney, right?

18  And here my attorney, you as an interpreter, and

19  you as members that can decide for my life.  I

20  would like to add more, much more, but I know

21  time is valuable to you, and thank you very

22  much.

23          PRESIDING COMMISSIONER SHELTON:  Thank

24  you, sir.  We will now recess for deliberations.

25  It is 1:50 p.m.

26                  R E C E S S

27                    --oOo--

72

1      CALIFORNIA BOARD OF PAROLE HEARINGS

2                  D E C I S I O N

3          DEPUTY COMMISSIONER KEENAN:   Back on

4    record.

5          PRESIDING COMMISSIONER SHELTON:   All

6    right.  For the record, it is 2:25.  We are here

7    in the matter of Marco Marroquin, CDC number

8    H-62380.  Everyone has returned to the hearing

9    room that was here during the hearing.  The

10   panel has received and reviewed all the

11   information and relied on the following

12   circumstances in concluding that Mr. Marroquin

13   is not yet suitable for parole and would pose an

14   unreasonable risk of danger to society or a

15   threat to public safety if released from prison.

16   I'm going to take things a little out of order

17   here, sir.  We're giving you one year.  The last

18   hearing you had three years.  You have done an

19   extraordinarily wonderful job.  There's a few

20   more things we think you need to do to assure

21   that you can get through this parole process,

22   and the reason I say that is this.  We're not

23   the only ones you have to impress.  There's

24   another Board hearing, or a panel that does a

25   review, and then it goes to the Governor.  They

26   don't get to see you.  We get to see you.  We're

27   M. MARROQUIN    H-62380   DECISION PAGE 1    6/6/06

73

1    impressed by your presentation, we're impressed

2    by what you've done, and I'm going to go through

3    this stuff, but we know that there's other

4    things that people are going to ask that we want

5    you to get done ahead of time.  Does - do you

6    understand what I'm saying to you?

7         INMATE MARROQUIN THROUGH THE INTERPRETER:

8    Correct.

9         PRESIDING COMMISSIONER SHELTON:   All

10   right.  I'm going to go through this and I'm -

11   we have a couple of things that we are going to

12   need you to do this next year.  Again, we are

13   totally impressed by your presentation today, we

14   believe you to be telling us the truth, and we

15   have a couple of things that we need you to do

16   to assure that you're a - you're a step closer,

17   okay?  First of all, we know that this was -

18   this commitment offense was a - a terrible

19   offense.  You know, you had an opportunity to

20   walk away.  You didn't.  I know you mentioned

21   you felt your life was being threatened, but I

22   think there was a time where you could've walked

23   away.  You said you sat in your car for a little

24   bit.  The motive for this crime was very trivial

25   in relation to the offense.  These statements

26   were drawn from the summary of the crime that

27   M. MARROQUIN  H-62380   DECISION PAGE 2   6/6/06

74

1  was noted in the November 2002 Board Report and

2  carried on to the – let me get the month right

3  here – November 2005 Board Report.  You have no

4  previous record whatsoever.  That be on the

5  record.  It appears that your social history was

6  not unstable, and again, you had no prior

7  criminality.  I want to talk about your

8  institutional behavior.  You have received

9  absolutely zero 115s.  That is extraordinarily

10  rare, Mr. Marroquin.  That shows exemplary

11  behavior.  You received two 128a's, the last one

12  being in June of '93.  Again, exemplary

13  behavior.  You've been participating in AA and

14  NA since '95.  And I'm going to mix some of

15  these things, because we talk about

16  institutional behavior both positively and

17  negatively, but one of the things that we would

18  ask you to do is to try to participate in

19  another self-help program or two.  You've done –

20  what you've participated in is excellent, but we

21  think other people may review your file without

22  you sitting in front of them and say, "You

23  should've done, could've done more self-help

24  programs."  So do what you can to get into

25  anything you can this next year.

26        INMATE MARROQUIN THROUGH THE INTERPRETER:

27  M. MARROQUIN  H-62380    DECISION PAGE 3    6/6/06

75

1    Correct.

2              PRESIDING COMMISSIONER SHELTON:    You

3    understand, sir?  All right.  Your

4    psychiatrist's report was favorable.  Dr.

5    Macomber indicated that you had a GAF rating of

6    85.  The report was positive.  He indicated you

7    showed genuine remorse, and he felt that if

8    paroled, you would be better on parole - you

9    would be in the top 2 percent for success.  He

10   says that there are no risk factors, and the

11   prognosis for your success is good.  Your parole

12   plans are good.  This is one other area that we

13   need you to something for yourself.  You have

14   excellent parole plans for Guatemala.  There is

15   a very slim chance that you could possibly be

16   paroled here.  You have a home here and your

17   family here, so that side's okay.  What you need

18   to do is to see if you can get any kind of

19   support letter showing that you could

20   potentially get a job in Los Angeles if you

21   needed to.  Comprende?

22             INMATE MARROQUIN THROUGH THE INTERPRETER:

23   Yes.  But?

24             PRESIDING COMMISSIONER SHELTON:    No, no

25   buts.  No buts.  You need to find - you need to

26   at least - you have two skills that I'm aware

27   M. MARROQUIN   H-62380    DECISION PAGE 4    6/6/06

76

1   of, sir.  You've got your diesel mechanic skill,

2   and by your own words you indicated that you had

3   worked in marble and you had started your own

4   business.  We know that you have the ability to

5   provide for yourself.  Commissioner Keenan and I

6   believe that you can take care of yourself and

7   your family no problem, but you've got to

8   convince other people of that too, so get

9   something that says that you can have - or you

10  can find work, you have the abilities to find

11  work.  I mean, Commissioner Keenan called you an

12  entrepreneur.  That means you can survive on

13  your own with your skills and your intellect,

14  but you need to show that that can happen here,

15  just on that off chance that you don't go to

16  Guatemala right out the door.  Now that doesn't

17  mean that if you do - if you do get paroled here

18  someday, you do well on parole here, then

19  eventually you can go to Guatemala.

20          INMATE MARROQUIN THROUGH THE INTERPRETER:

21  Can I answer to that?

22          PRESIDING COMMISSIONER SHELTON:

23  Certainly.

24          INMATE MARROQUIN THROUGH THE INTERPRETER:

25  I have an INS hold, so I can consider that that

26  - there's nobody, nor an attorney, or even a

27  M. MARROQUIN   H-62380    DECISION PAGE 5    6/6/06

77

1  judge, over the control that INS has, because I
2  will be deported.  It's very difficult for me to
3  think that I (indiscernible) work, function, but
4  to work or function in my mind are making
5  illusions that I'm going to stay here.
6         PRESIDING COMMISSIONER SHELTON:  Okay.
7         INMATE MARROQUIN THROUGH THE INTERPRETER:
8  For me, that's something impossible.
9         PRESIDING COMMISSIONER SHELTON:   I
10 understand.
11        INMATE MARROQUIN THROUGH THE INTERPRETER:
12 Deporting (indiscernible).
13        PRESIDING COMMISSIONER SHELTON:  Mr.
14 Marroquin, I understand, but the world is full
15 of strange happenings and decisions and
16 nothing's for sure until it happens.  I'm just
17 saying on the – on the off chance, you need to
18 be prepared – this is – okay.  This - this is my
19 turn.  You need to be prepared for the world to
20 go upside-down sideways.  It already has in your
21 life.
22        INMATE MARROQUIN THROUGH THE INTERPRETER:
23 Correct.
24        PRESIDING COMMISSIONER SHELTON:  Se?
25        INMATE MARROQUIN THROUGH THE INTERPRETER:
26 Now I understand you.
27 M. MARROQUIN   H-62380   DECISION PAGE 6   6/6/06

78

1      PRESIDING COMMISSIONER SHELTON:  Okay.
2  That's all I'm telling you is that we're guiding
3  and directing you because we believe in you, all
4  right?  We believe in you, but this is a crazy
5  world, and you need to be prepared for whatever
6  way the ball bounces, okay?
7      INMATE MARROQUIN THROUGH THE INTERPRETER:
8  That is correct.  Like saying - well, it's like
9  putting into knowledge, or if I may be allowed
10  to ask you, what do you think, analyze or know,
11  what knowledge can you have regarding today?
12      PRESIDING COMMISSIONER SHELTON:  I
13  understand.  Okay.
14      INMATE MARROQUIN THROUGH THE INTERPRETER:
15  Regarding (indiscernible).
16      PRESIDING COMMISSIONER SHELTON:  Se,
17  senor.  Yeah.  Yeah.  Yo say.  We were talking
18  about that earlier.  Bien.  Se bien.
19      INMATE MARROQUIN THROUGH THE INTERPRETER:
20  That's fine.
21      PRESIDING COMMISSIONER SHELTON:  Es bien.
22  Okay.  We also want to acknowledge for the
23  record 32 - the 3042 responses from the District
24  Attorney's Office in Los Angeles and the Los
25  Angeles County Sheriff's Department, and again,
26  I want to reiterate the good things that you
27  M. MARROQUIN   H-62380    DECISION PAGE 7    6/6/06

79

1  have done, I want to go through this again, that

2  you have an excellent report from the

3  psychiatrist.  You worked hard for a two-year

4  period to receive your diploma as a diesel

5  mechanic, and you received that in August '04.

6  We were particularly impressed that you

7  continued and continued working on that and

8  followed through with the directions of your

9  last Board hearing.  Again, you have not

10  received any 115s during the time you were here,

11  you've been in AA and NA since 1995, you have

12  been and continue to participate in Adult Basic

13  Education, you took a Positive Parenting class,

14  you took classes on cause and prevention and

15  treatment of hepatitis, you worked on the Yard

16  Crew.  Most impressive was your request to

17  participate in individual counseling with Dr.

18  Reed.  What I especially enjoyed talking with

19  you about was the insight and feeling that you

20  developed participating in the Criminon course.

21  You participated in that last year, and for over

22  a year's period of time, and as I mentioned to

23  you during the hearing, I believe when you tell

24  us what you got out of that, because your eyes

25  lit up, you became animated, and it's like you

26  discovered a whole new sense of self and sense

27  M. MARROQUIN  H-62380   DECISION PAGE 8   6/6/06

80

1   of what life means.  So this year is a very

2   important year for you, sir, very, very

3   important.  You have done a lot of good work, we

4   want you to keep the momentum going, we want you

5   to keep it rolling, because the more you have

6   under your belt, the more you can convince other

7   people like us you have an opportunity for

8   success outside this institution.  Commissioner,

9   do you have anything to add?

10          DEPUTY COMMISSIONER KEENAN:  I would just

11  concur on your comments and note also you've

12  been on the right path, you're doing a lot of

13  good things, and I would say, you know, since

14  you have other people looking at your case in

15  the future, keep it up.  More is better.  That

16  would be my advice to you.  More is better.

17          PRESIDING COMMISSIONER SHELTON:  And

18  don't –

19          INMATE MARROQUIN THROUGH THE INTERPRETER:

20  Thank you.

21          PRESIDING COMMISSIONER SHELTON:  Don't

22  give it up.  Don't give up.  Keep on rolling.

23  All right, sir, good luck to you.  We're behind

24  you.

25          INMATE MARROQUIN THROUGH THE INTERPRETER:

26  Thank you very much.

27  M. MARROQUIN   H-62380    DECISION PAGE 9    6/6/06

81

1          PRESIDING COMMISSIONER SHELTON:   The time

2     is 2:40, and that concludes this hearing.

3     Seriously, good luck.

4          INMATE MARROQUIN THROUGH THE INTERPRETER:

5     Thank you.

6                         --oOo—

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23     PAROLE DENIED ONE YEAR

24     THIS DECISION WILL BE FINAL ON:_____     OCT 0 4 2006

25     YOU WILL BE PROMPTLY NOTIFIED, IF PRIOR TO THAT

26     DATE, THE DECISION IS MODIFIED.

27     M. MARROQUIN   H-62380   DECISION PAGE 10    6/6/06

82

CERTIFICATE AND
DECLARATION OF TRANSCRIBER

I, BERENICE BILLINGTON, a duly designated transcriber, PETERS SHORTHAND REPORTING, do hereby declare and certify under penalty of perjury that I have transcribed tape(s) which total two in number and cover a total of pages numbered 1 – 81, and which recording was duly recorded at CORRECTIONAL TRAINING FACILITY, SOLEDAD, CALIFORNIA, in the matter of the SUBSEQUENT PAROLE CONSIDERATION HEARING OF MARCO MARROQUIN, CDC NO. H-62380, ON JUNE 6, 2006, and that the foregoing pages constitute a true, complete, and accurate transcription of the aforementioned tapes to the best of my ability.

I hereby certify that I am a disinterested party in the above-mentioned matter and have no interest in the outcome of the hearing.

Dated AUGUST 27, 2006, at Sacramento, California.

_Berenice Billington_
BERENICE BILLINGTON
TRANSCRIBER
**PETERS SHORTHAND REPORTING**

COPY

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT, DIVISION FIVE

|  |  |
|---|---|
| In re<br><br>    MIKAEL SCHIOLD,<br><br>                    Petitioner-Appellee,<br><br>On Habeas Corpus. | A103107 |

San Francisco County Superior Court No. 4523
The Honorable Ksenia Tsenin, Judge

SETTLEMENT AGREEMENT AND FULL
AND FINAL RELEASE OF ALL CLAIMS

BILL LOCKYER
Attorney-General of the State of California

ROBERT R. ANDERSON
Chief Assistant Attorney General

FRANCES T. GRUNDER
Senior Assistant Attorney General

JULIE L. GARLAND
Supervising Deputy Attorney General

ANYA M. BINSACCA
Supervising Deputy Attorney General
State Bar No. 189613

455 Golden Gate Avenue, Suite 11000
San Francisco, CA 94102-7004
Telephone: (415) 703-5713
Fax: (415) 703-5843

Attorneys for Respondents/Appellants

k

i

COPY

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT, DIVISION FIVE

| | |
|---|---|
| In re | A103107 |
| MIKAEL SCHIOLD, | |
| Petitioner-Appellee, | |
| On Habeas Corpus. | |

SETTLEMENT AGREEMENT AND FULL
AND FINAL RELEASE OF ALL CLAIMS

"Releasor": MIKAEL SCHIOLD

"Releasees": GRAY DAVIS, IN HIS OFFICIAL CAPACITY AS
GOVERNOR OF THE STATE OF CALIFORNIA; THE
BOARD OF PRISON TERMS; MICHAEL E. KNOWLES,
IN HIS OFFICIAL CAPACITY AS THE WARDEN OF
MULE CREEK STATE PRISON; AND CAROL A. DALY,
IN HER OFFICIAL CAPACITY AS THE CHAIRPERSON
OF THE BOARD OF PRISON TERMS

1.   Releasor, petitioner-appellee Mikael Schiold, is currently in the custody of the California Department of Corrections pursuant to his conviction by guilty plea to second-degree murder while using a deadly weapon. Schiold's sentence is fifteen years to life plus one year. Schiold is identified by the Department of Corrections as inmate number D-31112.

2.   The Board of Prison Terms found Schiold suitable for parole on April 11, 2002. On September 6, 2002, the Governor reversed that decision and found Schiold unsuitable for parole.

3.   Schiold filed a petition for writ of habeas corpus in San Francisco

1

COPY

Superior Court, Case No. 4523, challenging the Governor's determination that he was unsuitable for parole. The Superior Court granted that petition, and respondents-appellants appealed to the First District Court of Appeal, Case No. A103107.

4.    Releasor and releasees desire to enter into this settlement agreement in order to provide for a recommendation that Schiold be transferred to the custody of Sweden under the Convention on the Transfer of Sentenced Persons in full settlement of all claims which are or might have been the subject of the petition in this case, upon the terms and conditions set forth below.

5.    This release is executed in consideration of the Board of Prison Terms submitting, with its approval, the application of Schiold for custodial transfer to Sweden under Government Code section 12012.1 and the Convention on the Transfer of Sentenced Persons.

6.    Releasor Schiold agrees that upon approval of the transfer by the United States Department of Justice, Sweden, and any other necessary entities, and upon transfer to Sweden, he will stipulate to vacate the San Francisco Superior Court's order granting the petition in Case No. 4523. Releasor Schiold further agrees that pursuant to the satisfaction of the conditions of this paragraph, he will then dismiss the petition in San Francisco Superior Court Case No. 4523.

7.    Releasor and releasees agree to stay Court of Appeal Case No. A103107 pending resolution of this settlement. The stay shall immediately terminate on October 29, 2003 if before that date releasees have not fully complied with their obligations set forth in paragraph 5. Moreover, the stay shall immediately terminate on December 25, 2003 if releasor Schiold is not in Sweden prior to that date. However, with respect to the immediately preceding sentence only, releasees may file a motion to continue the stay

2

COPY

past December 25, 2003 based upon a showing that the transfer process is proceeding expeditiously. If the stay terminates pursuant to the terms of this paragraph, releasor and releasees agree that the filing and service of the opening brief in Court of Appeal Case No. A103107 will be due two weeks after the stay terminates. Releasees agree to voluntarily dismiss that appeal upon releasor's dismissal of the petition described in paragraph 6.

8.      Releasor agrees that he will be held in custody by the government of Sweden until January 1, 2007.

9.      Releasees agree that so long as Schiold and the government of Sweden comply with this agreement, they will take no further action against releasor arising from his conviction in San Francisco County Superior Court Case No. 119276.

10.      Upon full satisfaction of the conditions set forth in paragraph 6, Schiold thereafter fully and forever releases and discharges: the respondents-appellants in the above-captioned case and in San Francisco Superior Court Case No. 4523; the State of California; the California Department of Corrections; the Chairperson of the Board of Prison Terms; and each of their employees, agents, servants, and other representatives, past and present, from all claims, demands, actions, and causes of action, including claims for attorneys' fees, court costs, and other costs of suit, that are or could have been the subject of the petition for writ of habeas corpus in San Francisco Superior Court Case No. 4523. This release expressly does not apply to the obligations set forth in this settlement agreement.

11.      In making this release, Schiold understands and agrees that he relies wholly upon his own judgment, belief and knowledge as to the nature, extent, effect, and duration of liability. The making of this release is without reliance upon any statement or representation of any of the releasees or their agents.

3

COPY

12.     It is expressly understood by Schiold that the approval and submitting of the application for transfer under the Convention on the Transfer of Sentenced Persons referenced in paragraph 5 of this release constitutes a compromise of a disputed claim, and that the releasees expressly deny any and all liability in the above-captioned case.

13.     This agreement shall constitute the entire agreement between releasor and releasees, including attorney's fees, arising from the actions described in paragraph 3, and it is expressly understood and agreed that this agreement has been freely and voluntarily entered into by all parties, and each of them.  It may not be altered, amended, modified, or otherwise changed in any respect except by writing duly executed by the parties to this agreement.

14.     This agreement shall be governed by and construed in accordance with the laws of the State of California.

15.     This release is freely and voluntarily made.  Schiold has not been influenced to any extent in making this release by any representations or statements made by any of the releasees or their agents except as set out herein.

///

///

4

COPY

16.   Facsimile signatures shall bind the parties to this agreement.


Date: 10/22/03

ETHAN A. BALOGH
KEKER & VAN NEST
Attorneys for Petitioner-Appellee Mikael Schiold


Date: 10/22/03

ANYA BINSACCA
Supervising Deputy Attorney General
Attorney for Releasees Gray Davis, in his official capacity as Governor of
the State of California; the Board of Prison Terms; Michael E. Knowles, in
his official capacity as the Warden of Mule Creek State Prison; and Carol A.
Daly, in her official capacity as the Chairperson of the Board of Prison
Terms

5

CONFORMED COPY
OF ORIGINAL FILED
Los Angeles Superior Court

JUN 26 2006

John A. Clarke, Executive Officer/Clerk

By _____, Deputy

LAW OFFICES OF
PICONE & DEFILIPPIS
625 North First Street
San Jose, CA 95112

SUPERIOR COURT OF THE STATE OF CALIFORNIA

FOR THE COUNTY OF LOS ANGELES

In re,

ROBERT ROSENKRANTZ,

       Petitioner,

      On Habeas Corpus

Case No.: BH003529
ORDER RE: WRIT OF HABEAS CORPUS

The court has read and considered petitioner's Writ of Habeas Corpus filed on August 17, 2005, as well as the return and denial filed in response to the court's order to show cause. Having independently reviewed the record, giving deference to the broad discretion of the Board of Prison Hearings ("Board") in parole matters, the court concludes that the Board's decision denying petitioner parole is not supported by "some evidence."

Petitioner is currently serving a sentence of 15 years to life with a two-year firearm enhancement following his 1986 conviction of second degree murder. Petitioner's minimum eligible parole date was January 23, 1996. Petitioner asserts constitutional claims, including the argument that the Board violated its regulations and petitioner's right to due process by its refusal to set a parole date despite its inability to find him unsuitable for parole or to deem him an unreasonable risk to public safety if paroled.

On April 25, 2005, the Board denied petitioner parole for one year. In denying petitioner parole, the Board relied upon the circumstances of the commitment offense. When determining

1

ep

unsuitability based on commitment offense, the Board may consider as a factor whether the victim was abused, defiled or mutilated during or after the offense. (See Cal. Code Regs., tit. 15, § 2402(c)(1)(C).) Here, the Board found that the victim was "abused" due to "the number of times he was shot and the manner in which he was shot." In addition, the Board concluded that the case "rises to the highest level of second-degree murder." The Board further stated in its decision that the Deputy District Attorney and the Los Angeles Sheriff's Department opposed parole. While the Board is required to consider such opposition (see Penal Code section 3042), that opposition is not a factor on which the Board may rely to deny parole as enumerated in title 15, section 2281 of the California Code of Regulations.

Towards the conclusion of the hearing, the Board summarily mentioned its concern that petitioner is a danger to his brother, Joey. The court finds that this assertion is not only unsupported by the record, but belied by the record, which contains documented evidence that contradicts any fear that the petitioner is a threat to his brother's safety. Furthermore, the court rejects the Board's inference that the absence of yearly supportive letters from petitioner's brother shows that petitioner is a danger to his brother. In fact, the petitioner's denial and traverse draws attention to a recent psychological evaluation addressing and dismissing the Board's concern for the safety of petitioner's brother. However, because this psychological evaluation was not evidence before the Board at the time of petitioner's hearing, the court may not properly rely upon it in reviewing the Board's decision. Regardless, the court finds that there is no evidence in the record that supports the conclusion that petitioner remains a danger to his brother.

The Board's sole reliance on the gravity of the offense to justify denial of parole can be initially justified as fulfilling the requirements set forth by state law. (*Biggs v. Terhune* (9th Cir. 2003) 334 F.3d 910, 916.) However, over time, should petitioner continue to demonstrate exemplary behavior and evidence of rehabilitation, denying a parole date simply because of the nature of the commitment offense raises serious questions involving his liberty interest in parole. (*Id.* at p. 917.) Here, petitioner's record is replete with reports of petitioner's exemplary conduct as well as his vocational and educational achievements over a period of many years. Indeed,

ep                                      2                    EX "C"  Page 2 of 6

1  petitioner is a model prisoner in every respect. A parole decision supported by some evidence

2  may nonetheless abrogate due process if it did not consider and weigh all favorable evidence.

3  (*In re Capistran* (2003) 107 Cal.App.4th 1299, 1306.)

4          The court finds that petitioner's continual parole denials have been based mainly on the

5  gravity of the commitment offense, the circumstances of which can never change. Therefore, the

6  Board's continued sole reliance on the commitment offense will essentially convert petitioner's

7  original sentence of life with the possibility of parole into a sentence of life without the

8  possibility of parole. Petitioner has no chance of obtaining parole unless the Board holds that his

9  crime was not serious enough to warrant a denial of parole. (*Irons v. Warden* (E.D. Cal. 2005)

10  358 F.Supp.2d 936, 947.)

11          Prior Board panels have found petitioner suitable for parole. Petitioner was found

12  suitable for parole on June 18, 1996, but a review unit later disapproved the parole grant. At

13  subsequent hearings in 1996, 1997 and 1998, petitioner was found unsuitable for parole based on

14  the gravity of his offense. On September 9, 1999, petitioner was found unsuitable for parole but

15  the panel set his prison term. On November 18, 1999, Governor Davis reversed petitioner's

16  parole grant. On June 30, 2000, a new panel found petitioner suitable for parole, but Governor

17  Davis reversed its decision on October 28, 2000. Petitioner has now served in excess of the

18  maximum term for both second degree and first degree murder. Therefore, the commitment

19  offense should no longer function as a factor for unsuitability and in that case, it should no longer

20  operate as "some evidence" to support the Board's parole denial. Petitioner has reached the

21  point in which the denial of parole can no longer be justified by reliance on his commitment

22  offense. The Board's continued reliance on the circumstances of the offense runs contrary to the

23  rehabilitative goals espoused by the prison system and has violated petitioner's due process.

24  //

25  //

26  //

27  //

28  //

ep                                        3

1    Therefore, this court orders that the petition for writ of habeas corpus be, and hereby is,

2    granted.

3

4    June 26, 2006

5

6

7                                                    DAVID S. WESLEY

8    Clerk to give notice.                           Judge of the Superior Court

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

ep                              4              EX "C"   Page 4 of 6

1

## MEMORANDUM OF POINTS AND AUTHORITIES

2

### I

3

**FAILURE OF THE TRIAL JUDGE, SUA SPONTE, TO GIVE REQUIRED MANDATORY INSTRUCTION OF LESSER INCLUDED OFFENSE OF MANSLAUGHTER OVER DEFENSE COUNSEL'S OBJECTION.**

4

5

6

7

8

9

10

11

12

13

14

In 1927, California Penal Code section §1181 was amended by adding subdivision 6, which empowered either the trial court or an appellate court to modify the judgment to a lesser degree of a lessor offense. In 1951, the section was amended to read as at present, authorizing the court to "modify" the verdict, finding or judgment. The purpose of these amendments was to obviate the necessity of a new trial when the trial court, on a motion for a new trial, or an appellate court, on appeal, believed that the evidence established the lesser offense, but not the greater.

15

16

17

18

Petitioner alleges that the trial court erred in not giving the lesser included manslaughter instruction, sua sponte, over defense counsel's objection. The trial record reflects the following facts:

19

20

21

22

23

The Court: (RT 672), Two days ago I gave counsel a packet of instructions; and the packet of instructions included the law of first degree murder, second degree murder, voluntary manslaughter self-defense as well as justifiable homicide in the course of self-defense and instructions related there to.

24

25

26

27

28

This morning I have added to your packet involuntary manslaughter instructions based upon misdemeanor manslaughter -- excuse me -- yes, based upon a misdemeanor battery theory and also a killing with undo -- by gross negligence, the 8.45 instruction.

1

1   The Court: (RT 673), The defense from Mr. Marroquin
2   has been strictly self-defense.

3   I have a duty under the law to instruct on all of the
4   issues; However, if I instruct on the manslaughter instructions,
5   voluntary or involuntary, it may be harmful to the defendants
6   case ...

7   Mr. Browne: (RT 674), ... for tactical reasons, your
8   Honor, I am not going to request the 192 instructions, the
9   argument will be based on a self-defense theory purely.

10   The Court: (RT 675), So you don't wish either the
11   voluntary or the involuntary manslaughter instructions?

12   Mr. Browne: For the record and for those tactical
13   reasons, I do not wish that they be given.

14   The Court: And I saw Mr. Marroquin nod his head.

15   Petitioner's defense was based on a theory of self-defense
16   and the issue of "need not retreat". The trial record establishes
17   the facts relating to "an argument", "broken beer bottles" and
18   "fear". While the record shows that the trial court judge offered
19   the manslaughter instructions and that this instruction was
20   refused by the trial counsel for "tactical" reasons, it was
21   judicial error not to give the lesser included instruction,
22   sua sponte, over counsels objection.

23   The sua sponte rule seems undoubtedly designed to promote
24   the ends of justice by providing some judicial safeguards for
25   defendants from the possible vagaries of ineptness of counsel
26   under the adversary system, so held the court in, People v.
27   Wade, 53 Cal.2d at p. 334, 1 Cal.Rptr. at p. 692, 348 P.2d at
28   p. 125.

2

1   In the case of <u>People v. Thompkins</u>, 240 Cal. Rptr. 516

2   (Cal. App. 4 Dist. 1987) the court held at page 517 at (4) "It

3   was error, when instructing on attempted murder, to fail to

4   give instruction on lesser included offense of attempted

5   voluntary manslaughter, <u>**EVEN**</u> if defense counsel expressly waived

6   instruction on attempted voluntary manslaughter."

7   The court further stated at p. 523 [4] "The **OBLIGATION**

8   to instruct on lesser included offenses exists **EVEN WHEN** as

9   a matter of trial tactics a defendant not only fails to request

10  the instruction **BUT** expressly objects to its being given." <u>People</u>

11  <u>v. Sedeno</u>, 10 Cal.3d 703, 716, 112 Cal. Rptr. 1, 518 P.2d 913.

12  The Court further stated, at p. 523;

13          "We sympathize with the burden sua sponte
            instructional requirements create for trial courts.
14          Where defense counsel drafts "pinpoint" instructions
            which focus on issues highlighted by the theory of
15          defense, <u>however</u>, the burden on the trial court is
            minimal. It consists primarily of understanding the
16          relevant legal principles well enough to determine
            whether the proffered instructions constitute accurate
17          statements of law. In this regard, we assume
            prosecutors will always be available to alert the
18          court to any inaccuracies in the defense offerings."

19  The recently published case of <u>People v. Ceja</u>, 94 daily

20  Journal D.A.R. 9081, June 29, 1994 bears many similarities to

21  the case at bar; Both cases were in the same neighborhood,

22  Compton, both had similar .380 caliber guns, both victims had

23  Corona beer bottles in their hands, both defendants were in

24  fear of their lives, although no weapon was found on the victim

25  in the <u>Ceja, supra</u> case this is not the facts in Petitioner's

26  case.

27  With respect to the murder count, Petitioner contends the

28  trial court committed reversible error by failing to instruct

3

1  on the lesser included offenses of voluntary and involuntary
2  manslaughter over defense objection when in fact it was offered
3  because the trial judge believed their was sufficient evidence
4  to support that finding by a jury. The jury was instructed on
5  justifiable self-defense as a complete defense to the murder
6  charge.

7      A trial court must instruct the jury on every theory that
8  is supported by substantial evidence and does not err when it
9  refuses to instruct on theories not so supported. People v.
10 Flannel, (1979) 25 Cal.3d 668, 685. see also People v. Glenn,
11 (1991) 29 Cal. App.3d 1461, 1465.

12     A genuine but unreasonably held belief in the need to defend
13 negates the malice and reduces the offense to manslaughter.
14 The California Supreme Court in the very recent case of In re
15 Christian, '94 Daily Journal D.A.R. 6607 upheld the continued
16 viability of the imperfect self-defense and concluded that
17 "[w]hen the trier of fact finds that a defendant killed another
18 person because the defendant actually but reasonably believed
19 he was in imminent danger of death or great bodily injury, the
20 defendant is deemed to have acted without malice and cannot
21 be convicted of murder." (Id. at p. 6612; see also People v.
22 DeLeon, (1992) 10 Cal. App. 4th 815, 821-825).

23     While the defendant testified that the victim came at him
24 with what he believed to be a knife and again came at him with
25 a broken bottle, even though witnesses testimony conflicts at
26 this point to finding no broken bottle, then finding broken
27 bottle(s), a witness to the actual attack by the victim.
28 Additionally, defendant testified he did not want to fight or

4

1  hurt the victim but was frightened, "I felt the kiss of death".

2  The jury might well have concluded that the defendant was

3  mistaken about the victim being armed but also have concluded

4  that the defendant honestly but reasonably believed his life

5  was in danger, making the killing at most voluntary or

6  involuntary manslaughter.

7       While a defendant may be mistaken and still claim

8  self-defense, that mistake must be <u>reasonable</u>. See <u>State v.</u>

9  <u>Kelly</u>, (N.J. 1984) 478 A.2d 364, 373; <u>State v. Vasquez</u>, (N.J.

10  Super. A.D. 1993) 628 A.2d 346, 356. An actual but unreasonable

11  mistake about the threat of imminent peril, on the other hand,

12  would not support self-defense yet would support imperfect

13  self-defense. The imperfect self-defense doctrine allows for

14  a situation where a reasonable man would not conclude a set

15  of keys held in the victim's hand was a gun, but the jury

16  nonetheless could decide the defendant actually but unreasonably

17  held such a belief.

18       In one sense, imperfect self-defense is a "lesser included"

19  defense of perfect self-defense. They share common elements;

20  the defendant killed because of an "actual" belief he was in

21  imminent danger of death or great bodily injury. Perfect

22  self-defense, however, requires proof of an additional element;

23  the defendant's belief was reasonable. For this reason, one

24  cannot establish the elements of perfect self-defense without

25  proving imperfect self-defense. For this same reason, if there

26  is sufficient evidence of all the elements required to justify

27  a perfect self-defense instruction, by definition there is

28  sufficient evidence supporting an instruction for the "lesser

5

1  included" defense of imperfect self-defense. This is the logic
2  which impelled the disposition of this same issue in People
3  v. DeLeon, supra, 10 Cal.App. 4th 815. Adherence to this ruling
4  in DeLeon requires trial courts to instruct on imperfect
5  self-defense whenever they instruct a jury on self-defense.

6      At issue in the case at bar is the fact that the trial
7  court judge found sufficient evidence, on his own, to offer
8  the lesser included instructions of voluntary and/or involuntary
9  manslaughter. All though the record shows that the defense
10 counsel objected to this instruction this is not the issue as
11 the rule states "it is the duty of the trial court judge to
12 give the instruction, sua sponte", even over objection when
13 the evidence is sufficient to warrant the instruction.

14     The following cases deal with the issue before this
15 Honorable Court:

16     U.S. v. Schweihs, 971 F.2d 1302 (7th Cir. 1992) and U.S.
17 v. Washington, 819 F.2d 221 (9th Cir. 1987) have both held that:

18          1) Defendant is entitled to instruction on any defense
19 recognized in law and supported by sufficient evidence to allow
20 reasonable jury to find in defendant's favor.

21          2) District Court must give instruction regarding
22 any legitimate theory of defense that is supported by evidence,
23 and failure to do so is reversible error.

24     In the case of U.S. v. Zuniga, 989 F.2d 1109 (9th Cir.
25 1993) which dealt with an alibi issue, Petitioner contends that
26 the legal principle is the same. Petitioner will substitute
27 the word "manslaughter" for the case word "alibi" in the
28 following statement. "Even if the alibi (manslaughter) evidence

6

1 is weak, insufficient, inconsistent, or of doubtful credibility,

2 alibi (manslaughter) instructions should be given."

3     Defendant in criminal trial is entitled to have jury

4 consider any theory of defense that is supported by law and

5 that has some foundation in evidence. U.S. v. Carter, 910 F.2d

6 1524 (7th Cir. 1990).

7     If evidence would permit jury to find defendant guilty

8 of a lessor included offense, defendant is entitled to

9 instruction on that defense. U.S. v. Cavanaugh, 948 F.2d 405

10 (8th Cir. 1991) and U.S. v. Sotelo-Rivera, 906 F.2d 1324 (9th

11 Cir. 1990).

12     "Failure to give jury instruction on defense when some

13 evidence supported it is reversible error." People of Territory

14 of Guam v. Agualo, 948 F.2d 1116 (9th Cir. 1991); U.S. v. Duncan,

15 850 F.2d 1104 (6th Cir. 1988); U.S. v. Coin, 753 F.2d 1510 (9th

16 Cir. 1985).

17     "The equal protection clause essentially requires that

18 all persons similar situated be treated alike". Mahone v. Addicks

19 Utility Dist. of Harris County, 836 F.2d 921 (5th Cir. 1988);

20 City of Cleburne v. Cleburne Living Center, 473 U.S. 432, 87

21 L.Ed.2d 313, 105 S.Ct. 3249, 1985.

22     The words "Duty", "Must give", "Obligated to by law" are

23 but a few of the words in the case at bar describing the duty

24 owed to Petitioner at trial by the trial court judge. These

25 words show the "Existence of a legal duty owed" to this

26 Petitioner. These words present a "Peremptory duty", City of

27 Milwaukee v. Saxbe, 546 F.2d 693, 700 (7th Cir. 1976), these

28 words do not permit "DISCRETION", and have been imposed by a

7

EX "D" Page 7 of 8.

1  constitutional mandate that has been "CLEARLY ESTABLISHED" by

2  judicial decision. Harlow v. Fitzgerald, 457 U.S., 800, 819

3  (1982).

4      This "DUTY" "so plainly prescribed as to be free from

5  doubt", Tagupa v. East-West Center, Inc., 642 F.2d 1197, 1129

6  (9th Cir. 1981).

7      Petitioner contends that it was judicial error and that

8  there was no discretion permitted for the trial judge's failure

9  to give the instruction, sua sponte, over counsel's objection

10  and contends that this Honorable Court may, in the interest

11  of justice, modify the verdict to an involuntary manslaughter

12  finding based on the facts in the record and the People v. Ceja,

13  supra, case as herein stated.

14

15      II

16      FAILURE OF THE PROSECUTOR TO CORRECT
    "KNOWN" PERJURED TESTIMONY, AND FAILURE

17      TO EFFECTIVELY CORRECT THAT PERJURY.

18      Witness, Guadalupe Suazo at (RT 147) states that he never

19  told the Deputies that he saw Petitioner and victim arguing

20  inside the bar prior to the killing. At (RT 151) he again denies

21  that he told the Deputies about what he saw and heard regarding

22  the argument in the bar.

23      Witness, Angeli Lespia, (RT 176) states that she never

24  told police that defendant and victim had a verbal argument.

25      Deputy Young testified at (RT 226) "The suspect said that

26  they had an argument inside the bar over disrespecting his

27  family", victim threatened to "kick the suspects ass". At (RT

28  233) he further testifies that he interviewed both the guard

8

1            COURT OF APPEAL OF THE STATE OF CALIFORNIA

2                   SECOND APPELLATE DISTRICT

3

4    THE PEOPLE OF THE STATE OF CALIFORNIA,    )
                                               )
5                    PLAINTIFF-RESPONDENT,     )
                                               )
6         VS.                                  ) SUPERIOR COURT
                                               ) CASE NO. TA016787
7    MARCO TULIO MARROQUIN,                     )
                                               )
8                    DEFENDANT-APPELLANT.      )
                                               )
9    _____

10

        APPEAL FROM THE SUPERIOR COURT OF LOS ANGELES COUNTY
11
           HONORABLE ELIZABETH A. BARON, JUDGE PRESIDING
12
                   REPORTER'S TRANSCRIPT ON APPEAL
13

14

15   APPEARANCES:

16   FOR PLAINTIFF-RESPONDENT:    DANIEL E. LUNGREN,
                                  STATE ATTORNEY GENERAL
17                                300 SOUTH SPRING STREET
                                  NORTH TOWER, SUITE 5001
18                                LOS ANGELES, CALIFORNIA   90013

19

20   FOR DEFENDANT-APPELLANT:    IN PROPRIA PERSONA

21

22

23
     VOLUME III OF V
24   (PAGES 370 TO 535, INCLUSIVE)

25

26                               DONNA L. DERICHSWEILER, CSR #2696
                                 OFFICIAL REPORTER
27                               200 W. COMPTON BLVD., DEPT. D
                                 COMPTON, CALIFORNIA  90220
28

(CORONER)

1    BY MS. CALLAHAN:

2         Q      CAN YOU PLEASE STEP DOWN FROM WHERE YOU ARE

3    SEATED, DR. REDDY, AND APPROACH THE DIAGRAM THAT IS TO YOUR

4    IMMEDIATE LEFT.   CAN YOU PLEASE TAKE THE RED AND BLUE PEN WITH

5    YOU.

6              WITH THE RED PEN, CAN YOU PLEASE SHOW US WHERE

7    THAT BULLET FIRST ENTERED ON THE DIAGRAM YOU HAVE IN FRONT OF

8    YOU, P-19.

9         A      THIS IS THE LEFT SIDE OF THE BODY.   THIS IS THE

10   RIGHT SIDE.   THE BULLET ENTERED SOMEWHERE HERE.

11             (WITNESS INDICATES.)

12             THE BULLET ENTERED THE LEFT UPPER ARM RIGHT ABOUT

13   HERE AND EXITED RIGHT NEXT TO IT AND THEN REENTERED ABOUT HERE

14   INTO THE ABDOMEN.

15             (WITNESS INDICATES.)

16        Q      CAN YOU PLEASE MARK ON THE ABDOMEN THE APPROXIMATE

17   AREA IN RED PEN WHERE THE BULLET ENTERED.

18        A      (WITNESS COMPLIES.)

19        Q      CAN YOU PLEASE SHOW --

20        A      IT WAS A LITTLE CLOSER.

21             (WITNESS INDICATES.)

22        Q      CAN YOU PLEASE SHOW WHERE, WITH THE BLUE PEN,

23   WHERE THE BULLET TRAVELED AFTER IT ENTERED.

24        A      IT TRAVELED THIS WAY AND THEN THIS WAY.

25             (WITNESS INDICATES.)

26        MS. CALLAHAN:   YOUR HONOR, I HAVE A PARTIAL PHOTO OF AN

27   AUTOPSY PHOTOGRAPH THAT I HAVE PREVIOUSLY SHOWN TO THIS WITNESS

28   IN FULL.

1          I WOULD LIKE TO MARK THE PARTIAL PHOTO WHICH

2    DEPICTS THE LEFT SIDE OR PORTIONS OF THE LEFT SIDE OF THE

3    INDIVIDUAL'S BODY AS P-20.

4          THE COURT:  IT WILL BE SO MARKED.

5          MS. CALLAHAN:  I HAVE SHOWN IT TO COUNSEL.

6          Q     I AM SHOWING YOU P-20 FOR IDENTIFICATION.

7                DO YOU RECOGNIZE THAT PHOTOGRAPH AS SOMETHING I

8    SHOWED YOU PREVIOUSLY?

9          A     YES.

10         Q     IS THIS ONE OF THE PHOTOGRAPHS THAT WAS TAKEN IN

11   CONNECTION WITH THE AUTOPSY OF LUIS SILVA?

12         A     YES.

13         Q     HOW DID YOU KNOW THAT?

14         A     I VERIFIED THE CORONER'S CASE NUMBER GIVEN TO THIS

15   CASE WAS PLACED ON THE BODY ACTUALLY; SO I SAW THE NUMBER THAT

16   VERIFIES.

17         Q     IS THAT PORTION OF THE NUMBER PART OF THE

18   PHOTOGRAPH THAT IS MISSING?

19         A     YES.

20         Q     CAN YOU PLEASE STEP DOWN FROM THE WITNESS STAND

21   AND STEP OVER TO THE PHOTOGRAPH AND SHOW THE JURORS WHERE THE

22   PROBE IS AND WHAT THE PROBE MEANS IN THAT PHOTOGRAPH.

23         MR. BROWNE:  MAY I, YOUR HONOR?

24         THE COURT:  YES.

25         THE WITNESS:  THIS IS THE PROBE DR. MUKADUM PLACED ON

26   THE GUNSHOT WOUND STARTING FROM THE ENTRANCE AND LEAVING THE

27   ARM AND THEN ENTERING INTO THE ABDOMEN AGAIN.

28                (WITNESS INDICATES.)

1    Q    YES, MA'AM.

2    A    APPROXIMATELY ABOUT 7,000 AUTOPSIES.

3    Q    AND THAT IS OVER A PERIOD OF HOW MANY YEARS?

4    A    TWELVE YEARS.  ACTUALLY SIXTEEN YEARS.

5    Q    WERE THEY ALL PERFORMED FOR THE LOS ANGELES COUNTY

6    MEDICAL EXAMINER?

7    A    MOST OF THEM, YES.

8    Q    NOW, YOU HAVE INDICATED THAT THE DECEASED WAS

9    APPROXIMATELY FIVE FEET TWO INCHES TALL; IS THAT CORRECT?

10    A    THAT'S CORRECT.

11    Q    AND WEIGHED ABOUT 160 POUNDS?

12    A    YES.

13    Q    NOW, YOU MENTIONED THERE WERE TWO WOUNDS.  ONE

14    APPEARED TO BE A FLESH WOUND IN THE LEFT ARM, WOULD THAT BE A

15    FAIR CHARACTERIZATION?

16    A    IT IS A PERFORATING WOUND.

17    Q    BUT IT WENT THROUGH FLESH, DID IT NOT?

18    A    YES.

19    Q    AND IT WAS APPROXIMATELY, WHAT, AN INCH OR SO FROM

20    THE CENTER OF HIS ARM IF WE WERE LOOKING RIGHT DOWN THE MEDIAL

21    PORTION OF HIS ARM?

22    A    I DON'T KNOW.  HE MEASURED FOUR INCHES ABOVE THE

23    ELBOW.  FROM HERE IT WOULD BE FOUR INCHES.

24    (WITNESS INDICATES.)

25    Q    THE HEIGHT OF IT.  I AM NOW CONCERNED WITH THE

26    DISTANCE FROM THE REAR OF HIS ARM TO THE FRONT OF HIS ARM.

27    A    LET ME LOOK FOR YOU EXACTLY.

28    Q    PLEASE.

1      A      HE DIDN'T SAY WHERE IT IS; BUT ACCORDING TO THE

2   PHOTOGRAPHS AND PICTURES, FROM HERE TO HERE LIKE I SHOWED

3   THERE.

4                  (WITNESS INDICATES.)

5      Q      WHAT WOULD THAT BE IN TERMS OF INCHES FROM THE

6   CENTER OF HIS ARM?

7      A      IT IS NOT MENTIONED.

8      Q      NO WAY OF KNOWING?

9      A      WELL, YOU CAN SEE THE PHOTOGRAPHS AND DIAGRAMS,

10  THEY ARE RIGHT, YOU KNOW, CLOSE TO EACH OTHER.

11     Q      YOU DON'T HAVE AN ESTIMATE?

12     A      EXCUSE ME?

13     Q      YOU DON'T HAVE AN ESTIMATE OF THAT DISTANCE?

14     A      I CAN'T ESTIMATE.

15     Q      VERY WELL.

16            NOW, THERE WAS, AS I SAY, A MENTION OF TWO WOUNDS;

17  AND THEY, OF COURSE, TO CLEAR UP ANY CONFUSION, WERE ALL CAUSED

18  BY THE SAME ROUND; IS THAT CORRECT?

19     A      YES.

20     Q      NOW, YOU MENTIONED THAT THE ARM HAD TO BE CLOSE TO

21  THE BODY AT THE TIME THE GUN WAS FIRED.

22     A      YES.

23     Q      WHAT MAKES YOU SAY THAT?

24     A      BECAUSE THE BULLET ENTERED THE BODY.  IF IT IS FAR

25  AWAY, IT IS UNLIKELY TO ENTER THE BODY.

26     Q      AND IN THAT PARTICULAR DIRECTION -- TRAJECTORY, I

27  SHOULD SAY, THAT ALSO INDICATES IT WAS RATHER CLOSE TO THE

28  BODY?

1    A    YES.

2    Q    AND THAT COULD HAVE BEEN ANYWHERE FROM DIRECTLY

3    TOUCHING IT OR WITHIN A FEW INCHES?

4    A    YES.

5    Q    NOW, IN THE TRAJECTORY THAT YOU HAVE ILLUSTRATED

6    ON PEOPLE'S 19, WHICH IS UP ON THE BOARD THERE, YOU HAVE MADE A

7    LINE THAT APPEARS TO GO THROUGH THE LEFT ARM AND ENTER THE

8    BODY.

9         DO YOU SEE THAT?

10    A    YES.

11    Q    AND THEN THE LINE SEEMS TO TAKE ANOTHER

12    DIRECTION.

13         ARE YOU INDICATING BY THAT LINE THAT THE WOUND

14    ENTERED AND THEN STARTED TO MOVE UPWARD?

15    A    YES.

16    Q    WHAT CAUSED THAT?

17    A    BENDING OF THE BODY.

18    Q    NOW, YOU HAVE ALSO INDICATED THAT YOU BELIEVE THE

19    WEAPON --

20    A    ONE MOMENT.  I WANTED TO SAY SOMETHING.  BENDING

21    OF THE BODY, SOMETIMES THE BULLET MAY RICOCHET, HITTING A

22    PORTION OF THE ORGAN IN THE BODY.  RICOCHET MEANS THAT IT IS

23    GOING STRAIGHT AND THEN REFLECT IN A DIFFERENT DIRECTION.

24    Q    AND ARE YOU INDICATING THAT THE BODY MOST LIKELY

25    BENT AT THE WAIST?

26    A    IT COULD BE ANY OF THOSE THINGS.  IT COULD BE

27    BENDING OF THE BODY, RICOCHET OF THE BULLET.

28    Q    IF IT WAS BENDING OF THE BODY, WOULD IT HAVE BEEN

1    WHEN YOU SAY IT ENTERED -- OR RATHER THE CAUSE OF

2 DEATH WAS A GUNSHOT WOUND TO THE ABDOMEN?

3    A    YES.

4    Q    AND, OF COURSE, THAT CAUSED SOME BLEEDING?

5    A    YES.

6    Q    IN FACT, THE BLEEDING WAS THE CAUSE OF DEATH,

7 WASN'T IT?

8    A    BLEEDING AND ALSO DESTRUCTION OF THE TISSUES.  ONE

9 OF THE KIDNEYS ACTUALLY HAS TO BE REMOVED AND A PORTION OF THE

10 COLON HAS TO BE REMOVED; SO THAT ALSO IS A MAJOR REASON.

11    Q    WITH RESPECT TO THE TRAJECTORY AGAIN OF THE ENTRY

12 WOUND, COULD YOU TELL US IN YOUR BEST ESTIMATE APPROXIMATELY

13 WHAT HEIGHT THE WEAPON WAS THAT FIRED THE BULLET?

14    A    NO.

15    Q    COULD YOU TELL US WHETHER OR NOT THE BODY OR SOME

16 PORTION OF THE VICTIM WAS IN MOTION AT THE TIME THE WEAPON WAS

17 FIRED?

18    A    IT'S POSSIBLE.

19    Q    WOULD THAT KIND OF A TRAJECTORY, THAT KIND OF A

20 WOUND, CAUSE IMMEDIATE EXPIRATION OR IMMEDIATE DEATH?

21    A    YES, IT'S POSSIBLE, YES.

22    Q    IN THIS CASE, DO YOU KNOW WHEN DEATH OCCURED?

23    A    YEAH, I CAN LOOK UP.  IT IS ALL DOCUMENTED IN THE

24 HOSPITAL AND ALL THAT.

25    Q    IF YOU COULD.

26    A    THE DATE AND TIME OF THE INJURY HE RECEIVED,

27 ACCORDING TO THIS INFORMATION, 1-13-92 AT 0020 HOURS.

28    Q    THAT WOULD HAVE BEEN 20 MINUTES AFTER MIDNIGHT?

1      A      YEAH, SOON AFTER MIDNIGHT.

2      Q      AND --

3      A      AND THEN HE DIED AT 1-13 -- SAME DAY, 1-13-92, AT

4    739 HOURS.

5      Q      THAT WOULD HAVE BEEN APPROXIMATELY 7:30 THAT

6    MORNING; SO APPROXIMATELY SEVEN HOURS LATER?

7      A      YES.

8             CAN I SAY ONE MORE THING?

9      Q      SURE.

10      A      ALL THESE SEVEN HOURS HE WAS IN SURGERY.  THEY

11    TRIED TO DO SURGERY TO HIM OF THE BULLET INJURY.

12      Q      I THINK WE ALL UNDERSTAND.

13             NOW, BASED ON YOUR EXPERIENCE, WOULD A PERSON

14    RECEIVING SUCH A WOUND BE ABLE TO MOVE, TAKE A STEP OR TWO OR

15    THREE OR WHATEVER FROM THE MOMENT OF HIS WOUND TO THE POINT

16    WHERE HE MAY HAVE BEEN FOUND ON THE GROUND?

17      A      IT'S POSSIBLE.

18      Q      IS THERE ANY WAY OF ESTIMATING HOW MANY OR HOW FAR

19    OF A DISTANCE HE COULD HAVE MOVED IN TERMS OF STEPS?

20      A      I CAN'T -- EACH PERSON IS DIFFERENT.  SOME

21    PEOPLE --

22      Q      WHAT YOU CAN SAY, HOWEVER, THAT MOVEMENT IS

23    POSSIBLE?

24      A      MOVEMENT IS POSSIBLE, YES.

25      Q      AND HOW FAR WE DON'T KNOW?

26      A      I DON'T KNOW.  AND HOW MUCH, I DON'T KNOW.

27    MR. BROWNE:  I HAVE NOTHING FURTHER AT THIS TIME.

28    THE COURT:  MISS CALLAHAN?

BOARD OF PRISON TERMS                                        STATE OF CALIFORNIA
LIFE PRISONER HEARING DECISION FACE SHEET

☐ PAROLE GRANTED – (YES)
☐ CDC:  Do not release prisoner before
    Governor's Review

☒ PAROLE DENIED – (NO)  *1 (one) year*

| Records Use Only |
| --- |
| Parole Release Date |
| YR     MO     DA |
| Attach Prison Calculation Sheet |

☐ AGREED UNSUITABLE (Attach 1001A Form) FOR: _____ YEAR(S)
☐ HEARING POSTPONED/REASON: _____

## PANEL RECOMMENDATIONS AND REQUESTS

**The Board Recommends:**
☐ No more 115's or 128A's          ☒ Stay discipline free
☐ Work to reduce custody level     ☐ Learn a trade*              ☒ Earn positive chronos
☒ Get self-help*                   ☐ Get therapy*                ☐ Get a GED*

☐ Recommend transfer to _____
☐ Other _____
    *These programs are recommended if they are offered at your prison and you are eligible / able to participate.

| Penal Code 3042 Notices | ☒ Sent    Date:   4-21-06 |
| --- | --- |

Commitment Offense(s)

| 187 2ND W/ 12022.5(A) | MURDER 2ND W/ USE OF F'ARM |
| --- | --- |
| Code(s) | Crime(s) |
| TA016787 | 01 |
| Case(s) | Count(s) |

| Date Inmate Came to CDC<br>1-14-93 | Date Life Term Began<br>12-24-93 | Minimum Eligible Parole Date<br>12-24-03 |
| --- | --- | --- |
| ☐ Initial Hearing | ☒ Subsequent (Hearing No,)  **1** | Date of Last Hearing<br>11-21-02 |

CDC Representative

Attorney for Prisoner   **RICHARD RUTLEDGE**          Address

D.A. Representative                              County   **LOS ANGELES**

This form and the Board's decision at the end of the hearing on only proposed and NOT FINAL.  It will not become final until it is review

| Chair | *Linda Shelton* | Date | 6/1/06 |
| --- | --- | --- | --- |
| Panel Member | | Date | 6/1/06 |
| Panel Member | | Date | |

| NAME<br>MARROQUIN, MARCO | CDC#<br>H-62380 | PRISON<br>**CTF-SOLEDAD** | CALENDAR<br>JUNE 2006 | DATE<br>6-6-06 |
| --- | --- | --- | --- | --- |

BPT 1001 (Rev. 08/03)                    1                      EX "F"   Page 1 of 1

# Attachment 1

even total engagement in performing public contracts." (*Rendell–Baker v. Kohn* (1982) 457 U.S. 830, 841, 102 S.Ct. 2764, 2771, 73 L.Ed.2d 418.) The something more in this case is that the nature of TRW's work involves the defense of the country and its national security, a function traditionally the exclusive prerogative of the federal government. (*San Francisco Arts & Athletics v. U.S.O.C.* (1987) 483 U.S. 522, 544, 107 S.Ct. 2971, 2985, 97 L.Ed.2d 427 ["This Court also has found action to be governmental action when the challenged entity performs functions that have been ' "traditionally the exclusive prerogative" ' of the Federal Government. [Citations.]" (Emphasis omitted.) ]; *Becker v. Philco Corporation, supra,* 372 F.2d 771 [defense contractor immune from defamation action for statements made to the United States under defense contract].) Finally, the specific constitutional violation asserted by Ma of deprivation of his Fifth Amendment right to counsel flows from the investigative responsibilities imposed on TRW because the investigation was a first step that may have exposed Ma to federal criminal prosecution.

In this connection, I am not persuaded by the majority's assertion that because paragraph 7(c) of the ISM did not specify how the preliminary inquiry was to be conducted, the inquiry did not qualify as state action. This is a distinction without a difference in view of the undisputed fact that the end result of the inquiry might be criminal prosecution. Additionally, *Rendell–Baker v. Kohn, supra,* 457 U.S. 830, 102 S.Ct. 2764, on which the majority relies, is easily distinguishable on its facts as is *Blum v. Yaretsky* (1982) 457 U.S. 991, 102 S.Ct. 2777, 73 L.Ed.2d 534. In neither case did the private entity fulfill the kind of traditional governmental function that was involved here nor were they obligated to perform policing tasks on behalf of the federal government.

I therefore dissent on this issue.



26 Cal.App.4th 78

The PEOPLE, Plaintiff and Respondent,

v.

Leopoldo CEJA, Defendant and Appellant.

No. B076169.

Court of Appeal, Second District, Division 7.

June 23, 1994.

Defendant was convicted in the Superior Court, Los Angeles County, No. TA017607, Steven Suzukawa, J., of second-degree murder and exhibiting firearm and he appealed. The Court of Appeal, Lillie, P.J., held that: (1) failure to instruct on lesser included offenses of voluntary and involuntary manslaughter was reversible error, and (2) admission of preliminary hearing testimony of unavailable witness without first holding hearing on competence of defense counsel at preliminary hearing did not violate rights to counsel and due process, absent showing that defendant was denied opportunity effectively to cross-examine witness at preliminary hearing.

Reversed and remanded in part; affirmed in part.

Johnson, J., filed concurring opinion.

**1. Homicide ⟫309(4), 341**
Failure to instruct jury in murder prosecution on lesser included offenses of voluntary and involuntary manslaughter was reversible error; there was evidence from which jury could have concluded that defendant, who shot and killed victim, was mistaken about victim being armed, and from which jury could have concluded that defendant honestly but unreasonably believed his life was in danger, making killing at most voluntary or involuntary manslaughter.

**2. Criminal Law ⟫770(2), 814(3)**
Trial court must instruct jury on every theory that is supported by substantial evi-

dence but may refuse· to instruct on theories not so supported.

### 3. Criminal Law ⊜770(2)

"Substantial evidence" such as will support instruction is evidence from which reasonable jury could have concluded that particular facts underlying instruction did exist.

> See publication Words and Phrases for other judicial constructions and definitions. ·

### 4. Criminal Law ⊜795(2.1)

Where theory is that defendant committed lesser included offense, court must instruct on lesser included offense when there is evidence from which rational trier of fact could conclude beyond reasonable doubt that defendant was guilty of lesser crime.

### 5. Homicide ⊜116(3, 4)

To be exculpated on theory of self-defense one must have honest and reasonable belief in need to defend.

### 6. Homicide ⊜116(4)

Bare fear is not enough to exculpate on theory of self-defense; circumstances must be sufficient to excite fears of reasonable person, and the party killing must have acted under influence of such fears alone.

### 7. Homicide ⊜116(5)

Genuine but unreasonably held belief in need to defend negates malice and reduces murder offense to manslaughter.

### 8. Homicide ⊜33, 34

Person who kills another in honest but unreasonable belief in necessity to defend against imminent peril to life or great bodily injury may be guilty of voluntary or involuntary manslaughter depending on existence of intent to kill.

### 9. Homicide ⊜309(4), 341

It is reversible error to refuse manslaughter instruction in case where murder is charged and evidence would warrant conviction of manslaughter.

### 10. Constitutional Law ⊜268(10)
#### Criminal Law ⊜641.12(1), 695½

· Allowing preliminary hearing testimony of unavailable witness to be read to jury at

murder trial without first holding hearing on competence of defense counsel at preliminary. hearing did· not violate defendant's constitutional rights to counsel and due process; witness had been cross-examined at preliminary hearing in attempt to show that his identification of defendant was incorrect and to establish that witness had not seen who had fired fatal shots. West's Ann.Cal.Evid. Code § 1291(a); West's Ann.Cal. Const. Art. 1, § 15; U.S.C.A. Const.Amend. 6.

### 11. Criminal Law ⊜662.60

Right of confrontation does not preclude prosecution from proving its' case through prior testimony of witness who is unavailable at trial so long as defendant had right and opportunity to cross-examine witness during earlier proceeding at which witness gave testimony. West's Ann.Cal.Evid.Code § 1291(a); West's Ann.Cal. Const. Art. 1, § 15; U.S.C.A. Const.Amend. 6.

### 12. Criminal Law ⊜641.13(5)

Defendant convicted of second-degree murder and exhibiting firearm failed to show that he received ineffective representation by counsel who cross-examined witness at preliminary hearing; the witness was asked questions that attempted to show that his identification of the defendant was incorrect, that he had only seen defendant for a short period of time, and that a long time had passed since the shooting incident, and the witness testified that he·had not seen who had fired the fatal shots. West's Ann.Cal. Const. Art. 1, § 15; U.S.C.A. Const.Amend. 6.

### 13. Constitutional Law ⊜268(11)

Instruction on presumption of innocence and proof beyond reasonable doubt did not violate defendant's constitutional rights.

---

⌊₈₃⌋Martin Nebrida Buchanan, San Diego, under appointment by the Court of Appeal, for defendant and appellant.

Daniel E. Lungren, Atty. Gen., George Williamson, Chief Asst. Atty. Gen., Carol Wendelin Pollack, Sr. Asst. Atty. Gen., Marc E. Turchin, Supervising Deputy Atty. Gen.,

and Steven D. Matthews, Deputy Atty. Gen., for plaintiff and respondent.

LILLIE, Presiding Justice.

Leopoldo Ceja appeals from judgment entered following a jury trial in which he was convicted of second degree murder and exhibiting a firearm. (Pen.Code, §§ 187, subd. (a), 417, subd. (b).) The jury found that in connection with the murder, Ceja caused great bodily injury and death by discharging a firearm from a motor vehicle within the meaning of Penal Code section 12022.55, and that he personally used a firearm within the meaning of Penal Code section 12022.5, subdivision (a). Ceja contends the trial court committed several instructional errors which were prejudicial, and [82]that it prejudicially erred in allowing the preliminary hearing testimony of a witness to be read to the jury.

## STATEMENT OF FACTS AND PROCEDURAL HISTORY

On March 8, 1992, Joe Avila was on the southeast corner of Alondra and Tamarind talking on the phone when defendant approached and asked where he was from.[1] Defendant said, "fuck the '70s and stuff," and Avila responded that he didn't "bang." Avila rode his bike around the corner and defendant followed, driving a blue Escort. When Avila stopped, defendant pointed a gun at him and said he was going to kill him. Avila did not have a gun or any other type of weapon and said something to the effect, "Yeah, go ahead. You tough because you got a gun. That's all." Defendant drove away. About four or five minutes later, Avila heard approximately four shots; he then went to Alondra and Willowbrook thinking someone might have gotten killed, and saw a lot of people and a "guy laying down." An officer took Avila to Compton Boulevard where he identified the defendant.[2]

Rafael Padilla, previously convicted of armed robbery and being an ex-felon with a gun, "used to run" with the "CV-70's" gang. "CV" stands for "Compton Varrio" and is a primarily Hispanic gang with about 200 to 300 members. The CV-70's belong to an area near Willowbrook and Alondra.

On March 8, Rafael Padilla was hanging out and drinking on Caldwell and Alameda when his brother, Juan Padilla, rode up on a bicycle. After drinking at the location for about a half hour, the brothers drove to a liquor store on Willowbrook and Alondra. Several other cars also drove to the liquor store. Rafael Padilla parked his car on the sidewalk and Juan Padilla entered the store. Two or three "home boys" also with CV-70's went into the store; Juan Padilla stayed in the liquor store for no longer than five minutes and then walked out and put a bottle of liquor in someone else's car. He then walked to his brother and Alberto Robles, who were talking, and listened to their conversation. Defendant drove up in a blue Escort automobile and asked the time. Juan Padilla turned around, said "what" and walked towards the car, holding a Corona beer in his hands. He did not point a gun or shoot a gun. Robles walked behind him and Rafael Padilla walked behind Robles. Rafael Padilla was getting ready to look at his watch when he heard some gunshots. [83]As he looked up, he saw his brother falling. Defendant was pursued by Raphael Padilla and subsequently arrested. Juan Padilla died from a gunshot wound to the chest.

Neither Rafael Padilla nor Juan Padilla wore a gun that day. If Juan Padilla had been wearing a gun under his clothing he would have shown it to his brother. CV-70's are also called the " '70s." If someone were to say something like "fuck the '70s" that would be "disrespecting the '70s." Juan Padilla was mellow, not very drunk and not hostile at the liquor store.

Compton police officer Roderick Pettus took defendant into custody and searched his

---

1. Pursuant to Evidence Code section 1291, Avila was declared unavailable as a witness and his preliminary hearing testimony was read to the jury. Ceja does not dispute the trial court's finding that Avila was unavailable as a witness.

2. During cross-examination at the preliminary hearing, defense counsel established that Avila had never seen defendant before that day, that he saw him for only a short period of time, that the shooting had taken place quite some time ago and that he had not seen who had fired the shots he heard.

car. Pettus recovered a small caliber handgun from underneath the steering column dash and two expended .380 casings, one from the front of the vehicle and the other from the rear of the vehicle. One unexpended round was jammed into the chamber of the firearm and two live rounds were in the magazine inside the weapon.

Compton police officer Stoney Jackson collected evidence at the crime scene. No weapon was found, but two expended bullets and one expended .380 caliber casing were found. Jackson inspected the blue Escort automobile, looking for additional casings, bullets, bullet holes, etc. He found no bullets, casings or bullet holes on the exterior or interior of the vehicle. He inspected Rafael Padilla's automobile and found no guns, bullets or expended casings.

During an autopsy of Juan Padilla, the deputy medical examiner recovered a bullet which had been fired from the gun found in defendant's automobile.

*Defense*

Defendant testified that on March 8, he was near the courthouse, somewhere on Raymond, dropping off one of his brother's friends. To get home, he drove north on Tamarind. When he got to Alondra he asked a guy at a pay phone (Avila) "where he was from," because he just wanted to know "where he was from"; he knew he was in the CV-70's neighborhood; he is in a rival gang, the "CV T-Flats." Avila responded, but he (defendant) was listening to the radio and didn't know exactly what was said; he figured Avila was a CV-70 and said, "fuck the '70s" to "disrespect" them; Avila rode off on a bike, and he followed Avila to intimidate and scare him; when Avila stopped, he stopped his car and had a discussion with him and asked why he had to run; when he called Avila a punk, Avila approached, and he pulled out a gun; he did not point it at Avila, just showed it to him, and said to stay right there; he only intended to intimidate and scare Avila.

|84 Defendant further testified he then drove down Raymond and turned right on Willowbrook and drove to Alondra; while on Alondra, a train was passing; since he had to wait for the train, he decided to go to a liquor store and get a soda; while looking for a place to park, three people came out of the store, one of whom asked him, "What do you want, what do you want," so he asked him for the time; while Rafael Padilla looked at his watch, Juan Padilla approached and with his right hand pulled out a revolver from his waistband; he saw the barrel of the gun and got scared, extended his arm and, without aiming, fired three times; he did not want to hurt Juan Padilla but was scared; if Juan Padilla had shot him, he would get killed; he was just defending himself, and fired three rounds; he was not sure if Juan Padilla fired his gun, it happened so fast; he did not shoot at any of the other people in the liquor store; he drove away from the scene because he believed Rafael Padilla would come after him and do something.

Defendant carried a gun for protection; where he lives a lot of things happen; there are a lot of gang related shootings; rival gangs hate each other; you do not really go into other gangs' neighborhoods, if you do you might get shot; by going into the neighborhood as a "T-Flat," he was kind "disrespecting" them, especially by saying "fuck the '70s"; the store where he shot Juan Padilla was not the same store at which the incident with Avila occurred.

After the shooting, an analysis for gunshot residue was performed on Juan Padilla's hands; a particle of gunshot residue was found on his right hand. There was also a second particle that was consistent with gunshot residue but not unique to it. One can get a particle of gunshot residue on his hand from firing a gun, handling a gun that has residue on it, being in close proximity to firearm discharge, touching something other than a gun with residue on it, or being touched by someone with residue on his hands. It is unpredictable how much gunshot residue or particles are shot out from a Davis .380, but the defendant's criminalist testified he would expect more than one particle. He said the shot itself produces thousands of particles; if someone fired a gun there is probably a good chance that someone would have more than one particle deposited at the time of a shot; whether more

26 Cal.App.4th 86    Cite as 31 Cal.Rptr.2d 475 (Cal.App. 2 Dist. 1994)

han one particle could be identified at some later time when the samples are taken is another question; he has examined samples from suspected shooters where only one or two particles were found.

An analysis of a blood sample taken from the victim revealed the blood contained ethanol and cocaine. Ethanol is drinking alcohol. The blood-alcohol level was 0.13 grams percent; the cocaine level was 0.06 micrograms per milliliter and the metabolite was 0.84 micrograms per milliliter. |₈₅Metabolite is a breakdown product of cocaine. When ethanol and cocaine are taken at the same time, there is a possibility of a drug being formed called ethyl cocaine or cocaethylene. The fluence or the effect of the substances is potentiated or increased.

Dr. Terence McGee testified that a combination of cocaine and alcohol prolongs the effect of the substances, and the effects of such a combination are much greater than the effect of either substance singularly. One with a combination of the drugs in his system would have much more of a tendency to "fly off the handle," or do things that might not occur to him in a sober state. If a person has a tendency towards being hostile, the combination of substances would "throw fuel on the fire." It would not be uncommon for such persons to be calm in their demeanor at one moment in time and the next moment be aggressive.

I

*JURY INSTRUCTIONS RE VOLUNTARY AND INVOLUNTARY MANSLAUGHTER*

[1] With respect to the murder count, appellant contends the trial court committed reversible error by failing to instruct the jury on the lesser included offenses of voluntary and involuntary manslaughter. This contention is well taken.

The jury was instructed on justifiable self-defense as a complete defense to the murder charge. The court, however, refused to give voluntary manslaughter instructions, finding there was no evidence to warrant such instructions. Defendant argued the voluntary manslaughter instructions would be appro-

priate if the jury should find defendant's belief in the need for self-defense was honest but unreasonable.

[2–4] A trial court must instruct the jury on every theory that is supported by substantial evidence and does not err when it refuses to instruct on theories not so supported. (See *People v. Flannel* (1979) 25 Cal.3d 668, 685, 160 Cal.Rptr. 84, 603 P.2d 1.) Substantial evidence is evidence from which a reasonable jury could have concluded "'that the particular facts underlying the instruction did exist.' [Citation.]" (*People v. Lemus* (1988) 203 Cal.App.3d 470, 477, 249 Cal.Rptr. 897.) Where the theory is that the defendant committed a lesser included offense, the court must instruct on the lesser included offense when there is evidence from which a rational trier of fact could conclude beyond a reasonable doubt, the defendant was guilty of the lesser crime. (*People v. Glenn* (1991) 229 Cal.App.3d 1461, 1465, 280 Cal.Rptr. 609.)

[5, 6] |₈₆"To be exculpated on a theory of self-defense one must have an honest *and* reasonable belief in the need to defend. [Citations.] A bare fear is not enough; 'the circumstances must be sufficient to excite the fears of a reasonable person, and the party killing must have acted under the influence of such fears alone.' [Citation.]" (*People v. Flannel, supra,* 25 Cal.3d at pp. 674–675, 160 Cal.Rptr. 84, 603 P.2d 1; emphasis in original.)

[7] A genuine but unreasonably held belief in the need to defend negates the malice and reduces the offense to manslaughter. (25 Cal.3d at p. 680, 160 Cal.Rptr. 84, 603 P.2d 1.) The California Supreme Court in the very recent case of *In re Christian S.* (1994) 7 Cal.4th 768, 30 Cal.Rptr.2d 33, 872 P.2d 574, upheld the continued viability of imperfect self-defense and concluded that "[w]hen the trier of fact finds that a defendant killed another person because the defendant actually but unreasonably believed he was in imminent danger of death or great bodily injury, the defendant is deemed to have acted without malice and cannot be convicted of murder." (*Id.* at p. 783, 30 Cal.Rptr.2d 33, 872 P.2d 574; see also *People*

*v. De Leon* (1992) 10 Cal.App.4th 815, 821–825, 12 Cal.Rptr.2d 825.)

[8] "A person who kills another in the honest but unreasonable belief in the necessity to defend against imminent peril to life or great bodily injury may be guilty of voluntary or involuntary manslaughter depending on the existence of an intent to kill. [Citations.]" (*People v. Glenn, supra,* 229 Cal. App.3d at p. 1467, 280 Cal.Rptr. 609.)

While defendant testified that the victim pulled a gun from his waistband and that defendant saw the barrel of the victim's gun before defendant shot the victim, no gun was found at the scene and prosecution witnesses testified that the victim did not have a gun. Additionally, defendant testified he did not want to hurt the victim but was frightened. The jury was entitled to accept portions of a witness's testimony and to disbelieve other portions (see *Stevens v. Parke, Davis & Co.* (1973) 9 Cal.3d 51, 67–68, 107 Cal.Rptr. 45, 507 P.2d 653) and might well have concluded that defendant was mistaken about the victim being armed but also have concluded that defendant honestly but unreasonably believed his life was in danger, making the killing at most voluntary or involuntary manslaughter. (See *People v. Glenn, supra,* 229 Cal.App.3d at p. 1467, 280 Cal.Rptr. 609.)

[9] The failure to instruct on the lesser included offense cannot be deemed harmless. "'[I]t is reversible error to refuse a manslaughter instruction in a case where murder is charged, and the evidence would warrant a conviction of manslaughter.' [Citations.]" (*People v. Edwards* (1985) 39 Cal.3d 107, 116, 216 Cal.Rptr. 397, 702 P.2d 555.) Moreover, the factual questions posed by the omitted instructions were not necessarily [87]resolved adversely to defendant under other, properly given instructions. (*Id.* at pp. 116–117, 216 Cal.Rptr. 397, 702 P.2d 555.)

## II

### *PRELIMINARY HEARING TESTIMONY*

[10] Appellant contends the trial court violated his sixth and fourteenth amendment rights to counsel and due process by admitting the preliminary hearing testimony of Joe

Avila without first holding a hearing on the competence of defense counsel at the preliminary hearing. This contention is without merit.

"Evidence Code section 1291, subdivision (a), provides, in pertinent part: 'Evidence of former testimony is not made inadmissible by the hearsay rule if the declarant is unavailable as a witness and: [¶] ... [¶] (2) The party against whom the former testimony is offered was a party to the action or proceeding in which the testimony was given and had the right and opportunity to cross-examine the declarant with an interest and motive similar to that which he has at the hearing.'" (*People v. Zapien* (1993) 4 Cal.4th 929, 974, 17 Cal.Rptr.2d 122, 846 P.2d 704.)

[11] "Both the state and federal Constitutions guarantee criminal defendants the right to confront the witnesses against them. (U.S. Const., 6th Amend.; Cal. Const., art. I, § 15.) The right of confrontation is not absolute, however; in particular, it does not preclude the prosecution from proving its case through the prior testimony of a witness who is unavailable at trial, so long as the defendant had the right and the opportunity to cross-examine the witness during the earlier proceeding at which the witness gave this testimony. [Citations.]" (*People v. Cudjo* (1993) 6 Cal.4th 585, 618, 25 Cal.Rptr.2d 390, 863 P.2d 635.) "As long as defendant was given the opportunity for effective cross-examination, the statutory requirements were satisfied; the admissibility of this evidence did not depend on whether defendant availed himself fully of that opportunity. [Citations.]" (*People v. Zapien, supra,* 4 Cal.4th at p. 975, 17 Cal.Rptr.2d 122, 846 P.2d 704.)

[12] Appellant's claim that he was denied the opportunity to effectively cross-examine in that his counsel at the preliminary hearing was ineffective is not supported by this record. In order to establish that a defendant has been denied effective assistance of counsel, a court must conclude that counsel's performance was deficient, falling below an objective standard of reasonableness under prevailing professional norms and that there is a reasonable probability that but for counsel's unprofessional errors, the result [88]of the pro

ceeding would have been different. (*People v. Kaurish* (1990) 52 Cal.3d 648, 677, 276 Cal.Rptr. 788, 802 P.2d 278.) During cross-examination, witness Avila was asked questions which attempted to show that his identification of the defendant was incorrect, that he had only seen defendant for a short period of time, and that a long time had passed since the incident had occurred. Additionally, with reference to the murder charge, Avila testified he had not seen who had fired the fatal shots. In arguing that he should be allowed a hearing to determine the effectiveness of the preliminary hearing counsel, trial counsel could not say what questions should have been asked on cross-examination at the preliminary hearing or that he in fact would have asked those questions. On this record, appellant has failed to establish that he was denied effective assistance of counsel for purposes of cross-examining witness Avila at the preliminary hearing.[3]

### III

### *JURY INSTRUCTION REGARDING REASONABLE DOUBT*

[13]  Appellant contends the trial court committed prejudicial error and violated his constitutional rights when it instructed the jury on the presumption of innocence and proof beyond a reasonable doubt in accordance with CALJIC No. 2.90.

The United States Supreme Court in *Victor v. Nebraska* (1994) — U.S. —, — [114 S.Ct. 1239, 1248, 127 L.Ed.2d 583, 597], filed March 22, 1994, has squarely rejected this contention.

### *DISPOSITION*

The judgment of conviction for second degree murder is reversed and the cause remanded to the superior court with directions to enter a judgment of guilty of involuntary manslaughter if the prosecutor consents to forego prosecuting defendant for second degree murder and to resentence defendant accordingly; or, in the alternative, to set the

cause for retrial if the prosecutor does not so consent. In all other respects the judgment is affirmed.

FRED WOODS, J., concurs.

JOHNSON, Associate Justice, concurring.

I wholeheartedly concur in the judgment and my colleagues' holding on the imperfect self-defense issue—so far as it goes. I write separately solely to register my view a trial court must also instruct on [89]"imperfect self-defense" whenever it determines a "perfect self-defense" instruction is appropriate. In explaining my reasons, it will be helpful to begin with self-defense, both the perfect and imperfect varieties.

California Penal Code section 197, subdivision (3) makes the killing of a person justifiable if committed "... when there is reasonable ground to apprehend a design ... to do some great bodily injury, and imminent danger of such design being accomplished; ..." (1 Witkin & Epstein, Cal.Criminal Law (2d ed. 1988) Defenses, § 241 p. 277; CALJIC 5.12; *People v. McDonnel* (1949) 94 Cal. App.2d 885, 211 P.2d 910.) When this "actual" and "reasonable" belief exists it constitutes an absolute defense, relieving the defendant of criminal responsibility for the homicide.

As the majority explains, the courts also have recognized a related mental state which reduces, but does not eliminate, the defendant's culpability. It is usually called "imperfect self-defense." The California Supreme Court fully explained this concept in *People v. Flannel* (1979) 25 Cal.3d 668, 160 Cal.Rptr. 84, 603 P.2d 1. "An *honest but unreasonable* belief that it was necessary to defend oneself from imminent peril to life or great bodily injury negates malice aforethought, the mental element necessary for murder, so that the chargeable offense is reduced to manslaughter." (*Id.* at p. 674, 160 Cal.Rptr. 84, 603 P.2d 1, original italics omitted, new italics added.)

Again in a very recent and exhaustive [4] opinion, the California Supreme Court fur-

---

3.  As an offer of proof, trial counsel sought to demonstrate to the court that the lawyer that handled the preliminary hearing "never read the reports, didn't know the elements of the offenses,

didn't know the exposure, never spoke to the witnesses." The privately retained attorney at the preliminary hearing was subsequently replaced by appointed counsel.

ther refined and upheld the continued viability of "imperfect self-defense." (*In re Christian S.* (1994) 7 Cal.4th 768, 30 Cal.Rptr.2d 33, 872 P.2d 574.) Quoting extensively and approvingly from this court's opinion in *People v. De Leon* (1992) 10 Cal.App.4th 815, 12 Cal.Rptr.2d 825, the Supreme Court concluded the Legislature did not eliminate "imperfect self-defense" when it abolished the "diminished capacity defense" in 1981. (7 Cal.4th at pp. 776–778, 30 Cal.Rptr.2d 33, 872 P.2d 574.) The high court did, however, alter somewhat the terminology used to define "imperfect self defense." "Although *Flannel* and other opinions referred to an 'honest belief' we shall use the more precise term '*actual belief*' because it avoids the confusing suggestion inherent in the phrase 'honest belief' that a person could have a 'dishonest belief', i.e., that a person could believe something he does not believe." (7 Cal.4th at p. 773, 30 Cal.Rptr.2d 33, 872 P.2d 574, emphasis in original.)

The trial court's decision to instruct on self-defense but not on imperfect self-defense in this case may have been based on its misunderstanding of an admittedly subtle distinction—how mistakes of fact affect the doctrine of self-defense itself. LaFave & Scott offer this explanation:

"When his *belief is reasonable* ... he may be *mistaken* in his belief and still have the *defense.* Thus one may be justified in shooting to death an adversary who, having |90threatened to kill him, reaches for his pocket as if for a gun, though it later appears that he had no gun and that he was only reaching for his handkerchief." (LaFave & Scott, Criminal Law (2d ed. 1986) Justification & Excuse 5.7(c), p. 457, italics added.)

While a defendant may be mistaken and still claim self-defense, that mistake must be *reasonable.* (See *State v. Kelly* (1984) 97 N.J. 178, 478 A.2d 364, 373; *State v. Vasquez* (A.D.1993) 265 N.J.Super. 528, 628 A.2d 346, 356.) An actual but unreasonable mistake about the threat of imminent peril, on the other hand, would not support self-defense yet would support imperfect self-defense. The imperfect self-defense doctrine allows for a situation where a reasonable person would not conclude a set of keys held in the victim's hand was a gun, but the jury nonetheless could decide the defendant actually but unreasonably held such a belief.

In one sense, imperfect self-defense is a "lesser included" defense of perfect self-defense. They share common elements—the defendant killed because of an "actual" belief he was in imminent danger of death or great bodily injury. Perfect self-defense, however, requires proof of an additional element—the defendant's belief was reasonable. For this reason, one cannot establish the elements of perfect self-defense without proving imperfect self-defense. For this same reason, if there is sufficient evidence of all the elements required to justify a perfect self-defense instruction, by definition there is sufficient evidence supporting an instruction for the "lesser included" defense of imperfect self-defense.

This is the logic which impelled our disposition of this issue in *People v. De Leon supra,* 10 Cal.App.4th 815, 12 Cal.Rptr.2d 825. The Attorney General argues adherence to this court's decision in *De Leon* requires trial courts to instruct on imperfect self-defense whenever they instruct a jury on self-defense. In this, the Attorney General is correct. In my view, this is what *De Leon* indeed requires. In criticizing this position, however, the Attorney General claims "such a requirement has never been articulated by any court...." In this assertion the Attorney General is incorrect.

While *De Leon* is the only California case I have found which clearly states this requirement, our decision does not stand alone in its reasoning. LaFave & Scott state "[w]hen this 'imperfect' right of self-defense is recognized, it is generally the case that whenever the facts would entitle the defendant to an instruction on self-defense regarding a murder charge, an instruction on this variety of manslaughter should also be given. [Fn. omitted.]" (Lafave & Scott, *supra,* Crimes Against the Person 7.11(a), p. 666.)

The first judicial decision my research uncovered implying a necessary tie between instructing on self-defense and manslaughter was decided by the |91Supreme Court of North Carolina in 1922, over 70 years ago (*State v. Thomas* (1922) 184 N.C. 757, 114 S.E. 834.) Since that time, several other

states have expressly articulated this requirement.[1] The Supreme Court of Wisconsin has decided "... it is inconsistent and reversible error to deny the imperfect self-defense instruction where an instruction is given as to perfect self-defense." (*State v. Gomaz* (1987) 141 Wis.2d 302, 414 N.W.2d 626, 630.)

The Illinois Supreme Court expresses their requirement as "... a self-defense and a voluntary manslaughter instruction should be given when any evidence is presented showing the defendant's subjective belief that use of force was necessary. If the subjective belief is reasonable, the result is justifiable use of force; if the subjective belief is unreasonable, the result is voluntary manslaughter. [Citations.] [¶] The determination of whether the defendant's subjective belief is reasonable is for the jury to make." (*People v. Lockett* (1980) 82 Ill.2d 546, 45 Ill.Dec. 900, 903, 413 N.E.2d 378, 381.)

The Maryland Court of Special Appeals also has addressed the issue, stating, "[i]t is difficult to envision circumstances which are sufficient to generate the issue of justification or excuse by way of perfect self-defense which do not also generate the issue of mitigation by way of imperfect self-defense. Generally, if a defendant is entitled to an instruction with respect to the former, he will be entitled to an instruction with respect to the latter." (*Faulkner v. State* (1983) 54 Md.App. 113, 458 A.2d 81, 84, fn. 5.)

I do not mean to suggest appellant has established "imperfect self-defense" as a matter of law. On the evidence presented, a jury reasonably could have found neither self-defense nor imperfect self-defense applied. As my colleagues also recognize, the problem is the jurors were not given the opportunity to consider the latter, since the court failed to even instruct on imperfect self-defense while it did instruct on self-defense itself.

In my view, *De Leon* gave expression in California to a sound, eminently logical principle which has gained wide acceptance else-

where. In this and future cases where trial courts find sufficient reason to give an instruction on perfect self-defense, they also should grant a requested instruction on imperfect self-defense.

---

1. While the definitions of self-defense and imperfect self-defense may differ slightly from state to state, they are close enough to the California definitions to be persuasive authority on this issue.

PROOF OF SERVICE BY MAIL

C.C.R.1013(a)(1)(a)(2)

I, Marco Marroquin, declare that;

    I am over 18 years of age, that I am the pro per petitioner to the hereto attached cause of action, and that I reside at CTF-Central, California State Prison, CA. My complete mailing address is:  Marco Marroquin, H-62380, P.O.Box  689, F-316L, California State Prison, Soledad, CA. 93960-0689.

    On February _12_ , 2007, I placed the enclosed/attached documents; PETITION FOR WRIT OF HABEAS CORPUS, with attached thereto exhibits, placed in the hands of prison staff for mail room processing, with postage fully prepaid, addressd to the following;

CALIFORNIA APPELLATE COURT
SECOND APPELLATE DISTRICT
300 SOUTH SPRING STREET
FLOOR 2, NORTH TOWER
LOS ANGELES, CA. 90013-1213

ATTORNEY GENERAL
300 SOUTH SPRING STREET
FLOOR 2, NORTH TOWER
LOS ANGELES, CA. 90013

    I declare under penalty of perjury that the foregoing is true and correct. Executed this _12_ day of February, 2007, at California (State Prison).

//
//
//
//
//

_____
Marco Marroquin