# EXHIBIT 4

MC-275

§15555

Name    MARCO MARROQUIN

Address    P.O. Box 689   C-123L

CALIFORNIA STATE PRISON

SOLEDAD, CA. 93960-0689

CDC or ID Number    H-62380

ORIGINAL

FILED WITH PERMISSION

SUPREME COURT
F I L E D

AUG 2 3 2007

Frederick K. Ohlrich Clerk

DEPUTY

SUPREME COURT

STATE OF CALIFORNIA

(Court)

| MARCO MARROQUIN | |
|---|---|
| Petitioner | |
| vs. | |
| CURRY, WARDEN | |
| Respondent | |

No. _____

PETITION FOR REVIEW

(To be supplied by the Clerk of the Court)

EVIDENTIARY HEARIG REQUESTED.

## INSTRUCTIONS—READ CAREFULLY

- If you are challenging an order of commitment or a criminal conviction and are filing this petition in the Superior Court, you should file it in the county that made the order.

- If you are challenging the conditions of your confinement and are filing this petition in the Superior Court, you should file it in the county in which you are confined.

- Read the entire form *before* answering any questions.

- This petition must be clearly handwritten in ink or typed. You should exercise care to make sure all answers are true and correct. Because the petition includes a verification, the making of a statement that you know is false may result in a conviction for perjury.

- Answer all applicable questions in the proper spaces. If you need additional space, add an extra page and indicate that your answer is "continued on additional page."

- If you are filing this petition in the Superior Court, you need file only the original unless local rules require additional copies. Many courts require more copies.

- If you are filing this petition in the Court of Appeal, file the original and four copies of the petition and, if separately bound, one copy of any supporting documents.

- If you are filing this petition in the California Supreme Court, file the original and ten copies of the petition and, if separately bound, two copies of any supporting documents.

- Notify the Clerk of the Court in writing if you change your address after filing your petition.

- In most cases, the law requires service of a copy of the petition on the district attorney, city attorney, or city prosecutor. See Penal Code section 1475 and Government Code section 72193. You may serve the copy by mail.

Approved by the Judicial Council of California for use under Rule 60 of the California Rules of Court [as amended effective January 1, 2005]. Subsequent amendments to Rule 60 may change the number of copies to be furnished to the Supreme Court and Court of Appeal.

Page one of six

RECEIVED    PETITION FOR WRIT OF HABEAS CORPUS

AUG 2 2 2007

Form Approved by the
Judicial Council of California
MC-275 [Rev. July 1, 2005]

Penal Code, § 1473 et seq.;
Cal. Rules of Court, rule 60(a)

American LegalNet, Inc.
www.USCourtForms.com

This petition concerns:

☐ A conviction                    ☐ Parole

☐ A sentence                      ☐ Credits

☐ Jail or prison conditions       ☐ Prison discipline

☒ Other (specify): **Denial of suitability at a parole suitability hearing. (2nd, hearing).**

1. Your name: **Marco Marroquin**

2. Where are you incarcerated? **California State Prison at Soledad, CA, Hgh. 101 North.**

3. Why are you in custody?  ☒ Criminal Conviction    ☐ Civil Commitment

   *Answer subdivisions a. through i. to the best of your ability.*

   a. State reason for civil commitment or, if criminal conviction, state nature of offense and enhancements (for example, "robbery with use of a deadly weapon").

   **Convicted of second degree murder with gun use enhancement. Note: Conviction is not**

   **at issue, petition relates to parole suitability due process violations.**

   b. Penal or other code sections: **§§187 and 12022.5.**

   c. Name and location of sentencing or committing court: **Superior court, Compton, California**

   d. Case number: **TA016787**

   e. Date convicted or committed: **1/4/93**

   f. Date sentenced: **Confusion on my part as to date of conviction and sentence above.**

   g. Length of sentence: **15 years to life plus 3 years.**

   h. When do you expect to be released? **Undetermined with "to Life" top on sentence.**

   i. Were you represented by counsel in the trial court? ☒ Yes.    ☐ No.   If yes, state the attorney's name and address:

   **Unknown at this time, documentation lost of period of years.**

4. What was the LAST plea you entered? *(check one)*

   ☒ Not guilty    ☐ Guilty    ☐ Nolo Contendere    ☐ Other: _____

5. If you pleaded not guilty, what kind of trial did you have?

   ☒ Jury    ☐ Judge without a jury    ☐ Submitted on transcript    ☐ Awaiting trial

7. Ground 2 or Ground _____ (i_____)cable):

Due process and equal protection violations; see attached petition.

_____

_____

_____

a. Supporting facts:

See attached petition and Motion for Judicial Notice attached hereto.

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

b. Supporting cases, rules, or other authority:

See attached petition and Motion for Judicial Notice attached hereto.

_____

_____

_____

_____

MC-275 [Rev. January 1, 1999]    PETITION FOR WRIT OF HABEAS CORPUS    Page four of six

8. Did you appeal from the conviction, sentence, or commitment? [XX] Yes. [ ] No. If yes, give the following information:

a. Name of court ("Court of Appeal" or "Appellate Dept. of Superior Court"):

Does not apply to this petition; documents lost over period of years.

b. Result: Relief denied                    c. Date of decision: Unavailable

d. Case number or citation of opinion, if known: Unknown

e. Issues raised: (1) Unavailable at this time.

(2) //

(3) //

f. Were you represented by counsel on appeal? [XX] Yes. [ ] No. If yes, state the attorney's name and address, if known:

Unavailable, documents lost of period of years.

9. Did you seek review in the California Supreme Court? [XX] Yes. [ ] No. If yes, give the following information:

a. Result: Relief denied                    b. Date of decision: Unavailable

c. Case number or citation of opinion, if known: Unavailable

d. Issues raised: (1) Unavailable

(2) //

(3) //

10. If your petition makes a claim regarding your conviction, sentence, or commitment that you or your attorney did not make on appeal, explain why the claim was not made on appeal:

Does not apply to this petition, parole suitability denial issue only presented.

11. Administrative Review:

a. If your petition concerns conditions of confinement or other claims for which there are administrative remedies, failure to exhaust administrative remedies may result in the denial of your petition, even if it is otherwise meritorious. (See *In re Muszalski* (1975) 52 Cal.App.3d 500 [125 Cal.Rptr. 286].) Explain what administrative review you sought or explain why you did not seek such review:

Does not apply to this petition.

b. Did you seek the highest level of administrative review available? [ ] Yes. [XX] No. Does not apply.

*Attach documents that show you have exhausted your administrative remedies.*

75 (Rev. January 1, 1999)    PETITION FOR WRIT OF HABEAS CORPUS    Page five of six

6.  GROUNDS FOR RELIEF
   **Ground 1:** State briefly the ground on which you base your claim for relief. For examp... the trial court imposed an illegal
   enhancement." *(If you have additional grounds for relief, use a separate page for each ground. State ground 2 on page four. For
   additional grounds, make copies of page four and number the additional grounds in order.)*

   Due process and equal protection violations; see attached petition.

   a.  Supporting facts:
      Tell your story briefly without citing cases or law. If you are challenging the legality of your conviction, describe the facts upon
      which your conviction is based. *If necessary, attach additional pages.* CAUTION: You must state facts, not conclusions. For
      example, if you are claiming incompetence of counsel you must state facts specifically setting forth what your attorney did or
      failed to do and how that affected your trial. Failure to allege sufficient facts will result in the denial of your petition. (See *In re
      Swain* (1949) 34 Cal.2d 300, 304.) A rule of thumb to follow is: *who* did exactly *what* to violate your rights at what time *(when)* or
      place *(where). (If available, attach declarations, relevant records, transcripts, or other documents supporting your claim.)*

      See attached petition and Motion for Judicial Notice attached hereto.

   b.  Supporting cases, rules, or other authority (optional):
      *(Briefly discuss, or list by name and citation, the cases or other authorities that you think are relevant to your claim. If necessary,
      attach an extra page.)*

      See attached petition and Motion for Judicial Notice attached hereto.

12. Other than direct appeal, have you filed any other petitions, applications, or motions with respect to this conviction,   **MC-275**
    commitment, or issue in any court?  ☒☒ Yes. If yes, continue with number 13.  ☐ No. If no, skip to number 15.

13. a.  (1) Name of court: __Superior court of California, Los Angeles Aounty.__

    (2) Nature of proceeding (for example, "habeas corpus petition"): __Habeas Corpus Petition__

    (3) Issues raised: (a) _____ __See attached petition in full__

    (b) _____ __//__

    (4) Result (Attach order or explain why unavailable): __Semi-post card denial attached hereto__

    (5) Date of decision: _____ __January 12, 2007__

    b.  (1) Name of court: __Court of Appeals, Second Appellate District, Division Four__

    (2) Nature of proceeding: _____ __Petition for review__

    (3) Issues raised: (a) _____ __See attached petition in full__

    (b) _____ __//__

    (4) Result (Attach order or explain why unavailable): __Semi-post card denial attached hereto__

    (5) Date of decision __August 8, 2007 (Received by Petitioner Aug 17, 2007__

    c.  For additional prior petitions, applications, or motions, provide the same information on a separate page.

14. If any of the courts listed in number 13 held a hearing, state name of court, date of hearing, nature of hearing, and result:

    __No hearings, review, or evidentiary hearings held in any court__

15. Explain any delay in the discovery of the claimed grounds for relief and in raising the claims in this petition. (See In re Swain (1949)
    34 Cal.2d 300, 304.)

    __There is no delay for this Petition for review as the denial was received by this__

    __Petitioner on August 17, 2007, 9 days after the denial (copy of envelope attached.__

16. Are you presently represented by counsel?  ☐ Yes.  ☒☒ No. If yes, state the attorney's name and address, if known:
    __Petitioner is being assisted by inmate Samuel A. Dubyak, D-54700, Petitioner is not__
    __literate in the English language or legaleze, being a Guatemalan National__

17. Do you have any petition, appeal, or other matter pending in any court?  ☐☒☒ Yes.  ☐ No. If yes, explain:

    __Petitioner is currently before the Northern District Federal Court on his previous,__
    __2003, denial of suitability for parole.__

18. If this petition might lawfully have been made to a lower court, state the circumstances justifying an application to this court:

    __This is the Court of proper jurisdiction as to exhaustion requirements before filing__
    __for relief in the federal courts.__

I, the undersigned, say: I am the petitioner in this action. I declare under penalty of perjury under the laws of the State of California
that the foregoing allegations and statements are true and correct, except as to matters that are stated on my information and belief,
and as to those matters, I believe them to be true.

Date:    8 / 20 / 07                 ▷    _____
                                                (SIGNATURE OF PETITIONER)

PETITION FOR REVIEW

IN THE

SUPREME COURT OF CALIFORNIA

1.  Comes now, Marco Marroquin, Petitioner in pro per, and through this verified petition for review requests that this Honorable Court review the denial(s) from the Appellate and Superior Courts as both are without a 'reasoned opinion', semi-post card denials, and relying solely on the commitment offense, past historical events.

Petitioner contends that the denial by the Superior Court was a miscarriage of the intent of the habeas corpus act as the Superior Court appeared to not even read and consider the petition but chose to apply the "some evidence" standard to support the Board's form/rote language for parole suitability denial.

The Superior and Appellate Court fell into the same form/rote language that was applied by the Board, virtually reciting the Board's decision without reading and/or considering Petitioner's claims and the true facts of rehabilitation with his lack of education, his constant efforts to learn, his virtually clean prison record, his family support for returning to his home country of Guatemala (INS hold for deportation, in the record).

As this Court will discover upon a full and fair reading of this petition for review, the lower courts were obligated to consider 'all' issues and not just make a finding based on "some evidence" of past historical events to support the Board's denial and the lack of a nexus to support a current threat level.

In the case of City of Auburn v. Quest Corp., 260 F.3d 1160 (9th Cir. 2001): Under the Supremacy Clause, the state courts are obligated to apply and adjudicate federal claims that were fairly presented to them.

Obviously Petitioner being a lay man at law reasonably believed that the Supremacy Clause in City of Auburn, supra, would apply to the Superior and Appellate Courts as well. As is established in the instant petition for review,

1

1  CLAIM NUMBER THREE was completely independent of being found suitable for parole

2  by the Board, CLAIM NUMBER SIX, also pertaining to an independent finding by the

3  Board without having to be found suitable was further by-passed by the lower courts

4  in their haste to pass over and avoid review of substantial matters presented.

5      The Superior and Appellate Courts chose to not follow the California and

6  United States equal protection and due process provisions, and, failed to follow

7  U.S. Supreme Court authority as stated in the petition for review.

8      The Appellate Courts assertion that "The record shows that the circumstances

9  of Petitioner's second-degree murder offense "exceed the minimum elements necessary

10  to sustain a conviction" of second-degree murder." Also, "The motive for the

11  offense was very trivial, and petitioner deliberately returned to the bar with

12  a loaded gun and callously shot the un-armed victim.", are without merit.

13      First, the denial of suitability must be based on a 'current' threat level

14  to the public and although, as the appellate court stated, "Denial of parole may

15  be based upon the particular circumstances of the inmate's commitment offense."

16  See below.

17      As the recent Court of Appeals in, In re Scott, 133 Cal.App.4th 573, 34

18  Cal.Rptr.3d 905 (2005) regarding the continuous use of conduct prior to

19  imprisonment wrote:

20      "The Governor's assumption that a prisoner may be deemed unsuitable
for release on the basis of the commitment offense 'alone' is correct,
21  (Rosenkrantz, 29 Cal.4th at p.682), but the proposition must be properly
understood. The commitment offense is one of only two factors indicative
22  of unsuitability a prisoner can not change (the other being his 'previous
record of violence'). Reliance on such an immutable factor 'without
23  regard to or consideration of subsequent circumstances' may be unfair
(In re Smith, (2003) 114 Cal.App.4th 343, 372), and 'runs contrary to
24  the rehabilitative goals espoused by the prison system and could result
in a due process violation.' (Biggs v. Terhune, 334 F.3d at p.917).
25  The commitment offense can negate suitability only if the circumstances
of the crime reliably established by evidence in the record rationally
26  indicate that the offender will present an unreasonable public risk
if released from prisonm. Yet, the predictive value of the commitment
27  offense may be very questionable after a long period of time. (Irons
v. warden of California State Prison – Solano (E.D. Cal. 2005) 358
28  F.Supp.2d 936, 947, fn.2)." (Id. at pp.919-920)."

1    Regarding the commitment offense Petitioner committed 15 years ago, this

2  passage of time was discussed in WEN LEE, 2006 DJDAR 13961, as to Mr. Lee's parole

3  denial on a conviction of "attempted premeditated murder, and, second degree murder

4  of Mrs. Soong and two firearm enhancements" in which the Court stated that:

5         "Lee's crimes almost 20 years ago have lost much of their usefulness
          in foreseeing the likelihood of future offenses than if he had committed
6         them five or ten years ago. (In re Scott, supra, 133 Cal.App.4th 573,
          595]past crime's value for predicting future crime diminishes over
7         time])." (Id. at 13964-13965).

8     The Board's reliance on the commitment offense violates due process because

9  the facts surrounding the offense do not now constitute 'some evidence' with 'some

10  indicia of reliability' of petitioner's dangerousness. Hill, 472 U.S. at 455;

11  Biggs, 334 F.3d at 917; Irons, 358 F.Supp.2d at 947; Masoner v. State 2004 WL

12  1080177 *1-2 (C.D. Cal. 2004). (Id. at 816).

13    Under the holdings of Smith (Second District), Scott I & II (First District),

14  and Shaputis (Fourth District) (Courts of Appeal), the Board's boilerplate findings

15  that every crime, regardless of the facts, shows an "exceptionally callous

16  disregard for human suffering", and/or committed in a "dispassionate, and/or

17  calculated manner", of "callous manner", cannot be sustained. These criteria 'are'

18  inclusive in the Board's Matrix thus establishing them as unexceptional.

19    The instant petition before the Court is no more "callous" or "trivial" than

20  the following recent cases from the appellate courts of California. In re Scott,

21  supra, 119 Cal.App.4th at p.891: "All second degree murders by definition involve

22  some callousness - i.e., lack of emotion or sympathy, emotional insensitivity,

23  indifference to the feelings, and suffering of others". Rather, the inquiry is

24  whether among murders, the one committed by Lee (supra), was particularly heinous,

25  atrocious or cruel. (In re Ramirez (2001), 94 Cal.App.4th 549, 570, disapproved

26  on another point by In re Dannenberg (2005), 34 Cal.4th 1061, 1082-1083, 1100).

27  By that measure, Lee's crimes were more commonplace that egregious."

28    "Comparing Lee to defendants for whom the Board or Governor properly denied

3

1  parole because the defendant's crimes were atrocious is illuminating." Rosenkrantz,

2  29 Cal.4th at p.678; In re Dannenberg, 34 Cal.4th at p.1095; In re McClendon,

3  (2003) 113 Cal.App.4th 315 at p.321-322; In re Burns, (2006) 136 Cal.App.4th 1318

4  at pp.1327-1328; In re Van Houten, (2004) 116 Cal.App.4th 339, at pp.346, 351,

5  366; In re Deluna, (2005) 126 Cal.App.4th 585 at p.593; In re Lowe, 130 Cal.App.4th

6  1405 at p.1414; In re Morrall, (2002) 102 Cal.App.4th 280.

7       Petitioner contends that, in the above case of WEN LEE and the following

8  case of Weider, the State of California has established what offenses and their

9  circumstances constitute the terminology of "especially or exceptionally callous,

10  particularly egregious, heinous, atrocious or cruel." WEN LEE or Weider did not

11  fall under these categories and neither does Petitioner's commitment offense,

12  because, the language used by the Appellate Court to deny Petitioner a fair review

13  was "callous", and that was no more than what is required for the conviction of

14  the offense.

15       See also, In re Bernard John Weider, Sixth Appellate District Court of Appeal,

16  2006 DJDAR 15795, discussing "callous" disregard for human suffering, where Weider

17  "took a weapon into a bar, into a public place". "The evidence shows that he was

18  angry and distraught".

19       In a most recent case, which applied Scott dicta: Willis v. Kane, 485

20  F.Supp.2d, p.1127 (N.D. Cal. 2007) (As cited in Cooper (released on parole

21  8-9-2007): "We agree that Cooper's crime was callous when he beat his wife with

22  a sledgehammer. However, the facts of this case were no more callous than most

23  such offenses and not beyond the minimum for malice aforethought." (See, e.g.,

24  Smith II, 114 Cal.App.4th at p.367.)

                              CONCLUSION

26       The facts of Petitioner's case establish that he is entitled to a parole

27  release date (turned over to INS for deportation), that, the Superior and Appellate

28  Courts did not give Petitioner's case proper review and consideration under

                                    4

1   California and United States due process and equal protection claims.

2       Petitioner asserts that his Psychological Evaluation establishes that he

3   is not a 'current' risk to society. Also see RECIDIVISM study below.

4                            RECIDIVISM STUDIES

5       The purpose of this information is to bring to the court's attention of

6   studies done several years ago regarding recidivism rates among inmates that the

7   Board appears to ignore, given the no parole policy due to alleged threat or risk

8   level to the public safety, always used by the Board and/or governor as excuses

9   for parole suitability denials, at the current rate of 99% denials, I submit the

10  following information.

11

12  "Studies of parole success repeatedly indicate that those who commit murder

13  are among the best parole risks." Allen, Eldridge and Latessa, Vito, Probation

14  and Parole in America, p.254, 1985, citing Niethercut, 1972. Both with regard

15  to the commission of felonies in general and the crime of homicide, no other

16  offender has such a low rate of recidivism. Bedau, Hugo Adams, The Death Penalty

17  in America, 3rd Ed., p.180, n.3, 1980. "Paroled murderers actually present some

18  of the best parole risks." Bedau, Hugo Adams, The Death Penalty in America, 3rd

19  Ed., p.180, n.3, 1980, citing NCCD newsletter, Uniform Parole Reports, 1972, p.2.

20  "Compared with other groups, murderers are actually the best parole risks." Bedau,

21  Hugo Adams, The Death Penalty in America, 3rd Ed., p.180, n.3, citing Stanton

22  p.149, 1969. Two studies indicated that only three (3) in 10,000 and six (6) in

23  10,000 convicted of murder commit another crime. Bedau, Hugo Adams, The Death

24  Penalty in America, 3rd Ed., pp.176-179, 1980. After conducting a study for the

25  California Board of Prison Terms (1983-1987) it was concluded that no one released

26  after committing a murder had been returned to prison for murder. Ellwood, Eldridge

27  T., PH.D, Research Projects On Life Prisoners, p.3, April 1989, California BPT.

28  "As a matter of statistical probability, murderers released from a prison are

far less likely to commit a new crime than any other category of offender." Orland, Leonard, Justice, Punishment, Treatment, p.425, 1973. "Many murderers could be released immediately after conviction with little likelihood of offending again." Von Hirsh, Andrew, Doing Justice, Report On The Committee For The Study Of Incarceration, p.126, 1976. These authorities, from some of the most respected sociologists in our country, reveal the fallacy of <u>assumptions</u> regarding the dangerousness of those convicted of murder.

In reference to a murder case: Hending v. Smith, 781 F.2d 850 (11th Cir. 1986) ["[I]t is a matter of general knowledge that except for professional killers, few people commit more that one murder in a life time. It is a crime involving a specific interpersonal crisis, and not a habitual offense."]; Rosenkrantz, 444 F.Supp.2d 1063, 2006 WL 2327085 at *12-17).

Respectfully submitted,

Marco Marroquin

Dated: August 20, 2007



CLERK'S OFFICE
Court of Appeal
SECOND APPELLATE DISTRICT
300 SOUTH SPRING STREET
SECOND FLOOR - NORTH TOWER
LOS ANGELES, CA 90013-1204

GW-123L
MARROQUIN

RECEIVED
AUG 17 2007

UNITED STATES POSTAGE
PITNEY BOWES
02 1M
0004234077
$ 00.41°
AUG 08 2007
MAILED FROM ZIP CODE 90013

PAGE 3 OF A

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

COURT OF APPEAL - SECOND DIST.

F I L E D

DIVISION FOUR

AUG 8 2007

JOSEPH A. LANE    Clerk

Deputy Clerk

| | | |
|---|---|---|
| In re | ) | B196761 |
| | ) | |
| MARCO MARROQUIN, | ) | (Super.Ct.No. TA016787) |
| | ) | (Gary E. Daigh, Judge) |
| on Habeas Corpus. | ) | |
| | ) | ORDER |
| | ) | |
| | ) | |

THE COURT:*

The petition for writ of habeas corpus has been read and considered.

The petition is denied. Denial of parole may be based solely upon the particular circumstances of the inmate's commitment offense. The record shows that the circumstances of petitioner's second-degree murder offense "exceed the minimum elements necessary to sustain a conviction" of second-degree murder. (*In re Dannenberg* (2005) 34 Cal.4th 1061, 1070-1071, 1094 - 1095.) The motive for the offense was very trivial, and petitioner deliberately returned to the bar with a loaded gun and callously shot the un-armed victim.

* WILLHITE, Acting P. J.,        MANELLA, J.,        SUZUKAWA, J.

MINUTE ORDER
SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES

DATE PRINTED: 01/12/07

-----------------------------------------------------------------------

CASE NO. TA016787

THE PEOPLE OF THE STATE OF CALIFORNIA
VS.
DEFENDANT 01:  MARCO  MARROQUIN

-----------------------------------------------------------------------

COUNT 01: 187(A) PC FEL  - MURDER.


ON 12/22/06 AT  830 AM  IN SOUTH CENTRAL DISTRICT DEPT SCO

CASE CALLED FOR HABEAS CORPUS PETITION

PARTIES: GARY E DAIGH (JUDGE)  JAIME CORONA  (CLERK)
         NONE    (REP)  DALE A DAVIDSON  (DDA)

DEFENDANT IS NOT PRESENT IN COURT, AND NOT REPRESENTED BY COUNSEL

THE COURT HAS READ AND CONSIDERED DEFENDANTS PETITION FOR
WRIT OF HABEAS CORPUS FILE STAMPED ON 10/24/06, BUT NOT RECEIVED
BY THIS COURT UNTIL WEEKS THEREAFTER. IN IT THE DEFENDANT
ALLEGES HE WAS IMPROPERLY DENIEDPAROLE AT HIS 6/6/06 PAROLE
BOARD HEARING. ATTACHED TO DEFENDANTS PETITION IS THE TRANSCRIPT
OF THE PAROLE HEARING. IN IT THE BOARDFULLY CONSIDERED
DEFENDANTS LACK OF RECORD, GRAVITY OF THE MURDER DEFENDANT
COMMITTED, HIS FAMILY HISTORY AND POST-PAROLE PLANS. THE
PAROLE BOARD CONCLUDED THAT DEFENDANTS RELEASE AT THIS TIME

WOULD POSE AN UNREASONABLE RISK OF DANGER TO SCOIETY. THIS
DECISION IS SUPPORTED BY THE CIRCUMSTANCES OF THE CRIME
ITSELF AND THE REFUSAL BY THE DEFENDANT TO TAKE FULL
RESPONSIBILITIES FOR HIS ACTIONS.

THE DEFENDANTS PAROLE BOARD TESTIMONY MAKES CLEAR THAT HE
BLAMES OTHER PERSONS WHO "KIDNAPPED AND ROBBED" HIM THAT NIGHT
AND THE VICTIMS ACTIONS ACTIONS FOR HIS CONVICTION. THE
CONTINUED SELF DEFENSE EXPLANATION FOR DEFENDANTS ACTIONS
ON THE NIGHT OF THE MURDER DID NOT IMPRESS THE PAROLE BOARD
OR THIS COURT. IT CONCLUSION THAT THE DEFENDANT IS A DANGER
TO THE COMMUNITY, IF RELEASED, IS AMPLY SUPPORTED BY THE
EVIDENCE. PETITION DENIED.

A COPY OF THIS MINUTE ORDERED IS MAILED VIA U.S MAIL TO THE

HABEAS CORPUS PETITION
                                            HEARING DATE: 12/22/06

CASE NO. TA016787
DEF NO.  01

DATE PRINTED 01/12/07

FOLLOWING-

MR. MARCO MARROQUIN CDC#H-62380
BOX 689 G-144U
CALIFORNIA STATE PRISON
SOLEDAD, CA. 93960

CC;
DA
PD
FILE

NEXT SCHEDULED EVENT:

PROCEEDINGS TERMINATED

PAGE NO.   2

HABEAS CORPUS PETITION
HEARING DATE: 12/22/06

CALIFORNIA COURT OF APPEALS

SECOND APPELLATE DISTRICT

Petitioner herein appeals to the Honorable Second Appellate District Court of California from the Order made by the Superior Court of California, County of Los Angeles, dated January 12, 2007, attached hereto for reference.

The Superior Court apparently did not even read Petitioner's second parole hearing denial of which the instant habeas petition was based. Petitioner contends that his "first" petition to the Superior Court years ago had as a portion of Petitioner's prison address, as Box 689 "G-144U". Upon examining page 2 of the courts order it is apparent that the Court simply referred to past information in their computer file and produced the instant decision based on the "first" petitions information.

Petitioner's habeas form at page (1), (Second/instant petition), clearly had Petitioner's new and at the time of the second petition his address as Box 689 "C-117". There is only one court documentation that contained the "G-144U" address and that was the "first" petition several years ago, which is currently under consideration in the United States District Court (Northern District) in San Francisco.

Nonetheless the Superior Court's 'decision' was contrary to and an unreasonable application of U.S. Supreme Court law and an apparent violation of Petitioner's right of "meaningful" access to the court for a proper and just adjudication, on the merits, of his claims.

The semi-post card denial was ultimately based on the circumstances of the crime and Petitioner's refusal to take full responsibility for his actions, with the Superior Court apparently relying on Petitioner's "first" parole board denial, the petition of which was filed years ago.

First, it is established in the record that Petitioner was convicted of a second degree murder and not an offense that warranted the death penalty or

1

1  life without the possibility of parole as set forth in full in the second petition

2  attached hereto.

3      Secondly, while so many courts, including the Governor and the Board rely

4  on an inmate "taking full responsibility for his actions" (showing remorse is

5  the ultimate issue) creates an equal protection violation in and of itself. Under

6  California law, Penal Code §5011(b) (Legislative intent being at issue), state

7  in pertinent part:

8          (b) The Board of Prison Terms shall not require, when setting parole
           dates, an admission of guilt to any crime for which an inmate was
9          committed. (Stats...).

10  Although not at issue (yet) is the fact that every denial from the Governor

11  (and Boards decision, at issue herein), relies on a failure to show sufficient

12  remorse or failure to take full responsibility for the crime.

13      Although the Board cites to their rules and regulations that they will not

14  take into consideration the fact that the inmate refuses to discuss the crime

15  or make an admission the Board does employ the rote/form language that "until

16  the inmate shows 'insight', ...". The only logical reason for the denial was

17  that Petitioner's perception of the offense did not compare to the Board's wishes.

18  Petitioner has always admitted his culpability in the instant offense and has

19  shown signs of remorse, although obviously insufficient signs of remorse for

20  the Board or Superior Court.

21      Under the Fourteenth Amendment of the U.S. Constitution and California

22  Constitution Article I, Section 7(a) we find the Equal Protection Clauses. It

23  is established that under the Boards "guidelines" for suitability, that showing

24  signs of remorse is a positive feature of finding suitability. Thus if a person

25  refuses to show remorse or through his claim of actual innocence, he cannot show

26  remorse he fails to have this one positive feature considered in his suitability

27  equation, discrimination by the Board because Petitioner's version of the offense

28  does not comport with their version. Case precedents support the fact that a

2

1  denial cannot be based or relied upon to support a finding that Petitioner's

2  version is different. A "class of one" has been created through separate and

3  distinct treatment for parole suitability, see Petitioner's case citations and

4  argument in the herein attached petition under Term Setting, see, habeas corpus

5  petition attached, at pages 8-12 for U.S. Supreme Court case precedents.

6      The Superior Court came to the 'conclusion' that the instant offense was

7  committed due to the issue of kidnapping and robbery by the victim and his

8  friends. Petitioner asserts that while this issue of what Petitioner, through

9  his translation comes out as a kidnapping, the issue that caused the shooting

10  was the 'perceived' threat on his life by the victim coming at him with a broken

11  beer bottle, see trial transcripts. The issue of the broken beer bottle is

12  established in the list of evidence and direct testimony from police that

13  discovered the broken neck of the beer bottle. Under Flannel and Ceja, California

14  Court of Appeal cases (citations omitted), the Ceja case was adjudicated by this

15  Court, it was what Petitioner perceived at the time, an eminent threat to his

16  life, even if totally unjustified it is what he saw in his reasoning at that

17  instant. (see attached exhibit # "1").

18      In Flannel and Ceja it was discussed that it could be perceived that a man

19  making a gesture toward him, with keys in his hand could be perceived as a knife

20  or gun and although being harmless keys it is what Ceja and/or Flannel perceived

21  at the time. (Thus making the offense one of manslaughter). The offense of

22  manslaughter vs. second degree murder is not at issue but that the Superior Court

23  somehow converts the offense to one of perceived kidnapping from one of perceived

24  deadly assault with a broken beer bottle, resulting in Petitioner shooting the

25  victim in the arm, is unjustified. Note* The bullet traveled into the victim's

26  torso, the victim was not nor ever shot twice nor shot directly in the body.

27  Somehow the Board and Superior Court judge Petitioner's "lack of taking full

28  responsibility for his actions" because he claims self defense for what he

1  perceived at the time. Petitioner's current Psychological Evaluation is replete

2  with Petitioner showing remorse, and the Board's trial transcripts show the same

3  fact, that Petitioner does show remorse, although P.C. §5011(b), by Legislative

4  intent, does not require a showing of remorse for a parole suitability trial.

5      The Superior Court's form/rote language that the Board's, "It conclusion

6  (sic) that the defendant is a danger to the community, if released, "is amply

7  supported by the evidence". (See attached exhibit # "1").

8      Nowhere does the Superior Court even hint at what evidence they are referring

9  to for support of their semi-post card denial. There is no evidence in the

10  (current) record, what-so-ever to support such a decision and "some evidence"

11  in the record is not the standard of proof in California, see Evidence Code §115

12  and Hamdi v. Rumsfeld in the instant petition.

13      Additionally, the Superior Court failed to adjudicate the claims presented

14  by Petitioner, thus under California Rules of Court those claims are deemed to

15  be true and correct, as Petitioner understands the issue.

16      The Superior Court failed to consider the fact that Petitioner can never

17  be "paroled" but only deported, not even giving a reference to this issue the

18  Court simply recited from the Board's denial, "The parole board concluded that

19  defendants release at this time would pose an unreasonable risk of danger to

20  scoiety (sic)."

21      Although one could argue that society means a threat to Guatemalan society

22  it must be understood that California law and parole stop at the border,

23  California cannot impose its ideas, culture or values on another countries

24  society, to bootstrap and bolster its excuses for denial of suitability for

25  parole. Petitioner cannot be paroled but only deported, he has an INS hold, he

26  will never be turned over to a parole agent, he will never be among California

27  or Unites States society.

28      The Superior Court's semi-post card denial based on what Petitioner perceives

1  with reasonable belief, due to the address of G-144U, that the court never gave

2  full or even minuscule consideration to his second hearing denial petition and

3  if they would have fairly adjudicated the claims the court would have came to

4  an obviously different and fair consideration/conclusion of his constitutional

5  issues.

6      Thus, Petitioner herein submits his 'complete' habeas petition as was

7  delivered to the Superior Court, for this Court's adjudication, as though set

8  forth in full.

9                        Respectfully submitted,

10

11          _____

12                    Marco Marroquin

13

14  Dated: February ___, 2007

15

16  (By, fellow inmate Samuel A. Dubyak,
    due to lack of understanding by
17  Petitioner of the English language
    and legal matters).
18

19

20

21

22

23

24

25

26

27

28

To the Honorable Judges:

    Comes now, Marco Marroquin, Petitioner in pro per, and hereby petitions this Court for a writ of habeas corpus and by this verified petition he sets forth the following facts and causes for issuance of the writ.

I.

    Petitioner is presently incarcerated and confined from his liberty by the Warden in the state prison at Soledad, CA. Petitioner is serving a sentence of 15 years to life plus 3 years, pursuant to a judgment imposed by the Honorable Elizabeth Baron, Judge of the Los Angeles County Superior Court.

II.

    Petitioner hereby incorporates all relevant exhibits, numbered and referenced throughout this petition, and via Motion for Judicial Notice.

III.

    Petitioner asserts that under the California Indeterminate Sentencing Laws, he is entitled to a term fixed proportionately to his individual culpability and fair, and individualized, consideration for parole under Cal. P.C. §3041(a)(b) along with rules and regulations and case citations listed herein.

IV.

    An indeterminate sentence which does not have a term fixed is deemed to be the maximum term for purposes of constitutional analysis. Since no indeterminately sentenced prisoners in California have a term fixed (see, exceptions under CLASS OF ONE) all have had their punishment summarily fixed at the maximum.

V.

    The Legislature has specified three categories of culpability for the offense of murder in California. The most serious is one of "special circumstances" first degree murder, involving malice, premeditation, and the concurrent commission of an additional serious felony, and has a punishment of either the death penalty

i

or life without the possibility of parole. The second most serious is first degree murder, involving malice and premeditation, and has a punishment of 25 years-to-life. The last category is second degree murder, involving only malice, and a punishment of 15 years-to-life.

VI.

Since no terms are fixed (except the CLASS OF ONE), all have been set at "life"; this is contrary to the California Supreme Courts determination that each offender is entitled to a term fixed proportionately to individual culpability.

VII.

The failure to fix terms (except CLASS OF ONE) and summary denial of parole dates for life prisoners by the BPH show a defacto policy of refusing to follow the California Penal Codes, the California Constitutions Article I, section 7(a) Equal Protection Clause, also, United States Constitutions Fourteenth Amendment, Equal Protection.

VIII.

Petitioner has no plain, speedy or adequate remedy at law to protect his constitutional rights on these issues other than by this petition.

//

//

//

## STATEMENT OF THE CASE

In August of 1991, Luis Silva and his girlfriend, Delcia Lopez, agreed to buy a car from Petitioner for two thousand dollars. Silva was given possession of the car, and was supposed to pay Petitioner every two weeks. After the first two weeks however, Silva returned the car, saying that it had a lot of defects. Silva and Petitioner disagreed and argued when Silva tried to give the keys back to Petitioner. Petitioner asked Silva to pay him for the time that he had the car, but Silva refused to pay. Petitioner told Silva that he would regret what he had done to him.

At approximately 10 P.M. on January 12, 1992, Petitioner and another man entered the La Bajadita Bar in Compton. Before entering, the security guard checked the two men for weapons and found none. A short time later, Silva also entered the bar, but did not sit with Petitioner. Both men ordered beer. From that point forward, the defense and prosecution cases go in different directions, with vastly different evidence and completely different testimony in support of their theories of the case.

The prosecutions case continues with none of the employees at the bar recalling any argument between Petitioner and Silva, or even seeing the men approach each other while inside the bar. At some point, Silva left the bar to move his car. About two minutes after Silva left, Petitioner also left the bar, with the man that he had entered with, and walked along Compton towards Williams street.

About 10 minutes later, Petitioner and his companion returned to the bar and tried to re-enter it. However, when the security guard searched Petitioner, he discovered a gun and told Petitioner that he could not go inside the bar with a weapon. Petitioner and his companion then moved away to a distance of about three parked cars from the entrance to the bar and remained there.

Silva, after moving his car, returned in the direction of the bar. As Silva

1  reached the curb, Petitioner came toward him, according to the security guard.
2  Petitioner called Silva a son of a bitch and they argued about a car. Petitioner
3  said to Silva that he would have to pay Petitioner for the car. Silva said that
4  he did not want any problems with Petitioner, and did not threaten Petitioner
5  in any manner. Petitioner then called Silva a son of a big whore. The guard did
6  not see if Silva had anything in his hands, and that Silva's hands were at his
7  sides.

8       The security guard saw Petitioner point a gun at Silva and say that i'm
9  going to kill you. Petitioner pulled the trigger the first time and the gun did
10 not fire; he pulled it a second time and it fired. The guard did not see if Silva
11 was shot when Petitioner fired the gun. As Silva bent over, the guard pulled
12 him down to the ground and placed him in front of the doorway. Petitioner turned
13 and walked towards Williams street with his friend. There was no one else on
14 the street at that time.

15      The security guard contacted Deputy Reynolds and directed the officers to
16 Petitioner where he was standing by a white Toyota pickup with a gun in his hand.

17      A search of the immediate area and the victim's person revealed no weapons.
18 One shell casing was later found about 10-12 feet from where Silva had been lying.
19 No broken bottles were found at that time, however testimony showed the presence
20 of two broken bottles in the immediate area. One unbroken Budweiser bottle was
21 found.

22      Petitioner stated that Silva had argued with him about a family problem,
23 that Silva had threatened to kick his ass and that he went to get his gun because
24 he was afraid of Silva. Petitioner kept the gun in the battery section of the
25 engine compartment of his truck. He put the gun in his back waistband and walked
26 in the direction of the bar to get something to eat at the stand outside of the
27 bar. When he got to the bar, Silva came out and began arguing again; he then
28 pulled out his gun and shot Silva. Petitioner's defense was that Silva had tried

iv

to cut him with a broken bottle.

The cause of death was listed as a gunshot wound to the abdomen, the evidence established that the initial point of entry was a flesh wound to the arm and the projectile deflecting into the body.

The defense case describes problems between Silva and Petitioner's girlfriend and her brothers. It seems that Silva was living with Delcia, Petitioner's girlfriend's sister, but was married to one of Delcia's cousins. This resulted in Delcia and her brothers throwing Silva out of their house.

The night of the incident, Petitioner was in the bar talking with a friend called "Pink Floyd", who was also a friend of Silva. When Petitioner was seated in the bar, Silva came up and said to Floyd, "stop talking to trash", referring to Petitioner. Silva then picked Petitioner up by his collar, and when Floyd said, "you're not going to fight in here", Silva then said, "tell him to go outside if he's a man". Silva then pushed Petitioner and said to him, "let's go out, faggot". Silva accused Petitioner of being a gigolo because someone was supporting him, and also accused him of trying to defraud Silva by asking for money for the use of the car.

They went outside the bar where Floyd stood between them and prevented them from fighting. Petitioner walked towards his car, intending to leave. He heard steps behind him and turned to see Silva coming at him with something in his right hand that could have been a knife. Petitioner kicked Silva's hand and Silva turned and ran away. Petitioner was very frightened because he believed Silva had tried to kill him. Petitioner then got his gun from his truck and loaded it. He looked toward the front of the bar and saw Silva's car driving away.

Thinking that Silva had left, Petitioner then returned towards the bar. As he walked towards the bar, Silva drove by in his car and yelled to him, challenging him to a fight. Silva then made a U-turn and parked on the opposite side of the street. Silva then came running toward Petitioner and, as he

approached, he reached down and broke a bottle he was holding by the neck.

Silva attacked Petitioner several times with the broken neck of the bottle, but Petitioner was able to jump out of the way. Silva continued to taunt and insult Petitioner. After Floyd again tried to intervene, Silva lunged a final time at Petitioner with the broken bottle and Petitioner shot him in the arm. At the moment that he pulled the trigger, Petitioner thought that Silva was going to stab him with the bottle neck.

Victor Matute testified that he arrived at the La Bajadita Bar on January 12, 1992, between 10 P.M. and midnight. As he approached the door, he saw three people arguing on the sidewalk. It appeared that two of the people wanted to fight the other person. He then saw one of the people try to hit the third person with a bottle. The third person moved to the side to avoid being hit. He then saw the third person shoot the person with the bottle.

Finally, Los Angeles County Deputy Sheriff Reynolds testified that on the night of the shooting, Guadalupe Suazo, the manager of the La Bajadita Bar, told him he had seen Petitioner and Silva argue for a minute inside the bar. Bertha Angeli, the owner of La Bajadita, also indicated to him that she had seen Petitioner and Silva arguing in the bar that night.

//

//

//

<u>INDEX OF ISSUES RAISED</u>

**I.**

CALIFORNIA PENAL CODE §3041(a)(b) CREATES A PROTECTABLE LIBERTY INTEREST AT A PAROLE SUITABILITY HEARING, AND A "REASONABLE" EXPECTATION OF A RELEASE DATE. THE COMMANDING WORD "SHALL" CLEARLY ESTABLISHES THIS EXPECTATION.

**II.**

THE BOARD VIOLATED PETITIONER'S DUE PROCESS RIGHTS UNDER THE FIFTH AND FOURTEENTH AMENDMENTS OF THE U.S. CONSTITUTION, CALIFORNIA CONSTITUTION, ARTICLE I, Sec. 7(a), WHEN THEY APPLIED TITLE 15 C.C.R. §§2400-2411 TO OVER-RIDE AND CONTROL PENAL CODE Sec. §3041(a)(b).

**III.**

THE BOARD VIOLATED PETITIONER'S EQUAL PROTECTION RIGHTS UNDER THE CALIFORNIA CONSTITUTION, ARTICLE I, Sec. 7(a), AND, THE FOURTEENTH AMENDMENT OF THE U.S. CONSTITUTION WHEN THEY FAILED TO CONSIDER SETTING HIS TERM AND FAILURE TO FIX A PRIMARY TERM, (SEPARATE AND DISTINCT TREATMENT OF A "CLASS OF ONE").

**IV.**

THE BOARD VIOLATED PETITIONER'S DUE PROCESS RIGHTS UNDER THE FIFTH AND FOURTEENTH AMENDMENTS OF THE U.S. CONSTITUTION WHEN THEY DENIED HIM A PAROLE DATE BASED ON P.C. §3041(b), BECAUSE HIS CONVICTION WAS "A TERRIBLE OFFENSE".

**V.**

THE BOARD VIOLATED PETITIONER'S DUE PROCESS RIGHTS UNDER THE FIFTH AND FOURTEENTH AMENDMENTS OF THE U.S. CONSTITUTION AND, CALIFORNIA CONSTITUTION ARTICLE I, Sec. 7(a) WHEN THEY DENIED PAROLE BASED ON A PREDETERMINED OUTCOME.

**VI.**

THE BOARD VIOLATED PETITIONER'S DUE PROCESS RIGHTS UNDER THE FIFTH AND FOURTEENTH AMENDMENT OF THE U.S. CONSTITUTION BY HOLDING "PAROLE SUITABILITY" HEARINGS FOR A FOREIGN NATIONAL, THAT WILL BE DEPORTED, WHO CAN NEVER BE RELEASED ON PAROLE IN CALIFORNIA. PENAL CODE §3041(a)(b) IS UNCONSTITUTIONALLY VAGUE AND AMBIGUOUS AS TO PAROLE v. DEPORTATION FOR FOREIGN NATIONALS WITH AN "INS" HOLD.

//

//

//

Marco Marroquin, H-62380
Box 689   C-117L
California State Prison
Soledad, Ca 93960-0689

      Petitioner, in pro per

THE SUPERIOR COURT OF CALIFORNIA

FOR THE COUNTY OF LOS ANGELES

| | |
|---|---|
| MARCO MARROQUIN, | Case No. _____ |
|     Petitioner, | |
| vs. | MOTION/REQUEST FOR JUDICIAL NOTICE |
| B. CURRY, Warden (Acting?) | |
|     Respondent. | |

TO: THE HONORABLE JUDGE(S) OF THE LOS ANGELES COUNTY SUPERIOR COURT:

    Pursuant to California Evidence Code sections 451, subdivision (a), 452 subdivision (a), (c) and (d), and 459 subdivision (a), Commodoe Home System, Inc. v. Superior Court, (1982) 32 Cal.3d 211, 218-219, and Adamson v. Zipp, (1984) 163 Cal.App.3d Supp. 1, n.17, Petitioner hereby requests that this Court take "Judicial Notice" of the attached documents (directly attached to the habeas petition): (A), Petitioners Transcripts of the June 6, 2006 parole suitability hearing, the subject of the instant petition: (B), SETTLEMENT AGREEMENT AND FULL AND FINAL RELEASE OF ALL CLAIMS: (C), In re Robert Rosenkrantz (BH003529): (D), Petitioner's "Sua Sponte" claim: (E), Coroner's Report, and, (F), Petitioner's "Hearing Sheet".

    The Court must take Judicial Notice of the factual findings of other courts, even though the Court need not accept the truth of those findings. See, Mack v. State Bar of California, (2001) 92 Cal.App.4th 957, 961, rehearing denied; review denied; Duggal v. G.E. Capitol Communications Service, Inc., (2000) 81

Cal.App.4th 81, 82; People v. Moore, (1997) 59 Cal.App.4th 168, 178.

Petitioner obtained the attached copies of the exhibits from the prison legal library staff, law firms and a source that was in contact with the Swedish Consulate/Embassy. Review of the attached documents/cases will assist this Court in evaluating the arguments presented in Petitioner's habeas corpus, pages 1-29. The documents were attached to the instant habeas petition to avoid separation of papers and legal documentation.

Respectfully submitted,

_____

Marco Marroquin

Dated: _____

STATE AND FEDERAL CLAIM NUMBER ONE (I)

CALIFORNIA PENAL CODE §3041(a)(b) CREATES A PREOTECTABLE LIBERTY INTEREST AT A PAROLE SUITABILITY HEARING, AND A "REASONABLE" EXPECTATION OF A RELEASE DATE. THE COMMANDING WORD "SHALL" CLEARLY ESTABLISHES THIS EXPECTATION.

Under California law, a convicted person sentenced to a term of 15/25 years "TO LIFE" shall be released on parole unless his release would pose an unreasonable risk to public safety or unreasonable risk to society if released from prison. Cal. P.C. §3041(a)(b); Cal. Code of Regs., Title 15, §§2400-2402.

It is well established that the words "...shall be released on parole..." create a liberty interest in parole release therefore constitutional due process standards are mandatory. Moody v. Daggett, 429 U.S. 78, 50 L.Ed.2d 236, 97 S.Ct. 274 (1976). A parole liberty interest involves values protected by the due process clauses of the Fifth and Fourteenth Amendments.

It is settled that a liberty interest has been created by California law; Perveler v. Estelle, (9th Cir. 1992) 974 F.2d 1132; Bergen v. Spaulding, (9th Cir. 1989) 881 F.2d 719, 721, (citing Greenholtz and Allen); Biggs v. Terhune, (9th Cir. 2003) 334 F.3d 910, 914-916; McQuillion v. Duncan, (9th Cir. 2002) 306 F.3d 895, 901-902: Sass, 2006, DJDAR 11931 (9th Cir.).

"Although we have never directly held that California parole scheme creates a protected liberty interest, we have repeatedly assumed that it does." See, Powell v. Gomez, 33 F.3d 39, 40 (9th Cir. 1994); "today we hold what we have previously assumed. Under the "clearly established" framework of Greenholtz and Allen, we hold that California's parole scheme gives rise to a cognizable liberty interest to release on parole. The scheme "creates a presumption that parole release will be granted" unless the statutorily defined determinations are made." Allen, 482 at 378 (quoting Greenholtz, 442 U.S. at 12); The California Court of Appeals in In re Deluna, 126 Cal.App.4th 585, 24 Cal.Rptr.3d 643 (2005), decided after Dannenberg, held that under Rosenkrantz, 29 Cal.4th at 661, and McQuillion v. Duncan, supra, that parole applicants continue to have a "liberty interest" in parole release.

1

STATE AND FEDERAL CLAIM NUMBER TWO (II)
THE BOARD VIOLATED PETITIONER'S DUE PROCESS RIGHTS UNDER
THE FIFTH AND FOURTEENTH AMENDMENTS OF THE U.S. CONSTITUTION,
CALIFORNIA CONSTITUTION, ARTICLE I, Sec. 7(a), WHEN THEY
APPLIED TITLE 15 C.C.R. §§2400-2411 TO OVER-RIDE AND CONTROL
PENAL CODE Sec. §3041(a)(b).

Title 15 C.C.R. §§2400-2411 are in direct violation of the California

Constitution, Article II, §10(c) (Referendum Process). Proposition 7 did not

permit (to P.C. §190, et seq.) any additions, amendments, repealing or

superceeding; to be 'inclusive' to Proposition 7 without voters approval.

> Government Code Section 11340(a); "The Administrative regulations are
> authorized by statute, and consistent with other statutes of law,
> section (f) requires the direct involvement of the Legislature and
> the Executive Branch."

> Government Code Section 11340.1(a); "The Legislature declares that
> public interest established the Office of Administrative Law (OAL)
> which shall be charged with review of adopted regulations, which
> substitutes performance standards (e.g., the fulfillment or
> accomplishment in a given case, the substantial performance) for
> 'prescriptive' (based on legal prescription or as approved by law)
> standards. The intent that neither the OAL nor court shall substitute
> its judgment for rule-making agency in the substantive content of
> adopted regulations. With the intent of the Legislature the OAL is
> a part of the Executive Branch of the state government, and reports
> directly to the Legislature."

> Government Code Section 11342.2: "The adoption of regulations is to
> implement, interpret and make specific to carry out the provisions
> of the statute ..."but" ... no regulation adopted is valid or effective
> unless consistent and not in conflict with statutes or constitution
> to effectuate the purpose, of the regulations." (Emphasis added).

Petitioner asserts that; The Department of Corrections (CDC) Regulations

Management Department writes the regulations. The OAL as to Gov. Code 11342.2

implements, interprets and makes specific the provisions for the regulations

statute. The Legislative Body chapters, presents to the Governor and is filed

with the Secretary of State as a statute of law for 15 C.C.R. regulations.

Petitioner asserts that; The Initiative Measure Proposition 7, did not

provide for any continuation (Gov. Code §9604) of rules and regulations of the

Administrative Procedures Act (APA) of 1976, nor the OAL enacted in 1979,

operative 7-1-1980, which gives the CDC and the BPH explicit authority for

2

1 | administration of prisoners, (P.C.'s §§5058, 5076.2) under Gov. Code Section

2 | 11340, enabling statute.

3 |    The interpretation of Proposition 7, with no implied provisions or mandates

4 | to be carried through from one statute to another, "under circumstances" in which

5 | would be required or considered as re-instatements for continuation of statute

6 | (Gov. Code §9604) ... "but" ... as Petitioner asserted the BPH regulations are

7 | approved by the OAL under the Legislatures Constitutional grant of power (Cal.

8 | Const. Art. VI, §6; P.C. §6). The BPH added New Article II, Sections §§2400-2411

9 | as filed 9-8-1981; Register 81 No. 37; the parole considerations criteria and

10 | guidelines, creating 'prodecural provisions and mandates' that <u>cannot</u> be applied

11 | to Proposition 7's Initiative Measure without voters approval.

12 |    In <u>People v. Cooper</u>, C.A.1st, No. A087483, Nov. 1, 2000; re: issue of

13 | application of time credits under P.C. §2933, the court held that:

14 |      "Specifically, Cooper argued that since section 190, the Briggs
15 |      initiative, was adopted by voters in 1978, it can only be amended upon
     approval of the voters. Hence, Section 2933 cannot apply to his sentence
16 |      because it was adopted by the Legislature."

17 |      Affirmed as modified. "The additions ... constituted a legislative
     change to the Briggs Initiative that required voter approval pursuant
18 |      to Article II, Section 10, of the California Constitution." In re Oluwa,
     207 Cal.App.3d 439 (1989).

19 |    Petitioner asserts that; Title 15, Division II, C.C.R. §§2400-2411 which

20 | are guidelines used by the BPH against inmates sentenced under Proposition 7's

21 | P.C. §190 et seq., are in direct violation of the California Constitutions

22 | Referendum Process. P.C. §3041 cannot be controlled by Division II criteria (as

23 | is exactly what is done by the Board, thus over-riding a clearly stated penal

24 | code), thus the only true (and legally correct) criteria for a parole date is

25 | that the inmate does not pose an unreasonable risk to society, see P.C.

26 | §3041(a)(b); this issue has already been decided (twice) by a state

27 | certified/licensed (expert) psychologist/psychiatrist.

28 |    An inspection of the parole hearing transcripts (passim) establish that,

"You have received absolutely zero 115s. That is extraordinarily rare." (Ex-"A" p.74). "You have no previous record whatsoever"; "You've participated in AA and NA since 95"; "Your psychiatrist's report was favorable"; "the report was positive"; "he indicated you showed genuine remorse"; "you would be better on parole — you would be in the top 2 percent for success"; "Your parole plans are good"; "You have excellent parole plans for Guatemala"; "...you had started your own business"; "Commissioner Keenan called you an entrepreneur"; "Commissioner Keenan and I believe that you can take care of yourself and your family no problem"; "...we're guiding and directing you because we believe in you..."; "We were particularly impressed..." (p.79); "Most impressive was your request to participate in individual counseling with Dr. Reed"; "...the insight and feeling that you developed..."; "You have done a lot of good work, we want you to keep the momentum going"; "you've been on the right path, you're doing a lot of good things": "We're behind you".

On page 75 (Ex-"A") the Board is requiring letters of support showing that he could potentially get a job in the Los angeles area.

It is clear that Petitioner has an INS hold on him and "will" be deported, also this issue was established at his first hearing when the Commissioners stated that "you will be deported, I can guarantee it".

In Martin v, Marshall, 2006 WL 1344584 (N.D. Cal.), page 8-9: "Section 2402(d)(8) provides that a prisoner may be suitable for release if "[t]he prisoner has made realistic plans for release or has developed marketable skills that can be put to use upon release." The subsection does not require that a prisoner have viable parole plans in the United States." "The Governor's reasoning would require petitioner to make plans to enter the United States illegally, then communicate those illegal plans to the Board in order to be granted a release date."

Although Petitioner asserts that Division II, Sections §§2400-2411 cannot

4

be applied to him, or any other similarly situated inmate, in violation of the California Constitution (which thus violates Petitioner's due process and equal protection rights under both the California and United States Constitutions), he further asserts that "if" the sections 'for suitability' were applied to him NONE of the criteria for a denial of a parole date would be met by the BPH. Indeed, a reasoned reading of the Board's "DECISION" indicates or rather fails to indicate any discernible reason or excuse for a denial of a parole release date. The 'only' articulated wording that could possibly be implied as a 'reason' for denial are: "First of all, we know that this was − this commitment offense was a − a terrible offense". (Ex−"A" at p.73); "the motive for the crime was very trivial in relation to the offense." (Ex−"A" at p.73).

These reasons/excuses are clearly within the framework of the Matrix which the Board is supposed to follow. Indeed, because Title 15 C.C.R. §§2400−2411 enactment is in clear violation of the California Constitution the Board cannot even apply the Matrix to his crime. Thus Petitioner falls within the equal protection clauses of both the California and United States Constitution because of unequal treatment. Prior to the passage of Proposition 7 in 1978 the Board had a 'legally enacted Matrix' to follow for purposes of uniformity of sentences and currently there is no legal Matrix. (Separate treatment, separate class of individuals under the intent and meaning of equal protection.).

Furthermore, a regulation (Title 15 §§2400−2411) cannot over−ride a clearly stated statutory enactment (Cal. P.C. §§3041 et seq.). See, Aerolineas Argentinas v. U.S., 77 F.3d 1564 (Fed. Cir. 1996).

The BPH cannot apply or use §§2400−2411 to over−ride the Legislative intent (as asserted herein) of Cal. P.C. §3041(b). §3041(b) is not ambiguous but rather it is plain and clear in its meaning and who/when it applies and is a factual representation of Legislative intent; That an inmate "shall" receive a parole date at his first hearing, except for certain circumstances, basically stated:

5

1    that he is not a threat or risk to society and his crime was "not particularly

2    egregious".

3        An agency may not confer power on itself. See, Gorbach v. Reno, 219 F.3d

4    1087 (8th Cir. 2000).

5        When an administrative regulation conflicts with a statute, the statute

6    controls. (Government Code §11342.2).

7        Regulations that contravenes a statute is/are invalid. See, R & W Flammann

8    GMBH v. U.S., 339 F.3d 1320 (Fed. Cir. 2003).

9        A statute by its very nature, trumps conflicting regulations. See, Caldera

10   v. J.S. Alberici Const. Co. Inc., 153 F.3d 1381 (Fed. Cir. 1998).

11       An agencies regulations cannot legitimate the violations of constitutional

12   or statutory rights. See, U.S. v. Marolf, 173 F.3d 1213 (9th Cir. 1999).

13       By the very nature of the language of P.C. §3041(a)(b) and the absence of

14   provisions and mandates to control hearings for 15/25 years "to life" sentences

15   the Board illegally, unconstitutionally and in violation of Federal and State

16   Due Process and Equal Protection rights "attempts to control and over-ride" P.C.

17   §3041(a)(b) through the application of unconstitutionally enacted rules and

18   regulations, §§2400-2411, criteria of which NONE are legal requirements/guidelines

19   under §3041 for consideration of suitability for parole release.

20       The Board has effectively amended P.C. §3041(a)(b) and the Legislative intent

21   has been circumvented. The Board has 'unreasonably applied' U.S. Supreme Court

22   law, when using unconstitutionally enacted rules and regulations to over-ride

23   the language in Greenholtz and Allen; "SHALL" be released on parole. The Board's

24   decisions/excuses are clearly "contrary" to established U.S. Supreme Court law,

25   the California Constitution (Referendum Process) thus contrary to the holdings

26   in Greenholtz and Allen's language of Due Process rights to a fair, impartial,

27   legal and "meaningful" hearing.

28                                    //

STATE AND FEDERAL CLAIM NUMBER THREE (III)
THE BOARD VIOLATED PETITIONER'S EQUAL PROTECTION RIGHTS UNDER
THE CALIFORNIA CONSTITUTION, ARTICLE I, Sec. 7(a), AND, THE
FOURTEENTH AMENDMENT OF THE U.S. CONSTITUTION WHEN THEY FAILED
TO CONSIDER SETTING HIS TERM AND FAILURE TO FIX A PRIMARY
TERM, (SEPARATE AND DISTINCT TREATMENT OF A "CLASS OF ONE").

For an equal protection claim to proceed Petitioner must allege specific facts in support of his claim. A habeas petitioner has the burden of alleging specific facts that show a federal claim is presented, or the petition is subject to dismissal. Jones v. Gomez, 66 F.3d 199, 204-05 (9th Cir. 1995). Conclusory allegations do not warrant habeas relief. Id. at 204.

Petitioner's allegations are not conclusory, they state a prima facie equal protection claim under both the California and Federal Constitutions.

The Fourteenth Amendment Equal Protection Clause provides that no State shall deny to any person "the equal protection of the laws." (See also, California Constitution Article I, Sec. 7(a)). The Equal Protection Clause ensures that "all persons similarly situated should be treated alike." City of Cleburne v. Cleburne Living Center, 473 U.S. 432, 439 (1985). To prevail on an equal protection claim, Petitioner must initially show that he was treated differently from other similarly situated persons. City of Cleburne, supra, 473 U.S. at 439; Fraley v. United States Bureau of Prisons, 1 F.3d 924, 926 (9th Cir. 1993) (per curiam).

The mere fact that some inmates convicted of second degree murder may have been paroled sooner than Petitioner does not establish the basis for a federal equal protection claim. See, Sturm v. California Adult Authority, 395 F.2d 446, 448-49 (9th Cir. 1967) (holding that "the fact that other prisoners have had their sentence reduced, or been granted parole, affords no ground for complaint by petitioner.")

However Petitioner's equal protection claim lies elsewhere, other than a mere comparison between an inmate released earlier or paroled sooner than himself, as set forth herein.

## EQUAL PROTECTION UNDER "CLASS OF ONE"

In the case of In re MIKAEL SCHIOLD, Court of Appeals, First Appellate District, Division Five, Case No. A103107, attached hereto with MOTION FOR JUDICIAL NOTICE, as Exhibit "B-1-6". (With numbered paragraphs).

Schilod was transferred to the country of Sweden, under the "SETTLEMENT AGREEMENT AND FULL AND FINAL RELEASE OF ALL CLAIMS", on habeas corpus. Schiold and Respondents entered into an "agreement" transferring Schiold to Sweden (Paragraph #4 of Exhibit "B").

Case No. A103107 was agreed to as "stayed" pending Schiold's transfer. (Paragraphs #5,6,7).

Explicitely at paragraph #8: "Releasor (Schiold) agrees that he will be held in custody by the government of Sweden until January 1, 2007."

Page 5, paragraph 16 (of Exhibit "B") establishes that: the agreement and settlement, in order to stay the case, was signed by the Supervising Deputy Attorney General, Anya Binsacca, dated 10/22/2003.

Petitioner asserts that the State of California in collusion with the Attorney General's Office and the Board did in fact violate the equal protection clause of the Fourteenth Amendment of the U.S. Constitution, and, California Constitution Article I, Sec. 7(a), by "setting an immutable release date" for Schiold, when his term was set without being found suitable under §3041(b) and going directly to §3041(a).

The language in paragraph #8 of page #3 (Exhibit "B") of the settlement expressly states that "he will be held in custody by the government of Sweeden UNTIL January 1, 2007". Petitioner asserts that this date, January 1, 2007, established a 'term setting' under P.C. §3041(a). (Emphasis added).

One foreign national (Schiold) is being treated distinctly different than another foreign national (Petitioner Marroquin) (for that matter 'all' U.S. Citizens are being treated distinctly different than Schiold because they cannot

1   be transferred) and all similarly situated foreign nationals, thus creating

2   separate and distinct "classes" of inmates for release criteria.

3       The fact that Schiold was first found to be suitable by the Board is

4   irrelevant to the claim herein, the Governor then found Schiold to be unsuitable

5   which nullified the Board's finding of suitability. See, Paragraphs #2,3,6 of

6   Exhibit "B".

7       The most basic requirement for a claim of violation of equal protection

8   under the Fourteenth Amendment of the U.S. Constitution lies on the issue of

9   non-equal treatment of a "CLASS", or, a showing of separate and/or distinct

10  difference in treatment, both criminally and civilly, among groups or "CLASSES"

11  of persons.

12      The United States Supreme Court has established a "class of one" in the

13  case of Village v. Willowbrook v. Olech, 528 U.S. 562, 145 L.Ed.2d 1060, 120

14  S.Ct. 1073 (2000) at pp.1074-75; "We granted certiorari to determine whether

15  the equal Protection Clause gives rise to a cause of action on behalf of a "class

16  of one" where the plaintiff did not allege membership in a class or group." (527

17  U.S. 1067, 120 S.Ct. 10, 144 L.Ed.2d 841 (1999)):

18          "Whether the complaint alleges a class of one or a class of five is
            of no consequence because we concluded that the number of individuals
19          in a class is immaterial for equal protection analysis."

20      Our cases have recognized successful equal protection claims brought by

21  a "class of one", where the plaintiff alleges that he/she has been intentionally

22  treated differently from others similarly situated and that there is no rational

23  basis for the difference in treatment. See, Sioux City Bridge Co. v. Dakota

24  County, 260 U.S. 441, 43 S.Ct. 190, 67 L.Ed. 340 (1923); Allegheny Pittsburgh

25  Coal Co. v. Commission of Webster City, 488 U.S. 336, 109 S.Ct. 633, 102 L.ED.2d

26  688 (1989). "In so doing, we have explained that 'the purpose of the equal

27  protection clause of the Fourteenth Amendment is to secure every person within

28  the State's jurisdiction against intentional and arbitrary discrimination, whether

                                        9

1  occasioned by express terms of a statute or by its proper execution through duly

2  constituted agents." See, Sioux City Bridge Co., supra, at p.445, 43 S.Ct. 190

3  (quoting Sunday Lake Iron Co. v. Township of Wakefield, 247 U.S. 350, 352, 38

4  S.Ct. 495 (1918)). "it is clearly established that a state violates the equal

5  protection clause when it treats one set of persons differently from others who

6  are similarly situated." Wheeler v. Miller, 168 F.3d 241, 252 (5th Cir. 1999).

7      Petitioner has established separate treatment, discrimination and the Board's

8  failure to follow United States Supreme Court precedents thus their failure to

9  set Petitioner's term, as was done to Schiold, violates both the California and

10 United States Constitutions Equal Protection Clauses

### FAILURE TO CONSIDER TERM SETTING

12     At no time during the hearing, nor at any time during Petitioner's

13 incarceration has the Board considered the determinate term that Petitioner would

14 serve (as calculated by the unconstitutionally enacted Matrix) or the time he

15 has actually served as factors in the suitability equation. The Court of Appeals

16 in, In re Ramirez (12-12-01) 94 Cal.App.4th 549, at 569 held:

17     "The Board cannot ignore the determinate term prescribed for a
   commitment offense when it considers the gravity of the crime as a
18  factor weighing against a finding of suitability for parole. The Board
   must make its determination 'in a manner that will provide uniform
19  terms for offenses of similar gravity and magnitude in respect to their
   threat to the public.' (P.C. §3041(a)). Determining what would be a
20  'uniform' term for an inmate serving a determinate life term for
   offenses that include concurrent determinate terms is not an exact
21  science. However, the Board should strive to achieve at least a rough
   balance between the gravity of the offense, the time the inmate has
22  served, and the sentences prescribed by law for the commitment offense."

23     At page 570, the court said:

24     "The Board must also consider the length of time the inmate has served
   in relation to the terms prescribed by the Legislature for the offenses
25  under consideration, in order to arrive at a "uniform" term as
   contemplated by P.C. §3041(a)."

26     The gravity of Petitioner's offense must be measured not in terms of the

27 life maximum potential, but in relation to the determinate terms prescribed for

28 such offenses in 15 C.C.R. §2403(c). The Board must consider the appropriate

1   determinate term that would be set and the time he has already served. The Board

2   has failed to follow the criteria of §2403(c). (Note*: Although Petitioner asserts

3   that §§2400-2411 cannot be applied to him the Board is still in violation by

4   not complying with rules and regulations that they are applying.)

5                       ## FAILURE TO FIX PRIMARY TERM

6        At no time during Petitioner's incarceration has the Board ever held a

7   hearing to fix Petitioner's 'primary term' on his indeterminate sentence. A

8   'primary term' is not set in conjunction with or dependent upon a parole hearing.

9   See, In re Rodriguez, (1975) 14 Ca.3d 639; People v. Scott, (1984) 150 Cal.App.3d

10  910; 918-919. Petitioner has a right to have his term fixed proportionately to

11  his offense and his culpability.

12       The Los Angeles County Superior court, on June 26, 2006, In re Robert

13  Rosenkrantz, Case No. BH003529, attached as Exhibit "C", specifically at page

14  3, lines 14-15 establish that the Board set Rosenkrantz term, "On September 9,

15  1999, petitioner was found unsuitable for parole but the panel set his prison

16  term. A June 30, 2001 date was set for release. (Emphasis added).

17       Evaluating proportionality does not hinge on the life maximum, but is

18  measuring the time actually served with the sentence deemed appropriate by the

19  Board's sentencing regulations. The Board cannot abdicate this responsibility

20  either by saying it has no authority to fix terms (see Schiold & Rosenkrantz)

21  or by subsuming term-fixing under the parole function. Petitioner is entitled

22  to the fixing of his primary term as an ultimate, immutable release date, under

23  the Equal Protection (CLASS OF ONE) of the Fourteenth Amendment. See also, In

24  re Rodriguez, supra; People v. Duran, (1983) 140 Cal.App.3d at 502-503; People

25  v. Rodriguez, (1977) 19 Cal.3d 221, 230; Rosenkrantz, supra.

26       In McGinnis v. Royster, 93 S.Ct. 1055 (1973) the court held; at page 1057

27  that; "each inmate has both a 'minimum' parole date, which is the earliest date

28  on which he 'may' be paroled at the discretion of the Parole Board, and a

                                        11

'statutory release' date which is the earliest date he 'must' be paroled by the Parole Board. (fn.3), "he also has a maximum expiration date which is the date of the maximum sentence to which an inmate can be held if he receives no good time credits at all."

The case refers to an "indeterminate sentence" and establishes that there are actually three (3) dates to such a sentence; (1) the minimum parole date; (2) the statutory release date, (3) the maximum expiration date (i.e., death).

In, in re Jeanice D. (1980) 28 C.3d 210, at p.220, the California Supreme Court stated: 'The initiative, of course, was not drafted as part of the general DSL, but on the contrary, explicitly replaced the determinate sentence of 5,6, or 7 years established by the DSL for second degree murder with an Indeterminate "15 years to life" sentence.

The court noted that the DSL repealed the criteria, provisions and mandates of the ISL to govern indeterminate sentences. The court gave guidance at footnote 7 (28 C.3d 210) which the BPH still fail to take notice of (i.e., P.C. §3000).

Penal Code §190's 15 years to life sentence does not "expressly prescribe" 15 years to life to be a life sentence. See, P.C. §669; In re Collins, 99 C.A.2d 780, 781, 222 P.2d 686, citing, People v. Rivas, 85 C.A.2d 540, 193 P.2d 151. "When the term of imprisonment for second degree murder is pronounced it is "indeterminate" "until fixed" by the BPT so authorized.

While P.C. §1170 et seq., apply to determinate sentences, the current provisions of section §3041 governing parole for inmates serving indeterminate terms were added as part of the bill enacting the Determinate Sentencing Law, and were intended to serve the same purpose as the determinate sentencing provisions. (Stats., 1976 Ch. 1139, Sec. 281, p.5151; In re Stanworth, (1982) 33 Cal.3d 176, 182). Our Supreme Court has made it clear that the "uniform terms" called for by section §3041(a) are analytically equivalent to determinate sentences imposed under §1170 et seq. (People v. Jefferson, 21 Cal.4th 86, 96.)

12

STATE AND FEDERAL CLAIM NUMBER FOUR (IV)

THE BOARD VIOLATED PETITIONER'S DUE PROCESS RIGHTS UNDER THE FIFTH AND FOURTEENTH AMENDMENTS OF THE U.S. CONSTITUTION WHEN THEY DENIED HIM A PAROLE DATE BASED ON P.C. §3041(b), BECAUSE HIS CONVICTION WAS "A TERRIBLE OFFENSE".

The key to understanding who, how and the "exception" to setting a parole date is by tracing the statute back to when it was enacted ... (July 1, 1977) (SB42), and what life prisoners the Board was required to hold hearings for.

The Uniform Determinate Sentencing Act (DSL) became effective July/1977, §3041(a)(b) were enacted as part of the (DSL) and reads today as it did in 1977. Requiring the Board to "normally" set parole dates one year before a life prisoners M.E.P.D., (subd. (a)) with (subd. (b)) providing a narrow exception to setting a parole release date for "particularly egregious offenses."

The class of life prisoners the Board was required to see after the enactment of the DSL on July 1, 1977, were (1st) degree murders and 'kidnappers', of whom both of these sentences had to serve seven (7) years before becoming eligible for parole. P.C. §3041(a)(b) was enacted 16 months before Initiative Measure Proposition 7, which increased the murder penalty of (1st) degree murder from "life" to "25 years to life" and changed (2nd) degree murder from a "determinate" term of 5, 6 or 7 years to an "indeterminate" sentence of "15 years to life."

Before Proposition 7, of November, 1978, the Board was required to see (2) main classes of life offenses of (1st) degree murder and 'kidnapping'. P.C. §3041(a) required the Board to "normally" set parole dates for those (2) classes of life sentences. The "EXCEPTION" to setting a parole date when §3041(b) is applied; offense(s) that were such in gravity; so especially grave; so particularly egregious that public safety concerns required a longer period of incarceration for these individuals and a parole date could not be set at the initial hearing.

In People v. Anderson, 6 Cal.3d 628 (1972), the California Supreme Court held that the 'then' California death penalty law was impermissibly cruel, and

128 prisoner's whose sentences were fixed at death now would have their sentences reduced to 'life' with the possibility of parole (there was no life without the possibility of parole in California at that time). (See, e.g., In re Stanworth, (1982) 33 Cal.3d 176. In 1966 Stanworth was sentenced to death following a plea of guilty to two (2) counts of 'first' (1st) degree murder. Stanworth was one of the prisoners who came off of death row and was given a term of life with a possibility of parole. In 1979 Stanworth was given a parole date after 13 years and served a total of 17 years at the time of his release on parole.

When the DSL was enacted, July 1, 1977, this group/class of 128 prisoners, that came off of death row, after serving 7 years were eligible for parole. However, Sec. (b) of P.C. §3041 enabled the Board to indefinitely deny parole because their offense(s) were of such gravity ("particularly egregious") in nature that public safety concerns allowed the Board to deny setting a uniform term under subd. (a) of §3041.

The offense(s) of the 128 prisoners that came off of death row were not comparable to 'normal' first (1st) degree murder or kidnapping offenses, under the provisions of the Uniform Proportionate Punishment for base terms in the Boards Matrix guidelines for similar offenses. All of the 128 prisoners convictions had "special circumsnatnces" (initially warranting the death penalty sentence). P.C. §3041(a) requires the Board to establish criteria not only for the setting of a parole release date, but also criteria for the "EXCEPTION" to setting a parole date under §3041(b) and §3041.5(b)(2). This criteria to the "exception" is implemented in the Board's 1978 amended regulations, Title 15 C.C.R. §2281(c)(1)(A)(B)(C)(D), et seq..

The first amendment of subsection (c) filed 6/28/1979, (Register 79, No. 26): "Circumstances tending to show unsuitability", "the prisoner committed the offense in an especially henious, atrocious or cruel manner."

The language and circumstances were adopted from Proposition 7's section

14

§190.2(a)(14). P.C. §190.2 ONLY applies to prisoners with a sentence of life without the possibility of parole or the death penalty, NOT for prisoners serving a (1st) or (2nd) degree murder sentence with the possibility of parole. Compare Title 15 C.C.R. §2281 and §2402.

The circumstances tending to show unsuitability ... are the "EXCEPTIONS" to setting a parole release date, which, prior to the sentences of 15/25 years to life of Proposition 7 (1978) had a VERY NARROW application. The "exception" was not NORMALLY applied but was meant to be (per legislative intent), applied to the 128 prisoners that came off of death row.

The Board is violating Petitioner's due process rights by unconstitutionally applying the "exception", §3041(b) to ALL 'to life' prisoners of Proposition 7. By applying P.C. §3041(b) to ALL 'to life' prisoners, making the EXCEPTION the NORM, the Board has effectively destroyed the proportionality contemplated by P.C. §3041(a).

By legislative intent, P.C. §3041(b) CANNOT be applied to (1st) or (2nd) degree murder sentences (15/25 years to life), "unless" the exception is proven.

In summary, the enactment of P.C. §3041(a) of 1977, provided that parole dates shall normally be set for (1st) and (2nd) degree murder sentences, with subdivision (b) serving as the NARROW EXCEPTION and only being applied to offenses that are not of the normal first or second degree murder ... the 128 prisoners that came off of death row had special circumstances that the "exception" was intended (by legislative intent) to apply to.

In People v. Thompson, 29 Cal.Rptr.2d 847 (Cal.App.2 Dist. 1994); a case involving a fire bombing of a residence after midnight and a 2 year old child was killed, the court held that;

"Given this deference to the Legislature, defendant is wise not to challenge the sentence imposed by the Legislature for those who are convicted under section 12310. That branch has determined this crime is particularly dangerous to human life and those who are convicted of causing death by igniting a destructive device should be sure to

15

suffer a penalty separate and apart from the murder statutes. The penalty challenged herein is calculated to advance a critically important social policy for the protection of the public at large, i.e., the deterrence of a PARTICULARLY EGREGIOUS type of life-endangering criminal conduct." (People v. Isitt (1976) 55 Cal.App.3d 23, 31, 127 Cal.Rptr. 279; People v. Laursen (1972) 8 Cal.3d 192, 198, 104 Cal.Rptr. 425, 501 P.2d 1145.).

At pp.851-852: "As noted above, the legislative determination has made that the crime involved in this case is a more serious crime than premeditated murder and deserves the augmented penalty associated with it. The use of destructive devices, Molotov cocktails in this instance, which can inflict indiscriminate and multiple deaths, marks defendant as a greater danger to society than a person who premeditates the murder of a single individual." (Emphasis added throughout).

It is apparent that the court followed "legislative intent" for cases that were "particularly egregious" in sentencing Thompson. As asserted by Petitioner above, §3041(b) was enacted by the Legislature for such purposes that the "exceptions" to, separate and apart from the murder statutes, would apply. Thompson, [3] at 850.

A crime is "particularly egregious" when elements of 'special circumstances' were found that would authorize a sentence of life without the possibility of parole or the death penalty. In re Leslie Van Houten, 116 Cal.App.4th 339, (2004). (Note* In Van Houten, the jury found special circumstances, true at her trial).

Petitioner's conviction clearly falls within the Matrix (although under California Constitution Article II, §10(c) is illegal, see argument herein), that the Board is "supposed to follow", and, there were no special circumstances found to be true at his trial thus the Board cannot apply subdivision (b) of §3041 to his suitability hearing. Additionally, several courts have used the language of "ax murder", "execution style murder", when compared to "normal", "ordinary run", "common scenario", "conventional" when addressing NON particularly egregious murder cases. (Citations omitted).

Properly viewed, under the facts presented above, Petitioner's commitment offense simply cannot be so "particularly egregious" as to justify a denial of parole pursuant to P.C. §3041(a)(b).

1    Petitioner asserts that, in the Board's DECISION, there is not one word

2    indicating the usage of particularly egregious or any other language that could

3    be remotely construed as such. The only language used to deny him a parole date

4    were: "this commitment offense was a - a terrible offense"; "The motive for the

5    crime was very trivial in relation to the offense."

6    In, In re Ramirez, Marin County Superior Court, Case No. SC109829A

7    (9-13-2000), (94 Cal.App.4th 549), the court held that parole could not be

8    withheld absent a factual finding that the offense was "particularly egregious."

9    Petitioner asserts that, The triviality of the crime claim is only supported

10    by Title 15 C.C.R. §2400-2411, which were unconstitutionally enacted in violation

11    of the Referendum Process, see Cal. Const. Art. II, §10(c).

12    The Board's decision was arbitrary and capricious as there was no legitimate,

13    logical reason for the denial of a release date as Petitioner has served over

14    the minimum term for a second degree offense and is now starting to serve a

15    sentence of first degree murder.

16    Furthermore, the "Proposal" for the initiative measure Proposition 7 clearly

17    states that the ONLY change to 2nd degree murder is the increase to 15 years

18    "to life". Proposition 7 ONLY changes the number of years to be served, i.e.,

19    an increase in punishment. There is NO implied difference between the malice

20    as to 5, 6 or 7 years for 2nd degree murder and 15 years "to life".

21    See, In re Jeanice D. (1980) 28 Cal.3d p.220, of which establishes 15 years

22    "to life" as being a lesser crime than 1st degree murder, 25 years "to life".

23    Petitioner has a liberty interest in parole according to the legislative

24    intent of the statute. In re Rosenkrantz (IV) 2002 DJDAR 727 (01-18-2002) ___

25    Cal.App.4th ___ ; In re Ramirez, supra; Greenholtz v. Nebraska Penal Inmates (1979)

26    442 U.S. 1, 7-11; Board of Pardons v. Allen, (1987) 482 U.S. 369, 376.

27                                        //

28                                        //

                                         17

STATE AND FEDERAL CLAIM NUMBER _IVE (V)
THE BOARD VIOLATED PETITIONER'S DUE PROCESS RIGHTS UNDER
THE FIFTH AND FOURTEENTH AMENDMENT OF THE U.S. CONSTITUTION,
AND, CALIFORNIA CONSTITUTION ARTICLE 7(a) WHEN THEY DENIED
PAROLE BASED ON A PREDETERMINED OUTCOME.

The Board's decision satisfies due process only if "some evidence supports the decision". Superintendent, Mass. Corr. Inst. v. Hill, 472 U.S. 445, 455, 105 S.Ct. 2768, 2774, 86 L.Ed.2d 356 (1985); Rosas v. Nielsen, 428 F.3d 1229, 1232 (9th Cir. 2005)(per curiam).

Although the Board's decision is almost always based on citation to the commitment offense of the original crime, there comes a point when the use of the crime to deny parole, without other evidence, is a violation of due process. The question that still remains unresolved by the courts is 'how many times can the Board use the crime to deny parole before the due process violation occurs'.

The crime is never going to change and although the Board or Governor is "INITIALLY JUSTIFIED" in relying on the gravity of an inmate's offense in denying parole, Rosas, 428 F.3d at 1232-33; Biggs, 334 F.3d at 916, "continued reliance" on unchanging factors, the circumstances of the offense and conduct prior to imprisonment, runs contrary to the rehabilitation goals espoused by the prison system and could result in a due process violation". Biggs, 334 F.3d at 916-17; Irons v. Warden of Cal. State Prison-Solano, 358 F.Supp.2d 936, 947 (E.D. Cal. 2005).

Petitioner asserts that the court in Biggs, Irons and Rosas have already decided the issue as to how many times the crime can be used for parole consideration when they used the language of "Initially justified".

Relying on Black's Law Dictionary, SIXTH EDITION, Centennial Edition (1891-1991), which is construed as the guideline for courts language, Petitioner refers to the following examples:

1). INITIAL: That which begins or stands at the beginning.

2. INITIAL APPEARANCE: After arrest, the first appearance of the accused

before a judge or magistrate.

3). INITIAL CARRIER: In the law of bailments, the carrier who _first_ receives the goods...

4). INITIAL DETERMINATION: With respect to social security benefit claims, refers to _first_ determination of agency...

5). INITIATE: _Commence_; _start_; _originate_; _introduce_.

Petitioner asserts that the key to understanding the courts reasoning when it stated "initially justified", under the dictionary's interpretation of "initially" means "_FIRST_". Thus the court has already determined that the crime cannot be used after the "initial" (first) parole board suitability hearing, thus the subsequent or second usage of the crime will cause a due process violation to exist.

Petitioner further asserts that the "some evidence" standard espoused by _Hill_, supra is not the authority under California law. Under the holdings in _Jurasek v. Utah State Hospital_, 158 F.3d 506 (10th Cir. 1998), the state may confer more comprehensive due process protections upon its citizens than does the federal government.

Petitioner relies on the California Evidence Code Section §115, under "PREPONDERANCE OF EVIDENCE" standard, where, the preponderance of evidence is to be applied to situations where there is no evidence standard set. (Such as parole hearings).

Therefore the State of California has conferred more, or a greater, evidence standard upon the Board, by making the 'minimum' evidence standard 'preponderance of evidence', rather than that espoused in _Hill_, supra, i.e., "some evidence".

_Hill_, supra, derived the "some evidence" standard from _Powell_, relating to a disciplinary hearing. _Hill_, addresses, at page 2774; "requiring a modicum of evidence to support a decision to revoke _good time credits_". (Emphasis added throughout).

At page 2774: [3]: "We hold that the requirements of due process are satisfied if some evidence supports the decision by the prison disciplinary board to revoke good time credits." (Emphasis added).

"This standard is met if 'there was some evidence from which the conclusion of the administrative tribunal could be deduced...' United States ex rel. Vajtauer v. Commissioner of Immigration, 273 U.S., at 106, 47 S.Ct., at 304.

Nonetheless the State of California has, by legislative intent, conferred more, or a greater, due process protection during parole suitability hearings under Evidence code §115 "Preponderance of Evidence" standard.

The pertinent section of Evidence Code §115 states: "Except as otherwise provided by law, the burden of proof requires proof by a preponderance of evidence." (Stats. 1965, c. 299 §2, operative Jan. 1, 1967).

Clearly Evidence Code §115 applies to parole board hearings, under the "except as otherwise provided by law" section because parole board hearings did not have any standard of proof applied until Hill was attached under the "some evidence" standard, which is contrary to California law.

Petitioner contends that the Board's denial of a parole date based on his crime being a "terrible offense", and, "The motive for the crime was very trivial in relation to the offense" does not constitute "some evidence" or for that matter, under the California legal standard (Evidence Code §115) the Board's denial does not meet the preponderance of evidence standard, that Petitioner posed a threat to public safety at the time of the second hearing, the Psychologist report established otherwise.

A denial of parole based on factors other than those contemplated by California law (P.C. §3041(b)), i.e., public safety concerns, is a decision without "some" evidentiary support within the statutory framework.

As stated by the Court in Biggs v. Terhune, (9th Cir. 2003) 334 F.3d 910:

"To insure that a state-created parole scheme serves the public interest purposes of rehabilitation and deterrence, the Parole Board must be cognizant not only of the factors required by state statute to be considered, but also the concepts embodied in the Constitution requiring

20

1    due process of law." (Id., at 916).

2    However, the deferential "some evidence" standard has outer limits. See,

3    Coleman v. Board of Prison terms, No. 96-0783 LKK PAN, slip op. at 9 (E.D. Cal.

4    May 19, 2005). If it is established that a particular judgment was predetermined,

5    then a prisoner's due process rights will have been violated even if there is

6    "some evidence" to support the decision. See, Bakalis v. Golembeski, 35 F.3d

7    318, 326 (7th Cir. 1994) (a decision-making "body that has prejudged the outcome

8    cannot render a decision that comports with due process."); See also, In re

9    Rosenkrantz, 29 Cal.4th at 677, 128 Cal.Rptr.2d 104, 59 P.3d 174 (a parole

10   decision "must reflect an individualized consideration of the specified criteria

11   and cannot be arbitrary and capricious.").

12   Petitioner's case presents a stronger case for release than Biggs for several

13   reasons. First Petitioner's commitment offense was far less serious than Biggs.

14   Biggs was involved an a violent, manipulative, and premeditated murder while

15   Petitioner here acted in what he perceived at the time, as a threat to his life,

16   in response to the circumstances. Second, Biggs had not yet served the full term

17   of his sentence, while Petitioner here has exceeded, with credits, his sentence

18   for second degree murder and is now serving the time for a first degree sentence.

19   Petitioner here has demonstrated exemplary behavior and evidence of

20   rehabilitation for a significant period of time (not one instance of a rules

21   violation while incarcerated). Therefore, the sole reliance on Petitioner's

22   commitment offense in denying him parole impinges on Petitioner's constitutional

23   liberty interest in parole.

24   Petitioner asserts that the excuse "it was a terrible offense" is not even

25   found in the Matrix criteria and even though the second excuse is in the Matrix

26   (triviality of the reason for the crime) is insufficient to support even the

27   unconstitutional "some evidence" standard. Therefore the Board's denial is without

28   foundation or support under the "some evidence" standard, coupled with the Board's

21

1    requirement for parole plans in California and Petitioner's 'perfect' prison

2    record the Board's decision was in violation of and an unreasonable application

3    of U.S. Supreme Court law.

STATE AND FEDERAL CLAIM NUMBER SIX (VI)

4    THE BOARD VIOLATED PETITIONER'S DUE PROCESS RIGHTS UNDER
     THE FIFTH AND FOURTEENTH AMENDMENT OF THE U.S. CONSTITUTION

5    BY HOLDING "PAROLE SUITABILITY" HEARINGS FOR A FOREIGN
     NATIONAL, THAT WILL BE DEPORTED, WHO CAN NEVER BE RELEASED

6    ON PAROLE IN CALIFORNIA. PENAL CODE §3041(a)(b) IS
     UNCONSTITUTIONALLY VAGUE AND AMBIGUOUS AS TO PAROLE v.

7    DEPORTATION FOR FOREIGN NATIONALS WITH AN "INS" HOLD.

8    Petitioner was given a parole suitability hearing, the second or subsequent,

9    (with an interpreter present), on June 6, 2006, the subject of this petition.

10   The rote language, at page 72 (DECISION), "...Mr. Marroquin is not yet

11   suitable for parole and would pose an unreasonable risk of danger to society

12   or a threat to public safety if released from prison." Petitioner was given a

13   one (1) year denial.

14   What is confounding in the record is that there is no reference to why

15   Petitioner is dangerous to society and the Psychiatrist report establishes just

16   the opposite. Petitioner's threat level assessment, by a state licensed

17   professional Psychiatrist sets his threat level at 98. To understand this figure

18   (98) simply means that in the assessment of dangerousness to re-offend, out of

19   100 inmates released there would be 98 inmates that would re-offend or commit

20   another crime before Petitioner did. Petitioner has an amazing 2% chance of

21   committing another crime and that in itself is sufficient to find Petitioner

22   suitable for parole.

23   The Board 'never' referred to any language of "particularly egregious" as

24   they always do. (See previous arguments).

25   Although at the first hearing (and second) there was a claim that

26   Petitioner shot the victim twice, and the letter from the police department claims

27   that Petitioner shot the victim in the stomach are not true statements of fact

28   as to what actually happened.

In actuality there were two (2) entry wounds and only one (1) shot was fired at the victim's arm which held the broken beer bottle. The Bullet deflected into the upper torso area which caused death many hours later. See (Ex-"D-E").

The Board failed to support its conclusory findings to deny parole with any material or relevant evidence, as is required by 15 C.C.R. §2000(b)(62) (Material Evidence), or (60) (Relevant Evidence). The Board's conclusions were not supported by reference to any evidence in the record bearing on the "suitability criteria". The Board failed to adhere to its own "preponderance" (see Evid. C. §115) of "material" and "relevant" evidence standard in the weighing of evidence during its pre-decisional process. (15 C.C.R. §2000(b)(49) (Good Cause). See, In re Powell (1988) 45 Cal.3d 894, at fn.10. (Inmate's right to procedural due process). The Board must follow its own heightened evidentiary standard. See, Terhune v. Superior Court (1998) 65 Cal.App.4th 864.

There was no evidence that Petitioner's offense was "egregious" enough to justify a denial of parole since the various elements of his crime are already provided for in the illegal Matrix. Indeed, as stated perviously, the egregious language was never mentioned by the Board). See, in re Ramirez, supra, 94 Cal.App.4th 549, at 570.

There was no evidence to justify denial based on the unsupported conclusion (See, "Ex-F") that Petitioner needs more self-help. The Board ignored the positive findings expertly prepared psychological reports indicating that Petitioner does not pose an unreasonable threat to public safety, (see, P.C. §3041). The Board's Commissioners are not legally permitted to assume the role of expert witnesses and therefore cannot reassess the findings or re-weigh the importance of an individually prepared and detailed report by a state licensed professional psychiatrist/psychologist staff member; by statutory code this is the sole domain of the CDC Psychiatric/Psychological staff. The hearing record is completely void of any listed 'expertise' regarding the Commissioners educational background

23

1    or state license for Psychological training that gives them the 'right' or

2    'authority' to over-ride a legitimately prepared psychological report based on

3    a 'whim/excuse', which is often done by the Board if the report is positive.

4        The Psychologists have cleared Petitioner of any need for additional therapy

5    "or" self-help. There must be a factual underpinning to support the Board's

6    determination. See, In re Caswell (10-10-01) 92 Cal.App.4th 1017, 1027; In re

7    Rosenkrantz, supra, 80 Cal.App.4th 409; In re Ramirez, 94 Cal.App.4th 1017.

8        There must be "specific facts" and a "rational basis" for a departure from

9    parole guidelines. Misasi v. U.S. Parole Comm., 835 F.2d 754 (10th Cir. 1987).

10        Therefore, absent such factual underpinnings, not even sufficient to meet

11    the "some evidence" standard, the Board's conclusions were unsupported and

12    therefore arbitrary and capricious. The decision to deny parole requires reversal

13    and Petitioner should be given a deportation date. (Note a parole date).

14        In the case of John E. Dannenberg, Case No. SC112688A, Filed May 8, 2001,

15    where the court held: citing to In re Powell, (1988) 45 Cal.3 894, that the Board

16    enjoys broad but not absolute discretion in parole-related matters. The Supreme

17    Court held in that case that there must be "some evidence" to support the Board's

18    determination. Id., at 904. The Marin County Court believed that the standards,

19    i.e., "some evidence" and "arbitrary and capricious" were indistinguishable.

20                          DEPORTATION V. PAROLE ISSUE

21        Petitioner was born in Guatemala, his mother still lives there, his wife

22    is going to move there with him. Petitioner has an INS hold. (See, Ex-A, passim).

23        What is most troubling to Petitioner is that the Board is requiring parole

24    plans and job offers for California when it is well established that he will

25    be deported, without question. Petitioner has a residence in Guatemala, a trade,

26    family support. (Ex-A, passim).

27        Petitioner asserts that, as a most basic understanding of P.C. §3041(b)

28    (threat level to the public), in the case at bar, Petitioner contends that when

1    he is paroled (which cannot legally happen) he will no longer be (and will never

2    be) under the parole authority, (he will never be turned over to a Parole Agent

3    but rather he will be turned over to the Federal Government's INS Agency, thus

4    under a Catch-22 situation, when he is paroled he will be free of parole because

5    California and Guatemala have no treaty for parole supervision. Thus all the

6    criteria/excuses from the Board to further his self-help, get "atta-boy chronos"

7    furnish parole plans and job offers in California are mere excuses under the

8    arbitrary and capricious standard and furthermore cannot be applied to Petitioner.

9    (Note* One "ah-s____" wipes out all "atta-boys".)

10        It is basically understood that the reason for any inmate's denial because

11    of a threat level to the public is to enhance the prisoner's sentence, given

12    the fact that a foreign national, like Petitioner, can "never" be found suitable

13    for parole simply because he can never be paroled (only deported), §3041(b),

14    consideration for public safety cannot be considered. In reality any foreign

15    national that is going to be deported should be found suitable for deportation

16    at his first hearing because (b) can never be applied to the determination.

17        The court in U.S. v. Cuero-Flores, 276 F.3d 113 (2nd Cir. 2002), held that;

18    when addressing a "special" parole issue; the court agreed with other circuits

19    that have held supervised release terminates when the parolee is deported.

20                    STATEMENT IN SUPPORT OF PAROLE vs. DEPORTATION

21        California P.C. §3041(a)(b) is unconstitutionally vague and ambiguous as

22    to its application for foreign nationals that have an "INS" hold, inmates that

23    cannot be paroled but only deported thus the same criteria cannot be applied

24    to both classes of inmates, U.S. Citizens, and, foreign nationals. Proposition

25    7 did not address the issue of deportation vs. parole.

26        Of course, all second degree murders by their very nature involve a disregard

27    for the life of another; In re Rosenkrantz, (2000) 80 Cal.App.4th 409, 419 fn.13;

28    People v. Summers, (1983) 147 Cal.App.3d 180, 184-85 (195 Cal.Rptr. 21); People

1   v. Matta, (1976) 57 Cal.App.2d 472, 480-81 (129 Cal.Rptr. 205; People v. Bayea,

2   (1974) 38 Cal.App.3d 176, 188-89 (113 Cal.Rptr. 254). See also, CALJIC No. 8.31.

3       As in In re Smith, (2003) 114 Cal.App.4th 343, there is no evidence that

4   petitioner tormented, terrorized or injured his victim before deciding to shoot

5   him or that he gratuitously increased and unnecessarily prolonged his suffering.

6   As asked in Scott, was the crime callous? Yes, however, are the facts of the

7   crime evidence that he acted with exceptionally callous disregard for the victim's

8   suffering or do the facts distinguish his crime from other murders as

9   exceptionally callous? The record establishes that there was no intent to murder

10  the victim, to the contrary Petitioner's victim was shot once, in the arm holding

11  the broken beer bottle, and the bullet traveled to the chest area. (See Ex. "D"

12  wherein it was what Petitioner "percieved" at that instant, an eminent threat

13  to his life).

14      The inquiry of whether an actual period of confinement is excessive and

15  disproportionate hinges not on the life "potential" but on the sentencing

16  regulations promulgated by the Board under authority of statute, but not in

17  violation of the California Constitutions Referendum Process, Article II, section

18  10(c). See P.C. §§3041, 3052, 5076.2, Title 15 C.C.R. §§2400-2411.

19      Petitioner submits that his parole suitability hearing constituted a

20  meaningless, pro forma charade, the outcome of which was preordained and, as

21  such, deprived him of substantive and procedural due process.

22      It is a proper function of judicial review to ensure that the Board has

23  honored in a "practical sense" the petitioner's right to "due consideration",

24  also "individualized consideration". See, Sturm, 11 Cal.3d at p.268.

25      In the case of In re Edward Ramirez, Court of Appeal, First Appellate

26  District, Division Three, Case No. A092699, filed 12/12/01; the Court addressed

27  similar issues as presented herein and in the DISPOSITION the Court ordered,

28  among other orders, that "the Board must consider Ramirez's psychological profile

1    as a factor favoring his application for a parole date..."

2        Nonetheless, P.C. §3041(a)(b) is vague and ambiguous as to suitability for

3    "deportation" vs. suitability for "parole". The criteria to favor a positive

4    parole decision cannot apply to a foreign national, without being in violation

5    of the laws of California and the United States.

6        California P.C. §3041(a)(b) are clear in their legislative intent, for U.S.

7    Citizens that will be found suitable for "parole", the "only" criteria (see

8    Illegal Matrix argument) for a parole release date is that the inmate shall not

9    pose an unreasonable risk to society. The Board does not have the authority to

10   make this assessment and "must" follow the evaluation prepared by the state

11   licensed Psychiatrist so authorized to make such an assessment. Additionally

12   the Board has no authority in penal codes or rules and regulations to find a

13   'foreign national' (that has an INS hold or will be deported) suitable for parole

14   but only suitable for deportation.

15                              CONCLUSION

16       Petitioner asserts that his MEPD for a sentence of second degree murder

17   has lapsed, his psychological evaluation concluded that his release (for

18   deportation) would not pose an unreasonable (current) risk of danger to public

19   safety, no contrary evidence exists, and Petitioner has a vested liberty interest

20   in being deported protected by due process and equal protection that required

21   the Board to find him suitable for deportation, at his first/initial hearing

22   as §3041(a)(b) cannot apply to him under the vague and ambiguous doctrine.

23       Because the Board's recitation contrary, to U.S. Supreme Court law, their

24   conclusion was inapposite to the record and unsupported by any evidence standard

25   whatsoever, denial of suitability for release for deportation on that basis denied

26   Petitioner his due process and equal protection rights.

27       Because the Board's grounds/excuses for its decision to deny release for

28   deportation, boilerplate phrases and adjectives, were unsupported by any evidence,

                                    27

1   inapposite to the record, applicable to all such offenses, irrelevant to

2   suitability for deportation, and/or arbitrary in the extreme, and because the

3   Board did not determine and could not have found any evidence supporting a notion

4   that Petitioner's offense was "a terrible offense" compared to other life offenses

5   such as Rosenkrantz and Van Houten, the denial of Petitioner's release for

6   deportation based on the unchanging factors of his offense has abrogated his

7   right to due process and equal protection and his liberty interest in release

8   for deportation, and has converted his sentence to a first degree murder because

9   he has already served the time prescribed by law, and the illegal matrix, for

10  a second degree murder.

11      It is axiomatic that Petitioner, if someday granted a release date, under

12  P.C. §3041(a)(b), which cannot be applied to a foreign national, he will be

13  deported, thus the excuses for denial of a release date, for deportation, are

14  meaningless, contrary to law and the Legislative intent of P.C. §3041(a)(b)'s

15  vague and ambiguous language as to foreign nationals being deported vs. found

16  suitable for release on parole.

                            PRAYER/RELIEF REQUESTED

18      1). Order Respondents to show cause why Petitioner is not entitled to the

19  relief requested:

20      2). Conduct an evidentiary hearing to determine a term of imprisonment

21  proportionate to Petitioner's individual offense under the equal protection claim:

22      3). Order/direct the Board to set a date (immutable deportation date)

23  consistent with Petitioner's MEPD, which has already lapsed, as was established

24  by Legislative intent of P.C. §3041(a)(b), which cannot be applied to Petitioner:

25      4). Order that the Board does not have the authority to "parole" or even

26  to "consider suitability for parole", of a foreign national that has an INS hold

27  "or" will be deported, under P.C. §3041(a)(b):

28      5). Order that the Board can "only" find Petitioner releasable for

deportation under §3041(a)'s MEPD, as (b) cannot be applied:

6). Order that the Board cannot deny deportation of a foreign national (or even parole for an american citizen) based on him not having employment, further education, proof of job offers and ability to earn a living in Guatemala, "or" parole plans in California or elsewhere, under the criteria established in P.C. §3041(a)(b) as the Matrix was unconstitutionally enacted:

7). Order that the Board must find foreign nationals suitable for deportation at their "first hearing" because P.C. §3041(a)(b)'s vague and ambiguous language of unsuitability, danger to the public, do not apply outside of the borders of California or the United States due to the fact that California Penal Codes only have authority within California:

8). Grant Petitioner, and other similarly situated foreign nationals, such other relief as this Court deems just and proper in the interest of justice.

## DECLARATION

I declare under penalty of perjury that the foregoing is true and correct, with attached exhibits and documents deemed to be true to the best of my knowledge and good faith belief. Executed this _20_ day of _August_, 2006, at Soledad, California, State Prison, County of Monterey.

Marco Marroquin

29

## PROOF OF SERVICE BY MAIL

### C.C.R. 1013(a)(1)(2)

I, Marco Marroquin, declare that;

I am over 18 years of age, that I am the pro per petitioner to the hereto attached cause of action, and that I reside at CTF-Central, California State Prison, Soledad, CA. My complete mailing address is: Marco Marroquin, H-62389, Box 689  G-123L, California State Prison, Soledad, CA 93960-0689.

On August _20_, 2007, I deposited the enclosed/attached documents (PETITION FOR REVIEW WITH SUPPORTING DOCUMENTS), in the prison mail box with postage fully prepaid and addressed to the following parties:

OFFICE OF THE CLERK
SUPREME COURT OF CALIFORNIA
350 McALLISTER St.
SAN FRANCISCO, CA  94102

I declare under penalty of perjury that the foregoing is true and correct, executed this _20_ day of august, 2007 at Soledad, CA.

Marco Marroquin